IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECOND AMENDMENT FOUNDATION, INC., RAINIER ARMS, LLC, SAMUEL WALLEY, and WILLIAM GREEN, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | |
| | § | Case No. 3:21-cv-00116-B |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, STEVEN M. DETTELBACH, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, UNITED STATES DEPARTMENT OF JUSTICE, and MERRICK B. GARLAND, in his official capacity as Attorney General of the United States, | § § § § § § § § § § | |
| Defendants. | | |

**Plaintiffs' Brief in Support of
Plaintiffs' Motion for a Preliminary Injunction**

**Table of Contents**

Summary of the Argument ...................................................................................................1

Facts .....................................................................................................................................3

Argument ..............................................................................................................................9

I.    There is a sufficient likelihood of success ..................................................................9

    A.    Count One: APA § 706(2)(A), (C)—Statutory Contradiction ...............................9

    B.    Count Two: APA § 706(2)(A)—Failure to consider ...........................................11

    C.    Count Five: APA § 706(2)(B)—Right to Keep and Bear Arms............................12

    D.    Count Six: APA § 706(2)(B)—Due Process Clause .............................................14

    E.    Count Seven: APA § 706(2)(A), (C)—Unlawful Effective Date.........................17

II.    Irreparable harm...........................................................................................................17

    A.    The Arm Brace Rule irreparably harms Rainier Arms.........................................18

    B.    The Arm Brace Rule irreparably harms SAF and the Individual Plaintiffs. .........20

III.    Balance of harms and public interest. ........................................................................21

# Table of Authorities

**Cases**

*Cargill v. Garland,*
    57 F.4th 447 (5th Cir. 2023) (en banc) ........................................................... 10

*Colorado v. EPA,*
    989 F.3d 874 (10th Cir. 2021) ..................................................................... 9

*District of Columbia v. Heller,*
    554 U.S. 570 (2008). .................................................................................. 14

*E. Bay Sanctuary Covenant v. Biden,*
    993 F.3d 640 (9th Cir. 2021). ..................................................................... 17

*Gordon v. Holder,*
    721 F.3d 638 (D.C. Cir. 2013) ...................................................................... 22

*Johnson v. United States,*
    576 U.S. 591 (2015) ............................................................................... 2, 16

*League of Women Voters of United States v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ......................................................................... 22

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm,*
    463 U.S. 29 (1983). .................................................................................. 11

*New York State Rifle & Pistol Ass'n, v. Bruen,*
    142 S.Ct. 2111 (2022) ........................................................................ *passim*

*O'Donnell v. Goodhart,*
    900 F.3d 220 (5th Cir. 2018) ....................................................................... 22

*Opulent Life Church v. City of Holly Springs, Miss.,*
    697 F.3d 279 (5th Cir. 2012). ...................................................................... 18

*Register.com, Inc. v. Verio, Inc.,*
    356 F.3d 393 (2d Cir. 2004) ........................................................................ 19

*Sessions v. Dimaya,*
    138 S. Ct. 1204 (2018) ........................................................................... 2, 16

*Texas v. EPA,*
    829 F.3d 405 (5th Cir. 2016). ................................................................. 18, 19

*Texas v. Seatrain Int'l, S.A.*,
        518 F.2d 175 (5th Cir. 1975) ................................................................9

*Tripoli Rocketry v. ATF*,
        437 F.3d 75 (D.C. Cir. 2006) .............................................................15

*United States v. Evans*,
        333 U.S. 483 (1948) ............................................................................16

*United States v. Lim*,
        444 F.3d 910 (7th Cir. 2006) ..............................................................15

*United States v. Mead Corp.*,
        533 U.S. 218 (2001) ............................................................................14

*United States v. Rahimi*,
        59 F.4th 163, 2023 WL 1459240 (5th Cir. 2023) ..............................13

*Wages & White Lion Investments, L.L.C. v. United States Food & Drug Admin.*,
        16 F.4th 1130 (5th Cir. 2021) ..............................................18, 19, 21, 22

*Winter v. NRDC*,
        555 U.S. 7 (2008) ..................................................................................9

**Statutes**

Gun Control Act of 1968, Pub. L. 90–618, 82 Stat. 1213 ................................................3

National Firearms Act of 1934, Pub. L. 73–474, 48 Stat. 1236 (1934) ...........................3

5 U.S.C. § 553(d) ...........................................................................................................17

5 U.S.C. § 706 ........................................................................................................*passim*

18 U.S.C. § 921(a)(3) .......................................................................................................3

18 U.S.C. § 921(a)(7) .................................................................................................4, 5, 9

18 U.S.C. § 921(a)(30) .....................................................................................................5

18 U.S.C. § 922(b)(4) .......................................................................................................4

26 U.S.C. § 5812 ..............................................................................................................4

26 U.S.C. § 5822 ..............................................................................................................4

26 U.S.C. § 5841 ................................................................................................................4

26 U.S.C. § 5845(a) ...........................................................................................................3

26 U.S.C. § 5845(c) .......................................................................................................5, 9

26 U.S.C. § 5871. ...............................................................................................................4

**Regulations**

27 C.F.R. § 478.11 ..............................................................................................................7

27 C.F.R. § 478.98 ..............................................................................................................4

27 C.F.R. § 479.61 ..............................................................................................................4

27 C.F.R. § 479.62 ..............................................................................................................4

27 C.F.R. § 479.66 ..............................................................................................................4

27 C.F.R. § 479.84 ..............................................................................................................4

27 C.F.R. § 479.85 ..............................................................................................................4

27 C.F.R. § 479.11 ..............................................................................................................7

27 C.F.R. § 479.101 ............................................................................................................4

27 C.F.R. § 479.102 ............................................................................................................4

28 C.F.R. § 0.131(d) ...........................................................................................................4

**Summary of the Argument**

The Court should enter a preliminary injunction halting enforcement of President Biden's new "Arm Brace Rule," *Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* 88 Fed. Reg. 6478 (Jan. 31, 2023), because its "rifle" redefinition violates the Administrative Procedure Act, the Due Process Clause, and the Second Amendment, illegally turning millions of law-abiding American "pistol" owners into lawbreaking short-barreled "rifle" owners overnight.

The President's Arm Brace Rule redefines federal firearm law's "rifles"/"pistol" distinction. This has huge implications because Congress treats "rifles" far more harshly than "pistols." Whereas the Gun Control Act of 1968 applies to most "rifles" and "pistols" alike, with proscriptions that are plenty onerous, the National Firearms Act applies to short-barreled "rifles" but not "pistols," with proscriptions that are far more onerous. Given these high stakes, any "rifle" definition must be clear, logical, and of course constitutional. The Arm Brace Rule is not.

Congress defined "rifle" with a simple provision that the Biden Administration thinks is too kind to the Second Amendment. The President wants more guns deemed "rifles" and not "pistols" so that administrative enforcers can wield the more onerous NFA more often. So the President took the law into his own hands, promulgating with the Arm Brace Rule a sweeping new "rifle" definition that covers far more than Congress or anyone else anticipated.

Exactly how many millions of new criminals this change creates is unknown, since the Arm Brace Rule uses a bewildering six-factor test that no normal American can comprehend. The new "rifle" definition turns not on objective properties that citizens can predict, but on subjective conjecture about a firearm's "likely use" and the meaning of marketing materials to bureaucrats in DC. It exceeds what Congress intended and exceeds what the Constitution allows.

1

Plaintiffs will most certainly succeed on the merits of Count Six, which asserts that the Arm Brace Rule violates the Due Process Clause's vagueness doctrine because its "rifle" redefinition uses inherently amorphous terms that deny citizens fair notice of what is punishable and is so inherently subjective that it invites arbitrary enforcement. *Johnson v. United States*, 576 U.S. 591 (2015), and *Sessions v. Dimaya,* 138 S. Ct. 1204 (2018), are controlling. There and here alike, the government failed to define key criminal terms in terms of objective "real-world facts" knowable by the citizenry. *Id.* at 1213. There and here alike, the government instead yielded "hopeless indeterminacy" by making the law turn on a government official's "imagined" "hypothesis" about what is "ordinary." *Id.* Those dangerous vagaries cannot be tolerated for any criminal law, and especially not for one that strikes at the heart of the Second Amendment.

May 31, 2023 is the Arm Brace Rule's "compliance date." But severe irreparable harm is mounting already. Individuals holding what has just now been deemed a short-barreled "rifle" are preparing to either surrender their firearm entirely or bow to the NFA's extraordinarily onerous demands. Meanwhile, for the businesses that deal in arm braces and brace-equipped pistols, the Arm Brace Rule is already cutting off critical streams of income, nullifying customer good will, and forcing compliance costs that will never be reclaimed.

Plaintiffs are likely to succeed on their case's merits, with several claims clearly spelling the Arm Brace Rule's defeat. If the Arm Brace Rule is not preliminarily enjoined, Plaintiffs will suffer irreparable harm needlessly. The Agencies, meanwhile, have no pressing reason to lord this extraordinary new criminal power over the citizenry immediately. The prior "rifle" definition was in place for years and years—and the sky did not fall. Reverting to that status quo until this litigation's conclusion is sound both in principle and practice, providing a completely fair balance of equities. The motion should be granted.

**Facts**

**I.      Congress made the "rifle" definition extremely consequential.**

Federal firearms law consists of two main statutory schemes, the Gun Control Act of 1968, Pub. L. 90–618, 82 Stat. 1213 ("GCA") (codified as amended mostly at 18 U.S.C. ch. 44), and the National Firearms Act of 1934, Pub. L. 73–474, 48 Stat. 1236 (1934) ("NFA") (codified as amended mostly at 26 U.S.C. ch. 53).  The GCA and NFA differ markedly, both in what they regulate and how they regulate it.  The exact legal regime governing firearm depends largely on which of these statutory schemes applies to it.  Definitional thresholds are critical.

The GCA's threshold "firearm" definition is broader than the NFA's.  The GCA defines "firearm" to generally cover both a "rifle" *and* a "handgun" (aka "pistol").  *See* 18 U.S.C. § 921(a)(3) ("The term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device.").  To this broad set of "firearms," generally including most "rifles" and "handguns," Congress in the GCA opted to apply a wide variety of legal restrictions that are substantial but not as onerous as the NFA.

The NFA's threshold "firearm" definition is narrower than the GCA's.  The NFA defines "firearm" to cover only short-barreled "rifles" and a few other discrete items—but not "pistols." *See* 26 U.S.C. § 5845(a) ("The term "firearm" means (1) a shotgun having a barrel or barrels of less than 18 inches in length; (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length; (3) a rifle having a barrel or barrels of less than 16 inches in length; (4) a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length; (5) any other weapon, as defined in subsection (e); (6) a

3

machinegun; (7) any silencer (as defined in section 921 of title 18, United States Code); and (8) a destructive device."). To this narrow set of "firearms," including short-barreled "rifles" but *not* "pistols," Congress in the NFA opted to impose a set of legal restrictions that are far more onerous than the GCA alone.

The legal and regulatory consequences of NFA coverage are very onerous. NFA firearm makers must submit an application to ATF and pay a tax. 26 U.S.C. § 5822; 27 C.F.R. §§ 479.61, 479.62. NFA firearm transfers must also submit an application and pay an additional tax. 26 U.S.C. § 5812; 27 C.F.R. §§ 479.66, 479.84. NFA firearm recipients must provide ATF with fingerprints and notify a local police department of the transfer. 26 U.S.C. § 5812; 27 C.F.R. §§ 479.84(c), 479.85. NFA firearm possessors must register themselves in a federal firearm database. 26 U.S.C. § 5841; 28 C.F.R. § 0.131(d); 27 C.F.R. §§ 479.101, 479.102. Violations of such NFA requirements can be punished with imprisonment for up to ten years and fines up to ten thousand dollars. 26 U.S.C. § 5871.

"Rifle" status therefore carries huge legal significance. A short-barreled firearm that Congress deems a "handgun" or "pistol" generally need only comply with the GCA (which itself has plenty of onerous provisions*, see, e.g.*, 18 U.S.C. § 922(b)(4); 27 C.F.R. § 478.98). But a short-barreled firearm that constitutes an NFA "rifle" and not a "handgun" or "pistol" must comply with both the GCA and the extraordinarily consequences of NFA coverage as well.

"Rifle" is defined almost identically by the GCA and NFA. Both statutes make the "rifle" definition turn on whether the weapon is "designed," "made," and "intended" to be "fired from the shoulder." The GCA defines "rifle" this way in 18 U.S.C. § 921:

> The term "rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a rifled bore for each single pull of the trigger.

4

18 U.S.C. § 921(a)(7).  The NFA likewise defines "rifle" this way in 26 U.S.C. § 5845(c)::

> The term "rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge.

26 U.S.C. § 5845(c).

"Handgun" is defined by the GCA but not the NFA.  The GCA "handgun" definition turns largely on whether the firearm has a "short stock" and is "designed" to be "held and fired by the use of a single hand":

> (a) As used in this chapter –
> . . .
> > (30)   The term "handgun" means—
> >
> > > (A)   a firearm which has a short stock and is designed to be held and fired by the use of a single hand; and
> > >
> > > (B)   any combination of parts from which a firearm described in subparagraph (A) can be assembled.

18 U.S.C. § 921(a)(30).  On this definitional spectrum, many modern firearms in common usage occupy a position that is close to the "rifle"/"pistol" divide.  Among them are brace-equipped pistols.

## II.   Brace-equipped pistols are still "pistols"

"Arm braces," also known as a "stabilizing arm braces" or "stabilizing braces," are a mainstream firearm accessory in common usage.  *See generally* Arm Brace Rule, 88 Fed. Reg. at 6,479–6,494. They function by letting the bearer stabilize the firearm against the forearm of the same arm that is holding the firearm in the main. *Id.* Originally developed for use by people with limb-related disabilities, arm braces are now used both by those with and without disabilities to facilitate safe and accurate firearm use that cannot be otherwise achieved.  *Id.*

Millions of brace-equipped pistols exist in America today.  Rainier's arm brace products are representative of what is in common use.  *See* Ex. 1 at 1.

### III.    ATF used to deem brace-equipped pistols still "pistols"

The Arm Brace Rule constitutes a marked departure from the Agencies' past position about whether brace-equipped pistols still "pistols."  For over a decade, the Agencies took the position that brace-equipped pistols did *not* constitute short-barreled "rifles."  Between 2012 and 2014 in particular, ATF issued no fewer than 17 classification letters about one specific arm brace or another, all opining that arm brace designs did *not* convert pistols into short-barreled rifles.  Arm Brace Rule, 88 Fed. Reg. at 6,502 & n.84.

### IV.    The Arm Brace Rule deems brace-equipped pistols "rifles"

To create what would become the instant Arm Brace Rule, the Agencies in June of 2021 again published a notice of proposed rulemaking titled "Factoring Criteria for Firearms with Attached "'Stabilizing Braces,'" 86 Fed. Reg. 30826 (June 10, 2021).  The NPRM inspired over 200,000 overwhelmingly negative comments, making it among the most opposed rules in Agency history.

On January 31, 2013, the Agencies committed the final agency action at issue by promulgating the Arm Brace Rule, *Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* 88 Fed. Reg. 6478, 6574 (Jan. 31, 2023).  The rule's key subjects are 27 C.F.R. § 478.11 and 27 C.F.R. § 479.11, the regulations that defines "rifle" for GCA and NFA purposes.

Before the Agencies promulgated the Arm Brace Rule, the regulatory "rifle" definitions simply repeated the statutory definitions   Just like the GCA, 18 U.S.C. § 921(a)(7), the Agencies in the prior version of 27 C.F.R. § 478.11 defined "rifle" as follows:

Rifle. A weapon designed or redesigned, made or remade, and intended to be fired
from the shoulder, and designed or redesigned and made or remade to use the

6

energy of an explosive to fire only a single projectile through a rifled bore for each single pull of the trigger.

27 C.F.R. § 478.11 (2022).  And just like the NFA, 26 U.S.C. § 5845(c), the Agencies in the prior version of 27 C.F.R. § 479.11 defined "rifle" as follows:

*Rifle.* A weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge.

27 C.F.R. § 479.11.

The Arm Brace Rule brings about a sea change in the "firearm" definition with two key actions.  First, the Arm Brace Rule expressly invalidates every prior arm brace classification that ATF had issued. Arm Brace Rule, 88 Fed. Reg. at 6,480.

The Arm Brace Rule then overhauls the "rifle" definition of 27 C.F.R. § 478.11 and 27 C.F.R. § 479.11.  It does so by adding (to the sentence mirroring the statutes) two new paragraphs and six subparagraphs:

Rifle. A weapon designed or redesigned, made or remade, and intended to be fired from the shoulder, and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a rifled bore for each single pull of the trigger.

(1) For purposes of this definition, the term "designed or redesigned, made or remade, and intended to be fired from the shoulder" shall include a weapon that is equipped with an accessory, component, or other rearward attachment (e.g., a "stabilizing brace") that provides surface area that allows the weapon to be fired from the shoulder, provided other factors, as described in paragraph (2), indicate that the weapon is designed, made, and intended to be fired from the shoulder.

(2) When a weapon provides surface area that allows the weapon to be fired from the shoulder, the following factors shall also be considered in determining whether the weapon is designed, made, and intended to be fired from the shoulder:

(i)    Whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;

(ii)     Whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method), that is consistent with similarly designed rifles;

(iii)    Whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;

(iv)     Whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;

(v)      The manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and

(vi)     Information demonstrating the likely use of the weapon in the general community.

Arm Brace Rule, 88 Fed. Reg. at 6574-75.

The Rule is effective immediately. Arm Brace Rule, 88 Fed. Reg. at 6,478.

May 31, 2023, is the rule's "Compliance date." Parties with a brace-equipped firearm have until then to either destroy it, permanently modify it, or surrender it. *Id.* at 6480. But this is just an exercise of the Agencies' "enforcement discretion." *Id.* at 6480–81. The Agencies nonetheless have announced that "the rule is immediately effective in that the Department may seek to enforce the NFA's requirements with respect to any new making or new transfer of a weapon with an attached 'stabilizing brace' that constitutes a short-barreled rifle under the NFA." *Id.* at 6481.

8

**Argument**

Preliminary injunctions are warranted if the movant shows that he "is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). But "none of the four prerequisites has a fixed quantitative value." *Tex. v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975). "Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus." *Id.* All factors point strongly in favor of relief here. A preliminary injunction against the Arm Brace Rule's enforcement should be granted, and for the same reasons so should an order postponing the Arm Brace Rule's effective date, *see Colorado v. EPA*, 989 F.3d 874, 883 (10th Cir. 2021).

## I.    There is a sufficient likelihood of success

### A.    Count One: APA § 706(2)(A), (C)—Statutory Contradiction

Plaintiffs will likely succeed on the merits of Count One, which asserts that the Arm Brace Rule violates both 5 U.S.C. § 706(2)(A) and § 706(2)(C) because its "rifle" redefinition contradicts the statutes at issue and violates the rule of lenity. Doc. 50 at 17-18, ¶¶ 57-61. Congress defined "rifle" as far as that term goes—full stop. The Agencies have no authority to re-define that term more expansively. Yet that is precisely what the Arm Brace Rule does.

Congress's "rifle" definitions turn on how the weapon is "designed or redesigned, made or remade, and intended to be fired"—and no more. 18 U.S.C. § 921(a)(7); 26 U.S.C. § 5845(c). But the Arm Brace Rule goes beyond that. It expands the term's meaning by adding a litany of triggering elements to the definitions that Congress never made part of the law.

Congress's statutory "rifle" definitions did not care how a weapon is physically "equipped"—a term that must be different than "made." Yet the Agencies' "rifle" definition uses that concept centrally, expanding the "rifle" term beyond just firearms "made" as a "rifle."

Congress's statutory "rifle" definitions did not care how one firearm compares to another.  Either it's a "rifle" or it's not, regardless of what else the market will sell someone.  Yet the Arm Brace Rule's "rifle" definition uses that non-statutory concept as a means of expansion, defining firearms in terms of whether they are "consistent with similarly designed" firearms.

Congress's statutory "rifle" definitions did not care how a firearm is marketed by others. Yet the Arm Brace Rule's "rifle" definition uses that non-statutory concept as yet another means of expansion, defining a physical item by reference to its "manufacturer's direct and indirect marketing and promotional materials."  Surely ATF would never concede that a citizen can make their "rifle" a "pistol" by themselves calling it a "pistol."  But when it suits the Agencies' political goals, they are happy to embrace that same kind of logic to let someone else's label define the citizen's arms.

Congress's statutory "rifle" definitions did not care about what the "general community" has in its possession.  Yet the Arm Brace Rule uses that non-statutory concept as yet another means of expansion, determining whether an item is criminal based on "[i]nformation demonstrating the likely use of the weapon in the general community."

None of this is mere regulatory "gloss."  It is the Agencies' administrative takeover of Congress's legislative role—a clear usurpation of the separation of powers.  That the takeover happens not so openly but furtively, with illegal vagueness, is certainly no saving grace.

Finally, the Arm Brace Rule contradicts the statute by ignoring the rule of lenity.  The rule of lenity applies here because the statutes at issue are at best grievously ambiguous as to whether the "rifle" definition can cover a brace-equipped pistol; as a result, lenity dictates that Agencies and courts alike are bound to construe Congress's enactment as *not* extending so far. *See Cargill v. Garland*, 57 F.4th 447, 471 (5th Cir. 2023) (en banc).

**B.      Count Two: APA § 706(2)(A)—Failure to consider**

Plaintiffs will likely succeed on Count Two, which asserts that the Arm Brace Rule violates 5 U.S.C. § 706(2)(A) because the Agencies promulgated it without considering the Second Amendment factors and data made relevant by *New York State Rifle & Pistol Ass'n, v. Bruen*, 142 S.Ct. 2111 (2022).  Doc. 50 at 19-20, ¶¶ 62-64.

In Count Two, Defense Distributed and SAF assert a process-based claim about the Agencies having violated the Administrative Procedure Act by promulgating the Arm Brace Rule with insufficient considerations.   It is not the same as Count One, which asserts an outcome-based APA violation (the Final Rule's contradiction of its enabling statute). Nor is it the same as Count Five, which asserts an outcome-based APA and constitutional violation (the Arm Brace Rule's contradiction of the Second Amendment). Count Two is process-focused instead of outcome-focused and, though it invokes Second Amendment precedent, the resulting violation is of the APA and not the Constitution.

Count Two shows that the new Arm Brace Rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," § 706(2)(A), because the Agencies when promulgating the Arm Brace Rule failed to consider legally relevant factors and data. Whenever an agency makes a rule, the Agency's rulemaking process "must examine" "relevant factors" and "relevant data." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm*, 463 U.S. 29, 43 (1983). For this rule, the Agencies had to consider the "relevant" Second Amendment inquiry upheld by *New York State Rifle & Pistol Association, v. Bruen*, 142 S.Ct. 2111 (2022). That is, the APA required the Agencies to consider whether this "regulation is consistent with this Nation's historical tradition of firearm regulation" and to do so strictly—i.e., without using the "means-end scrutiny" that Bruen deemed unconstitutional. *Id.* at 2126-32. No such inquiry occurred here.

When promulgating the new Arm Brace Rule, the Agencies doubly violated the APA by both (1) failing to consider the factors and data that *Bruen* deems constitutionally mandatory and (2) relying instead on factors and data that *Bruen* deems constitutionally improper. Most importantly, the record shows no *Bruen*-compliant considerations because the Agencies did not even try to determine whether this "regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126-32. The Agencies never attempted to consider whether the new Arm Brace Rule "addresses a general societal problem that has persisted since the 18th century," and if so whether there was "a distinctly similar historical regulation addressing that problem." *Id.*

Footnote 145 is the Arm Brace Rule's only attention to *Bruen*, and it commits a decisive matter-of-law error. 88 Fed. Reg at 6,548 n.145. There the Agencies' concluded that, on their reading of *Bruen*, nothing about the Arm Brace Rule required a historical analysis because the Arm Brace Rule implicated only "dangerous and unusual weapons." *Id.* But because that premise is wrong—the Arm Brace Rule required a historical analysis, *see infra* Part I.C.—the Agencies failure to do so makes their promulgating process erroneous as a matter of law.

C.      **Count Five: APA § 706(2)(B)—Right to Keep and Bear Arms**

Plaintiffs will likely succeed on the merits of Count Five, which asserts that the Arm Brace Rule violates the Second Amendment (and APA) because it its "rifle" redefinition infringes the individual right to keep and bear Arms and is inconsistent with this Nation's historical tradition of firearm regulation. Doc. 50 at 22-23, ¶¶ 74-77.

The Arm Brace Rule infringes the individual right to keep and bear Arms and is inconsistent with this Nation's historical tradition of firearm regulation. As such, it is an unconstitutional abridgment of Second Amendment rights. *See N.Y. State Rifle & Pistol Ass'n,*

*v. Bruen*, 142 S.Ct. 2111 (2022).  The firearms regulated by the Arm Brace Rule are in common use, are not unusual or dangerous, and there is no historical analog for the severe legal and regulatory burdens placed upon those firearms by the Arm Brace Rule's "rifle" redefinition.

In this respect, the Agencies were flatly wrong in the Arm Brace Rule's footnote 145 to say that brace-equipped pistols fall outside of the Second Amendment. 88 Fed. Reg at 6,548 n.145.  They said so on the theory that, "based on historical tradition, the Second Amendment does not extend to dangerous and unusual weapons."  *Id.*  But that is wrong as a matter of law.

*United States v. Rahimi*, 59 F.4th 163, 2023 WL 1459240 (5th Cir. 2023), is the most recent decision squarely defeating the Agencies' attempt to avoid a historical inquiry. *Rahimi* held that "possession of a pistol and a rifle easily falls within the purview of the Second Amendment." 2023 WL 1459240, at *5. Because "the 'Constitution presumptively protects that conduct,' . . . the Government 'must justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.'" *Id.* (quoting *Bruen*).

At issue is a debate about competing Second Amendment approaches that *Rahimi* resolved. "As summarized by now-Justice Barrett, 'one [approach] uses history and tradition to identify the scope of the right, and the other uses that same body of evidence to identify the scope of the legislature's power to take it away.'" *Rahimi*, 2023 WL 1459240, *at* *3. The Agencies here are using the first approach, which *Rahimi* held "runs headlong into Heller and *Bruen*." *Id.* "Unpacking the issue, the Government's argument fails because (1) it is inconsistent with *Heller*, *Bruen*, and the text of the Second Amendment, (2) it inexplicably treats Second Amendment rights differently than other individually held rights, and (3) it has no limiting principles." *Id.* Under *Rahimi*, therefore, the Arm Brace Rule did indeed require a *Bruen*-compliant historical inquiry.

The notion that brace-equipped pistols might not have been in common usage at the founding does not matter, for "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008).  In other words, "even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self defense."  *Bruen*, 142 S. Ct. at 2131.  And as the Agencies' only materials show, brace-equipped pistols are very much in common use now.  *See* Arm Brace Rule, 88 Fed. Reg at 6479, 6566.

### D.      Count Six: APA § 706(2)(B)—Due Process Clause

Plaintiffs will likely succeed on the merits of Count Six, which asserts that the Arm Brace Rule violates the Due Process Clause's vagueness doctrine (and APA) because its "rifle" redefinition uses inherently amorphous terms that deny citizens fair notice of what is punishable and is so inherently subjective that it invites arbitrary enforcement.  Doc. 50 at 23-24, ¶¶ 78-81. The Fifth Amendment of the Constitution of the United States forbids deprivations of life, liberty, or property without due process of law.  The Clause's vagueness doctrine is violated by criminal laws that either deny defendants fair notice of what is punishable or invite arbitrary enforcement by lack of standards.  *Johnson v. United States*, 576 U.S. 591, 595 (2015).

The Arm Brace Rule commits both Fifth Amendment vagueness violations.  It redefines "rifle" with inherently amorphous terms that deny citizens fair notice of what is punishable, and its definition is so inherently subjective that it invites arbitrary enforcement.  *See id.; see also United States v. Mead Corp.*, 533 U.S. 218, 241 (2001) (Scalia, J., dissenting) (on "th'ol' 'totality of the circumstances' test").

The Arm Brace Rule's unconstitutional vagueness stems first from the provision saying that the "rifle" definition entails assessing whether a brace "provides surface area that allows the weapon to be fired from the shoulder." Arm Brace Rule, 88 Fed. Reg. at 6575.  Yet the rule does not say, and no reasonable person can reliably infer, what amount of surface area meets that threshold.  The Agencies instead expressly decline "to specify a quantifiable metric for what constitutes surface area that allows for shouldering of the weapon" and will not "attempt to precisely measure or quantify the surface area." Arm Brace Rule, 88 Fed. Reg. at 6529.  Vacuous metrics like this are invalid.  *See Tripoli Rocketry v. ATF*, 437 F.3d 75, 81 (D.C. Cir. 2006.)

The Arm Brace Rule's unconstitutional vagueness stems next from the provision saying that the "rifle" definition entails assessing whether brace-affixed pistols have a weight, length, and length of pull that are "consistent with" "similarly designed rifles." Arm Brace Rule, 88 Fed. Reg. at 6575.  Yet the rule does not say, and no reasonable person can reliably infer, what constitutes the requisite "consisten[cy] and "similar[ity]."   Specific measurements would be needed to cure this fault, *see United States v. Lim*, 444 F.3d 910, 916 (7th Cir. 2006), and the Arm Brace Rule has none.

The Arm Brace Rule's unconstitutional vagueness also stems from the provision saying that the "rifle" definition entails assessing "marketing and promotional materials."  Arm Brace Rule, 88 Fed. Reg. at 6575.  Yet the rule does not say, and no reasonable person can reliably infer, which "marketing and promotional materials" this inquiry will focus on and what inferences are to be drawn from them.

The Arm Brace Rule's unconstitutional vagueness finally stems from the provision saying that the "rifle" definition entails assessing "[i]nformation demonstrating the likely use of the weapon in the general community."  Arm Brace Rule, 88 Fed. Reg. at 6575.  Yet the rule

does not say, and no reasonable person can reliably infer, what the "general community" is and what its "likely uses" are.

Crimes cannot be defined by government imagination.  So held *Johnson v. United States*, 576 U.S. 591 (2015), which deemed the law at issue unconstitutionally vague because it "ties the judicial assessment of risk to a judicially imagined 'ordinary case' of a crime, not to real-world facts or statutory elements."  *Id.*  The Arm Brace Rule is just as bad, in that it ties the definition of all "rifle"-based crimes to an administratively imagined notion of what a "rifle" really is, based on little more than a DC bureaucrat's ipse dixit.  "It is one thing to apply an imprecise . . . standard to real-world facts; it is quite another to apply it to a judge-imagined abstraction." *Id.* The Arm Brace Rule's Agency-imagined abstraction is no better.

Importantly, the Supreme Court in applying this test "has acknowledged that the failure of 'persistent efforts ... to establish a standard' can provide evidence of vagueness."  *Id.*  So it is here with the Agencies' decade-long unsuccessful struggle to cogently explain what a "rifle" is.

"Each of the uncertainties in the [Arm Brace Rule] may be tolerable in isolation, but 'their sum makes a task for us which at best could be only guesswork.''  *Id.* (quoting *United States v. Evans*, 333 U.S. 483, 495 (1948)).  "Invoking so shapeless a provision to condemn someone to prison . . . does not comport with the Constitution's guarantee of due process."  *Id.*

It is no answer for the government to say that *some* cases make for easy application of its "rifle" definition.  The controlling holdings—both *Johnson* and *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018)—"squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp."  *Johnson*, 576 U.S. at 602.  Just as in *Johnson* and *Sessions*, the Arm Brace Rule  produces "more unpredictability and arbitrariness than the Due Process Clause tolerates."   *Sessions*, 138 S. Ct. at 1215.

### E.     Count Seven: APA § 706(2)(A), (C)—Unlawful Effective Date

Plaintiffs will likely succeed on the merits of Count Seven, which asserts that the Agencies violated 5 U.S.C. § 706(2)(A) and 5 U.S.C. § 706(2)(C) by giving the Arm Brace Rule immediate effect without satisfying 5 U.S.C. § 553(d).  Doc. 50 at 23-24, ¶¶ 78-81.

5 U.S.C. § 553(d) forbids agencies from giving new rules immediate effect unless one of three special exceptions is met.  The Agencies here gave the Arm Brace Rule immediate effect without satisfying any of the 5 U.S.C. § 553(d) exceptions.  The Arm Brace Rule is not a "a substantive rule which grants or recognizes an exemption or relieves a restriction," § 553(d)(1), and is not an "interpretative rule[]" or "statement[] of policy," § 553(d)(2); and its immediate effective date was not "otherwise provided by the agency for good cause found and published with the rule," § 553(d)(2).

This wrongdoing caused real harm.  "Notice-and-comment requirements are intended to ensure public participation in rulemaking, and the thirty-day waiting period is 'intended to give affected parties time to adjust their behavior before the final rule takes effect.'"  *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 675 n.15 (9th Cir. 2021).  The Arm Brace Rule's immediate effect deprived all Plaintiffs of that opportunity, inflicting especially egregious economic harms upon the business operations of Plaintiff Rainier Arms, LLC.

## II.     Irreparable harm.

If the Court does not issue a preliminary injunction, the Agencies' promulgation of the Arm Brace Rule will inflict irreparable harm upon every Plaintiff.  The injury's exact nature might differ, depending on which compliance option the Arm Brace Rule forces each Plaintiff to undertake.  But there is *no* compliance option that does not cause irreparable harm.  No matter the compliance path taken, the Arm Brace Rule will necessarily inflict irreparable harm.

One form of irreparable harm at issue is monetary.  If compliance with the Arm Brace Rule forces Plaintiffs to satisfy NFA requirements for their brace-equipped pistols, doing so will be expensive.  And compliance with the Arm Brace Rule forces Plaintiffs to avoid NFA requirements by altering their  brace-equipped pistols (e.g., by changing barrel lengths), doing so will be expensive as well.  Either way the Plaintiffs face the irreparable harm of having to pay substantial compliance costs.  These constitute irreparable harm for two reasons.  The compliance costs are irreparable because they are "substantial" in amount, regardless of whether or not they can be later recovered. *Wages & White Lion Investments, L.L.C. v. United States Food & Drug Admin.*, 16 F.4th 1130, 1142 (5th Cir. 2021); *Texas* v. *EPA*, 829 F.3d 405, 433 (5th Cir. 2016).  And the compliance costs are irreparable because they cannot be later recovered (because of the Agencies' immunity from suit), regardless of their amount.  *Id.*  These principles apply with equal force to Rainier Arms' compliance costs *and* lost profits.  *See id.*.

Another form of irreparable harm at issue is constitutional.  If compliance with the Arm Brace Rule forces Plaintiffs to destroy or yield away their brace-equipped pistols, doing so will injure their Second Amendment right to keep and bear Arms.   The violation of alleged constitutional rights constitutes irreparable harm.  *See, e.g.*, *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 295 (5th Cir. 2012).

### A.      The Arm Brace Rule irreparably harms Rainier Arms.

The complaint clearly pleads, Doc. 50 at 5-6, 11-16, and evidence now clearly proves, that Plaintiff Rainier Arms, LLC ("Rainier") will suffer irreparable harm if the Arm Brace Rule is not preliminarily enjoined.  *See generally* Ex. 1 (Declaration of John Hwang).

Rainier is in the business of selling a wide variety of firearms and firearm parts and accessories to customers nationwide.  *Id.* at 1. Most of Rainier's business is conducted via the

internet.  *Id.*  Rainier sells arm braces and brace-equipped firearms ("arm brace products").  *Id.*[1] This aspect of Rainier's business is longstanding, "substantial" in economic magnitude, a "significant" driver of customer good will, and "critical" to the company's overall financial health.  *Id.*

The Arm Brace Rule injures Rainier concretely and "substantially" in multiple irreparable ways.  *Id.* at 1.  Immediately upon issuance, the Arm Brace Rule deprived Rainier of "substantial profits" by causing customers to cancel then-pending orders; and ever since its issuance, the Arm Brace Rule has deprived Rainier of "substantial" profits by making otherwise willing customers either legally ineligible or practical incapable of using Rainier's arm brace products.  *Id.*  The Arm Brace Rule also injured and continues to injure Rainier by forcing it to incur "substantial" compliance costs that are "unrecoverable."  *Id.*  All of these financial harms are irreparable both because they are "substantial" in magnitude and because they are "irrecoverable" in nature. *See Wages & White Lion Investments, L.L.C.*, 16 F.4th at 1142; *Texas* v. *EPA*, 829 F.3d at 433.

The Arm Brace Rule also injures Rainier by depriving it of substantial customer "good will," as its products have now arguably triggered onerous federal firearms regulations. *Id.*  Lost business good will is another form of irreparable harm.  *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (explaining that "loss of reputation, good will, and business opportunities" constitutes irreparable harm).

---

[1] Rainier's arm brace products are designed and manufactured by well-established third-party firms such as A3 Tactical and SB Tactical, whose current arm brace offerings are generally representative of Rainier's arm brace products. Ex. 1 at 1.  Specific representative examples of Rainier's arm brace products include the "SB TACTICAL SOB BRACE BLACK," the "SB TACTICAL SBA3 PISTOL STABILIZING BRACE," the "SB TACTICAL SBM47 AK47/74 BRACE," the "A3 TACTICAL ALUMINUM OFFSET MODULAR SIDE FOLDING STEADY ARM BRACE," and the "SIG SAUER MCX / MPX PIVOTING CONTOUR BRACE."  *Id.*

**B.      The Arm Brace Rule irreparably harms SAF and the Individual Plaintiffs.**

The complaint clearly pleads, Doc. 50 at 4-5, 7-8, ¶¶ 6-10, 17-22, and evidence now clearly proves, that SAF and the Individual Plaintiffs will suffer irreparable harm if the Arm Brace Rule is not preliminarily enjoined.  *See generally* Ex. 2 (Declaration of Alan Gottlieb); Ex. 3 (Declaration of William Green), Ex. 4 (Declaration of Samuel Walley).

SAF promotes the right to keep and bear arms by supporting education, research, publications, and legal efforts about the Constitution's right to privately own and possess firearms and the consequences of gun control.    Ex. 2 at 1.  A "substantial" number of SAF members use a brace-equipped pistol's arm brace only as an arm brace because of limb-related physical disabilities that "inhibit" "safe and effective firearm use" otherwise. *Id.*   Other SAF members do not have limb-related disabilities and use such a firearm's arm brace only as an arm brace to facilitate "safe and effective firearm use that cannot be achieved otherwise." *Id.*[2]

For these SAF members, compliance with the Arm Brace Rule causes serious and irreparable injuries no matter what compliance method occurs. For these SAF members, the NFA registration process costs are "substantially injurious" and "irrecoverable." *Id.*   Altering their firearms would "significantly lessen" the firearm's "safety and/or efficacy." *Id.*   And worst of all, a requirement of firearm destruction or turnover would abridge their Second Amendment right to keep and bear arms. *Id.*   The Individual Plaintiffs, each of whom is a SAF member, exemplify these irreparable harms.

Individual Plaintiff William Green is a licensed police officer in Texas and employed as a full-time police officer.   Ex. 3 at 1.   He was seriously injured in the line of duty, resulting in

---

[2] All of these SAF members have in the past and/or would in the immediate future legally acquire from sellers such as Rainier Arms, LLC either an arm brace or a brace-equipped pistol of the kind that is currently offered. Ex. 2 at 1. All of these SAF members are fully eligible to possess firearms under federal and state law. *Id.*  All of these SAF members use firearms for only traditionally lawful purposes, such as self-defense within the home. *Id.*

permanent disabilities that impact his firearm capabilities.  *Id.*  He owns brace-equipped pistols because of his disability and by necessity.  *Id.*  "Without an arm brace, [his] disability prevents the operation of these firearms with sufficient safety and efficacy."  *Id.*  But "[w]ith an arm brace, [he is] able to safely and effectively operate these firearms despite [his] disability."  *Id.*

Individual Plaintiff Samuel Walley is a United States Army veteran with disabilities incurred during active duty that impact his firearm capabilities.  Ex. 4 at 1.  He too owns brace-equipped pistols because of his disability and by necessity.  *Id.*  His "disability prevents the operation of these firearms with sufficient safety and efficacy" when not brace equipped.  *Id.*  But when an arm brace, he can "safely and effectively operate these firearms despite [his] disability."  *Id.*

The Arm Brace Rule injures Mr. Green and Mr. Walley directly, concretely, and substantially no matter which compliance path is forced.  Ex. 3 at 1; Ex. 4 at 1.  For them, complying via the NFA registration process would inflict "substantial financial injuries" that would never be recovered.  *Id.*  Complying by altering their firearms would both be costly and inflict the substantial practical injury of "significantly lessened firearm safety and/or efficacy." *Id.*  "Worst of all, compliance by way of firearm destruction or surrender inflicts the irreparable harm of abridging [his] Second Amendment right to keep and bear arms."  *Id.*

## III.    Balance of harms and public interest.

Maintaining the status quo is a prime directive for harm balancing and the public interest. *See Wages & White Lion Investments, L.L.C. v. United States Food & Drug Admin.*, 16 F.4th 1130, 1143 (5th Cir. 2021).  A preliminary injunction maintains the status quo by returning the law's "rifle" definition to what it had been for decades.

The public interest also favors a preliminary injunction because  the "public interest is in having governmental agencies abide by the federal laws that govern their existence and

21

operations." *Id*.  "And 'there is generally no public interest in the perpetuation of unlawful agency action.'"  *Id.* (cleaned up).  For "our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Id.*

Furthermore, Plaintiffs' "extremely high likelihood of success on the merits is a strong indicator that a preliminary injunction would serve the public interest." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

Last but not least, with respect to the constitutional claims at issue, preserving constitutional rights always serves the public interest, *see, e.g., O'Donnell v. Goodhart*, 900 F.3d 220, 232 (5th Cir. 2018), whereas "enforcement of an unconstitutional law is always contrary to the public interest," *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013).

**Conclusion**

The motion should be granted.  The Court should enter a preliminary injunction enjoining the Agencies from enforcing the "Arm Brace Rule," *Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* 88 Fed. Reg. 6478 (Jan. 31, 2023), against the Plaintiffs and postponing the Arm Brace Rule until this litigation's conclusion.

Respectfully submitted,

BECK REDDEN LLP
By /s/ *Chad Flores*
Chad Flores
cflores@beckredden.com
State Bar No. 24059759
1221 McKinney St., Suite 4500
Houston, Texas 77010
(713) 951-3700 | (713) 952-3720 (fax)