**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

---

SECOND AMENDMENT FOUNDATION,
*et al.*,

        *Plaintiffs,*

   v.

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS, AND EXPLOSIVES, *et al.*,

      *Defendants.*

No. 3:21-cv-0116-B

---

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND ...............................................................................................................2

I.      Statutory and Regulatory Background ...................................................................2

II.     ATF's Pre-Rule Classifications of, and Guidance Regarding, Firearms Equipped with "Stabilizing Braces" ....................................................................................4

III.    The Rule ...........................................................................................................7

IV.    This Lawsuit ....................................................................................................10

LEGAL STANDARDS ...................................................................................................11

ARGUMENT ..................................................................................................................11

I.      Plaintiffs are unlikely to succeed on the merits of their claims ........................11

     A.    The Rule is a valid exercise of ATF's statutorily delegated authority and comports with the relevant statutory provisions ................................11

     B.    The Rule does not infringe Second Amendment rights. .......................20

          1.    Firearm braces are not bearable arms protected by the Second Amendment. ................................................................................21

          2.    Registration of short-barreled rifles does not implicate the Second Amendment. ................................................................22

          3.    Short-barreled rifles are dangerous and unusual weapons that are not protected by the Second Amendment. ...................................23

          4.    Historical tradition of regulation supports the Rule and the NFA. .........26

     C.    The Rule is not void-for-vagueness ....................................................30

     D.    The Rule's immediate effective date is lawful. ...................................33

II.     Plaintiffs fail to demonstrate irreparable harm absent preliminary relief. ........34

III.    The equities and the public interest weigh against a preliminary injunction. .............37

IV.    In all events, the specific forms of relief that Plaintiffs seek are improper. ...............37

CONCLUSION ...............................................................................................................39

# TABLE OF AUTHORITIES

## Cases

*Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.,*
  878 F.2d 806 (5th Cir. 1989) ................................................................................................................. 11

*Am. Telnet v. GTE Corp.,*
  1999 WL 242686 (N.D. Tex. Apr. 16, 1999) ....................................................................................... 36

*Aposhian v. Barr,*
  374 F. Supp. 3d 1145 (D. Utah 2019) ................................................................................................... 13

*Arizona v. Biden,*
  40 F.4th 375 (6th Cir. 2022) ................................................................................................................... 38

*Assoc. of Am. Physicians & Surgeons, Inc. v. Tex. Med. Board,*
  627 F.3d 547 (5th Cir. 2010) ................................................................................................................. 36

*ATK Launch Sys., Inc. v. EPA,*
  669 F.3d 330 (D.C. Cir. 2012) ............................................................................................................... 32

*Bennett v. Spear,*
  520 U.S. 154 (1997) ................................................................................................................................. 12

*Bezet v. United States,*
  714 F. App'x 336 (5th Cir. 2017) ...................................................................................................... 22, 23

*Caetano v. Massachusetts,*
  577 U.S. 411 (2016) ................................................................................................................................. 25

*Castro v. City of Grand Prairie,*
  2021 WL 1530303 (N.D. Tex. Apr. 19, 2021) ..................................................................................... 35

*Chacon v. Granata,*
  515 F.2d 922 (5th Cir. 1975) ................................................................................................................. 34

*Chapman v. United States,*
  500 U.S. 453 (1991) ................................................................................................................................. 20

*Coleman v. Bank of New York Mellon,*
  2013 WL 1187158 (N.D. Tex. Mar. 4, 2013) ....................................................................................... 35

*Consol. Rest. Operations, Inc. v. Nat'l Processing Co., LLC,*
  2002 WL 1432469 (N.D. Tex. June 28, 2002) ..................................................................................... 35

*Ctr. for Biological Diversity v. Regan,*
  597 F. Supp. 3d 173 (D.D.C. 2022) ....................................................................................................... 39

*Delaware Dep't of Nat. Res. & Env't Control v. EPA*,
    785 F.3d 1 (D.C. Cir. 2015)....................................................................27, 30, 31, 34

*DHS v. New York*,
    140 S. Ct. 599 (2020) .............................................................................................38

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)...........................................................................................21, 24

*Duarte v. City of Lewisville*,
    136 F. Supp. 3d 752 (E.D. Tex. 2015) ...................................................................34

*Flight Training Int'l, Inc. v. FAA*,
    58 F.4th 234 (5th Cir. 2023) ..................................................................................34

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018) ...........................................................................................38

*Gonzales v. Oregon*,
    546 U.S. 243 (2006).................................................................................................13

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972).........................................................................................32, 33

*Guedes v. ATF*,
    356 F. Supp. 3d 109 (D.D.C. 2019).......................................................................13

*Gun Owners of Am., Inc. v. Garland*,
    19 F.4th 890 (6th Cir. 2021) ..................................................................................15

*Haynes v. United States*,
    390 U.S. 85 (1968)..................................................................................................17

*Holland Am. Ins. Co. v. Succession of Roy*,
    777 F.2d 992 (5th Cir. 1985) .................................................................................37

*Hollis v. Lynch*,
    827 F.3d 436 (5th Cir. 2016) ...............................................................21, 24, 25, 26

*Huawei Techs. USA, Inc. v. Fed. Commc'ns Comm'n*,
    2 F.4th 421 (5th Cir. 2021) ...............................................................................26, 32

*Huddleston v. United States*,
    415 U.S. 814 (1974).................................................................................................3

*John Doe Co. v. CFPB*,
    849 F.3d 1129 (D.C. Cir. 2017)..............................................................................34

*Kanarr Corp. v. United States,*
  188 Ct. Cl. 1051 (1969) ............................................................................................................16, 17

*Kelly Servs., Inc. v. Creative Harbor, LLC,*
  846 F.3d 857 (6th Cir. 2017) ..........................................................................................................19

*Kolender v. Lawson,*
  461 U.S. 352 (1983) ........................................................................................................................30

*Lakedreams v. Taylor,*
  932 F.2d 1103 (5th Cir. 1991) ........................................................................................................35

*Lane v. Holder,*
  703 F.3d 668 (4th Cir. 2012) ..........................................................................................................23

*League of Women Voters of the U.S. v. Newby,*
  838 F.3d 1 (D.C. Cir. 2016) ..............................................................................................34, 35, 36

*Lomont v. O'Neill,*
  285 F.3d 9 (D.C. Cir. 2002) ..............................................................................................................2

*Louisiana v. Becerra,*
  20 F.4th 260 (5th Cir. 2021) ............................................................................................................38

*Madsen v. Women's Health Ctr., Inc.,*
  512 U.S. 753 (1994) ........................................................................................................................38

*Maracich v. Spears,*
  570 U.S. 48 (2013) ..........................................................................................................................20

*Mazurek v. Armstrong,*
  520 U.S. 968 (1997) ........................................................................................................................11

*Memphis A. Philip Randolph Inst. v. Hargett,*
  978 F.3d 378 (6th Cir. 2020) ..........................................................................................................34

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ....................................................................................................................14, 37

*Muscarello v. United States,*
  524 U.S. 125 (1998) ........................................................................................................................20

*N.Y. City Transit Auth. v. Beazer,*
  440 U.S. 568 (1979) ........................................................................................................................12

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
  142 S. Ct. 2111 (2022) ..............................................................................................21, 23, 27, 29

*Nat'l Nutritional Foods Ass'n v. Mathews,*
    557 F.2d 325 (2d Cir. 1977).................................................................................19

*Nat'l Rifle Ass'n v. Brady,*
    914 F.2d 475 (4th Cir. 1990)...............................................................................13

*Nken v. Holder,*
    556 U.S. 418 (2009)............................................................................................37

*Or. Firearms Fed'n, Inc. v. Brown,*
    --- F. Supp. 3d --, 2022 WL 17454829 (D. Or. Dec. 6, 2022)..........................23

*Perez v. Mortg. Bankers Ass'n,*
    575 U.S. 92 (2015)..............................................................................................34

*POET Biorefining, LLC v. EPA,*
    970 F.3d 392 (D.C. Cir. 2020)............................................................................15

*Posters 'N' Things, Ltd. v. United States,*
    511 U.S. 513 (1994)......................................................................................19, 33

*Romag Fasteners, Inc. v. Fossil, Inc.,*
    140 S. Ct. 1492 (2020).......................................................................................17

*Rural & Migrant Ministry v. EPA,*
    565 F. Supp. 3d 578 (S.D.N.Y. 2020).................................................................39

*Safety-Kleen Corp. v. EPA,*
    1996 U.S. App. LEXIS 2324 (D.C. Cir. Jan. 19, 1996).....................................39

*Sheffield v. Bush,*
    604 F. Supp. 3d 586 (S.D. Tex. 2022)................................................................35

*Sig Sauer, Inc. v. Brandon,*
    826 F.3d 598 (1st Cir. 2016)..........................................................................18, 19

*Sipes v. United States,*
    321 F.2d 174 (8th Cir. 1963)..............................................................................17

*Sorenson v. Sec'y of Treasury,*
    475 U.S. 851 (1986)............................................................................................39

*Spicer v. Maxus Healthcare Partners, LLC,*
    616 S.W.3d 59 (Tex. Ct. App. 2020)..................................................................36

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016)............................................................................................12

*Tenth Street Residential Ass'n v. City of Dallas,*
    968 F.3d 492 (5th Cir. 2020) ...................................................................................36

*Tex. Democratic Party v. Abbott,*
    961 F.3d 389 (5th Cir. 2020) ...................................................................................30

*Texas v. EPA,*
    983 F.3d 826 (5th Cir. 2020) ...................................................................................32

*Tripoli Rocketry v. ATF,*
    437 F.3d 75 (D.C. Cir. 2006) ...................................................................................32

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018) ............................................................................................38

*United States v. Al-Azhari,*
    2020 WL 7334512 (M.D. Fla. Dec. 14, 2020) .........................................................21

*United States v. Brooks,*
    681 F.3d 678 (5th Cir. 2012) ...................................................................................30

*United States v. Cox,*
    906 F.3d 1170 (10th Cir. 2018) .........................................................................21, 24

*United States v. Gilbert,*
    286 F. App'x 383 (9th Cir. 2008) .............................................................................25

*United States v. Golding,*
    332 F.3d 838 (5th Cir. 2003) ...................................................................................24

*United States v. Gonzalez,*
    2011 WL 5288727 (D. Utah Nov. 2, 2011) .............................................................25

*United States v. Hasson,*
    2019 WL 4573424 (D. Md. Sept. 20, 2019) .......................................................21, 22

*United States v. Hayes,*
    555 U.S. 415 (2009) ................................................................................................18

*United States v. Howard,*
    766 F.3d 414 (5th Cir. 2014) ...................................................................................30

*United States v. Lim,*
    444 F.3d 910 (7th Cir. 2006) ...................................................................................32

*United States v. Majid,*
    2010 WL 5129297 (N.D. Ohio Dec. 10, 2010) ........................................................25

*United States v. Mazurie,*
   419 U.S. 544 (1975) ...................................................................................................30

*United States v. Perez-Gallan,*
   2022 WL 16858516 (W.D. Tex. Nov. 10, 2022) ...................................................27

*United States v. Powell,*
   423 U.S. 87 (1975) .....................................................................................................32

*United States v. Rahimi,*
   59 F.4th 163, 2023 WL 1459240 (5th Cir. 2023) ..................................................24

*United States v. Rose,*
   695 F.2d 1356 (10th Cir. 1982) ..........................................................................16, 17

*United States v. Royce,*
   2023 WL 2163677 (D.N.D. Feb. 22, 2023) ..........................................................22

*United States v. Saleem,*
   2023 WL 2334417 (D. N.C. Mar. 1, 2023) .......................................................23, 27

*United States v. Santoro,*
   242 F. App'x 627 (11th Cir. 2007) ..........................................................................16

*United States v. Schuhmann,*
   963 F.2d 381 (9th Cir. 1992) ....................................................................................17

*United States v. Syverson,*
   90 F.3d 227 (7th Cir. 1996) ......................................................................................18

*United States v. Thompson/Center Arms Co.,*
   504 U.S. 505 (1992) ..........................................................................................2, 13, 16

*United States v. Zeidman,*
   444 F.2d 1051 (7th Cir. 1971) ..................................................................................16

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,*
   455 U.S. 489 (1982) ...................................................................................................31

*Ward v. Rock Against Racism,*
   491 U.S. 781 (1989) ...................................................................................................32

*Westfall v. Miller,*
   77 F.3d 868 (5th Cir. 1996) ......................................................................................22

*White v. Carlucci,*
   862 F.2d 1209 (5th Cir. 1989) ..................................................................................34

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) .................................................................................................11, 35

*Wis. Gas. Co. v. FERC,*
    758 F.2d 669 (D.C. Cir. 1985) .................................................................................34

*Wooden v. United States,*
    142 S. Ct. 1063 (2022) ..............................................................................................20

*Xi'an Metals & Minerals Imp. & Exp. Co. v. United States,*
    50 F.4th 98 (Fed. Cir. 2022) ....................................................................................15

**Federal Statutes**

5 U.S.C. § 553 ....................................................................................................................33

5 U.S.C. § 705 ....................................................................................................................39

18 U.S.C. § 921 ...........................................................................................................*passim*

18 U.S.C. § 922 ....................................................................................................................3

18 U.S.C. § 926 .............................................................................................................4, 13

26 U.S.C. § 5801 ............................................................................................................2, 3

26 U.S.C. § 5841 ............................................................................................................1, 3

26 U.S.C. § 5845 .......................................................................................................*passim*

26 U.S.C. § 7801 ..........................................................................................................4, 13

26 U.S.C. § 7805 ................................................................................................................13

**State Statutes**

Ala. Code § 13A-11-63(a) ................................................................................................26

Alaska Stat. Ann § 11.61.200(c) ....................................................................................26

Ariz. Rev. Stat. Ann. § 13-3101(B) ...............................................................................26

Cal. Penal Code § 16590 ..................................................................................................26

Colo. Rev. Stat. Ann. § 18-12-102(1) ............................................................................26

D.C. Code Ann. § 7-2502.02 ...........................................................................................26

Fla. Stat. Ann. § 790.221(1)-(3) .....................................................................................26

Ga. Code Ann § 16-11-121 ..................................................................................................26

Ga. Code Ann § 16-11-122 ..................................................................................................26

Haw. Rev. Stat. Ann. § 134-8 ..............................................................................................26

Iowa Code Ann § 724.1C ....................................................................................................26

La. Stat. Ann. § 40:1785 ......................................................................................................26

Md. Code Ann., Pub. Safety § 5-203 ...................................................................................26

Mich. Comp. Laws Ann. § 750.224b ...................................................................................26

Mo. Ann. Stat. § 571.020 .....................................................................................................26

Mont. Code Ann. § 45-8-340 ...............................................................................................26

N.C. Gen. Stat. Ann. § 14-288.8 ..........................................................................................26

N.D. Cent. Code Ann. § 62.1-02-03 .....................................................................................26

Neb. Rev. Stat. Ann. § 28-1203 ...........................................................................................26

Nev. Rev. Stat. Ann. § 202.275 ............................................................................................26

Ohio Rev. Code Ann. § 2923.17 ..........................................................................................26

Okla. Stat. Ann. tit. 21, § 1289.18 .......................................................................................26

Or. Rev. Stat. Ann. § 166.272(1)-(4) ...................................................................................26

S.C. Code Ann. § 16-23-250 ................................................................................................26

Tex. Penal Code Ann. § 46.05(a)(1)(C) ...............................................................................26

Va. Code Ann. § 18.2-303.1 .................................................................................................26

Wash. Rev. Code Ann. § 9.41.190(4) ...................................................................................26

Wis. Stat. Ann. § 941.28(2)-(4) ...........................................................................................26

**Legislative Materials**

H.R. Rep. No. 83-1337 (1954) .........................................................................................2, 16

**Regulations**

27 C.F.R. § 478.11 ...........................................................................................................8, 14

27 C.F.R. § 479.11 ..............................................................................................................8, 14

28 C.F.R. § 0.130 ................................................................................................................4, 13

*Objective Factors for Classifying Weapons with "Stabilizing Braces,"*
85 Fed. Reg. 82,516 (Dec. 18, 2020) ........................................................................8

*Objective Factors for Classifying Weapons with "Stabilizing Braces"; Withdrawal of Guidance,*
85 Fed. Reg. 86,948 (Dec. 31, 2020) ........................................................................8

*Factoring Criteria for Firearms with Attached "Stabilizing Braces,"*
86 Fed. Reg. 30,826 (June 10, 2021) ........................................................................8

*Factoring Criteria for Firearms With Attached "Stabilizing Braces,"*
88 Fed. Reg. 6,478 (Jan. 31, 2023) .................................................................*passim*

## Other Authorities

2 General Laws of Massachusetts from the Adoption of the Constitution to February 1822
(1823) .........................................................................................................................29

15 The Public Records of the Colony of Connecticut 191 (1890) ......................................29

1775-1776 Mass. Acts 18 ....................................................................................................28

Act of Apr. 1, 1881, ch. XCVI, § 1, 1881 Ark. Acts 191
(*codified at* Ark. Code. Ann. ch. 48 § 1498 (1894)) ................................................29

Act of Apr. 3, 1778, ch. 33, 1778 N.Y. Laws 65 ...............................................................28

Act of Apr. 12, 1871, ch. XXXIV, § 1, 1871 Tex. Gen. Laws 25
(*codified at* 1879 Tex. Crim. Stat. 24) ....................................................................29

Act of Dec. 2, 1875, § 1, 1876 Wyo. Sess. Laws 352 .......................................................29

Act of Feb. 15, 1899, ch. 19, § 14, 1899 Wyo. Sess. Laws 27..........................................29

Act of Feb. 21, 1867, ch. CCCXVII, §§ 1-8, 1867 Miss. Laws 412..................................29

Act of Feb. 24, 1844, ch. 1, § 1, 1844 Miss. Laws 57.......................................................29

Act of Jan. 8, 1781, ch. XII, § 13, 1781 N.J. Laws 39.......................................................28

Act of Mar. 2, 1631, act LVI, 1631 Va. Acts 175..............................................................28

Act of Mar. 13, 1872, ch. 100, § 62, 1872 Kan. Sess. Laws 210
(*codified at* Kan. Gen. Stat. § 1003 (1901))............................................................29

Act of Mar. 26, 1879, ch. CLXXXVI, § 1, 1879 Tenn. Pub. Acts 231................................................29

An Act About Powder Money,
   1759-1776 N.H. Laws 63................................................29

"An Act for the better regulating of the Militia of this Province,"
   1747, McCord, *Statutes at Large,* 9:647................................................28

An Act to License the Carrying of Fowling Pieces and other Fire-Arms,
   1870 Haw. Sess. Laws 26................................................29

An Act to Provide a License for the Sale of Pistols or Pistol Cartridges within the Limits of this
   State, § 1, 1890 S.C. Acts 653 ................................................29

Colonial Laws of Massachusetts Reprinted from the Edition of 1672 (1890)................................................29

County Bonds, Taxes, Etc. tit. VI, 1866 Ga. Laws 27................................................29

IRS, Rev. Rul. 61–45, 1961-1 C.B. 663, 1961 WL 12798 (Jan. 1, 1961)................................................16

Joseph Abram Walker, The Revised Code of Alabama 169 § 10,
   (Reid & Screws, State Printers, 1867)................................................29

Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807
   (1807)................................................28

Laws of the State of Maine 546 (1830)................................................28

Laws of the State of New Hampshire; with the Constitutions of the United States and of the
   State Prefixed 277 (1830) ................................................29

*NFA Handbook,* (Apr. 2009), https://perma.cc/P3NL-G35G................................................4

*Records of the Colony of Rhode Island and Providence Plantations, In New England,* 2:196
   (John Russell Bartlett, ed., Providence: A. Crawford Greene and Brother vol. 2, 1857)................................................28

Revenue, ch. 34, § 23(4), 1857 N.C. Sess. Laws 34................................................29

Robert H. Churchill, "Gun Regulation, the Police Power, and the Right to Keep Arms in Early
   America: The Legal Context of the Second Amendment,"
   25 Law & Hist. Rev. 139 (2007)................................................28

The Statutes at Large of Pennsylvania, ch. 1857, §§ 1-12, 346-51
   (James T. Mitchell & Henry Flanders comps. 1911)................................................29

## INTRODUCTION

For nearly a century, Congress has regulated the possession, manufacture, and distribution of short-barreled rifles, weapons that it determined were especially dangerous. Federal law defines the term "rifle" to mean any rifle-bored weapon that, *inter alia*, is "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). If a "rifle" has a barrel shorter than 16 inches in length, it is a short-barreled rifle under the National Firearms Act ("NFA") and the Gun Control Act ("GCA"), 26 U.S.C. § 5841; 18 U.S.C. § 921(a)(8), and is subject to certain registration and taxation requirements, among other federal controls.

Over the last decade, firearms manufacturers have marketed devices widely referred to as "stabilizing braces." These devices are generally designed to attach to the rear end of a heavy pistol made with a rifle receiver but no buttstock. Though "stabilizing braces" are frequently advertised to wrap around or brace against a shooter's forearm to assist with one-handed firing, manufacturers often design them to resemble common shoulder stocks and market them so that they may be used to convert pistols into shoulder-fired weapons. The result has been the widespread circumvention of Congress's longstanding requirements for the manufacture and possession of short-barreled rifles.

In 2021, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") took action to ensure that short-barreled rifles constructed with a "stabilizing brace" are registered and taxed pursuant to statutory requirements. After publishing a notice of proposed rulemaking and receiving public comments, ATF promulgated a rule, *Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* 88 Fed. Reg. 6,478 (Jan. 31, 2023) ("Rule"). Consistent with the statutory text, the Rule clarified that the statutory definition of "rifle" can include, under certain circumstances, a weapon equipped with a "stabilizing brace" or similar device. And to provide the regulated community with necessary guidance, the Rule also outlined the relevant criteria that ATF considers when determining whether a particular weapon configured with a "brace" device is designed, made, and intended to be fired from

1

the shoulder, such that it constitutes a "rifle" within the meaning of the NFA and the GCA.

Plaintiffs seek to preliminarily enjoin the Rule's enforcement but fail to show any of the prerequisites to obtain that extraordinary relief. First, Plaintiffs are unlikely to succeed on the merits of their claims. Congress empowered and obligated ATF to determine whether and when "brace"-equipped weapons become "rifles," as defined under federal law, and the Rule comports with the relevant statutory provisions and complies with the Administrative Procedure Act ("APA"). Moreover, the modest registration requirements that federal law impose do not violate the Second Amendment and, in any event, the right to bear arms does not protect the use of firearm modifications to evade federal firearms laws. Nor does the Rule suffer from any other constitutional defect. And merits aside, Plaintiffs will not suffer irreparable harm absent preliminary relief, and the requested injunction would undermine the public interest. The Court should therefore deny Plaintiffs' motion.

## BACKGROUND

### I.       Statutory and Regulatory Background

**1.** The National Firearms Act of 1934, as amended, 26 U.S.C. §§ 5801–5872, the first major federal statute to regulate firearms, imposed various requirements on persons possessing or engaged in the business of selling certain types of firearms and other weapons. Seeking to curtail the criminal misuse of firearms, *see Lomont v. O'Neill*, 285 F.3d 9, 11 (D.C. Cir. 2002), the NFA targeted particularly dangerous and easily concealable weapons that "could be used readily and efficiently by criminals," H.R. Rep. No. 83-1337, at A395 (1954). To that end, the Act defined eight categories of "firearms" that fall under its purview. *See* 26 U.S.C. § 5845(a)(1)–(8).

Among the "firearms" the NFA regulates are weapons commonly referred to as short-barreled rifles— *i.e.*, "a rifle having a barrel or barrels of less than 16 inches in length" or "a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length." *Id.* § 5845(a)(3), (4); *United States v. Thompson/Center Arms Co.*, 504 U.S.

505, 517 (1992) (plurality op.) ("[The NFA's] regulation of short-barreled rifles" targets "a concealable weapon" "likely to be used for criminal purposes.").[1] The Act defines "rifle" to mean any

> weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger . . . .

26 U.S.C. § 5845(c). These short-barreled rifles must be registered in the National Firearms Registration and Transfer Record to a person entitled to possess the firearm. *Id.* § 5841. They also are subject to making and transfer taxes, *id.* §§ 5811, 5821, and must be approved by the Attorney General before they are made or transferred, *id.* §§ 5812, 5822. Moreover, any person engaged in the business of importing, manufacturing, or dealing in NFA firearms must register with the Attorney General and pay a special occupational tax (or "SOT"). *Id.* §§ 5801, 5802.

    **2.** In 1968, Congress enacted the Gun Control Act, as amended, 18 U.S.C. §§ 921–931, to comprehensively regulate the manufacture and distribution of firearms and ammunition. Acknowledging the inadequacy of federal controls over "the widespread traffic in firearms," and motivated by concerns that "the ease with which firearms could be obtained" had "contributed significantly to the prevalence of lawlessness and violent crime" in the country, *Huddleston v. United States*, 415 U.S. 814, 824 (1974), the GCA increased federal controls for persons engaging in the business of importing, manufacturing, or dealing in firearms. *See, e.g.*, 18 U.S.C. §§ 922–923.

    Among these were specific controls on the interstate transport of "short-barreled rifles" and the obligation of Federal Firearms Licensees ("FFL") to receive approval from the Attorney General before their sale. *Id.* § 922(a)(4), (b)(4). The Act defined "short-barreled rifle" to mean any "rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by

---

[1] The NFA's definition of "firearm" also includes machineguns and short-barreled shotguns, as well as several items that would not be considered "firearms" in ordinary parlance, such as silencers, rockets, and grenades. 26 U.S.C. § 5845(a).

alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches." *Id.* § 921(a)(8). The GCA's definition of "rifle" mirrored the NFA's. *Id.* § 921(a)(7).

**3.** Congress has vested in the Attorney General the authority to prescribe rules and regulations to administer and enforce the NFA and the GCA. *See* 18 U.S.C. § 926(a); 26 U.S.C. §§ 7801(a)(2)(A), 7805(a). The Attorney General has delegated that responsibility to ATF, *see* 28 C.F.R. § 0.130, which has promulgated regulations implementing both statutory schemes, *see* 27 C.F.R. parts 478, 479.

Although not statutorily required, ATF encourages manufacturers and members of the public to submit weapons or other devices to ATF for a classification of whether the weapon or device qualifies as a "firearm" under the NFA. *NFA Handbook* § 7.2.4 (Apr. 2009), https://perma.cc/P3NL-G35G. The classification process enables ATF to provide manufacturers and individual possessors with "the agency's official position concerning the status of [a] firearm[] under Federal firearms laws." *Id.* § 7.2.4, 7.2.4.1. ATF has made clear, however, that "classifications are subject to change if later determined to be erroneous or impacted by subsequent changes in the law or regulations." *Id.* § 7.2.4.1.

## II.   ATF's Pre-Rule Classifications of, and Guidance Regarding, Firearms Equipped with "Stabilizing Braces"

In the last decade, ATF has received numerous classification requests for weapons equipped with various types of "brace" devices. 88 Fed. Reg. at 6,482. Manufacturers often design these devices to attach to the rear end of a heavy pistol made with a rifle receiver but no buttstock—*e.g.*, a pistol variant of an AR- or AK-type rifle. *Id.* at 6,518; *Commercially available firearms equipped with a "stabilizing brace" that are short-barreled rifles* ("Commercial Guidance"), https://perma.cc/BK6C-BRGQ (providing images of weapons configured with common "brace" devices). And though manufacturers have nominally claimed that "brace" devices are meant to attach to or stabilize against a shooter's forearm, "stabilizing braces" often replicate characteristics of a shoulder stock and are frequently marketed by manufacturers and used by individual possessors to enable a shooter to shoulder a firearm. 88 Fed. Reg. at 6,479, 6,527–29, 6,544–47. To determine whether a particular weapon equipped with a

"stabilizing brace" falls within the statutory definition of a short-barreled rifle, 26 U.S.C. § 5845(a)(3), (4); 18 U.S.C. § 921(a)(8), ATF looks to the statute to determine, *inter alia*, whether the weapon, as configured, is "designed or redesigned, made or remade, and intended to be fired from the shoulder," and therefore a "rifle" under the terms of the statute, 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7).



Figures 1 & 2: Comparing heavy pistols equipped with a "stabilizing brace" (top) to firearms equipped with a commercial shoulder stock (bottom). *See* 88 Fed. Reg. at 6,494.

ATF first encountered this type of device in 2012, when it received a classification request regarding a prototype of a "forearm brace" designed to slip onto an AR-15-type pistol's buffer tube. 88 Fed. Reg. at 6,482. The device's design was modest, constructed of foam-type rubber flaps and two Velcro straps. ECF No. 3-3. According to the requester, the device was designed to assist individuals with limited strength or mobility due to a disability with single-handed firing of a heavy pistol. 88 Fed. Reg. at 6,482. Based on its evaluation of the materials submitted, ATF concluded that the particular "brace" device, when configured with a pistol, would not convert that firearm into a weapon designed or intended to be fired from the shoulder and would not alter the weapon's classification. *Id.* at 6,483. ATF did not publicly explain, however, the criteria it applied in reaching that conclusion.

Over the next several years, ATF received an increasing number of classification requests for weapons equipped with new types of "stabilizing braces" of varying designs. *Id.* at 6,479. But unlike the 2012 prototype, these newer "brace" designs began to include characteristics common to shoulder stocks. *Id.*; *see also, e.g., id.* at 6,528–29 (comparing two "stabilizing braces" to similarly designed

shoulder stocks); *id.* at 6,528 (noting that a manufacturer listed a "stabilizing brace" as a firearm's "stock type"); *id.* at 6,503, 6,547. Given their stock-like function and design, ATF soon became aware that some "stabilizing braces" were being widely marketed by manufacturers and used by individual possessors to fire weapons from the shoulder. *See, e.g., id.* at 6,479, 6,503 & n.87, 6,505, 6,527, 6,546–47. Accordingly, as early as 2014, ATF had classified multiple weapons configured with different "brace" devices as short-barreled rifles subject to the NFA. *Id.* at 6,484.

Yet the agency's early classification letters did not apply a standard set of criteria to determine whether a firearm equipped with a "brace" device was designed, made, and intended to be fired from the shoulder, resulting in inconsistent (and occasionally incorrect) guidance on how a "brace" device might affect a weapon's classification under the NFA and the GCA. *Id.* at 6,501–02. For example, some early classification letters (and a 2015 Open Letter) suggested that whether a weapon was a short-barreled rifle depended (at least in part) on an individual's actual, intended, or incidental use of the "stabilizing brace," as either a device assisting single-handed fire or shoulder fire. *Id.* at 6,484, 6,487–88. ATF also occasionally focused on the "brace" device itself, considering whether it had been "classified as a shoulder stock," *id.* at 6,484 n.26, or whether it *could* be used for single-handed fire, *id.* at 6,501. But during this same period, the agency also had explained in some classification letters that a weapon's classification is "based on [its] physical design characteristics," *id.* at 6,502 n.81, and classified several "brace"-equipped weapons as short-barreled rifles after considering, *e.g.,* whether the "brace" device served any purpose other than to extend the rear surface to enable shouldering, *id.* at 6,485, or whether the device created a "length of pull" akin to a shoulder-fired weapon, *id.* at 6,489.

Recognizing the inconsistencies in its early attempts to classify these novel "brace"-equipped weapons, ATF began to revisit its guidance and analytical framework. In 2017, the agency corrected its prior guidance that "incidental" shouldering could alter a weapon's classification, explaining that a classification depends principally on a weapon's physical configuration and not on a shooter's

incidental use of the firearm. *Id.* at 6,491. In 2018, ATF informed classification requestors that, to properly evaluate how a "brace" device affects a weapon's classification, the agency would need to examine the overall configuration of the weapon with the "brace" device attached. *Id.* at 6,492.

By mid-2020, ATF's classification letters reflected a focused analysis of the weapon's objective design features to determine whether it was designed, made, and intended to be fired from the shoulder, as instructed by the statutory definition of a "rifle." For example, in May 2020, ATF received a classification request from SB Tactical for an AR-type pistol equipped with the SBA3 "brace" device. *Id.* at 6,493 (providing images of the submission). ATF determined that the weapon, as configured with the SBA3, was a short-barreled rifle because it possessed objective design features characteristic of weapons designed and intended to be fired from the shoulder—*e.g.*, the SBA3's similar form and function to known shoulder stocks; the SBA3's hardened rear surface area; the utilization of an AR-type receiver extension, which allowed the SBA3 to extend rearward; and the firearm's length of pull, which enabled useful shoulder fire. *Id.* A month later, ATF classified another submitted heavy pistol equipped with a "stabilizing brace" as a short-barreled rifle after applying the same analytical framework. *Id.* at 6,493–94 (providing images of the submission compared to a rifle marketed by the same company). Notably, neither manufacturer sued to challenge these classifications.

## III.    The Rule

**1.** By late 2020, although ATF had correctly focused its analysis of whether a weapon is designed, made, and intended to be fired from the shoulder on the weapon's objective design features, the agency acknowledged that inconsistencies in its early classification letters and guidance had confused the regulated community. *Id.* at 6,496. Adding to the confusion, manufacturers were labeling "brace" devices as "ATF compliant" without having submitted the particular device for classification. *Id.* at 6,492. Even more problematic, the agency continued to observe that manufacturers were widely marketing and members of the public were widely using "brace" devices to create short-barreled rifles

without complying with NFA requirements, *id.*, which Congress had aimed at preventing the criminal and violent use of uniquely dangerous and concealable weapons, *supra* p. 2.

In March 2021, a 21-year-old individual armed with an AR-type pistol equipped with a "stabilizing brace" opened fire at a supermarket in Boulder, Colorado, killing ten people, including an on-duty police officer. This shooting came on the heels of another mass shooting in Dayton, Ohio, in which a 24-year-old individual similarly armed with an AR-type pistol equipped with a "stabilizing brace" killed nine people and injured 17 others within approximately 30 seconds from firing the first shot.[2] In both instances, the shooters reportedly used the "brace" devices attached to their rifle-variant pistols as shoulder stocks. 88 Fed. Reg. at 6,495.

**2.** In light of its pre-existing concerns, as well as these violent crimes evincing the exact harms that Congress sought to prevent when it enacted the NFA, ATF determined that it was necessary to clarify how it evaluates the classifications of weapons equipped with "stabilizing braces." *Id.* The agency therefore published a notice of proposed rulemaking ("NPRM") in June 2021, proposing amendments to 27 C.F.R. §§ 478.11 and 479.11 regarding the meaning of the term "rifle," as used in the NFA and the GCA. 86 Fed. Reg. 30,826.[3] The NPRM also proposed publishing the criteria that ATF evaluates when determining whether a weapon submitted for classification is designed, made, and intended to be fired from the shoulder, including weapons equipped with "stabilizing braces" or other similar attachments. *Id.* The notice elicited over 230,000 public comments. 88 Fed. Reg. at 6,497.

ATF announced the rule on January 13, 2023, and it was published in the Federal Register on January 31, 2023, 88 Fed. Reg. at 6,478. The Rule, which reflects careful consideration of the voluminous comments from the public, *id.* at 6,497–6,569, contains the following key provisions:

---

[2] CNN, *10 killed in Colorado grocery store shooting*, https://perma.cc/HG5S-3NAF; USA Today, *Dayton shooter used a modified gun that may have exploited a legal loophole*, https://perma.cc/89XK-SNVR.
[3] In December 2020, ATF published a notice of proposed rulemaking, *Objective Factors for Classifying Weapons with "Stabilizing Braces,"* 85 Fed. Reg. 82,516 (Dec. 18, 2020), but withdrew it weeks later, 85 Fed. Reg. 86,948 (Dec. 31, 2020).

*Definition of the statutory term "rifle."* The Rule amended regulations issued under the NFA and the GCA that address the statutory definition of "rifle," as proposed in the NPRM. *Id.* at 6,569. The amended regulations clarify that, in ATF's view, the statutory phrase "designed, redesigned, made or remade, and intended to be fired from the shoulder" includes any weapon that is equipped with an accessory, component, or other rearward attachment (*e.g.*, a "stabilizing brace") that provides surface area allowing the weapon to be fired from the shoulder, provided that other factors indicate that the weapon is designed, made, and intended to be fired from the shoulder. *Id.* The other factors—which the NPRM discussed and were the subject of public comment, *id.* at 6,511–13—are:

(i) whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;

(ii) whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method) that is consistent with similarly designed rifles;

(iii) whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;

(iv) whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;

(v) the manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and

(vi) information demonstrating the likely use of the weapon in the general community.

*Id.* at 6,569–70.

*Options for persons who may possess unregistered short-barreled rifles.* The Rule also outlined several options for persons currently possessing short-barreled rifles equipped with "stabilizing braces," including individual possessors, FFLs, and certain governmental entities. *Id.* at 6,570–71. For example,

an individual who was an unlicensed possessor of a "brace"-equipped short-barreled rifle before the Rule was published has until May 31, 2023, to come into compliance with the NFA by:

    (i)    filing the necessary ATF form to register the firearm in the National Firearms Registration and Transfer Record by May 31, 2023;

    (ii)   removing the firearm from the definition of "short-barreled rifle," 26 U.S.C. § 5845(a)(3), (4); 18 U.S.C. § 921(a)(8), by either (a) removing the short barrel and attaching a 16-inch or longer rifled barrel to the firearm, or (b) permanently removing and disposing of or altering the "brace" device so that it cannot be reattached to the weapon;

    (iii)  turning the firearm into a local ATF office; or

    (iv)  destroying the firearm, per ATF's published instructions.

*Id.* at 6,570.

       *Tax-forbearance provisions.* Under the Rule, ATF is forbearing certain NFA tax obligations for persons who possessed short-barreled rifles equipped with "stabilizing braces" prior to the Rule's publication. *Id.* at 6,571. Individual possessors, for instance, will not be subject to the $200 making tax so long as they file the necessary ATF registration form by May 31, 2023. *Id.*

       *Rescission of prior classifications.* As a final matter, given that not all prior classification letters issued by ATF reflected the correct understanding of the statutory definition of "rifle," the Rule rescinded all of ATF's prior classifications of firearms equipped with "stabilizing braces." *Id.* at 6,480. These classifications are therefore no longer valid or authoritative. *Id.* at 6,569.[4]

## IV.   This Lawsuit

       Plaintiffs—a firearms advocacy association, a firearms dealer, and two individuals who possess pistols equipped with "stabilizing braces"—filed this lawsuit over two years ago, challenging two pre-

---

       [4] ATF also issued additional guidance in conjunction with the Rule's announcement, including (i) answers to frequently asked questions regarding the Rule, (ii) registration guidance, and (iii) a non-exhaustive list of commercially available firearms and common weapon platforms equipped with "stabilizing braces" that ATF has determined are short-barreled rifles under the NFA and the GCA. *See* ATF, *Factoring Criteria for Firearms with Attached "Stabilizing Braces,"* https://perma.cc/MRR9-ZBJ2.

Rule actions regarding "brace"-equipped weapons: an Open Letter that ATF issued in 2015 and a Notice published in the Federal Register in 2020. *See* Compl., ECF No. 1. In May 2021, the Court granted Defendants' motion to stay further proceedings in light of the President's announcement that ATF would be issuing a proposed rule to clarify when a weapon equipped with a "stabilizing brace" is a short-barreled rifle subject to NFA requirements.

The Court lifted the stay on February 1, 2023, *see* Order, ECF No. 49, following the Rule's publication. Soon thereafter, Plaintiffs filed an amended complaint claiming that the Rule is unconstitutional and otherwise violates the APA. Pls.' First Am. Compl. ("Compl.") ¶¶ 57–86, ECF No. 50. And two weeks later, they moved to preliminarily enjoin ATF from enforcing the Rule and to postpone its effective date. Pls.' Br. in Supp. of Pls.' Mot. for a Prelim. Inj. ("Mot."), ECF No. 52.

## LEGAL STANDARDS

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To justify this "drastic remedy," a plaintiff must make a "*clear showing*" that (1) it has a substantial likelihood of success on the merits; (2) it will suffer irreparable harm without the requested injunction; (3) the balance of equities tips in its favor; and (4) preliminary relief serves the public interest. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted). Failure to demonstrate any one of these elements requires denial of preliminary relief. *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989).

## ARGUMENT

I.   **Plaintiffs are unlikely to succeed on the merits of their claims.**

A.   **The Rule is a valid exercise of ATF's statutorily delegated authority and comports with the relevant statutory provisions.**

Plaintiffs claim that ATF lacked authority to promulgate the Rule because the Rule's interpretation of the statutory definition of "rifle" "goes beyond" the statutory text. Mot. at 9; Compl. ¶¶ 57–59. But the Rule fits squarely within ATF's delegated authority and correctly construes the

relevant statutory provisions. Plaintiffs' arguments, on the other hand, misconstrue the Rule and rest largely on bare assertions that, in any event, are contrary to basic principles of statutory construction.[5]

**1.** As a threshold matter, a facial APA challenge to the Rule is ill-suited for redressing Plaintiffs' alleged injuries. One would expect Plaintiffs to bring concrete challenges to ATF's actual classifications of the *particular* "brace"-equipped weapons that they possess or sell. After all, Plaintiffs' alleged, non-speculative injuries stem from whether *their* weapons are short-barreled rifles subject to NFA and GCA controls. *Infra* pp. 34–36. But no Plaintiff brings a legal claim to have the Court resolve whether its particular weapons are properly classified as short-barreled rifles under 26 U.S.C. § 5845(a)(3), (a)(4) or 18 U.S.C. § 921(a)(8). In fact, the record is devoid of any facts that would allow this Court to independently assess the classification of any Plaintiff's "brace"-equipped weapon under the terms of the statute (save, perhaps, a few facts about Green's unspecified "AR pistol" equipped with an "SBA3" "brace" device, *see* Green Decl., ECF No. 52-3). That omission is telling: if the Court were to conclude that a Plaintiff possessed or was selling a short-barreled rifle within the meaning of the NFA, any purported "injury" to the Plaintiff would not be traceable to the Rule at all, but would instead stem solely from the statute. Indeed, though Plaintiffs raise abstract challenges to the Rule, it is the statute—not the Rule—that would impose the relevant obligations on Plaintiffs (as the Rule is purely interpretive). For purposes of this motion, then, Plaintiffs have failed to demonstrate standing to facially challenge the Rule. *Cf. Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) ("[A]n injury" must be "fairly traceable to the challenged conduct.").[6]

**2.** But setting that aside, ATF possesses clear authority to interpret provisions within the NFA and the GCA, including terms used within the statutory definition of "rifle." Congress charged the

---

[5] Before reaching Plaintiffs' constitutional challenges to the Rule, the Court should first address their other contentions. *See, e.g., N.Y. City Transit Auth. v. Beazer*, 440 U.S. 568, 582 (1979).

[6] It is similarly unclear that a challenge to the Rule in the abstract is a challenge of final agency action under the APA. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997) (holding that final agency action must be one by which "rights or obligations have been determined" (citation omitted)).

Attorney General with the NFA's "administration and enforcement," 26 U.S.C. § 7801(a)(1), (a)(2)(A), providing that the Attorney General "shall prescribe all needful rules and regulations" to that end, *id.* § 7805(a); *see also id.* § 7801(a)(2)(A). Similarly, Congress delegated to the Attorney General the authority to prescribe any "such rules and regulations as are necessary to carry out" the GCA's provisions. 18 U.S.C. § 926(a). In turn, the Attorney General has delegated the responsibility for administering and enforcing both statutes to the Director of ATF. 28 C.F.R. § 0.130(a).

Pursuant to that delegated authority, ATF has long promulgated rules and regulations implementing both statutory schemes. 27 C.F.R. parts 478, 479. Like any executive actor charged with enforcing a statute, the agency has found it necessary to issue rules interpreting terms used in the NFA and the GCA. *See Gonzales v. Oregon*, 546 U.S. 243, 255 (2006) ("Executive actors often must interpret" statutes "Congress has charged them with enforcing and implementing."). The agency's interpretive authority is well established. *Guedes v. ATF*, 356 F. Supp. 3d 109, 129 n.3 (D.D.C. 2019) (noting "ATF's clear authority to interpret" the NFA's definitions), *aff'd*, 920 F.3d 1 (D.C. Cir. 2019); *accord Aposhian v. Barr*, 374 F. Supp. 3d 1145, 1150–51 (D. Utah 2019), *aff'd*, 958 F.3d 969 (10th Cir. 2020). Indeed, ATF has maintained regulations for decades that clarify the meaning of statutory terms that Congress did not fully define. *See* 88 Fed. Reg. at 6,500 (collecting examples). And consistent with this longstanding practice, ATF issued the Rule to clarify the meaning and proper application of another definitional phrase: "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7).

The need for this Rule cannot be gainsaid. 26 U.S.C. § 7805(a); *Nat'l Rifle Ass'n v. Brady*, 914 F.2d 475, 479 (4th Cir. 1990) ("[Section 926] confers [a] measure of discretion" to ATF "to determine what regulations are in fact 'necessary.'"). Federal law regulates the possession, manufacture, and distribution of short-barreled rifles, uniquely dangerous and concealable weapons specifically targeted by Congress for their criminal utility. *Thompson/Center*, 504 U.S. at 517. A short-barreled rifle is

13

statutorily defined as, *inter alia*, "a rifle having one or more barrels less than [16] inches in length." 18 U.S.C. § 921(a)(8); 26 U.S.C. § 5845(a)(3). Both the NFA and the GCA further defined the term "rifle" to include all weapons that are, *inter alia*, "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). But Congress shed no further light on the meaning of this clause, nor did it explain how to determine if this definition is met.

Then the "stabilizing brace" arrived and quickly proliferated. As explained, *supra* pp. 5–6, over the last decade, ATF has received numerous classification requests for weapons equipped with various types of "brace" devices, as the need for ATF to determine these weapons' classifications was clear to manufacturers from the start. While "stabilizing braces" are purportedly meant to assist single-handed fire by resting against a shooter's forearm, many of these devices closely resemble common shoulder stocks and incorporate design features tailored for shouldering a weapon. 88 Fed. Reg. at 6,479, 6,503, 6,528, 6,547. Indeed, when a heavy pistol is configured with a "stabilizing brace," it is often hard to tell the firearm apart from weapons marketed explicitly as short-barreled rifles. *Id.* at 6,493–94, 6,529; *FINAL RULE 2021R-08F*, at 12–13, https://perma.cc/W6ZW-8FUL (providing three visual comparisons). Given their stock-like designs and function, manufacturers have designed (and even explicitly marketed) various "brace" devices to convert heavy pistols into shoulder-fired weapons, and individual possessors have widely used these devices for that purpose, 88 Fed. Reg. at 6,479, 6,527– 29, 6,544–47—including two individuals who recently used "braced"-equipped firearms to carry out mass shootings. The result has been the widespread circumvention of NFA and GCA controls.

It is against this backdrop that ATF initiated the rulemaking at issue. *See Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) ("[A]n agency must be given ample latitude to 'adapt [its] rules and policies to the demands of changing circumstances.'" (citation omitted)). After completing the notice-and-comment process, the agency issued the Rule to amend its existing regulations, 27 C.F.R. §§ 478.11, 479.11, to provide a consistent, predictable framework for

applying to this class of weapons Congress's definition of "rifles," *i.e.*, weapons that are, *inter alia*, "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). The Rule explains that a weapon equipped with a "stabilizing brace" may, under certain circumstances, be a "rifle" under that statutory definition. 88 Fed. Reg. at 6,569. And to provide the regulated community with necessary guidance, the Rule outlines the relevant criteria that ATF considers when determining whether a particular weapon configured with a "brace" device is designed, made, and intended to be fired the shoulder. *Id.* at 6,569–70. As the Rule explains, *id.* at 6,513–43, ATF's firearms expertise and years of experience in classifying "brace"-equipped weapons informs these criteria. *Gun Owners of Am., Inc. v. Garland*, 19 F.4th 890, 908 (6th Cir. 2021).

Plaintiffs contend that the Rule exceeds ATF's authority, however, because the Rule's interpretation of the statutory definition of "rifle" is more "expansive[]" than the basic statutory text. Mot. at 9. In fact, they suggest that Congress has already defined the term "'rifle' as far as" it *can* be defined, such that any attempt by ATF to explain what it means for a weapon to be "designed or redesigned, made or remade, and intended to be fired from the shoulder," 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7), would be unlawful. Mot. at 9. But that contention is divorced from any acceptable view of an agency's interpretive authority. As already explained, ATF is charged with enforcing and administering the NFA and the GCA, so it must be able to interpret their provisions. And in promulgating the Rule, ATF was not confined to simply parroting the text of § 5845(c) and § 921(a)(7), but instead was permitted to draw "crisper and more detailed lines" to explicate the meaning of those provisions. *See POET Biorefining, LLC v. EPA*, 970 F.3d 392, 408 (D.C. Cir. 2020 (citation omitted)); *accord Xi'an Metals & Minerals Imp. & Exp. Co. v. United States*, 50 F.4th 98, 106 (Fed. Cir. 2022).

The Rule therefore rests on ATF's well-established authority and is consistent with its longstanding practice of issuing rules to clarify its understanding of the meaning and proper application of statutory terms.

15

**3.** Still, Plaintiffs contend that the Rule "contradicts" the statutory definition of "rifle." Mot. at 9. But Plaintiffs offer no serious interpretive analysis to support that claim. Nor do they articulate any better interpretation of the relevant statutory provisions. At any rate, their arguments do not comport with the statute's text or purpose, prior judicial constructions, or any canon of construction that they invoke. The Rule, on the other hand, reaches the correct conclusion: that a pistol equipped with a "stabilizing brace" can be a "rifle," and thus a short-barreled rifle, within the meaning of the NFA and the GCA.

Start with two points that Plaintiffs do not dispute. *First*, a pistol can be modified into a "rifle" within the meaning of § 5845(c) and § 921(a)(7). That is clear not only from the statutory text, which uses the broad and inclusive term "weapon," but also from the Supreme Court's decision in *Thompson/Center*. There, the Court explained that packaging a .22 caliber pistol with a carbine kit and a rifle stock brings the firearm "within the 'intended to be fired from the shoulder' language contained in the [NFA's] definition of rifle." 504 U.S. at 513 n.6 (citation omitted); *accord id.* at 523 (White, J., dissenting); *id.* at 525 (Stevens, J., dissenting). Lower courts have likewise applied that same reasoning. *E.g.*, *United States v. Zeidman*, 444 F.2d 1051, 1053 (7th Cir. 1971); *United States v. Santoro*, 242 F. App'x 627, 630 (11th Cir. 2007). As these decisions acknowledge, it is immaterial under the plain language of § 5845(c) and § 921(a)(7) whether a "rifle" is made or designed by starting with a pistol (or any other rifle-bored weapon) as a component part, so long as the ultimate "weapon" has been configured to be designed, made, and intended to be fired from the shoulder.[7]

---

[7] That is why even those weapons whose "characteristics are so different from what is commonly considered a 'rifle'" can "fit[] the letter and spirit" of the statutory definition. *See, e.g.*, *Kanarr Corp. v. United States*, 188 Ct. Cl. 1051, 1055–58 (1969) (grenade launcher); *United States v. Rose*, 695 F.2d 1356, 1357–58 (10th Cir. 1982) (Uzis with collapsible stocks). The NFA's legislative history also supports this understanding. When Congress enacted the statutory definition of "rifle" in 1954, a House committee report confirmed that the definition was intended to replace reliance on "ordinarily accepted definitions" in determining whether a particular weapon is an NFA "rifle." H.R. Rep. No. 83-1337, at A395. ATF also has long recognized that pistols can be modified to fall within the NFA's definition of "rifle." *See, e.g.*, IRS, Rev. Rul. 61–45, 1961-1 C.B. 663, 1961 WL 12798 (Jan. 1, 1961).

*Second*, the fact that a weapon may be designed to *also* allow effective single-handed fire is not dispositive of whether the weapon is designed, made, and intended to be fired from the shoulder. 88 Fed. Reg. at 6,501. Many litigants have argued that the definition of "rifle" should be limited only to weapons designed and intended to fire *exclusively* from the shoulder. Yet courts have roundly and rightly rejected that atextual reading of the statute. *E.g.*, *Rose*, 695 F.2d at 1357–58; *United States v. Schubmann*, 963 F.2d 381 (9th Cir. 1992); *Sipes v. United States*, 321 F.2d 174, 178 (8th Cir. 1963) ("That" a weapon "could be fired elsewhere than from the shoulder makes it no less a rifle within the statutory definition."), *overruled on other grounds by Haynes v. United States*, 390 U.S. 85 (1968); *Kanarr*, 188 Ct. Cl. at 1056–57. As the Rule explains, the plain language of the statute compels the conclusion that a pistol equipped with a "stabilizing brace" that it is designed, made, and intended to be fired from the shoulder is a "rifle," regardless of whether it includes design features—*e.g.*, an arm slot or Velcro straps—that also might permit effective single-handed firing. 88 Fed. Reg. at 6,501.[8]

Accordingly, and as the Rule repeatedly explains, the focal inquiry under the statutory definition of "rifle" is whether a weapon is designed, made, and intended to be fired from the shoulder. 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). Plaintiffs contend that the Rule "goes beyond" this definition, however, by determining whether a "brace"-equipped weapon is a "rifle" based not on its design and intended use but on various criteria that do not appear in the statutory text. Mot. at 9–10. But Plaintiffs evidently misapprehend the *reason* ATF considers the criteria outlined in the Rule. As the Rule explains, to properly apply the statutory definition of "rifle," ATF evaluates a particular weapon's objective design features, in addition to a manufacturer's description of the weapon in marketing materials and information indicating its likely use, for purposes of determining whether the weapon is designed and intended to be fired from the shoulder. 88 Fed. Reg. at 6,501. These criteria

---

[8] Indeed, the opposite conclusion would inject into the definition of "rifle" an "exclusive use" limitation that is nowhere found in the statutory text. *Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1495 (2020) ("Nor does this Court usually read into statutes words that aren't there.").

are thus merely indicative of whether a particular weapon meets the statutory requirements of a "rifle."

And that ATF considers a weapon's objective design features to determine its design and intended use is especially sensible, particularly in this context, where the record shows that manufacturers' descriptions or labeling of "brace"-equipped weapons are often at odds with the weapons' design features and common use. *Id.* at 6,479, 6,503 & n.87, 6,505, 6,527–29, 6,546–47. While a manufacturer's description of a weapon may be relevant in determining whether it is designed, made, and intended to be fired from the shoulder, relying solely on that description would (i) frustrate Congress's purpose in enacting the NFA and the GCA, (ii) lead to absurd results, and (iii) permit manufacturers to circumvent the law by nominally describing the intended use one way (as not a short-barreled rifle) and then designing and marketing the weapon as one. *Id.* at 6,544; *see also United States v. Hayes*, 555 U.S. 415, 426–27 (2009) (rejecting an interpretation that "would frustrate Congress' manifest purpose" and mean the statute was a dead letter in many applications). Indeed, if a weapon's classification turned entirely on the manufacturer's description, any manufacturer of a short-barreled rifle could easily skirt the NFA entirely by, *e.g.*, labeling the rifle as a non-shoulder-fired weapon, or by etching into the stock "this firearm is not to be shoulder fired." But surely, Congress did not intend the NFA to be so toothless, as the Rule explains. 88 Fed. Reg. at 6,544.

Courts have agreed in similar contexts. For example, in *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598 (1st Cir. 2016), the First Circuit held that ATF properly considered the objective design features of a particular product to determine whether it "was 'intended only for use'" in making a silencer—*i.e.*, an NFA "firearm." 826 F.3d at 601–02; *see also, e.g.*, *United States v. Syverson*, 90 F.3d 227, 232–33 (7th Cir. 1996) (looking to objective design features to make a similar determination under the NFA). The court found no reason to conclude that an objective approach to discerning intent (as opposed to relying solely on a manufacturer's stated intent) was prohibited under the NFA. *Sig Sauer*, 826 F.3d at 602. Indeed, foreshadowing ATF's analysis in the Rule, the court found it "hard to believe that Congress

intended to invite manufacturers to evade the NFA's carefully constructed regulatory regime simply by asserting an intended use for a part that objective evidence in the record—such as a part's design features—indicates is not actually an intended one." *Id.* For that reason, the court noted that an objective approach to discerning intent—like ATF's approach—"is a very familiar one in the law," *id.* at 601, as recognized in analogous contexts, *e.g.*, *Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 517–22 (1994) (adopting an objective construction of the phrase "primarily intended . . . for use").[9]

And, aside from a weapon's objective design features, ATF also considers other evidence of the weapon's intended use. These include, *inter alia*, the "manufacturer's own marketing materials," "indirect marketing or promotional materials" from accessory makers and sellers, and other information indicating the general community's likely use of a particular weapon, if it evinces the manufacturer's intent with regard to that weapon. 88 Fed. Reg. at 6,544. Courts have long relied on this type of evidence as well to discern intent in numerous contexts. *See, e.g.*, *Posters 'N' Things*, 511 U.S. at 521 n.11 (noting that "the likely use of customers generally" can be relevant to determining whether an item is "primarily intended" for a specific "use").[10]

Therefore, Plaintiffs' argument that ATF considers criteria unrelated to the design and intended use of a weapon, Mot. at 9–10, misconstrues the reason ATF evaluates this evidence: that is, to determine whether a weapon is designed, made, and intended to be fired from the shoulder, as required by the statutory definition of a "rifle," *see* 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7).[11]

---

[9] *See also, e.g.*, *Nat'l Nutritional Foods Ass'n v. Mathews*, 557 F.2d 325, 334 (2d Cir. 1977); *Kelly Servs., Inc. v. Creative Harbor, LLC*, 846 F.3d 857, 864 (6th Cir. 2017).

[10] Contrary to what Plaintiffs argue, ATF does not classify a "brace"-equipped weapon based on "someone else's label." *See* Mot. at 10. Rather, as explained above, a "manufacturer's own marketing materials" and "indirect marketing or promotional materials" from accessory makers and sellers are among several non-dispositive criteria that ATF considers holistically in determining whether a weapon is designed and intended to be fired from the shoulder, and is thus a "rifle" within the meaning of the NFA and the GCA.

[11] Plaintiffs' argument that the statutory definition of "rifle" does "not care how a weapon is physically 'equipped'—a term that must be different than 'made,'" Mot. at 9, is so vague and conclusory that it prevents a substantive response.

**4.** Finally, Plaintiffs' invocation of the rule of lenity is misplaced. *See* Mot. at 10. That rule of statutory construction applies only where, "after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in [a criminal] statute such that the Court must simply guess as to what Congress intended," in which case the ambiguity should be resolved in the criminal defendant's favor. *Maracich v. Spears*, 570 U.S. 48, 76 (2013) (citation omitted); *see also Chapman v. United States*, 500 U.S. 453, 463 (1991) ("The rule [of lenity] comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers." (citation omitted)). But the statutory provisions at issue here contain no grievous ambiguity for the rule of lenity to resolve, and Plaintiffs make no serious argument to the contrary. *See Muscarello v. United States*, 524 U.S. 125, 138 (1998) ("The simple existence of some statutory ambiguity . . . is not sufficient to warrant application of [the rule of lenity], for most statutes are ambiguous to some degree."); *accord Wooden v. United States*, 142 S. Ct. 1063, 1075 (2022) (Kavanaugh, J., concurring). As already explained, *supra* pp. 16–19, traditional tools of statutory construction firmly support the Rule's application of the statutory definition of "rifle" to weapons equipped with "stabilizing braces" where such weapons are designed, made, and intended to be fired from the shoulder.

### B. The Rule does not infringe Second Amendment rights.

Plaintiffs likewise fail to demonstrate any likelihood of success on the merits of their Second Amendment challenges to the Rule. *See* Mot. at 12–14. *First*, "stabilizing braces" are not "bearable arms," and thus Plaintiffs lack a Second Amendment right to use them. *Second*, the NFA's basic registration requirements do not implicate the right to bear arms. *Third*, short-barreled rifles are dangerous and unusual weapons that do not enjoy Second Amendment protections. *Fourth*, and finally, even if the Rule and the NFA implicated the right to bear arms, they are supported by a robust history and tradition of firearm regulations.

1.   Firearm braces are not bearable arms protected by the Second Amendment.

Under *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Second Amendment extends only to "instruments that constitute bearable arms." *Id.* at 582; *Hollis v. Lynch*, 827 F.3d 436, 447 (5th Cir. 2016). Indeed, "[a]n instrument need not have existed at the time of the founding to fall within the amendment's ambit, but it must fit the founding-era definition of an 'Arm.'" *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (cleaned up); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2132 (2022). Consistent with this requirement, *Heller* explained that the historical understanding of the term "arm" covers "[w]eapons of offence or armour of defence," or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." 554 U.S. at 581.

Because the Second Amendment protects only the right to use "bearable arms," laws that regulate the use of firearm "accessories" or "attachments" do not generally impinge on that right. For instance, the NFA requires registration and payment of a $200 tax—the same requirements for a short-barreled rifle—when making a firearm equipped with a "silencer."[12] Courts have uniformly held that because a "silencer is a firearm accessory . . . it can't be a 'bearable arm' protected by the Second Amendment." *Cox*, 906 F.3d at 1186; *accord United States v. Al-Azhari*, 2020 WL 7334512, at *3 (M.D. Fla. Dec. 14, 2020). Indeed, "a silencer cannot, on its own, cause any harm, and it is not useful independent of its attachment to a firearm," and "a firearm remains an effective weapon without a silencer" attached. *United States v. Hasson*, 2019 WL 4573424, at *4–5 (D. Md. Sept. 20, 2019) (collecting cases). "Stabilizing braces" fall outside the scope of the Second Amendment for the same reasons. In fact, Plaintiffs concede that a "stabilizing brace" is not a bearable arm but rather a "firearm

---

[12] "Silencer" is defined as, *inter alia*, "any device for silencing, muffling, or diminishing the report of a portable firearm." 18 U.S.C. § 921(a)(25).

accessory." Mot. at 5. The parties thus appear to agree that these devices are not weapons or arms and serve no useful purpose except as attachments to firearms.

While Plaintiffs may wish to use a "brace" to "improve the usage of a firearm," the firearms at issue remain effective without any "brace" attached. *See Hasson*, 2019 WL 4573424, at *5; *see also* Mot. at 5 (averring that braces are used to improve "safe[ty] and accura[cy]" of firearms). Attaching a firearm accessory like a brace to a weapon is thus "not protected by the Second Amendment." *See United States v. Royce*, 2023 WL 2163677, at *4 (D.N.D. Feb. 22, 2023). Plaintiffs' Second Amendment claim fails for this reason alone.

2. Registration of short-barreled rifles does not implicate the Second Amendment.

The Rule does not ban any firearms; rather the NFA (and thus the Rule) permits possession of short-barreled rifles upon registration with, and approval by, ATF. Although Plaintiffs raise a Second Amendment claim, Mot. at 11, they fail to explain what requirement of the NFA or the Rule is unconstitutional. In fact, Plaintiffs concede that they may lawfully possess their firearms if they "submit an application to ATF" and receive ATF's approval.[13] Compl. ¶ 33. And while the individual Plaintiffs aver that "NFA requirements" are "too costly," *id.* ¶ 19, it is not clear what costs Plaintiffs are referencing. Because the individual Plaintiffs were in possession of their firearms before the Rule's effective date, they are exempt from any tax, assuming that they timely register with ATF. *See* 88 Fed. Reg. at 6481. Plaintiffs are thus left to argue that the "legal and regulatory burdens" associated with the registration process impinges their Second Amendment rights. Mot. at 12.

---

[13] Plaintiffs do not allege that any future application would be denied, and indeed such a speculative allegation would not establish constitutional injury. The Fifth Circuit has repeatedly held that concern regarding future denial of a firearm certification or registration is insufficient to demonstrate Article III standing. *See Westfall v. Miller*, 77 F.3d 868, 872 (5th Cir. 1996); *Bezet v. United States*, 714 F. App'x 336, 340 (5th Cir. 2017).

But routine firearm registration procedures, like those required here, do not offend the right to bear arms. As the Fifth Circuit has explained, requirements that are part and parcel of the NFA (*e.g.*, being "photographed and fingerprinted") implicate no legally protected interest, but are "merely 'additional costs and logistical hurdles' that all citizens" must bear "under a government." *Bezet*, 714 F. App'x at 340; *accord Lane v. Holder*, 703 F.3d 668, 672–73 (4th Cir. 2012) (finding no injury from "additional costs and logistical hurdles" in purchasing handguns, and distinguishing laws imposing "minor inconveniences" from those effecting "an absolute deprivation" of the right to bear arms).

Indeed, Justice Kavanaugh reiterated in *Bruen* that 43 states employ concealed-carry licensing regimes that may demand "objective licensing requirements," like "fingerprinting, a background check, a mental health records check," none of which violates the Second Amendment. 142 S. Ct. at 2162 (Kavanaugh, J., concurring). And the Court took pains to note this point, as well. *Id.* at 2138 n. 9 (explaining that "nothing in our analysis should be interpreted to suggest the unconstitutionality" of these licensing regimes). Likewise, the NFA's registration procedures (*e.g.*, fingerprinting and background checks) pose no constitutional problem under *Bruen*. *See, e.g.*, *United States v. Saleem*, 2023 WL 2334417, at *11 n. 9 (W.D.N.C. Mar. 2, 2023) (noting that "the NFA's registration and taxation requirements are of the type that the Supreme Court in *Bruen* determined were permissible"); *Or. Firearms Fed'n, Inc. v. Brown*, --- F. Supp. 3d ---, 2022 WL 17454829, at *15 (D. Or. Dec. 6, 2022) (upholding under *Bruen* a state's firearms permit requirement that includes a "background check, fingerprinting, a mental health check," etc.).

Nor can Plaintiffs show the extraordinary circumstances left open by the Court in *Bruen*, in which otherwise constitutional licensing may still infringe on the Second Amendment because of "lengthy wait times" or "exorbitant fees" that effectively "deny ordinary citizens their right to public carry." 142 S. Ct. at 2138 n.9. The length of time required for registration here is irrelevant to Plaintiffs' Second Amendment claim, because if Plaintiffs submit their applications on or before May 31, 2023,

23

they may retain possession of their firearms until they receive ATF's response on the application. 88 Fed. Reg. at 6,559. Moreover, the Rule imposes no tax on Plaintiffs if their applications are timely filed. Plaintiffs thus fail to demonstrate why registration offends the Second Amendment.

3. Short-barreled rifles are dangerous and unusual weapons that are not protected by the Second Amendment.

The Rule does not implicate the Second Amendment for another reason: there is no right to bear dangerous and unusual arms like short-barreled rifles. *Heller*, 554 U.S. at 625 (explaining that the Second Amendment, as historically understood, does not protect "weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns").

The Fifth Circuit in *Hollis* outlined the proper analysis for determining when a weapon (a machinegun, in that case) is "dangerous and unusual" and thus unprotected by the Second Amendment. 827 F.3d at 451. The sole authority cited by Plaintiffs on this point, *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023), does not concern this analysis at all, let alone whether specific NFA-regulated firearms fall outside the Second Amendment.

In evaluating dangerousness, the court looked to Circuit precedent holding that the unlawful possession of a machinegun constitutes a crime of violence for purposes of a sentence enhancement. *Hollis*, 827 F.3d at 449. That same precedent explains that the same conclusion applies to all NFA firearms, including short-barreled rifles. *United States v. Golding*, 332 F.3d 838, 843 (5th Cir. 2003). The court also relied on decisions from other courts holding that machineguns are dangerous weapons outside the Second Amendment's ambit. *Hollis*, 827 F.3d at 448. As with machineguns, courts have uniformly agreed that the inherent dangerousness of short-barreled rifles places them beyond constitutional protections. *E.g.*, *Cox*, 906 F.3d at 1185; *see also* 88 Fed. Reg. at 6,499 (noting that short-barreled rifles "are dangerous and unusual due to both their concealability and their heightened ability

24

to cause damage—a function of the projectile design, caliber, and propellant powder used in the ammunition and the ability to shoulder the firearm for better accuracy").[14]

*Hollis* also analyzed what it means for a firearm to be "unusual." On this score, the court looked to Justice Alito's concurrence in *Caetano v. Massachusetts*, 577 U.S. 411 (2016), which suggested that the evaluation involves, at the very least, looking to the "absolute number" of weapons at issue "*plus*" the number of states where the firearm "may be lawfully possessed." *Hollis*, 827 F.3d at 449–50. Here, even generously assuming that there are now approximately 3.6 million short-barreled rifles in the United States (641,000 previously registered short-barreled rifles and 3 million with "stabilizing braces"), that falls far short of the numbers in *Hollis*. 827 F.3d at 449–50 (comparing numbers of machine guns to "50 million large-capacity magazines" in use, or the "more than 8 million AR- and AK-platform semi-automatic rifles"). Moreover, *Hollis* also recognized that "[p]ercentage analysis may also be relevant," in evaluating the relevant proportion of firearms. *Id.* at 450. Conservatively estimating that there are 400 million civilian-owned firearms in the United States,[15] the number of short-barreled rifles is less than one percent of this amount (0.9%). Where, as here, the relative number and percentage of firearms at issue is "quite low," *Hollis*, 827 F.3d at 450, there is little question that the weapon at issue is unusual.

Additionally, *Hollis* rejected the argument that the "number [of firearms] by itself was sufficient" to determine "usualness." *Id.* The court also looked to the number of states where machineguns could be "lawfully possessed," including states that banned them entirely and states that

---

[14] *E.g.*, *United States v. Gilbert*, 286 F. App'x 383, 386 (9th Cir. 2008); *United States v. Gonzalez*, 2011 WL 5288727, at *5 (D. Utah Nov. 2, 2011); *United States v. Majid*, 2010 WL 5129297, at *1 (N.D. Ohio Dec. 10, 2010).

[15] Washington Post, *There are More Guns than People in the United States, According to a New Study of Global Firearm Ownership*, https://perma.cc/LNE7-8TZQ. The number is likely far higher than 400 million, as consumers have purchased nearly 20 million firearms *per year* in recent years. Forbes, *U.S. Bought Almost 20 Million Guns Last Year—Second-Highest Year On Record*, https://perma.cc/TVS8-NNVW.

banned them unless possessed legally "under federal law." *Id.* With 34 states prohibiting machinegun possession, the court found this to be further support that machineguns are unusual. *Id.* There are a similar number of state laws concerning possession of short-barreled rifles: at least four states ban them entirely, and 24 states ban them unless NFA registered.[16] Like in *Hollis*, these laws further show that short-barreled rifles are dangerous. Consequently, such firearms "do not receive Second Amendment protection," *Hollis*, 827 F.3d at 451, and no additional "historical inquiry," Mot. at 13, is required to reject Plaintiffs' claim.

4.    Historical tradition of regulation supports the Rule and the NFA.

While the Rule does not implicate the Second Amendment, even if it did, the Rule and the NFA are constitutional because they rest upon centuries of similar taxation and registration requirements. Plaintiffs fault ATF for not providing a historical analysis in the Rule, and contend that the absence of such an inquiry at the administrative level constitutes an independent error of the "rulemaking process." Mot. at 11. But APA review mandates only that an agency "reasonably consider[] the relevant issues and reasonably explain[] the decision." *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 449 (5th Cir. 2021) (citation omitted). The Rule provided a detailed response to commenters who raised Second Amendment concerns, explaining the agency's position that "weapons regulated by the NFA, such as short-barreled rifles, fall outside the scope of the Second Amendment" because they are "dangerous and unusual." 88 Fed. Reg. at 6548. This discussion of the Second Amendment

---

[16] *See* Cal. Penal Code § 16590; D.C. Code Ann. § 7-2502.02; Haw. Rev. Stat. Ann. § 134-8.; Ala. Code § 13A-11-63(a); Alaska Stat. Ann § 11.61.200(c); Ariz. Rev. Stat. Ann. § 13-3101(B); Colo. Rev. Stat. Ann. § 18-12-102(1), (3), (5); Fla. Stat. Ann. § 790.221(1)-(3); Ga. Code Ann § 16-11-122, 16-11-121(4); Iowa Code Ann § 724.1C; La. Stat. Ann. § 40:1785; Md. Code Ann., Pub. Safety § 5-203; Mich. Comp. Laws Ann. § 750.224b; Mo. Ann. Stat. § 571.020; Mont. Code Ann. § 45-8-340; Neb. Rev. Stat. Ann. § 28-1203; Nev. Rev. Stat. Ann. § 202.275; N.C. Gen. Stat. Ann. § 14-288.8; N.D. Cent. Code Ann. § 62.1-02-03; Ohio Rev. Code Ann. § 2923.17; Okla. Stat. Ann. tit. 21, § 1289.18(B)-(E); Or. Rev. Stat. Ann. § 166.272(1)-(4); S.C. Code Ann. § 16-23-250; Tex. Penal Code Ann. § 46.05(a)(1)(C); Va. Code Ann. § 18.2-303.1; Wash. Rev. Code Ann. § 9.41.190(4); Wis. Stat. Ann. § 941.28(2)-(4).

plainly satisfies ATF's obligations under the APA. *See Del. Dep't of Nat. Res. & Env't Control v. EPA*, 785 F.3d 1, 15 (D.C. Cir. 2015) (holding that an agency's response to public comments should indicate "what major issues of policy were ventilated" and "why the agency reacted to them as it did").[17]

In any event, even if the Court disagrees as to whether short-barreled rifles are dangerous and unusual weapons, the Rule remains constitutional under any fair reading of the historical record. Where a regulation affects the Second Amendment, the Government may justify the regulation "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. The Government may do so by pointing to "a well-established and representative historical *analogue*." *Id.* at 2133. To be analogous, historical and modern firearms regulations must be "relevantly similar"—*i.e.*, they impose a "comparable burden" on the right of armed self-defense that is "comparatively justified." *Id.* at 2132–33. But there need not be "a historical *twin*." *Id.* This analysis can be "nuanced," particularly in cases implicating "dramatic technological changes," where it is important to remember that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied" those living in 1791 or 1868. *Id.* at 2132.

From colonial times, state and local governments have routinely exercised their authority to regulate the possession and manufacture of firearms, through taxation, registration, licensing, and similar requirements. Indeed, colonial and early state governments regularly sought to gather information regarding firearm ownership in their jurisdiction. As early as 1631, Virginia required a regular survey of people in the colony and "also of arms and munition," and door-to-door surveys of

---

[17] Moreover, Plaintiffs point to no case holding that an agency must conduct a historical analysis in promulgating a rule or regulation concerning firearms. *Cf. United States v. Perez-Gallan*, 2022 WL 16858516, at *13 (W.D. Tex. Nov. 10, 2022) (noting that the Government might, in Court, "develop[] an in-depth historical analysis to uphold a regulation"). Nor was ATF required to evaluate the history of firearm regulations, given that the agency correctly concluded that "short-barreled rifles are dangerous and unusual weapons that fall outside the scope of the Second Amendment." 88 Fed. Reg. at 6548; *see Saleem*, 2023 WL 2334417, at *11 (explaining that where "the Second Amendment's plain text does not protect [certain] conduct" a court "need not reach the historical inquiry").

firearms were authorized in Rhode Island in 1667, South Carolina in 1747, and New Jersey in 1781.[18]

Similarly, militia members in Massachusetts (1775) were required to have their firearms inspected, with

an official record documenting all such inspections, and New York (1778) imposed similar

requirements.[19] In 1805, Massachusetts required that all musket and pistol barrels manufactured in the

state and offered for sale be "proved" (inspected and marked by designated individuals) upon payment

of a fee, to insure their safe condition, and Maine enacted similar requirements in 1821.[20] Licenses or

inspection were also required in certain states to export or sell gunpowder (akin to modern

ammunition), such as in Massachusetts (1651, 1809), Connecticut (1775), and New Hampshire

(1820).[21] South Carolina authorized the issuance of licenses for the sale of pistols (1890).[22] And

personal firearm licenses for sporting purposes were required in Hawaii (1870) and Wyoming (1899).[23]

---

[18] Act of Mar. 2, 1631, act LVI, 1631 Va. Acts 175; *Records of the Colony of Rhode Island and Providence Plantations, In New England*, 2:196 (John Russell Bartlett, ed., Providence: A. Crawford Greene and Brother vol. 2, 1857); "An Act for the better regulating of the Militia of this Province," 1747, McCord, *Statutes at Large*, 9:647; Act of Jan. 8, 1781, ch. XII, § 13, 1781 N.J. Laws 39, 43. *See also* Robert H. Churchill, "Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment," 25 Law & Hist. Rev. 139, 161-62 (2007) (discussing the colonial militia practice of surveying firearms owned by members of the community).

[19] 1775-1776 Mass. Acts 18; Act of Apr. 3, 1778, ch. 33, 1778 N.Y. Laws 65.

[20] Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807, 259-61 (1807); Laws of the State of Maine 546 (1830).

[21] Colonial Laws of Massachusetts Reprinted from the Edition of 1672, at 126 (1890); 2 General Laws of Massachusetts from the Adoption of the Constitution to February 1822, 199 (1823); 15 The Public Records of the Colony of Connecticut 191 (1890); Laws of the State of New Hampshire; with the Constitutions of the United States and of the State Prefixed 277 (1830).

[22] An Act to Provide a License for the Sale of Pistols or Pistol Cartridges within the Limits of this State, § 1, 1890 S.C. Acts 653. Arkansas (1881) prohibited the sale or exchange of most pistols. Act of Apr. 1, 1881, ch. XCVI, § 1, 1881 Ark. Acts 191, 191 (codified at Ark. Code. Ann. ch. 48 § 1498 (1894)). Other states also enacted prohibitions or other restrictions on the carrying of pistols. *See* Act of Apr. 12, 1871, ch. XXXIV, § 1, 1871 Tex. Gen. Laws 25, 25 (codified at 1879 Tex. Crim. Stat. 24); Act of Mar. 13, 1872, ch. 100, § 62, 1872 Kan. Sess. Laws 210, 210 (codified at Kan. Gen. Stat. § 1003 (1901)); Act of Dec. 2, 1875, § 1, 1876 Wyo. Sess. Laws 352, 352; Act of Mar. 26, 1879, ch. CLXXXVI, § 1, 1879 Tenn. Pub. Acts 231, 231.

[23] An Act to License the Carrying of Fowling Pieces and other Fire-Arms, 1870 Haw. Sess. Laws 26, §§ 1-2; Act of Feb. 15, 1899, ch. 19, § 14, 1899 Wyo. Sess. Laws 27, 32–33.

Further, while individual plaintiffs are exempt from the NFA's tax, it is supported by multiple historical statutes. In 1759, for instance, New Hampshire required that certain ships pay a tax of money or gunpowder.[24] Taxes on firearms specifically were also common through the 19th century. Indeed, taxes were specifically levied on pistols, and in certain cases other firearms, in Alabama (1867), Mississippi (1844, 1867), North Carolina (1857), and Georgia (1866).[25]

Taken together, these laws reflect an unbroken historical tradition of American firearm regulation "relevantly similar" to that required by the NFA. *See Bruen*, 142 S. Ct. at 2133. Like colonial and state laws in the 17th, 18th, and 19th centuries, the NFA and its corresponding regulations seek to raise revenue through taxation, regulate but do not prohibit firearm ownership, and gather information on firearms and their owners in a given jurisdiction. Thus, any modest burden imposed by the NFA's regulations is certainly "comparable" and "comparably justified" to the numerous historical laws listed above.

### C.    The Rule is not void-for-vagueness.

Plaintiffs next challenge the Rule as vague in violation of due process. Mot. at 14–16. Having argued that Congress defined the term "rifle" as far as it can be defined, Plaintiffs here argue that the Rule is invalid because ATF has not defined the term enough. As an initial matter, it is "well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in light of the facts of the case at hand." *United States v. Brooks*, 681 F.3d 678, 696 (5th Cir. 2012) (citations omitted); *accord United States v. Mazurie*, 419 U.S. 544, 550 (1975). Plaintiffs do not allege that the Rule involves the First Amendment, and therefore, Plaintiffs' argument fails, if for no

---

[24] An Act About Powder Money, 1759-1776 N.H. Laws 63; Pennsylvania similarly imposed a taxation, testing, and grading regime for all gunpowder to be sold in Philadelphia. *See* The Statutes at Large of Pennsylvania, ch. 1857, §§ 1-12, 346-51 (James T. Mitchell & Henry Flanders comps. 1911).

[25] Joseph Abram Walker, The Revised Code of Alabama 169 § 10, (Reid & Screws, State Printers, 1867); Act of Feb. 24, 1844, ch. 1, § 1, 1844 Miss. Laws 57-59; Act of Feb. 21, 1867, ch. CCCXVII, §§ 1-8, 1867 Miss. Laws 412; Revenue, ch. 34, § 23(4), 1857 N.C. Sess. Laws 34; County Bonds, Taxes, Etc. tit. VI, 1866 Ga. Laws 27-28.

other reason, because they have brought a facial vagueness challenge to the Rule in the abstract, as opposed to an as-applied challenge to the facts of their case.

Regardless, the Rule is not unconstitutionally vague. "The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (citations omitted); *accord United States v. Howard*, 766 F.3d 414, 428 (5th Cir. 2014). "A statute is unconstitutionally vague if it does not give a person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 409 (5th Cir. 2020) (citations omitted).

The Rule provides regulated parties with ample opportunity to understand ATF's view of what the NFA requires and prohibits, and it is clearer and provides more notice than ATF's previous classification system. Prior to the Rule, ATF had not uniformly classified "brace"-equipped weapons or even adopted a framework for classifying such weapons; instead, ATF issued varied classification determinations for particular weapons, classifying some as short-barreled rifles and others as not. *Supra* pp. 5–7. By contrast, the Rule adopts a consistent, predictable framework for classification: ATF first considers whether a weapon provides surface area allowing it to be shoulder fired, and then weighs six additional factors to determine whether the weapon is designed, made, and intended to be fired from the shoulder. *Supra* p. 9. The Rule also specifies that persons currently possessing unregistered short-barreled rifles equipped with stabilizing braces have until May 31, 2023, to comply with the NFA by registering, modifying, relinquishing, or destroying the weapon. *Supra* p. 10.

Additionally, in connection with the Rule, ATF has issued interim guidance to provide further clarity. *See Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 n.5 (1982) (directing courts to "consider any limiting construction" an "agency has proffered" that may clarify a provision challenged as vague). ATF's guidance identifies firearm-brace combinations it will consider short-

30

barreled rifles. *See* Commercial Guidance, https://perma.cc/BK6C-BRGQ. ATF is also drafting and reviewing individual classification letters that it will send directly to manufacturers to notify them of how ATF has formally classified their weapons. Further, in the event of any confusion, an individual may "request a classification determination from ATF for additional clarity." 88 Fed. Reg. at 6,552; *see also Vill. of Hoffman Ests.*, 455 U.S. at 498 (relaxing vagueness test when party may clarify a regulation's meaning "by its own inquiry"). Simply put, ATF has gone beyond what the Constitution requires to ensure regulated parties understand how the Rule affects them, and voiding the Rule would only undermine the principles of fair notice underlying the vagueness doctrine.

Plaintiffs unsuccessfully try to challenge the Rule as vague by picking apart its various pieces. For instance, first, Plaintiffs contend that because the Rule does not specify a precise quantity of surface area that "allows [a] weapon to be fired from the shoulder," "no reasonable person can reliably infer[] what amount of surface area meets that threshold." Mot. at 15. Plaintiffs similarly critique the Rule for failing to provide "[s]pecific measurements" by which to compare "brace"-equipped weapons to "similarly designed rifles." *Id.*

Despite Plaintiffs' contentions, they cite no authority requiring an agency's analysis to be tied to numerical requirements to satisfy the requirements of due process, and it is entirely permissible for the agency to draw lines with less-than-mathematical precision. *See Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989) ("[P]erfect clarity and precise guidance have never been required."). Indeed, agencies regularly apply and courts routinely uphold multi-factor unweighted tests like the one the Rule adopts here. *See Texas v. EPA*, 983 F.3d 826, 839–40 (5th Cir. 2020) (upholding an agency's use of "a multi-factor balancing test" that included no "numeric thresholds"); *see also ATK Launch Sys., Inc. v. EPA*, 669 F.3d 330, 337 (D.C. Cir. 2012) (upholding nine-factor test that did not quantify uniform

amounts or thresholds for factors when test was designed to provide a "holistic assessment").[26] ATF's decision not to specify a surface-area threshold, for instance, is in line with this approach, and if anything, better serves the aim of the Rule: preventing circumvention of the NFA. Agencies are not required to achieve "meticulous specificity" at the cost of "flexibility and reasonable breadth," and thus, that the Rule does not specify particular measurements with respect to certain factors does not render it impermissibly vague. *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972).[27]

Plaintiffs also criticize the Rule for not providing more definite parameters for other factors, including the types of "marketing and promotional materials" ATF considers and for what purpose, as well as what ATF considers the "general community" and a weapon's "likely use." *See* Mot. at 15–16. These critiques strain at gnats. Plaintiffs quibble with terms that are more than clear, to the point of being obvious. "Condemned to the use of words, we can never expect mathematical certainty from our language." *Grayned*, 408 U.S. at 110. Indeed, Plaintiffs identify no reason why ATF's inquiry is vague unless limited to specific marketing and promotional materials, nor do they explain what limitation due process would require, or how such limitation would serve the statutory inquiry. What's more, courts regularly consider "likely use" in discerning manufacturer intent, *e.g., Posters 'N' Things*, 511 U.S. at 521 n.11 (noting that "likely use of customers generally" relevant to determining whether an item is "primarily intended" for a specific "use"), without implicating vagueness concerns, and Plaintiffs fail to explain why this case is somehow different. And finally, although ATF was not obliged

---

[26] *Tripoli Rocketry v. ATF*, 437 F.3d 75 (D.C. Cir. 2006), cited by Plaintiffs, *see* Mot. at 15, is not to the contrary. That case "involve[d] an agency's failure to explain how a broad standard applied to a particular case," and not a "facial" vagueness attack on a rule. *Huawei Techs*, 2 F.4th at 458.

[27] Plaintiffs' citation to *United States v, Lim*, 444 F.3d 910, 916 (7th Cir. 2006) provides no support for their argument. There, in analyzing *United States v. Powell*, 423 U.S. 87, 93 (1975), the court explained that although "Congress might have drafted the statute in more specific terms, as by delimiting the size of the firearms," "the fact that Congress could have employed clearer and more precise language equally capable of achieving the end which it sought does not mean that the statute which it in fact drafted was unconstitutionally vague," *Lim*, 444 F.3d at 916 (cleaned up and citations omitted)—reasoning that supports upholding the Rule here. Further, the court ultimately held that the statute Lim challenged was not unconstitutionally vague as applied to him. *Id.*

to further clarify the term "general community," the Rule provides additional clarity by offering various examples. *E.g.*, 88 Fed. Reg. 6,544 (explaining general community refers to "use by members of the firearms industry, firearms writers, and in the general community," as well as "the proposed use by the manufacturer"); *id.* at 6,545 (considering "magazines that similarly exhibited the use of" a particular stabilizing brace as a shoulder stock). Thus, these factors also are not impermissibly vague.

In sum, the Rule is not unconstitutionally vague: the factors it considers are clear and track the statutory inquiry—whether a weapon is designed, made, and intended to be fired from the shoulder.

### D. The Rule's immediate effective date is lawful.

Contrary to Plaintiffs' assertions, the Rule's immediate effective date does not run afoul of the APA because it is an "interpretive rule" exempt from the APA's 30-day delay requirement. The APA exempts "interpretive rules" from the general requirement that rules may not go into effect sooner than 30 days after publication. 5 U.S.C. § 553 (d)(1). Interpretive rules are "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers," *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015), and "explain what an agency thinks a statute or regulation actually says," *Flight Training Int'l, Inc. v. FAA*, 58 F.4th 234, 242 (5th Cir. 2023). ATF's Rule is interpretive: it merely advises the public of ATF's interpretation of the NFA and the GCA. It repeatedly states that it "does not impose any new legal obligations" and, instead, "merely conveys more clearly to the public the objective design features and other factors that indicate a weapon is in fact a firearm or short-barreled rifle under the relevant statutes." 88 Fed. Reg. at 6,478; *id.* at 6,569 ("The final regulatory text for the definition of 'rifle' reflects the best interpretation of the relevant statutory provisions."). Thus, the Rule's immediate effective date does not violate the APA.

### II. Plaintiffs fail to demonstrate irreparable harm absent preliminary relief.

Plaintiffs have also failed to show that they are likely to suffer irreparable harm, an "'indispensable' requirement for a preliminary injunction." *See Memphis A. Philip Randolph Inst. v.*

*Hargett*, 978 F.3d 378, 391 (6th Cir. 2020) (citation omitted). "To constitute irreparable harm, an injury must be certain, great, actual and not theoretical," *Duarte v. City of Lewisville*, 136 F. Supp. 3d 752, 791 (E.D. Tex. 2015) (citation omitted), and must be "so imminent that there is a clear and present need for equitable relief to prevent" it, *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (citation omitted); *accord Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975). A plaintiff cannot make this showing with "unsubstantiated and conclusory assertions," *John Doe Co. v. CFPB*, 849 F.3d 1129, 1134 (D.C. Cir. 2017), but must substantiate any claim of irreparable injury with "independent proof, or no injunction may issue," *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989). In addition, a plaintiff "must show that the alleged harm will directly result from the action which [he] seeks to enjoin.*" Wis. Gas. Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

<u>*Individual Plaintiffs*</u>. Green and Walley claim that "[c]omplying via the NFA registration process would inflict substantial financial injuries that would never be recovered." Green Decl. ¶ 7; Walley Decl. ¶ 5, ECF No. 52-4. But neither Green nor Walley specify any financial injuries they would suffer. Indeed, registering their weapons during the Rule's compliance period is free, and any other unspecified costs associated with registration are de minimis. 88 Fed. Reg. at 6,571. In light of the Rule's tax forbearance provisions, Green and Walley's conclusory allegations of financial injury are insufficient to support the issuance of an injunction. *See, e.g.*, *Lakedreams v. Taylor*, 932 F.2d 1103, 1107 (5th Cir. 1991) (conclusory allegations do not establish irreparable harm); *Coleman v. Bank of New York Mellon*, 2013 WL 1187158, at *8 (N.D. Tex. Mar. 4, 2013) (Lynn, J.) ("[U]nsupported, conclusory statements are insufficient to demonstrate entitlement to the extraordinary relief of a . . . . preliminary injunction."); *Consol. Rest. Operations, Inc. v. Nat'l Processing Co., LLC*, 2002 WL 1432469, at *5 (N.D. Tex. June 28, 2002) (allegations of irreparable harm were conclusory).

Moreover, the conclusory nature of Plaintiffs' alleged injury should the Rule remain in effect is further confirmed by the fact that the consequences for possessing a short-barreled rifle are imposed

by the NFA—not the Rule itself. *Supra* p. 12. Thus, enjoining the Rule would not obviate the need to register a weapon that is an NFA "firearm."

Beyond these conclusory financial injuries, the Green and Walley attempt to tie their alleged irreparable harm to their constitutional claims. But Plaintiffs have shown no likelihood of success on those claims, *supra* pp. 20–29, and their conclusory allegations cannot give rise to a cognizable injury. Indeed, courts have routinely declined to find irreparable harm based solely on a plaintiff's allegation that his constitutional rights have been violated, absent a showing of a likelihood of success on the merits. *E.g.*, *Castro v. City of Grand Prairie*, 2021 WL 1530303, at *2 (N.D. Tex. Apr. 19, 2021) (Lindsay, J.) (holding that a plaintiff's allegations that he had "suffered irreparable harm, including the loss of his constitutional rights," was "conclusory and insufficient to satisfy his burden as the movant" to show irreparable harm); *Sheffield v. Bush*, 604 F. Supp. 3d 586, 609 (S.D. Tex. 2022).

*Second Amendment Foundation.* Although the Second Amendment Foundation ("SAF") avers that it brings this action on behalf of itself as well as its members, Gottlieb Decl. ¶ 4, ECF No. 52-2, in substance, SAF's alleged irreparable harm is derivative of that of its members, and fails for the same reasons. *See id.* ¶ 6 (alleging the same conclusory financial harms as Green and Walley). Further, SAF offers no evidence to show that each of its members is suffering an Article III injury, much less that each member will face irreparable harm absent injunctive relief, as would be separately required to extend an injunction to SAF's entire membership. *See Tenth Street Residential Ass'n v. City of Dallas*, 968 F.3d 492, 500 (5th Cir. 2020) ("Associational standing requires that the individual members of the group each have standing[.]"). Moreover, any claim challenging the Rule requires a fact-intensive inquiry of a particular weapon configuration, *supra* p. 12, requiring the participation of individual members and thwarting associational standing. *Assoc. of Am. Physicians & Surgeons, Inc. v. Tex. Med. Board*, 627 F.3d 547, 552 (5th Cir. 2010). Because SAF fails to establish any concrete, non-speculative irreparable harm on its own or a right to seek injunctive relief on behalf of its members, no injunction

35

should issue in SAF's favor or that of its broader membership.

_Rainier Arms._ Rainier Arms alleges that the Rule has "deprived [it] of 'substantial' profits by making otherwise willing customers either legally ineligible or practical incapable of using Rainier's arm brace products." Mot. at 19. But the Rule does no such thing. "Individuals can and will continue to be able to use such firearms for personal defense" with the Rule in place. 88 Fed. Reg. at 6,566. To do so legally, customers who possess or purchase weapons subject to the NFA must simply comply with its registration requirements. Beyond this, Rainier includes no specific evidence of lost profits or consumer goodwill[28] to support its other conclusory allegations, precluding a finding of irreparable harm. _See Am. Telnet v. GTE Corp._, 1999 WL 242686, at *2 (N.D. Tex. Apr. 16, 1999) (Fitzwater, J.) (citing _Holland Am. Ins. Co. v. Succession of Roy_, 777 F.2d 992, 997 (5th Cir. 1985)).

## III.   The equities and the public interest weigh against a preliminary injunction.

The third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest—"merge when the Government is the opposing party." _Nken v. Holder_, 556 U.S. 418, 435 (2009). These factors tilt decidedly against the issuance of a preliminary injunction here.

In particular, the Rule benefits public safety. Congress passed the NFA for the express purpose of regulating firearms, like short-barreled rifles, that it determined posed a greater risk to public safety because of their unusual and dangerous nature. 88 Fed. Reg. at 6,566. The Rule enhances public safety by clarifying and supporting the enforcement of NFA controls that Congress designed to address this risk. _Id._ Plaintiffs' request to enjoin the Rule would, conversely, decrease public safety by facilitating widespread circumvention of these controls. Any harm to Plaintiffs in complying with the NFA is, by

---

[28] It is further unclear how the NFA's generally applicable requirements and other registration imposed by the ATF would cause Rainier to suffer a loss of consumer goodwill. _See Spicer v. Maxus Healthcare Partners, LLC_, 616 S.W.3d 59, 111 (Tex. Ct. App. 2020) ("Business goodwill is an intangible asset based on reputation and the relationships that a company has developed with its customers and employees.").

comparison, minimal.

In addition, the Rule serves the public interest by providing regulated parties with greater clarity. ATF initiated the rulemaking process, in part, because the prior system of *ad hoc* classification determinations, at times, resulted in inconsistent classifications of "brace"-equipped pistols. The 98-page Rule, however, thoroughly explains ATF's uniform approach. Further, ATF has also published interim guidance identifying pistol-brace combinations likely to be considered short-barreled rifles under the Rule and will issue classification letters directly to manufacturers. *Supra* p. 31. And the Rule provides that "an individual may contact ATF to receive a [classification] determination." 88 Fed. Reg. at 6,481. Thus, the public interest is better served by the Rule than by its absence.

## IV.   In all events, the specific forms of relief that Plaintiffs seek are improper.

**1.** Although preliminary relief is unjustified here, at a minimum, any such relief should be no broader than necessary to redress Plaintiffs' alleged, cognizable injuries. Because this Court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it," "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1933–34 (2018). And consistent with traditional equity principles, "injunctive relief should be no more burdensome" to Defendants "than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted).

But Plaintiffs appear to ask this Court to enter a preliminary injunction "halting" ATF's "enforcement" of the Rule, with no apparent limitation. Mot. at 1; *accord* ECF No. 51; *but see* Mot. at 22 (requesting a preliminary injunction preventing enforcement "against the Plaintiffs"). No such relief is warranted or appropriate. Nationwide injunctions "take a toll on the federal court system— preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring); *see also DHS v. New York*, 140 S. Ct. 599,

599–601 (2020) (Gorsuch, J., concurring) (lamenting the "asymmetric" effects of nationwide injunctions on "the government's hope of implementing any new policy"). Further, the Rule is subject to litigation in at least seven other cases in six different federal districts,[29] underscoring why this Court should not attempt to decide its legality for all parties nationwide—particularly on a motion brought by only four Plaintiffs. *See Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021) (explaining that "[p]rinciples of judicial restraint" counsel against granting relief to non-parties—particularly where, as here, "[o]ther courts are considering these same issues" at the same time); *see also Arizona v. Biden*, 40 F.4th 375, 395–98 (6th Cir. 2022) (Sutton, C.J., concurring).

**2.** Plaintiffs' alternative request that the Court postpone the Rule's effective date, Mot. at 9, fails for a separate reason: While 5 U.S.C. § 705 authorizes courts in some circumstances to delay the effective date of an agency action, it cannot be used where, as here, the agency action has already taken effect.[30] *See Rural & Migrant Ministry v. EPA*, 565 F. Supp. 3d 578, 605 (S.D.N.Y. 2020) ("Section 705 . . . specifically permits a court, *in advance of the effective date* of a regulation, . . . to postpone the effective date of an agency action.'" (emphasis added)). Courts construing § 705 have routinely interpreted the phrase "postpone the effective date" of an agency action to authorize the postponement of "the effective date of a *not yet effective rule*[] pending judicial review," but not suspension of a rule that is already in effect. *E.g.*, *Safety-Kleen Corp. v. EPA*, 1996 U.S. App. LEXIS 2324, at *2–3 (D.C. Cir. Jan. 19, 1996) (emphasis added); *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173, 204 (D.D.C. 2022) (collecting cases). Although these cases address an agency's decision to "postpone the effective date," § 705 uses identical language when referring to "the reviewing

---

[29] *See Britto v. ATF*, No. 2:23-cv-19 (N.D. Tex.); *Colon v. ATF*, No. 8:23-cv-223 (M.D. Fla.); *Firearms Regulatory Accountability Coalition, Inc. v. Garland*, No. 1:23-cv-24 (D.N.D.); *Miller v. Garland*, No. 1:23-cv-195 (E.D. Va.); *Mock v. Garland*, No. 4:23-cv-95 (N.D. Tex.); *Texas v. ATF*, No. 6:23-cv-13 (S.D. Tex.); *Watterson v. ATF*, No. 4:23-cv-80 (E.D. Tex.).

[30] The same four-part test governing the issuance of a preliminary injunction governs relief under § 705. *Dist. of Columbia v. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020).

court . . . postpon[ing] the effective date of an agency action." Therefore, it must be presumed that the identical phrases in the first and second sentences of § 705 were intended to carry the same meaning. *Sorenson v. Sec'y of Treasury*, 475 U.S. 851, 860 (1986). And the plain language of § 705 reinforces this conclusion. "The word 'postpone' means 'to put off to a later time,' or to 'defer.'" *Ctr. for Biological Diversity*, 597 F. Supp. 3d at 205. "But, once a rule has taken effect," a court "can no longer 'put off' the effective date." *See id.* Here, the Rule went into effect on January 31, 2023, 88 Fed. Reg. at 6,478, and it is thus too late to postpone an effective date that has already passed. And as already explained, *supra* p. 33, and contrary to what Plaintiffs suggest, Mot. at 17, nothing prevented ATF from making the Rule immediately effective.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for preliminary relief.

Dated: March 24, 2023                    Respectfully submitted,

                                         BRIAN M. BOYNTON
                                         Principal Deputy Assistant Attorney General

                                         BRIGHAM J. BOWEN
                                         Assistant Branch Director

                                         */s/ Jody D. Lowenstein*
                                         JODY D. LOWENSTEIN (MT Bar No. 55816869)
                                         MICHAEL DREZNER (VA Bar No. 83836)
                                         FAITH E. LOWRY (TX Bar No. 24099560)
                                         TAYLOR PITZ (CA Bar No. 332080)
                                         Trial Attorneys
                                         U.S. Department of Justice
                                         Civil Division, Federal Programs Branch
                                         1100 L Street NW
                                         Washington, DC 20005
                                         Phone: (202) 598-9280
                                         Email: jody.d.lowenstein@usdoj.gov

                                         *Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

On March 24, 2023, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Northern District of Texas, using the Court's electronic case filing system. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Jody D. Lowenstein*
JODY D. LOWENSTEIN
Trial Attorney
U.S. Department of Justice