# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| **SECOND AMENDMENT FOUNDATION,** § | |
| **RAINIER ARMS, LLC, SAMUEL** § | |
| **WALLEY and WILLIAM GREEN,** § | |
| **Plaintiffs,** § | |
| § | |
| **vs.** § | **CIVIL ACTION NO.  3:21-CV-0116-B** |
| § | |
| **BUREAU OF ALCOHOL, TOBACCO,** § | |
| **FIREARMS AND EXPLOSIVES, STEVEN** § | |
| **DETTELBACH in his official capacity as** § | |
| **Director of the Bureau of Alcohol Tobacco** § | |
| **and Firearms, U.S. DEPARTMENT OF** § | |
| **JUSTICE, and MERRICK GARLAND, in** § | |
| **his official capacity as U.S. Attorney General** § | |
| **Defendants.** § | |

**THE NATIONAL RIFLE ASSOCIATION OF AMERICA'S COMPLAINT IN
INTERVENTION FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.      The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") has allowed the general public to attach certain devices, commonly known as stabilizing braces, to pistols and other certain firearms. Stabilizing braces are designed to enable gun owners to operate certain firearms with one hand with more stability.  Since 2012, the ATF consistently released letter rulings that reassured manufacturers and the public that attaching a stabilizing brace would not change the legal classification of a pistol or any other firearm as defined by statutes and regulations.

2.      As recently as December 2020, ATF reiterated this position and confirmed that there are legitimate uses for stabilizing braces. 85 Fed. Reg. 82516 (Dec. 18, 2020). Consequently,

1

millions of law-abiding Americans have lawfully purchased stabilizing braces and pistols equipped with stabilizing braces from authorized and reputable manufacturers.

3.     This changed, however, on January 31, 2023, when the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") of the U.S. Department of Justice issued a Final Rule titled "Factoring Criteria for Firearms with Attached 'Stabilizing Braces'" 88 Fed. Reg. 6,478 ("Final Rule"). The Final Rule vests ATF with unbounded discretion to regulate stabilizing braces. This would come at a severe detriment to the millions of Americans who relied on ATF's prior rulings and acquired lawful firearms equipped with stabilizing braces.

4.     The Final Rule arbitrarily reverses several years of settled administrative practice and seeks by a stroke of a pen to redefine "pistols" with stabilizing braces as short-barreled "rifles" subject to the onerous licensing and taxation requirements of the National Firearms Act of 1934, as amended, codified at 26 U.S.C. § 5801, *et seq*.  ("NFA"). 18 U.S.C. §921 (a)(8); 26 U.S.C. § 5845(a)(4). The new definition of "rifle" promulgated by the ATF now turns on an incomprehensible six-factor test that is based on ultra-subjective criteria about a firearm's "likely use" and the parsing of marketing materials that a gun purchaser may never have even seen.

5.     Because of the Final Rule, the millions of Americans, including NRA members, who own a pistol and a stabilizing brace, regardless of style or caliber or type of brace, must either dispose of, alter, or register their firearms.  If they guess wrong, they face the prospect of felony prosecution, 10 years in prison, and large fines.

6.     Plaintiff-Intervenor, the National Rifle Association of America ("NRA"), brings this action on behalf of itself and its over four million members seeking 1) a preliminary injunction prohibiting Defendants from enforcing the Final Rule against the NRA and its members, 2) an order under the Administrative Procedure Act ("APA") holding Defendants' actions unlawful and

2

setting aside the Final Rule, along with its findings and conclusions, and 3) a declaratory judgment and permanent injunction prohibiting Defendants from enforcing the Final Rule against the NRA and its members.

## JURISDICTION AND VENUE

7.      The Court has jurisdiction over this action under 5 U.S.C. § 702 and 28 U.S.C. § 1331. This Court has authority to grant the remedy the NRA seeks under 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. § 706.

8.      Venue is proper in this district pursuant to 5 U.S.C. § 703 and 28 U.S.C. § 1391(e).

## PARTIES

9.      The NRA is a nonprofit corporation organized under the laws of the State of New York with its principal place of business in Fairfax, Virginia. For many decades, it has been the largest and most effective guns rights lobbying organization in the country.

10.      The NRA is a traditional membership association and America's leading provider of gun-safety and marksmanship education for civilians and law enforcement. Representing more than four million members, the NRA is the foremost defender of the Second Amendment to the United States Constitution.

11.      The NRA was founded in 1871 by U.S. Army veterans Col. William C. Church and Gen. George Wingate to "promote and encourage rifle shooting on a scientific basis." In the following decades, the NRA has provided world-class firearms instruction to thousands of gun owners across the country. When anti-gun lobbyists and politicians began their war on the Second Amendment four decades ago, the NRA fought back. And over the years, it has defeated hundreds of attempts on the national, state and local levels to infringe on the Right to Keep and Bear Arms. Today, the NRA stands as America's oldest civil rights organization.

3

12.     The NRA is a traditional membership association. The NRA is an organization for all law-abiding gun owners – and serves people of all ages. Members can join via https://membership.nra.org/MultiStep/JoinToday and choose various membership tiers. Once they join, members have access to their choice of magazines, grassroots gatherings, and educational opportunities. They receive many other benefits, including discounts from NRA business partners and free admission to special events.

13.     The NRA has more than four million members across the nation. Those millions of law-abiding NRA members rely on the NRA to protect their gun rights, including by pursuing litigation on behalf of its members to protect those rights.

14.     First among the "Purposes and Objectives" contained in the NRA's bylaws is "[t]o protect and defend the Constitution of the United States." The NRA is the foremost defender of the Second Amendment to the United States Constitution. The NRA's programs and outreach impact the lives of millions of law-abiding gun owners – around the United States and world. The NRA engages in extensive advocacy at all levels of government to promote the rights of its members and all Americans.

15.     The NRA spends tens of millions of dollars annually distributing pamphlets, fact sheets, articles, electronic materials, and other literature to advocate for its views on the Second Amendment and to assist NRA members engaging in national, state, and local firearm dialogue. The NRA's direct mail, television, radio, and digital communications seek to educate the public about issues bearing on the Second Amendment, protect its millions of law-abiding members against laws and regulations that would infringe their rights, and galvanize participation in the political process by NRA members and supporters.

16.     The NRA's legal, political and grassroots advocacy is particularly important in the State of Texas. Texas is home to approximately 350,000 members – the state ranks #1 for NRA membership. Texas is one of the Top 10 "best states for gun owners."[1] Almost 50 percent of adults in Texas live in homes with guns.[2] According to industry reports, the state is reliant on the firearms industry, which, directly and indirectly, creates and sustains more than 30,000 jobs.[3] This industry is being irreparably threatened by the Final Rule.

17.     Many NRA members, including Carl Carlson, own and utilize firearms with attached stabilizing devices, and their freedom to do so is being hindered by the Final Rule.[4] The NRA's members and supporters include gun owners who purchase, transfer, possess, own, customize, accessorize, and utilize stabilizing braces and firearms equipped with stabilizing braces. NRA members, including Mr. Carlson, have relied on previous decisions that the attachment of a stabilizing brace does not automatically subject a firearm to regulation under the NFA.

18.     Preserving and safeguarding these rights and interests aligns with the mission of the NRA, which aims to uphold and protect the Second Amendment and the rights of Americans to possess firearms, particularly in the face of unwarranted intervention by unelected and unaccountable anti-firearm bureaucrats.

---

[1] Keith Wood, "The Best States for Gun Owners Ranked for 2022," *Guns & Ammo* (Aug. 18, 2022), available at https://www.gunsandammo.com/editorial/best-states-for-gun-owners-2022/463592.

[2] Jessica Learish & Elisha Fieldstadt, "Gun Map: Ownership by State," *CBS News* (April 14, 2022), available at https://www.cbsnews.com/pictures/gun-ownership-rates-by-state/.

[3] Lora Korpar, "Texas Tops in Creating Gun Company Jobs in 2021, California a Close Second," *Newsweek* (April 1, 2022), available at https://www.newsweek.com/texas-california-gun-firearm-jobs-output-1694315.

[4] *See* Declaration of Dr. Carl Carlson ("Carlson Decl."), attached as Ex. 1.

5

19.     Defendant U.S. Department of Justice ("DOJ") is an executive agency within the federal government of the United States. DOJ is headquartered at 950 Pennsylvania Avenue NW, Washington, D.C. 20530. DOJ is the agency responsible for enforcing federal firearms laws.

20.     Defendant Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") is a component of the DOJ, and is headquartered at 99 New York Avenue NE, Washington, D.C. 20226. ATF is delegated authority to enforce federal gun control laws. *See* 28 U.S.C. § 599A; 28 C.F.R. § 0.130; 18 U.S.C. § 926(a).

21.     DOJ and ATF are collectively referred to herein as "Agencies."

22.     Defendant Merrick B. Garland is the Attorney General of the United States. He is vested with authority to enforce the Gun Control Act, 18 U.S.C. §§ 922, 926, and the National Firearms Act, 26 U.S.C. § 7801(a)(2). He is sued in his official capacity.

23.     Defendant Steven M. Dettelbach serves as the Director of ATF, and is responsible for overseeing the agency's promulgation of the Final Rule challenged herein. He is sued in his official capacity.

## STANDING

24.     The NRA has associational standing to bring suit on behalf of its members because, "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  For example, Carl Carlson is one of many NRA members in the Dallas area who use pistols with attached stabilizing braces, and rely on stabilizing braces to use their firearms.[5]

---

[5] *See* Carlson Decl., Ex. 1.

6

25.     NRA members, like Mr. Carlson, rely on the NRA to protect them from the Final Rule by means of litigation, lobbying, and other advocacy efforts.

26.     For example, on December 12, 2022, the NRA updated its members on the status of the Biden Administration's efforts to regulate pistol braces and promised, "Whatever develops on this front, you can count on NRA to remain involved, and to keep you updated."[6]

27.     And on January 30, 2023, the NRA assured its members that it "is already working on litigation to challenge this arbitrary and capricious attack on law-abiding gun owners by the Biden Administration."[7]

28.     The NRA has followed through on these promises, taking repeated steps to try to protect its members from the Final Rule.[8]

29.     For example, on September 8, 2021, the NRA filed public comments opposing the ATF's proposal to regulate stabilizing braces.[9] And then, the NRA successfully obtained clarification of multiple aspects of ATF's proposed rule before it went into effect, including 1) that braces removed from firearms do not necessarily have to be destroyed or altered in a way that prevents them from being reattached to a firearm; and 2) that imported pistols with stabilizing braces do not necessarily need to be destroyed or surrendered.[10]

---

[6] NRA-ILA, "Biden Administration Continues to Push to Target Firearms with Attached Stabilizing Braces" (Dec. 12, 2022); *available at* https://www.nraila.org/articles/20221212/biden-administration-continues-push-to-target-firearms-with-attached-stabilizing-braces, attached as Exhibit 5.

[7] NRA-ILA, "Updates to Final Rule on Stabilizing Braces" (Jan. 30, 2023); *available at* https://www.nraila.org/articles/20230130/updates-to-atf-final-rule-on-stabilizing-braces, attached as Exhibit 4.

[8] *Id*.

[9] NRA-ILA, "Comments of the National Rifle Association on ATF's Proposed Rule 2021R-08" (September 8, 2021), attached as Ex. 3.

[10] NRA-ILA, "Updates to Final Rule on Stabilizing Braces" (Jan. 30, 2023); *available at* https://www.nraila.org/articles/20230130/updates-to-atf-final-rule-on-stabilizing-braces, Ex. 5.

P. App'x 008

30.     If the NRA does not obtain relief on behalf of its members, their constitutional and statutory rights will be significantly infringed. Among other things, they face the prospect of felony prosecution if the Final Rule is not enjoined. Accordingly, the NRA's members are firearms owners that face irreparable harm arising from the Final Rule.

31.     Courts have held that the NRA has a protectable interest relating to its interest in preventing the imposition of firearms restrictions on its members.[11]

## BACKGROUND

### I.     THE NATIONAL FIREARMS ACT OF 1934 AND THE GUN CONTROL ACT

32.     The Government regulates firearms primarily through two federal statutes: the NFA, found in 26 U.S.C. §§ 5841–72, and the Gun Control Act ("GCA"), found in 18 U.S.C. §§ 921–31.

33.     The classification of firearms under these two statutes corresponds to the regulatory obligations they entail.

34.     Since the NFA specifically lists the "firearms" that fall under its jurisdiction, most guns, including rifles, shotguns, and pistols, are not subject to NFA regulations. However, those firearms that are regulated by the NFA must adhere to burdensome tax and registration requirements, which are enforced through criminal penalties.

35.     Firearms that fall within the NFA's jurisdiction are subject to substantially more regulation than those firearms that do not. Most notably, anyone wishing to acquire or make an NFA firearm must apply, register, and usually pay a making or transfer tax to possess those firearms. 26 U.S.C. §§ 5811, 5821, 5841. Some of these firearms are also subject to additional regulation under the GCA. For example, owners of destructive devices, machineguns, short-

---

[11] *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 266 F.R.D. 369, 373 (D. Ariz. 2010).

barreled shotguns, or short-barreled rifles must generally receive approval from the attorney general before transporting their firearms across state lines. *See* 18 U.S.C. § 922(a)(4).

36.     In addition to these federal requirements, some states apply additional regulations to NFA firearms, including complete bans. Thus, classification of certain firearms as regulable under the NFA may result in these firearms becoming contraband in some states.

37.     The GCA oversees the general business activities related to importing, manufacturing, or dealing in firearms. Additionally, the GCA imposes stricter regulations on the transportation, sale, and delivery of "short-barreled rifles," "short-barreled shotguns," or "machineguns." These additional restrictions are pursuant to 18 U.S.C. § 922(a)(4), (b)(4).

38.     Short-barreled rifles also fall under the NFA's jurisdiction.  A weapon classified as a "firearm" under the NFA is subject to extensive federal regulation. The NFA encompasses various regulations, including the imposition of a $200 tax on the making (by one not licensed to engage in the business of manufacturing firearms), manufacture (by one engaged in the business of manufacturing firearms), and transfer of machineguns, suppressors, short-barreled rifles, short-barreled shotguns, and destructive devices.

39.     The NFA defines "firearm" to include, in relevant part, "a weapon made from a *rifle* if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length." 26 U.S.C. § 5845(a)(4) (emphasis added). A "rifle" is "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge." 26 U.S.C. § 5845(c).

40.     ATF may not depart from this unambiguous definition. "When the words of a

9

statute are unambiguous, then … 'judicial inquiry is complete.'" *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 254 (1992) (citations omitted).

41.     The NFA also requires registration of all NFA firearms with the Secretary of Treasury, purportedly to monitor payment of the associated tax.

42.     Before the NFA was amended in 1968, if the possessor of an unregistered firearm applied to register the firearm, as required by the NFA, Treasury could supply information to State authorities about the registrant's possession of the firearm. State authorities could then use the information to prosecute the person whose possession violated State laws. In 1968, the Supreme Court held that the registration requirement imposed on the possessor of an unregistered firearm violated the possessor's right against self-incrimination under the Fifth Amendment of the U.S. Constitution. *See Haynes v. United States*, 390 U.S. 85 (1968).

43.     In 1968, in response to *Haynes*, Congress amended the NFA and removed the mechanism for the owner of an unregistered and untaxed NFA firearm to legally register that firearm. Congress also enacted 26 U.S.C. § 5848, which prohibits the use of "information or evidence obtained from an application, registration, or records required to be submitted or retained" regarding the "filing of the application or registration" of the NFA firearm for purposes of prosecuting a violation prior to or concurrent with the filing.

44.     Initially, the drafters of the NFA had the intention to include pistols within the legislation. The original version of the NFA defined a "firearm" as any "pistol, revolver, shotgun with a barrel length shorter than sixteen inches, or any other concealable firearm, along with accessories like silencers or machine guns."[12]

---

[12] Oliver Krawczyk, *Dangerous and Unusual: How an Expanding National Firearms Act Will Spell Its Own Demise*, 127 Dick. L. Rev. 273, 278 (2022).

45.    The $200.00 tax imposed by the NFA on short-barreled rifles and shotguns was essentially a means to discourage or eliminate individuals who wanted to evade a potential pistol ban by modifying a rifle to a shorter length.

46.    Although pistols were eventually excluded from the NFA's final version, short-barreled rifles and firearms made from rifles were not removed and continue to be subject to taxation.

## II. THE ATF REPEATEDLY HOLDS THAT STABILIZING BRACES DO NOT TRANSFORM PISTOLS INTO RIFLES, CREATING SUBSTANTIAL RELIANCE INTERESTS

47.    Since 2012, ATF's longstanding policy has been clear: firearms with stabilizing braces are not intended to be fired from the shoulder, and attaching a brace to a handgun does not transform it into a short-barreled rifles under the NFA.

48.    ATF has *repeatedly* recognized that stabilizing braces serve a legitimate function and the inclusion of a stabilizing brace on pistol or other firearm does not automatically subject that firearm to the provisions of the NFA. That's because stabilizing braces were first designed and intended to help disabled veterans fire large format pistols.[13] Pistol braces are orthotic devices that allow users to more safely and accurately fire handguns.[14]

49.    Pistol stabilizing braces were first developed by Army veteran Alex Bosco to help disabled combat veterans safely fire pistols, after observing a disabled veteran struggle to safely fire a pistol at a gun range.

50.    After testing his concept with disabled veterans, Bosco sought approval from the ATF. In response, in 2012, ATF determined that attaching the submitted "brace" to a firearm did

---

[13] *See* SB Tactical, "Our History," *available at* https://www.sb-tactical.com/about/company/, attached as Exhibit 6.

[14] Letter from Attorney General Patrick Morrissey to Kevin McCarthy re: ATF's final rule entitled "Factoring Criteria for Firearms With Attached 'Stabilizing Braces,'" (May 25, 2023), attached as Ex. 2.

not change the weapon's classification as a pistol and, therefore, did not subject it to NFA controls. In reliance on this guidance, Bosco co-founded SB Tactical with Grant Shaw and began making production prototypes for various types of rifles.

51.    Since then, ATF has approved multiple similar brace designs through classification letters. While these letters are not made public by ATF, the companies receiving them often share them with the public to educate customers and the industry about the referenced products.

52.    ATF has repeatedly confirmed that the inclusion of a stabilizing brace on a firearm does not make that firearm designed to be fired from the shoulder and subject to the NFA. While there was a limited time between 2015 and 2017 where ATF claimed that using a stabilizing brace as a shoulder stock could "redesign" the firearm and create an NFA firearm, ATF has never taken the position that the mere inclusion of a stabilizing brace on a firearm makes it an NFA firearm.

53.    On November 26, 2012, ATF issued a classification letter stating that a pistol stabilizing brace designed for forearm insertion and additional support did not qualify as a stock, thus not converting a pistol into a regulated short-barreled rifle.

54.    Also on November 26, 2012, ATF issued a determination letter to Sig Sauer stating that attaching its pistol brace to an AR-type pistol's buffer tube would not change the firearm's classification from a pistol to a short-barreled rifle.

55.    On March 6, 2014, ATF sent a letter to the Greenwood, Colo. Police Department stating that firing a weapon from a specific position, such as placing the receiver extension of an AR-15 type pistol on the shoulder, does not alter the weapon's classification. ATF also confirmed that certain firearm accessories like the SIG Stability Brace did not constitute shoulder stocks and, therefore, using the brace improperly did not result in a design change under federal law.

12

56.     On October 28, 2014, ATF sent a letter to a manufacturer stating that a shotgun with a pistol brace attached was not considered a regulated firearm under the NFA as long as the SigTac SB15 pistol stabilizing brace was used as intended and not as a shoulder stock.

57.     On December 15, 2014, ATF issued a determination letter to the manufacturer of the "Blade AR Pistol Stabilizer" stating that attaching the blade-style brace to a pistol would not change the pistol's classification under the NFA, as long as the brace was used as originally intended and not as a shoulder stock.

58.     Some of ATF's letters issued between 2014 and 2017 addressed the possibility of using a stabilizing brace to fire from the shoulder. While ATF indicated that attaching these devices to pistols did not make them short-barreled rifles, ATF also indicated that individual use of the firearm could be considered to determine if there was an intent to design or redesign the weapon into a short-barreled rifle.

59.     On January 16, 2015, ATF issued an Open Letter clarifying that a pistol stabilizing brace, when used as designed and described in the November 26, 2012 classification letter, could be attached to a handgun without making it an NFA firearm. However, the Open Letter stated that using the brace as a shoulder stock would constitute a "redesign" of the handgun, as it changed its intended function. The Open Letter did not define "use as a shoulder stock."

60.     The 2015 ATF Open Letter created confusion regarding the legality of various techniques for handling a brace-equipped firearm, based on ATF's perception of the user's intent and the question of whether mere intent could be considered a "design or redesign" under the law.

61.     ATF's Open Letter in 2015, which claimed that shouldering a firearm with a stabilizing brace converted it into a short-barreled rifle, represented a significant departure from ATF's previous guidance.

13

62.     However, the ATF never communicated a policy stating that attaching an approved brace to a firearm would automatically convert it into an NFA-controlled short-barreled rifle.

63.     On December 22, 2015, the ATF issued a determination letter regarding a new design of brace, indicating that an adjustable brace known as a "PDW-style brace" could be used as a pistol stabilizing brace as long as certain modifications were made.

64.     On October 3, 2016, the ATF issued a determination letter to Gear Head Works, LLC, stating that their "Tailhook" model of brace, when attached to an AR-type pistol, would not change the classification of the pistol or allow it to be fired from the shoulder.

65.     On January 12, 2017, the ATF issued another determination letter to Gear Head Works, LLC, confirming that their second generation of the "Tailhook" brace, when attached to an AR-type pistol, would not alter the classification of the pistol or enable shoulder firing.

66.     However, on March 21, 2017, the ATF sent a letter to SB Tactical, LLC, announcing a reversal of its stance on firing braced firearms from the shoulder. The letter clarified that the mere act of shouldering a pistol with a brace does not constitute a "redesign" of the brace unless specific steps are taken to configure the device for shoulder use.

67.     In other words, the 2017 letter from the ATF retracted the 2015 Open Letter, which had suggested that shouldering a pistol with a brace made it an illegal short-barreled rifle. The SB Tactical Letter indicated that using the brace as a shoulder stock would not be considered a redesign unless additional actions were taken to configure the device for that purpose.

68.     However, the 2017 ATF letter did not provide a clear definition of "incidental, sporadic, or situational use," leaving brace owners uncertain about the extent to which shouldering their pistols would cross ATF's undisclosed threshold.

69.     On October 31, 2017, the ATF issued a determination letter regarding the "Shockwave Technologies Blade Pistol Stabilizer 2.0," which was similar in design to the brace mentioned in a previous letter from December 15, 2014. The ATF concluded that attaching the Shockwave Blade Pistol Stabilizer alone to an AR-type handgun as a forearm brace would not make it an NFA weapon. However, if the person using the firearm takes steps to configure the device as a shoulder stock and fires the firearm from the shoulder, it would be considered a redesign.

70.     On July 24, 2018, the ATF issued a determination letter to Trinity Force Corporation, a manufacturer of a similar brace design to the Shockwave brace. The letter stated that if the brace was used as intended to stabilize a handgun while shooting with a single hand and the distance from the trigger face to the rear of the device was less than 13 ½ inches, it would not be considered a shoulder stock and could be attached to a handgun without making it an NFA firearm.

71.     Throughout the past decade, the ATF has issued various classification letters, adjusting and sometimes reversing determinations. These letters demonstrate that the ATF has repeatedly approved the sale of braces and braced pistols without indicating a need for registration or making simple possession a crime.

72.     Furthermore, despite the ATF's attempt in the Final Rule to distance itself from previous classifications or restrict them to specific sample firearms, this history of classifications contradicts that claim. Numerous ATF letters have established that adding a stabilizing brace to a pistol does not transform the firearm into a short-barreled rifle under the NFA.

73.     As a result of the ATF's consistent and longstanding history of classifying stabilizing braces as exempt from NFA registration, millions of law-abiding consumers have

15

purchased or manufactured pistols with stabilizing braces, relying on these assurances.

74.     Millions of Americans already legally own pistols with stabilizing braces, purchased and manufactured in the years since they were invented and first approved by ATF in 2012. From 2012-2020, there were at least ten new additions to the pistol brace market.[15] Many companies like SB-Tactical started manufacturing and evolving pistol braces to adjust to the users' wants and needs.[16] These products were developed following the legal guidelines set forth by ATF in combination with industry leaders. The massive increase in the sales of pistol braces also saw an increase in the production of pistol caliber carbines, classified as pistols, that could accept braces.

75.     In a letter to Attorney General Merrick Garland, 48 senators wrote that "ATF's effective rescission in 2017 of its previous misapplication of the law, combined with its repeated letter rulings approving stabilizing braces, created a thriving market for these stabilizing braces. Millions of law-abiding Americans have purchased braces to add them to their own firearms, or purchased firearms with the braces already attached."[17]

76.     "Millions of law-abiding Americans use pistol braces, and many of those Americans rely on braces because they are disabled," noted Senator John Kennedy (R-LA).[18]

77.     Indeed, a 2021 Congressional Research Service report cites estimates of from 10

---

[15] https://f5mfg.com/news/history-of-pistol-braces-with-the-changing-gun-laws-in-the-us/

[16] *Id*.

[17] Sen. Bill Cassidy, "Cassidy, McConnell, Colleagues Call on Biden Administration to Withdraw Gun Braces Ban" (June 25, 2021), *available at* https://www.cassidy.senate.gov/newsroom/press-releases/cassidy-mcconnell-colleagues-call-on-biden-administration-to-withdraw-gun-braces-ban, attached as Exhibit 7.

[18] Sen. John Kennedy, "Kennedy, Marshall, Clyde introduce resolution to stop Biden admin from turning lawful gunowners into felons with pistol brace rule" (Mar. 15, 2023); *available at* https://www.kennedy.senate.gov/public/2023/3/kennedy-marshall-clyde-introduce-resolution-to-stop-biden-admin-from-turning-lawful-gunowners-into-felons-with-pistol-brace-rule, attached as Exhibit 8.

to 40 million pistol braces owned by Americans.[19]

78.     Accordingly, the Final Rule threatens to make felons out of millions of law-abiding gun owners.

### III. THE ATF ARBITRARILY CHANGES COURSE AND SEEKS TO PUNISH LAW-ABIDING GUN OWNERS, ESPECIALLY DISABLED GUN OWNERS WHO RELY ON PISTOL BRACES

79.     After nearly a decade of having repeatedly approved the use of stabilizing braces on firearms, ATF first attempted to change policy in December of 2020, publishing a Notice of Proposed Rulemaking in the Federal Register entitled "Objective Factors for Classifying Weapons with 'Stabilizing Braces,'" 85 Fed. Reg. 82,516 (Dec. 18, 2020).

80.     After receiving 70,000 public comments, mostly in opposition, and criticism from members of Congress, ATF withdrew the 2020 Notice. *See* 85 Fed. Reg. 86,948 (Dec. 31, 2020).

81.     To create what would become the Final Rule, the Agencies in June of 2021 again published a notice of proposed rulemaking titled "Factoring Criteria for Firearms with Attached "'Stabilizing Braces,'" 86 Fed. Reg. 30826 (June 10, 2021) (the "Proposed Rule"). The Proposed Rule inspired over 200,000 overwhelmingly negative comments, making it among the most opposed rules in Agency history.

82.     In a public comment, the NRA voiced its opposition.[20]

83.     The NRA explained that many NRA members possess firearms with attached stabilizing braces, and their freedom to do so would be hindered by the Proposed Rule because it would subject nearly all configurations of those firearms to the taxation and registration requirements of the NFA.

---

[19] Congressional Research Service, "Handguns, Stabilizing Braces, and Related Components" (April 19, 2021), *available at* https://crsreports.congress.gov/product/pdf/IF/IF11763.

[20] NRA-ILA, "Comments of the National Rifle Association on ATF's Proposed Rule 2021R-08" (Sept. 8, 2021), Ex. 3.

84.     It explained that, for most of the last decade, the firearm industry, NRA members, and other American gun owners have relied on ATF's decisions that the attachment of a stabilizing brace does not automatically subject a firearm to regulation under the NFA. With the Proposed Rule, ATF sought to abandon this consistency and puts the millions of gun owners who have relied on its position in serious legal jeopardy.

85.     The Proposed Rule would have created a set of "factoring criteria" to determine whether certain firearms with attached stabilizing braces are or are not subject to regulation under the NFA. However, the approach taken by ATF with the Proposed Rule seemed to be an effort to categorically ban firearms with stabilizing braces rather than a legitimate attempt to provide clarity to regulated individuals and entities.

86.     Further, the Proposed Rule was hopelessly vague. It failed to explain when the new set of factors should be applied, uses factors that are extremely difficult to understand and subject to arbitrary application, doesn't adequately address effects on existing owners of brace-equipped firearms, and would result in taxation inconsistent with the applicable statutory framework.

87.     Rather than abandon its attempt to turn law-abiding gun owners into felons, the ATF pressed on with its unlawful attempt to transform "pistols" into "rifles" covered by the NFA, simply due to the addition of a stabilizing brace.

88.     On January 31, 2013, the Agencies committed the final agency action at issue by promulgating the Final Rule, Factoring Criteria for Firearms With Attached "Stabilizing Braces," 88 Fed. Reg. 6478, 6574 (Jan. 31, 2023). The rule amends 27 C.F.R. § 478.11 and 27 C.F.R. § 479.11, the regulations that define "rifle" for GCA and NFA purposes.

89.     Before the Agencies promulgated the Final Rule, the regulatory "rifle" definitions simply repeated the statutory definitions. Just like the GCA, 18 U.S.C. § 921(a)(7), the Agencies

in the prior version of 27 C.F.R. § 478.11 defined "rifle" as follows: "Rifle. A weapon designed or redesigned, made or remade, and intended to be fired from the shoulder, and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a rifled bore for each single pull of the trigger." 27 C.F.R. § 478.11 (2022).

90.     And just like the NFA, 26 U.S.C. § 5845(c), the Agencies in the prior version of 27 C.F.R. § 479.11 defined "rifle" as follows: "Rifle. A weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge."

91.     The Final Rule effects a sea change in the regulatory landscape. It expressly invalidates every prior arm brace classification that ATF had issued. Final Rule, 88 Fed. Reg. at 6,480.

92.     The Final Rule then overhauls the "rifle" definition of 27 C.F.R. § 478.11 and 27 C.F.R. § 479.11. It does so by adding (to the sentence mirroring the statutes) two new paragraphs and six subparagraphs:

> "Rifle. A weapon designed or redesigned, made or remade, and intended to be fired from the shoulder, and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a rifled bore for each single pull of the trigger.
> (1) For purposes of this definition, the term "designed or redesigned, made or remade, and intended to be fired from the shoulder" shall include a weapon that is equipped with an accessory, component, or other rearward attachment (e.g., a "stabilizing brace") that provides surface area that allows the weapon to be fired from the shoulder, provided other factors, as described in paragraph (2), indicate that the weapon is designed, made, and intended to be fired from the shoulder.
> (2) When a weapon provides surface area that allows the weapon to be fired from the shoulder, the following factors shall also be considered in determining whether the weapon is designed, made, and intended to be fired from the shoulder:
> (i) Whether the weapon has a weight or length consistent with the weight or length

19

of similarly designed rifles;

(ii) Whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method), that is consistent with similarly designed rifles;

(iii) Whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;

(iv) Whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is

necessary for the cycle of operations;

(v) The manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and

(vi) Information demonstrating the likely use of the weapon in the general community." Final Rule, 88 Fed. Reg. at 6574-75

93.     The Final Rule is effective immediately. Final Rule, 88 Fed. Reg. at 6,478.  May 31, 2023, is the rule's "compliance date." Parties with a brace-equipped firearm had until then to either destroy it, permanently modify it, or surrender it. Id. at 6480. But this is just an exercise of the Agencies' "enforcement discretion." Id. at 6480–81. The Agencies nonetheless have announced that "the rule is immediately effective in that the Department may seek to enforce the NFA's requirements with respect to any new making or new transfer of a weapon with an attached 'stabilizing brace' that constitutes a short-barreled rifle under the NFA." Id. at 6481.

## FIRST CAUSE OF ACTION
## (VIOLATION OF APA 5 U.S.C. § 706(2)(A))
**ARBITRARY, CAPRICIOUS, ABUSE OF DISCRETION, NOT IN ACCORDANCE WITH LAW—UNEXPLAINED CHANGE IN POSITION/FAILURE TO CONSIDER RELIANCE INTERESTS**

94.     Plaintiff-Intervenor incorporates by reference all prior paragraphs of this Complaint in Intervention and paragraphs in the counts below as though set forth fully herein.

95.     Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with the law." 5 U.S.C. § 706(2)(A).

96.    A court may hold that an agency action is arbitrary and capricious when the agency has failed to consider relevant evidence or articulate a satisfactory explanation for its action.

97.    In addition, an agency's departure from prior practice can serve as a basis for finding an agency's action to be arbitrary and capricious.

98.    The Final Rule is a clear change in position for ATF on stabilizing braces. Many designs that have been determined by the ATF to not be subject to the NFA in the past via private letter ruling will fail the factoring criteria.[21]

99.    "A central principle of administrative law is that, when an agency decides to depart from decades-long past practices and official policies, the agency must at a minimum acknowledge the change and offer a reasoned explanation for it*." Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017).

100.    There are four things that an agency must do when changing a policy under the APA: (1) the agency must show "awareness that it is changing [its] position"; (2) that "the new policy is permissible under the statute"; (3) that the agency "believes" the new policy is better; and (4) "good reasons" for the new policy. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009).

101.    In this case, ATF has dispensed with countless of its prior determinations and classifications, and adopted entirely new approaches and practices with respect to interpreting and applying the statutes it is tasked with enforcing.  ATF has failed to provide the required reasoned explanation for these sweeping and arbitrary policy shifts.

---

[21] *See, e.g.,* FTISB Letter 304,679 (Oct. 3, 2016) available at https://gearheadworks.com/wp-content/uploads/2018/12/Mod-2-Approval-Letter.pdf, attached as Exhibit 9.

102.    In addition, an agency action may be "arbitrary and capricious" because it fails to account for the reliance interests of those affected by the action. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1914-15 (2020).

103.    ATF has to provide more detailed explanations than it normally would because it changed factual findings (brace-equipped firearms are now intended to be shot from the shoulder) and many people relied on the prior position and bought braces. As the U.S. Supreme Court has held:

> "the agency need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate. Sometimes it must—when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)

104.    The Proposed Rule puts millions of otherwise law-abiding Americans in danger of federal criminal prosecution. Manufacturers, dealers, NRA members, and other firearm owners have all relied on ATF's past decisions on stabilizing braces when exercising their fundamental right to manufacture and own constitutionally protected arms. The Proposed Rule fails to address these interests entirely.

105.    ATF is "required to assess whether there [are] reliance interests, determine whether they [are] significant, and weigh any such interests against competing policy concerns. *Id*. at 1915.

106.    Because ATF has failed to sufficiently address these interests in the Proposed Rule, it is arbitrary and capricious and violates the APA.

**SECOND CAUSE OF ACTION**
**(VIOLATION OF APA 5 U.S.C. § 706(2)(A), (C))**
**ARBITRARY, CAPRICIOUS, ABUSE OF DISCRETION, NOT IN ACCORDANCE WITH LAW—UNLAWFUL DEPARTURE FROM CLEAR STATUTORY TEXT**

22

107.    Plaintiff-Intervenor incorporates by reference all prior paragraphs of this Complaint in Intervention and paragraphs in the counts below as though set forth fully herein.

108.    The Final Rule conflicts with the plain text of the statutes it purports to interpret and implement, and therefore is not in accordance with law.

109.    The primary federal statutory law governing the potential application of the NFA to brace-equipped firearms is the definition of "rifle:" "The term 'rifle' means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge." 26 U.S.C. § 5845(c).

110.    Defendants may not depart from this unambiguous definition. "When the words of a statute are unambiguous, then … 'judicial inquiry is complete.'" *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 254 (1992) (citations omitted).

111.    The pertinent part of the definition for brace-equipped pistols is whether they are "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c).

112.    When read in context, it is clear that "intended to be fired from the shoulder" means the intent of the person who "designed or redesigned [or] made or remade" the firearm. "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989).

113.    With the Final Rule, ATF is seeking to expand the definition of "rifle" by amending the regulatory definitions of rifle to include "a weapon that is equipped with an

23

accessory, component, or other rearward attachment (e.g., a 'stabilizing brace') that provides surface area that allows the weapon to be fired from the shoulder."

114.    While administrative agencies may be given some discretion when applying the statutes they are charged with enforcing, "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984) (internal page numbers omitted).

115.    The same rule applies when Congress has provided a statutory definition for a particular term. "Such an explicit reference to a statutory definition demonstrates a Congressional intent to forestall interpretation of the term by an administrative agency and acts as a limitation on the agency's authority." *Royce v. Hahn*, 151 F.3d 116, 123 (3d Cir. 1998).

116.    ATF cannot simply add to the clear and unambiguous definition of "rifle" provided by Congress. If an agency's regulation is not consistent with a statutory definition established by Congress, the agency has gone outside the bounds of its authority since it derives its authority from Congress. *See Peyton v. Reynolds Assocs.*, 955 F.2d 247, 251 (4th Cir. 1992) ("If a regulation reflects an administrative interpretation which is inconsistent with the plain language of the statute under which it is promulgated, we do not defer to the agency's interpretation.").

117.    The Final Rule unlawfully redefines "rifle" in contradiction of the NFA and GCA. The plain text of the NFA and GCA's statutory "rifle" definitions do not reach brace-equipped pistols.

118.    Pistol braces do not convert pistols into rifles under any reasonable reading of federal law. No good reason justifies subjecting pistols equipped with braces to the requirements

24

of federal firearms laws for short-barreled rifles.

119.    In addition, to the extent there is any ambiguity regarding the statutory definition of "rifle," the rule of lenity eliminates that ambiguity. The rule of lenity applies here because the statutes at issue are at best grievously ambiguous as to whether the "rifle" definition can cover a brace-equipped pistol; as a result, lenity dictates that Agencies and courts alike are bound to construe Congress's enactment as not extending so far. *See Cargill v. Garland*, 57 F.4th 447, 471 (5th Cir. 2023).

**THIRD CAUSE OF ACTION**

**(VIOLATION OF APA 5 U.S.C. §§ 553 and 706(2)(A), (C), (D))**

**ARBITRARY, CAPRICIOUS, ABUSE OF DISCRETION, NOT IN ACCORDANCE WITH LAW—INSUFFICIENT NOTICE, VIOLATION OF PROCEDURE REQUIRED BY LAW**

120.    Plaintiff-Intervenor incorporates by reference all prior paragraphs of this Complaint in Intervention and paragraphs in the counts below as though set forth fully herein.

121.    The APA at times requires that agencies engage in notice and comment rulemaking. 5 U.S.C. § 553(b).

122.    This requirement applies to the Final Rule.

123.    The Final Rule, however, did not abide by this requirement, as its definition of "rifle" is not the "logical outgrowth" of the original definition from the agency's proposed rulemaking.

124.    In particular, the Agencies' abandonment of point-based factoring criteria in its Proposed Rule ("Worksheet 4999") in favor of six-factor "balancing" test in its Final Rule violates the APA's requirement that notice be given of a proposed regulation's substance so that the public may comment on the proposal. An agency's "notice must adequately frame the subjects for discussion such that the affected party should have anticipated the agency's final course in

25

light of the initial notice." *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 447 (5th Cir. 2021) (cleaned up).

125.    Here, nothing in the Proposed Rule or the Agencies' accompanying explanation thereof "gave [any] indication that [the agency] was contemplating a potential change" as drastic as scrapping the entire point-based worksheet regime that formed the centerpiece of the Proposed Rule. *See Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1376 (Fed. Cir. 2017).

126.    On the contrary, the Proposed Rule explained that "[t]he ATF Worksheet 4999 is *necessary* to enforce the law consistently, considering the diversity of firearm designs and configurations.'" Proposed Rule at 30,826–01, 30,829 (emphasis added). Having read such language in the Agencies' Proposed Rule, commenters could not have reasonably foreseen that the Final Rule would adopt what appears to be a balancing-type test based on six factors that, if anything, are more subjective than those of the Worksheet—such as "whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles," "whether the weapon has a length of pull . . . that is consistent with similarly designed rifles," "the manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon," and "information demonstrating the likely use of the weapon in the general community." Final Rule at 6,480, 6,574–75.

127.    Moreover, in the section of the Proposed Rule entitled, "Comments Sought," the Agencies gave no hint that it might abandon Worksheet 4999, or the worksheet approach entirely; indeed, the word "worksheet" did not appear in that section. The closest this section of the Proposed Rule came to addressing the issue was in asking for comments on whether "ATF [had] selected the most appropriate criteria for determining whether a stabilizing brace has made a firearm subject to the NFA," and whether "commenters ha[d] additional criteria that should be

considered." Proposed Rule at 30,826–01, 30,850. These issues are quite different from that of whether the Worksheet system should be scrapped altogether. Realistically, there was "no way that commenters here could have anticipated which particular aspects of [the Agencies'] proposal were open for consideration." *See CSX Transp.*, 584 F.3d at 1082 (cleaned up).

128.    Further reinforcing the point that the Agencies' Proposed Rule differed substantially from its Final Rule, the Agencies more than doubled its estimate of the Rule's economic impact on affected societal groups (namely the manufacturers, dealers, and owners of firearms). The Proposed Rule estimated the cost of the rule over a ten-year period at $114.7 million at a 3% discount rate and $125.7 million at a 7% discount rate, see Proposed Rule at 30,826–01, 30,845 Tbl. 2; the explanation of the Final Rule, by contrast, put the corresponding figures at $242.4 million and $263.6 million, respectively, see Final Rule at 6,573, Tbl. 2. Such a drastic change in the "estimated financial impact of [an agency's] proposal . . . supports [the] conclusion" that the Final Rule was not a logical outgrowth of the Proposed Rule. *See Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1108 (D.C. Cir. 2014).

129.    The purpose of notice and comment rulemaking is to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments…." 5 U.S.C. § 553(c).

130.    Plaintiff-Intervenor, along with tens of thousands of its members and supporters, submitted comments critical of the definition of "rifle" as originally proposed by ATF.

131.    By failing to provide the opportunity for comment on its most recent attempt to define "rifle" in the Final Rule, the agency has failed to consider all the relevant arguments and important aspects of the problem.

132.    The Final Rule thus violated 5 U.S.C. § 553 and § 706(2)(D).

## FOURTH CAUSE OF ACTION
## (VIOLATION OF APA 5 U.S.C. § 706(2)(C))
### *ULTRA VIRES* AGENCY ACTION

133.    Plaintiff-Intervenor incorporates by reference all prior paragraphs of this Complaint in Intervention and paragraphs in the counts below as though set forth fully herein.

134.    Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

135.    The Final Rule represents a conclusive agency action that exceeds its lawful authority and should be invalidated by the Court.

136.    Defendants are only empowered to exercise the authority granted to them by statutes and are prohibited from enacting regulations to legislate and implement perceived intentions or purposes of Congress concerning federal gun control statutes.

137.    Further, if an agency seeks to decide an issue of major national significance, its action must be supported by clear congressional authorization. "Under that doctrine's terms, administrative agencies must be able to point to clear congressional authorization when they claim the power to make decisions of vast economic and political significance." *W. Virginia v. Env't Prot. Agency*, 142 S. Ct. 2587, 2616 (2022) (Gorsuch, J., concurring) (cleaned up).

138.    Whether braced pistols are in fact short-barreled rifles is a question of major national significance, affecting a major segment of the economy and the rights of millions of gun owners. Neither the NFA nor the GCA's statutory definition of "rifle" resolves that question. Instead, it is one for Congress to address.

139.    Indeed, the Final Rule compels millions of gun owners to undergo a registration process for firearms they lawfully purchased, which were not subject to regulation or registration

28

under the NFA at the time of purchase.

140.   The Final Rule requires the confiscation, destruction, or modification of all of the millions of legally-purchased firearms subject to registration where the owner does not wish to submit to registration.

141.   This will cause billions of dollars in economic damage or loss.

142.   The Final Rule expands the scope of federal crimes, potentially subjecting millions of otherwise law-abiding citizens to felony charges should they fail to comply with its provisions.

143.   Congress did not authorize the ATF, nearly a century after the passage of the NFA and at least a decade after the permissive classification of stabilizing braces, to reverse longstanding policies, materially modify definitions, and reclassify millions of lawfully-purchased firearms to bring them under the control of the NFA.

144.   The combined and individual impacts of the Final Rule, as mentioned above, are too significant to have been authorized by Congress many years ago, only to be discovered and applied at this time.

145.   The Final Rule is in excess of the authority Congress granted ATF and is therefore in violation of the APA, 5 U.S.C. § 706(2)(C). Article I, § 1 of the U.S. Constitution provides that, "[a]ll legislative powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."

146.   Article I, § 7, Clause 2 of the U.S. Constitution mandates that, "[e]very Bill . . . shall have passed the House of Representatives and the Senate" and "shall . . . be presented to the President of the United States . . . before it become a Law . . .."

147.    The Final Rule violates the Constitution by usurping legislative powers and violating Article I, §§ 1 and 7. Instead of relying on legislation, the Final Rule is an attempt by an administrative agency to alter the meaning of congressional enactments through bureaucratic fiat.

**FIFTH CAUSE OF ACTION**
**(VIOLATION OF APA 5 U.S.C. § 706(2)(B), SECOND AMENDMENT)**
**CONTRARY TO CONSTITUTIONAL RIGHT, POWER, PRIVILEGE, OR IMMUNITY**

148.    Plaintiff-Intervenor incorporates by reference all prior paragraphs of this Complaint in Intervention and paragraphs in the counts below as though set forth fully herein.

149.    According to the APA, agency action must be invalidated if it is deemed "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

150.    The Final Rule imposes regulations on items that Plaintiff-Intervenor argues are properly classified as handguns under the GCA, widely utilized by millions of Americans and lacking any historical precedent for registration and taxation by the government. "[T]he American people have considered the handgun to be the quintessential self-defense weapon." *District of Columbia v. Heller*, 554 U.S. 570, 629 (2008).

151.    Handguns, including both pistols and revolvers, are in wide use currently. Indeed, as of 2021, ATF reported that there were nearly 128 million handguns in the United States.[22]

152.    Further, there is no historical practice of regulating gunsmithing of personal firearms by private individuals for their own use. Historically, individuals have been able to modify their pistols by changing sights, optics, grips, etc. without losing either GCA classification or Second Amendment protection.

153.    Indeed, federal courts have recognized that even firearm components and parts

---

[22] Bureau of Alcohol, Tobacco and Firearms, Firearms Commerce in the United States: Statistical Update 2021, at pp. 1-6, *available at* https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download, at 1-6, attached as Exhibit 10.

deserve Second Amendment protection. Recently, the Delaware District Court explained that pursuant to *Bruen*, for the Government to prevail on an argument that firearm components fall outside Second Amendment protection, it would have to demonstrate that "firearm components are 'not typically possessed by law-abiding citizens for lawful purposes,'" which it failed to do. *Rigby v. Jenning*s, No. 21-1523 (MN), 2022 U.S. Dist. LEXIS 172375, at *16 (D. Del. Sept. 23, 2022).

154.    The Final Rule violates the Second Amendment's right to keep and bear arms and therefore should be invalidated under both the Second Amendment and the APA.

## SIXTH CAUSE OF ACTION
## (VIOLATION OF APA 5 U.S.C. § 553(d))
## UNLAWFUL EFFECTIVE DATE

155.    Plaintiff-Intervenor incorporates by reference all prior paragraphs of this Complaint in Intervention and paragraphs in the counts below as though set forth fully herein.

156.    Per the APA, unless there is a demonstration of good cause or the fulfillment of specific, limited criteria, the "publication … of a substantive rule shall be made not less than 30 days before its effective date." 5 U.S.C. § 553(d).

157.    The Final Rule is a substantive rule.

158.    The Final Rule was published on its effective date.

159.    The Final Rule does not provide good cause for its immediate-upon-publication effective date, 5 U.S.C. § 553(d)(3), nor does it claim that such good cause has been satisfied.

160.    The Final Rule, therefore, is invalid and should be vacated for its publication upon its effective date in violation of the APA, 5 U.S.C. § 553(d).

## SEVENTH CAUSE OF ACTION
## (VIOLATION OF APA 5 U.S.C. § 553(d)) AND FIFTH AMENDMENT)
## VOID FOR VAGUENESS

31

161.    Plaintiff-Intervenor incorporates by reference all prior paragraphs of this Complaint in Intervention and paragraphs in the counts below as though set forth fully herein.

162.    A law is void for vagueness when it "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972) (quoting *United States v. Harriss*, 347 U.S. 612, 617 (1954)).

163.    A statute is also vague if it is "so standardless that it invites arbitrary enforcement," *Johnson v. United States*, 576 U.S. 591, 595 (2015)—the "more important" vagueness standard, *Kolender v. Lawson*, 461 U.S. 352, 358 (1983). A statute that "impermissibly delegates basic policy matters to policemen, judges and juries for resolution on an ad hoc and subjective basis," with attendant dangers of arbitrary and discriminatory application, violates the Fifth Amendment. *Chatin v. Coombe*, 186 F.3d 82, 89 (2d Cir. 1999).

164.    The Final Rule adopts vague and arbitrary standards and tests that invite future arbitrary and capricious actions on the part of ATF. Put bluntly, the ATF's six-factor test is incomprehensible to the average gun owner.

165.    Thus, the provisions within the Final Rule do not provide sufficient clarity to a person of ordinary intelligence as to which firearms are subject to registration and tax obligations, and which firearms are exempt.

166.    The Final Rule is therefore void for vagueness, in violation of the APA and the Fifth Amendment.

**WHEREFORE**, Plaintiff-Intervenor prays that this Court grant the following relief:

(1) Declare that the Final Rule violates the APA as it is unlawful and an *ultra vires* agency action;

**P. App'x 033**

(2) Declare that the Final Rule violates the APA as it is "not in accordance with law";

(3) Declare that the Final Rule violates the APA as it is arbitrary and capricious;

(4) Declare that the Final Rule violates the APA as it is not the logical outgrowth of the Proposed Rule and does not abide by the requirements of the APA;

(5) Declare that the Final Rule violates the APA insofar as it is contrary to constitutional right, power, privilege, or immunity, including under the Second Amendment, the Fifth Amendment, and the major questions doctrine;

(6) Declare that the Final Rule violates the right to keep and bear arms protected by the Second Amendment;

(7) Declare that the Final Rule violates the Fifth Amendment's Due Process clause by being void for vagueness;

(8) Vacate, set aside and hold unlawful the Final Rule and any associated findings and conclusions, pursuant to the APA;

(9) Preliminarily and permanently enjoin Defendants and anyone acting in concert with them from enforcing the Final Rule or from taking any action inconsistent with the rescission of the Final Rule against the NRA and its members;

(10) Grant any other additional relief as the Court deems just and proper, including any attorneys' fees, reasonable litigation costs, and disbursements incurred in this action.

Dated:  June 6, 2023

Respectfully submitted,

**BREWER, ATTORNEYS &
COUNSELORS**

By:  */s/ William A. Brewer*
      William A. Brewer III
      State Bar of Texas No. 02967035
      wab@brewerattorneys.com
      Matthew H. Davis
      State Bar of Texas No. 24069580
      mhd@brewerattorneys.com
      Noah Peters (*pro hac vice* to be filed**)**
      nbp@brewerattorneys.com
      BREWER, ATTORNEYS &
      COUNSELORS
      1717 Main Street, Suite 5900
      Dallas, TX 75201
      Telephone: (214) 653-4012

      **ATTORNEYS FOR PLAINTIFF THE
      NATIONAL RIFLE ASSOCIATION OF
      AMERICA**

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| SECOND AMENDMENT FOUNDATION, *et al.*, | § § § |
| Plaintiffs, | § |
| | § |
| vs. | § CIVIL ACTION NO. 3:21-CV-0116-B |
| | § |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, *et al.*, | § § § § |
| Defendants. | § |

## DECLARATION OF DR. CARL CARLSON

My name is Dr. Carl Carlson. I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following declaration is true and correct:

1. I am an adult resident of Irving, TX, in Dallas County. I am fully competent to make this declaration. I have personal knowledge of all matters stated herein.

2. I am a longtime member of the National Rifle Association of America ("NRA"), having been a member for over a decade. I am a gun owner and Second Amendment supporter. Like many other NRA members, I rely on the NRA to protect and advocate for my right to keep and bear arms.

3. I am not a prohibited person, and thus I can lawfully purchase and possess firearms under federal and state law.

4. I have read the Final Rule of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") regarding pistol braces. I understand that it will significantly impact and negatively affect myself and my activities now and in the future.

5. I suffer from diffuse idiopathic skeletal hyperostosis (DISH disease), which limits my mobility and causes me pain in everyday life activities, including using a firearm. Because of my condition, I need a stabilizing brace to use a firearm.

6. I own a Daniels Defense Mark 18 pistol. Before the Final Rule, I used it in conjunction with a stabilizing brace. Before the Final Rule, the pistol I was using was perfectly legal to possess. I relied on repeated ATF rulings holding that the addition of a stabilizing brace did not transform a pistol into a short-barreled rifle for purposes of ATF regulation. But my understanding is that, under the Final Rule, the ATF would now classify that configuration of a firearm (and virtually every firearm with a stabilizing brace) as a short-barreled rifle.

7. I wish to be able to continue to posses my Daniels Defense Mark 18 pistol in its current configuration. However, the Final Rule requires me to modify, destroy, or surrender it.

8. Unless the final rule is enjoined, I and all those similarly-situated to me will have to destroy my firearm. This is particularly difficult for me, and many others like me who suffer from chronic pain, because I cannot use the firearm without the stabilizing brace.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __ day of June 2023.

Dr. Carl Carlson

2

# EXHIBIT 2




State of West Virginia
Office of the Attorney General
*Patrick Morrisey*
Attorney General

State of Texas
Office of the Attorney General
*Ken Paxton*
Attorney General

May 25, 2023

The Honorable Kevin McCarthy
Speaker
United States House of Representatives
Washington, DC 20515

Dear Mr. Speaker:

As State Attorneys General, we write to you concerning the Congressional Review Act resolution for the ATF's final rule entitled "Factoring Criteria for Firearms With Attached 'Stabilizing Braces.'" 88 Fed. Reg. 6478 (Jan. 31, 2023). We urge you to schedule a vote on that resolution early enough to complete the CRA process before the rule's May 31, 2023, registration deadline. Although we have filed a lawsuit challenging the pistol brace rule—and have sought preliminary injunctive relief—we need Congress's help, too.

The pistol brace rule is an egregious overreach. For over a decade, ATF has recognized that pistols equipped with stabilizing braces are not short-barreled rifles subject to the registration and tax requirements of the Gun Control Act of 1968 and the National Firearms Act. ATF has now reversed course, without statutory authority, and is requiring registration of nearly all pistols with stabilizing braces by the end of May. If an individual fails to register or otherwise dispose of a pistol equipped with a brace, then that person will be guilty of a serious federal felony.

Pistol braces are simply orthotic devices that allow users to more safely and accurately fire handguns. They were invented to help disabled combat veterans, not to assist in the commission of criminal wrongdoing. They do not convert pistols into rifles under any reasonable reading of federal law. No good reason justifies subjecting pistols equipped with braces to the requirements of federal firearms laws for short-barreled rifles. Indeed, there is little modern-day basis for the short-barreled rifle requirements in the first place.

ATF's contrary final rule is therefore unlawful under the relevant statutes. But it is also arbitrary and capricious for the agency to reverse course after a decade of permitting the thousands of Americans to purchase and benefit from pistol braces. Indeed, an estimated 10 to 40 million pistols with stabilizing braces are presently in circulation, and the ATF's rule requires nearly all of them to be registered with the federal government by May 31.

The Honorable Kevin McCarthy
May 25, 2023
Page 2

_____

For these reasons, more than half the States in the nation have filed suit against the agency's overreach.  In the States' view, this measure is unconscionable and must be stopped. After all, owners of these firearms should not have to submit fingerprints and identifying information to the government to avoid felony firearms charges.

Now is the time for Congress to step up, too. To eliminate the deadline that owners of braced pistols are facing, Congress can pass a resolution disapproving the rule under the CRA. A resolution to do just that, H. J. Res. 44, has already been introduced in the House with 189 sponsors. A companion resolution in the Senate has 47 sponsors. In short, there is strong support for a CRA disapproval.

But only a few days remain between now and the ATF's deadline. As State Attorneys General, we respectfully request that you schedule a vote on H. J. Res. 44 in time for proceedings in the House and Senate to be completed before the May 31 deadline. Although we generally defer to you on the schedule of the House, this issue is pressing and demands immediate action.

If President Biden vetoes the CRA disapproval, it will be up to us as Attorneys General, working with our private partners in the litigation, to get this rule overturned. But we should still try to alleviate this massive problem using the CRA when it has a chance of success. Time is of the essence. We ask that you schedule a vote as soon as possible.

Thank you for your consideration of this important matter.

Sincerely,


Patrick Morrisey
West Virginia Attorney General

Ken Paxton
Texas Attorney General


Steve Marshall
Alabama Attorney General

Treg Taylor
Alaska Attorney General

The Honorable Kevin McCarthy
May 25, 2023
Page 3

Tim Griffin
Arkansas Attorney General

Ashley Moody
Florida Attorney General

Christopher M. Carr
Georgia Attorney General

Raúl Labrador
Idaho Attorney General

Todd Rokita
Indiana Attorney General

Brenna Bird
Iowa Attorney General

Kris Kobach
Kansas Attorney General

Daniel Cameron
Kentucky Attorney General

Jeff Landry
Louisiana Attorney General

Lynn Fitch
Mississippi Attorney General

The Honorable Kevin McCarthy
May 25, 2023
Page 4

Andrew Bailey
Missouri Attorney General

Austin Knudsen
Montana Attorney General

Mike Hilgers
Nebraska Attorney General

John Formella
New Hampshire Attorney General

Drew Wrigley
North Dakota Attorney General

Dave Yost
Ohio Attorney General

Gentner F. Drummond
Oklahoma Attorney General

Alan Wilson
South Carolina Attorney General

Marty Jackley
South Dakota Attorney General

Jonathan Skrmetti
Tennessee Attorney General and Reporter

P. App'x 043

The Honorable Kevin McCarthy
May 25, 2023
Page 5

_____

Sean D. Reyes
Utah Attorney General

Jason S. Miyares
Virginia Attorey General

Bridget Hill
Wyoming Attorney General

# EXHIBIT 3

NATIONAL RIFLE ASSOCIATION OF AMERICA
INSTITUTE FOR LEGISLATIVE ACTION
11250 WAPLES MILL ROAD
FAIRFAX, VIRGINIA 22030



# NRA-ILA

## COMMENTS OF THE NATIONAL RIFLE ASSOCIATION ON ATF'S PROPOSED RULE 2021R-08

September 8, 2021

Denise Brown
Office of Regulatory Affairs,
Enforcement Programs Services,
Bureau of Alcohol, Tobacco, Firearms, and Explosives,
U.S. Department of Justice,
99 New York Ave. NE,
Washington DC 20226

*Via electronic submission to regulations.gov*

**Re: ATF's Notice of Proposed Rulemaking Docket Number ATF 2021R-08**

Since 2012, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") has repeatedly recognized that the attachment of certain devices, commonly known as stabilizing braces, to pistols and certain other firearms does not necessarily subject those firearms to the provisions of the National Firearms Act ("NFA").

As recently as December 2020, ATF reiterated this position:

In recent years, some manufacturers have produced and sold devices designed to be attached to large and/or heavy pistols which are marketed to help a shooter "stabilize" his or her arm to support single-handed fire ("braces"). ATF was advised by the first manufacturer to submit an arm brace for classification that the intent of the arm brace was to facilitate one-handed firing of the AR15 pistol for those with limited strength or mobility due to a handicap, and to reduce bruising

1

to the forearm when firing with one hand. According to this manufacturer, the brace concept was inspired by the needs of disabled combat veterans who still enjoy recreational shooting but could not reliably control heavy pistols without assistance. Consequently, ATF agrees that there are legitimate uses for certain "stabilizing braces."

85 Fed. Reg. 82516 (Dec. 18, 2020).

The National Rifle Association of America, Inc. ("NRA") is America's oldest civil-rights organization and is widely recognized as America's foremost defender of Second Amendment rights. It was founded in 1871, by Union officers who, based on their experiences in the Civil War, sought to promote firearms marksmanship and expertise amongst the citizenry. Today, the NRA has approximately five million members, and its programs reach millions more. The NRA is America's leading provider of firearms marksmanship and safety training for both civilians and law enforcement.

Many NRA members possess firearms with attached stabilizing braces, and their freedom to do so would be hindered by ATF2021R-08 (the "Proposed Rule") because it would subject nearly all configurations of those firearms to the taxation and registration requirements of the NFA. 86 Fed. Reg. 30826 (June 10, 2021). For most of the last decade, the firearm industry, NRA members, and other American gun owners have relied on ATF's decisions that the attachment of a stabilizing brace does not automatically subject a firearm to regulation under the NFA. With the Proposed Rule, ATF abandons this consistency and puts the millions of gun owners who have relied on its position in serious legal jeopardy.

The Proposed Rule would create a set of "factoring criteria" to determine whether certain firearms with attached stabilizing braces are or are not subject to regulation under the NFA. The creation of clear standards is much needed in this area. Firearms manufacturers, stabilizing brace manufacturers, and gun owners, including many NRA members, have struggled to comply with

ATF's existing *ad hoc* approach to stabilizing brace regulation. However, the approach taken by ATF with the Proposed Rule seems to be an effort to categorically ban firearms with stabilizing braces rather than a legitimate attempt to provide clarity to regulated individuals and entities.

The Proposed Rule fails to explain when the new set of factors should be applied, uses factors that are extremely difficult to understand and subject to arbitrary application, doesn't adequately address effects on existing owners of brace-equipped firearms, and would result in taxation inconsistent with the applicable statutory framework. For these reasons, the Proposed Rule violates the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 706(2)(A)-(C); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

**Discussion**

I.    <u>Whatever Framework ATF Uses, It Must Be Consistent With the Law</u>

Firearms that fall within regulation of the NFA are subject to substantially more regulation than those firearms that do not. Most notably, anyone wishing to acquire or make an NFA firearm must apply, register, and usually pay a making or transfer tax to possess those firearms. 26 U.S.C. §§ 5811, 5821, 5841. Some of these firearms are also subject to additional regulation under the Gun Control Act ("GCA"). For example, owners of destructive devices, machineguns, short-barreled shotguns, or short-barreled rifles, must generally receive approval from the attorney general before transporting their firearms across state lines. *See* 18 U.S.C. § 922(a)(4).

In addition to these federal requirements, many states adopt the federal classifications of certain firearms. Classification of certain firearms under the NFA may result in these firearms becoming contraband in some states.

The primary federal statutory law governing the potential application of the NFA to brace-equipped firearms[1] is the definition of "rifle:"

> The term "rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge.

26 U.S.C. § 5845(c).

ATF may not depart from this unambiguous definition. "When the words of a statute are unambiguous, then … 'judicial inquiry is complete.'" *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 254 (1992) (citations omitted).

The pertinent part of the definition for brace-equipped pistols is whether or not they are "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c).

Rifles with barrels of less than 16 inches in length or less than 26 inches in overall length are generally regulated under the NFA. 26 U.S.C.A. § 5845(a).

ATF has attempted to claim that the use of a particular firearm could result in it being "redesigned" seemingly based on the intent of the user. *See* ATF, Open Letter on the Redesign of "Stabilizing Braces," (Jan. 16, 2015). If ATF moves forward with the regulation of firearms with

---

[1] The definition of "shotgun" would also be applicable, but ATF has decided for the first time with the Proposed Rule that braces cannot be used on smooth bore firearms. "These criteria and worksheet do not apply to firearms with a smooth bore that use shotgun ammunition. These types of firearms, commonly referred to as 'pistol grip shotguns,' were never designed to be fired from one hand (e.g., Mossberg Shockwave, Remington Tac-14.) ATF has always classified these weapons as GCA 'firearms,' not shotguns or pistols, as they do not incorporate a stock, like a shotgun, and are not designed to be fired from one hand, like a pistol. Thus, the addition of a 'stabilizing brace' does not assist with single-handed firing, but rather redesigns the firearm to provide surface area for firing from the shoulder. 86 Fed. Reg. at 30,828-29. ATF's reasoning seemingly wouldn't apply to semi-automatic smooth bore firearms with stabilizing braces, but the Proposed Rule completely excludes these firearms from consideration as anything other than shoulder-fired weapons.

4

stabilizing braces, attempts to apply the statute based on the intent of users of a particular firearm should be avoided.

When read in context, it is clear that "intended to be fired from the shoulder" means the intent of the person who "designed or redesigned [or] made or remade" the firearm. "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989).

With the Proposed Rule, ATF is seeking to expand the definition of "rifle" by amending the regulatory definitions of rifle to include:

 "any weapon with a rifled barrel equipped with an accessory or component purported to assist the shooter stabilize the weapon while shooting with one hand, commonly referred to as a "stabilizing brace," that has objective design features and characteristics that facilitate shoulder fire, as indicated on Factoring Criteria for Rifled Barrel Weapons with Accessories commonly referred to as "Stabilizing Braces," ATF Worksheet 4999, published on [EFFECTIVE DATE OF THE FINAL RULE].

86 Fed. Reg. at 30,851.

While administrative agencies may be given some discretion when applying the statutes they are charged with enforcing,[2] "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984) (internal page numbers omitted).

---

[2] The rule of lenity, rather than agency deference, should apply in this case because these definitions form the basis for criminal statutes. *Gun Owners of Am., Inc. v. Garland*, 992 F.3d 446, 462 (6th Cir.), reh'g en banc granted, opinion vacated, 2 F.4th 576 (6th Cir. 2021).

P. App'x 050

The same rule applies when Congress has provided a statutory definition for a particular term. "Such an explicit reference to a statutory definition demonstrates a Congressional intent to forestall interpretation of the term by an administrative agency and acts as a limitation on the agency's authority." *Royce v. Hahn*, 151 F.3d 116, 123 (3d Cir. 1998).

ATF cannot simply add to the clear and unambiguous definition of "rifle" provided by Congress. It is also unnecessary. A framework for evaluating firearms could be applied without any change to the regulatory definitions.

II.    The Proposed Rule Doesn't Identify When It Should be Applied

The Proposed Rule doesn't give clear guidance on when the factoring criteria should be applied. ATF states that the factoring criteria are "for rifled barrel weapons with accessories commonly referred to as "Stabilizing Braces." That only begs the question of what is a "stabilizing brace"?  That is what the factoring criteria purport to answer.

The confusion is only made worse by ATF's claim that "ATF proposes to use ATF Worksheet 4999 to determine if a firearm is designed and intended to be fired from the shoulder . . . ." 86 Fed. Reg. at 30,830. This seems to indicate that the test must be applied to all firearms to determine if they are designed and intended to be fired from the shoulder.

This omission from the Proposed Rule raises numerous questions for gun owners and the firearms industry in any attempt to apply the factoring criteria. For example, if a gun owner improvised their own stabilizing device by simply taping the receiver extension of an AR-pattern pistol to their forearm, would the factoring criteria be applied to that pistol? And, if they would, and that firearm failed the factoring criteria because perhaps it was too light, or maybe too heavy,

then how would ATF defend the conclusion that such a pistol is designed and intended to be fired from the shoulder?

Without a clear indication of when the factoring criteria should apply, many absurd results like this example will arise from the Proposed Rule as it is currently drafted. If ATF finalizes a rule, it should clearly indicate when the new factoring criteria should be applied.

III.      The Factoring Criteria

The factoring criteria in the Proposed Rule are broken into three components. First, there are two prerequisites. If the firearm fails these, then it is automatically considered to be designed and intended to be fired from the shoulder. Second, the accessory itself is evaluated. Finally, the entire configuration of the weapon is examined. 86 Fed. Reg. at 30,830-34.

The vast majority of the factors suffer from the same defect; they are not objective factors despite ATF's repeated claims to the contrary.

ATF has a history of using subjective standards against regulated entities. In *Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, a rocketry association challenged ATF's classification of a material as an "explosive" because the reaction of the material was "*much faster* than the reaction achieved by what is more commonly associated with burning . . . ." 437 F.3d 75, 79-80 (D.C. Cir. 2006).[3]

The court found that ATF had not given the association a workable standard to operate under:

---

[3] Attorney General Garland, then serving as a circuit judge, joined this opinion.

Obviously, there is such a wide potential for disparity among the substances potentially classified as explosives that the vague description "much faster" conveys no information at all.

ATFE's relational definition suffers from a further methodological flaw: it designates no points of comparison. In order to say that one item burns "much faster" than another, one would need to know the speed at which each item burns. But ATFE has never pointed to evidence establishing the data points necessary to make a comparison. For one thing, ATFE has not stated the burn velocity of APCP in the form relevant to this regulation.

*Id.* at 82.

Like the vague standard used by ATF in *Tripoli Rocketry,* it is hard to see how ATF could employ the proposed factoring criteria in a way that gun owners could use them to determine if a particular firearm is "designed or redesigned, made or remade, and intended to be fired from the shoulder . . . ." 26 U.S.C. § 5845(c).

Many of the criteria are also simply factors that ATF considers features of known shoulder stocks. ATF attempted to use the same "known features" approach to classify firearm silencers, but it was rejected by a reviewing court.

As a general matter, relying *"solely* on the physical characteristics of the device," is a flawed method for classifying putative silencers. To be sure, physical characteristics may be one important factor. But basing a decision "solely" on such characteristics has the potential to be significantly overinclusive or underinclusive. For example, imagine a device designed for the sole purpose of muffling all sound emitted by a gunshot, and that was 100% effective at doing so—in other words, the world's greatest silencer. If this device relied on a novel or innovative design that did not contain many "physical characteristics" that are "characteristics of known firearm silencers," the agency would apparently not classify it as a silencer—despite the fact that it eliminates all noise produced by a gunshot. By the same token, Innovator claims to have invented a "Stabilizer Brake" for the purpose of reducing recoil, which happens to have three physical characteristics in common with those of "known silencers." But that does not mean that the Stabilizer Brake is actually capable of (or designed for) "diminishing the report of a portable firearm," 18 U.S.C. § 921(a)(24), which is the analysis the agency is supposed to be performing under the statute.

8

> Even if this general approach of relying "solely" on physical characteristics were sound, the agency did not perform a scientific or rigorous comparison of physical characteristics. Instead, it consulted a list of six characteristics that are allegedly common to "known silencers," and then, if the submitted device has some (unstated) number of those characteristics (here, three out of six was enough), it is a "firearm silencer." But where did that list of six characteristics come from? The agency never explains whether those six characteristics are present in all (or most?) silencers. The agency never explains whether there are other common characteristics that do not appear on its list. And the agency never explains how many characteristics in common are necessary to be classified as a "firearm silencer." What if a device has an "encapsulator" and an "end cap"—is it a silencer? What about a device that is attached to the muzzle of a rifle, and is full of "sound dampening material," but has none of the other five physical characteristics—is it a silencer? The agency's approach leaves Innovator (as well as other regulated parties, and reviewing courts) guessing.

*Innovator Enterprises, Inc. v. Jones*, 28 F. Supp. 3d 14, 25 (D.D.C. 2014) (internal citations omitted).

ATF should not rely on the same test for pistol braces that a federal court already rejected for firearm silencers.

 a. The Prerequisites

Before the general factoring criteria may even apply, the Proposed Rule first sets two prerequisites regarding the total physical characteristics of a firearm. These are "weapon weight" and "overall length."

 1. Weapon Weight

ATF notes that popular "traditional" pistols weigh about 39 ounces when loaded. 86 Fed. Reg. at 30,830. The Proposed Rule also correctly notes that stabilizing braces are useful when stabilizing larger and heavier pistols.[4] *Id.* But, it then proposes an arbitrary floor of 64 ounces for

---

[4] ATF takes a "Goldilocks" approach to weapon weight because a firearm that is too heavy would be considered incompatible with braced use under Section III of the factoring criteria. 86 Fed. Reg. at 30,834.

P. App'x 054

any firearm to even be considered as a pistol when equipped with a stabilizing brace. *Id*. There are several problems with this limit. It's quite the jump from 39 ounces given as a common example of a "traditional" pistol to the 64 ounce weight floor.

This weight floor also undermines one of the primary needs for stabilizing braces that ATF identifies: assisting shooters with a disability in firing large format pistols. *Id*. at 30,827. Holding nearly four pounds extended at arms-length with enough precision to accurately aim a firearm is difficult for any shooter. Limiting weight in this way isn't consistent with the purpose of stabilizing braces. It is also not indicative that a firearm is designed and intended to be fired from the shoulder. ATF should discard, or at least substantially lower, the weight floor.

### 2.   Overall Length

The second prerequisite provides that "[f]irearms possessing an overall length between 12 and 26 inches may be considered pistols for which a 'stabilizing brace' could reasonably be attached to support one-handed fire." *Id*. at 30,831. Like the weight floor, the overall length limitation would exclude firearms with attached braces from being considered pistols even where there is little evidence that they are designed and intended to be fired from the shoulder.

For example, two identically configured AR-15 pistols that only differ in barrel length would receive different classifications under the proposed overall length limit. This type of arbitrary line-drawing is exactly what the Administrative Procedures Act prohibits.

ATF also recognizes that braces assist in firing longer barreled pistols with only one hand, but then categorically prohibits the use of braces on many pistols that need a brace for safe one-handed firing due to their longer barrels.

10

Any final rule should not include the proposed overall length limitation because it creates arbitrary results and isn't determinative in whether a particular firearm is designed and intended to be fired from the shoulder.

### b.   Accessory Characteristics

The second step in the factoring criteria looks to the characteristics of the attached stabilizing accessory. Under the Proposed Rule, various features will result in points being awarded to a particular firearm because of its features. If an accessory receives four or more points, it will not be considered a stabilizing brace.

### 1.   Accessory Design

The Proposed Rule begins the supposedly "objective" factoring criteria with an entirely subjective standard. In the accessory design section, ATF will award an accessory zero points if it is "not based on a known shoulder stock design," one point if it "incorporates shoulder stock design feature(s)," and two points if it is "based on a known shoulder stock design." *Id*. at 30,832.

ATF gives some examples of "shoulder stock design features" as "adjustment levers or features that allow for the length of the device to be varied in a manner similar to an adjustable shoulder stock, sling mounts,[5] or hardened surfaces . . . ." *Id*.

---

[5] ATF notes that "[t]he location of a sling or quick detach (QD) mount is an indicator as to the intended use of the accessory. A sling attachment at the rear of the device could be a deterrent from shouldering the weapon, whereas some accessories incorporate QD mounts consistent with known shoulder stock designs." 86 Fed. Reg. at 30,832 n.16. This note highlights the subjective nature of this standard. A sling mount might either add or subtract points based on ATF's own determination of its utility.

P. App'x 056

These features can provide as much, or more, utility for stabilizing braces as they do for shoulder stocks. The user of a brace-equipped pistol who only has the use of one arm must often rely on a sling to stabilize the firearm while the user is reloading or clearing a stoppage. Sling mounts are not indicative of intent to fire a particular firearm from the shoulder.

Adjustable-length-brace designs also allow multiple users to use the same firearm. Users with different length forearms can use different length braces. And the further back a brace is supported on the user's forearm, the greater the stabilizing effect created due to the increased leverage. Adjustable length within the realm of potential end user forearm length should not determine whether a particular design is intended to be fired from the shoulder.

"Hardened surfaces" in an area that could be used to fire a weapon from the shoulder may be indicative of design intent, but ATF must give a usable standard. *See Tripoli Rocketry Ass'n, Inc.*, 437 F.3d at 82. Just as a standard of "much faster" was not sufficient to determine when a material explodes, "hardened" gives no point of reference for manufacturers or gun owners to apply. *Id.*

ATF also appears to be claiming that it may use the "accessory design" standard to award points based on the overall physical appearance of a brace. Manufacturers may wish to take advantage of their existing trade dress when designing pistol braces. If ATF believes that there are objective features in that appearance that are indicative of intent to be fired from the shoulder, then it must identify those features. Simply claiming that a design may receive points on its physical appearance without identifying how that appearance is indicative of intent to be fired from the shoulder is arbitrary and capricious in violation of the APA.

2.   Rear Surface Area

While the rear surface area of a device may be indicative of its design and intent to be shouldered, ATF fails to provide a workable standard. An objective surface area standard would likely be one measured in square inches, but the Proposed Rule instead will award the following points in the rear surface area criteria: Zero points for "device incorporates features to prevent use as a shouldering device." *Id*. at 30,830. One point for "minimized rear surface lacking features to discourage shouldering." *Id*. Two points for "rear surface useful for shouldering a firearm." *Id*. And, three points for "material added to increase rear surface for shouldering." *Id*.

It isn't clear how any manufacturer or gun owner is supposed to use such vague and subjective standards. This is especially true where surface area is something that is easily measured and given an objective standard.

Beyond the lack of objectivity, if a brace "incorporates features to prevent use as a shouldering device," then that should conclusively control that it is not designed and intended to be fired from the shoulder.

ATF should provide an actual objective standard if it moves forward with a rear surface area standard in a final rule.

### 3.   Adjustability

The Proposed Rule provides that an adjustable design will receive two points and a nonadjustable design will receive zero points. As discussed above in more detail, adjustability can provide utility for pistol braces, so it should not be factored against a design that is of a length reasonable for use on expected end user's forearms. Also, by including adjustability in two separate sections, adjustable designs will receive double points under the Proposed Rule.

13

Any final rule should not factor adjustability against a design if it is of a length that is reasonable for use as a stabilizing brace.

4.   Stabilizing Support

In this section, the Proposed Rule identifies the three main ways that existing designs provide stabilizing support. The designs are "counterbalance," "fin-type," and "cuff-type." *Id*. at 30,832-33. Evaluating designs based on their type may be a reasonable way to identify their utility for shoulder-fire, but the Proposed Rule does so in an extremely arbitrary manner.

The Proposed Rule would award one point to a "counterbalance design that folds creating rear contact surface," but a "fin-type" than doesn't have an arm strap, or a "cuff-type" that "fails to wrap around arm" would each receive two points. ATF notes that

> [T]here is no forearm stabilizing purpose in a Counterbalance design that folds closed such that it can no longer be used as a "stabilizing brace." Indeed, this type of design may create rear surface area such that the "stabilizing brace" may be suitable only as a shoulder stock when closed. The folding feature of the Counterbalance design stands in contrast to the purported intent of the device.

*Id*. at 30,832.

Fin-type and cuff-type designs receive more points for simply lacking certain features that make them more useful for stabilizing than a counterbalance design does for a feature that ATF has identified as being suitable only as a shoulder stock. This is clearly an arbitrary and capricious distinction.

The examples given for cuff-type designs are also very confusing. ATF determined that the SB-Mini design partially wrapped around the user's forearm. *Id*. at 30,835. But, for its evaluation of the SBA3 brace, ATF determined that the brace failed to wrap around the user's forearm. *Id*. at 30,837.

14

The SBA3 brace clearly "partially" wraps around the user's forearm,[6] but apparently not "partially" enough for ATF. The example given by ATF exemplifies the arbitrary nature of this standard. If ATF is convinced that the degree that a cuff-type brace engages a user's forearm is relevant to its use, then it must provide a standard that can be applied by manufacturers and gun owners.

This wouldn't be difficult. The regulation could require cuff-type braces to be measured on a cylinder of a particular size. ATF could then provide a reasonable percentage for a brace to wrap "partially" around the cylinder.

The existing standard proposed for stabilizing support is unworkable and contradictory and should not be included in any final rule.

     c.   Configuration of Weapon

The next set of criteria address the entire firearm in its complete configuration. As with the accessory features, firearms are awarded points for the factors and a firearm must have fewer than four points in this section to be considered a pistol with a stabilizing brace under the Proposed Rule.

     1.   Length of Pull

ATF proposes awarding zero points to a firearm with a length of pull under 10-1/2 inches, one point to a length of pull between 10-1/2 and 11-1/2 inches, two points to a length of pull between 11-1/2 and 12-1/2 inches, three points to a length of pull between 12-1/2 and 13-1/2 inches, and four points for anything longer than 13-1/2 inches. *Id.* at 30,833. While this is

---

[6] *See* SBA3 Product Page *available at* https://www.sb-tactical.com/product/sba3/

actually an objective standard, there are legitimate reasons why various users may need longer braces. As discussed above in more detail, different users will need different length braces to provide optimum stability.

Braces are more effective when they interact with the user's forearm close to the elbow. This positioning provides optimum leverage to the brace to counteract the weight of the firearm. Users with longer forearms should not be penalized by ATF's arbitrary length determinations. If a brace is of a reasonable length to be attached to a person's forearm, then it should not be penalized under the factoring criteria.

ATF should also clarify how it intends to measure length of pull. This measurement is traditionally made in a straight line from the trigger to the back end of the firearm. However, ATF has in the past made evaluations where it measured length of pull on an angle to the bottom of a pistol brace. This measurement will always be longer than the traditional straight-line method.

2.   Attachment Method

ATF begins this section with the conclusory statement that "[a] 'stabilizing brace's' attachment method often provides critical insight as to how a firearm is intended to be used." *Id*. No explanation is given to support this statement, other than pointing out how certain methods of attachment affect other criteria that ATF has already identified as indicative of an intent to fire a weapon from the shoulder.

The attachment method has nothing to do with a device's utility to be fired from the shoulder. ATF penalizes attachment methods in this section that offer adjustment or increase the

16

length of pull. But those factors are already covered, and penalized, in other sections. ATF even claims that folding adapters are indicative of intent to shoulder. *Id*.

A folding adapter simply allows for a more compact firearm for storage or transport. It has no bearing on the utility to use the firearm to fire from the shoulder. Any final rule should not consider a device's attachment method as relevant to whether or not a firearm is designed and intended to be fired from the shoulder.

3.   "Stabilizing Brace" Modifications/Configuration

In this section, ATF again begins with an odd claim: "'Stabilizing brace' accessories that have been modified from their original configuration will accrue additional points." *Id*. It's understandable that a brace that is modified to increase its utility for shouldering would accrue additional points, but surely all modifications wouldn't fall into that category.

Some of the criteria in this section are also too vague to apply. A firearm will receive four points, and therefore be automatically considered a shoulder-fired design, if it has a "'brace' accessory modified for shouldering." *Id*. This fails to give manufacturers and gun owners any specificity on what types of modifications are prohibited.

Another factor in this section would award four points for a "'cuff-type' design with the strap removed." *Id*. Does this mean that an NFA firearm may be made if the strap on cuff-type brace becomes damaged and must be removed to be replaced?

Modifications to firearms that aid in shouldering are relevant to determining whether a firearm is designed and intended to be fired from the shoulder, but any final rule should include clarity on what specific modifications might meet this standard and should only include those modifications that are actually relevant to use as a shoulder-fired weapon.

17

4.   Peripheral Accessories

For the last section, the Proposed Rule looks to accessories that are included on the firearm. As ATF notes, these are "often added by the end user . . . ." *Id*. at 30,834. These accessories should not be relevant in an evaluation of how a firearm has been "designed" or "made." While ATF has attempted to claim that end users can "redesign" a firearm by simply using it a certain way, that application of the statute would clearly "stretch" the term "well beyond what the statutory text can naturally bear." *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 51 (2008).

If a consumer physically modifies a firearm, that is one thing, but it is entirely another for ATF to claim that the firearm is redesigned or remade simply by including sights or an optic on the firearm. ATF even goes so far as to penalize firearms that have either no sights or do have sights.  86 Fed. Reg. at 30,834.

ATF will also award four points to any firearm with a "secondary grip." "Further, the presence of any secondary grip on a weapon with a 'stabilizing brace' accessory changes the classification from a one-handed to a two-handed weapon, thereby disqualifying it from being classified as a "braced pistol," and resulting in the subject firearm accruing 4 points. *Id*. at 30,384. Nearly all AR-15 pistols include a "handguard" around the barrel and gas system. The handguard is in addition to the pistol grip for the user's fire control hand. Does this qualify as a "secondary grip," and therefore preclude any AR-15 pistol from being used with a stabilizing brace under the Proposed Rule?

In this section, ATF also includes a weight limit of 120 ounces. *Id*. This is after ATF admitted that the purpose of stabilizing braces is to fire heavier pistols. "Stabilizing support is a

18

vital characteristic because it provides evidence to evaluate the purported purpose of the attached device, which is to provide shooters with forearm support for firing large, heavy handguns." *Id*. at 30,382 (emphasis added). ATF cannot claim that stabilizing braces are only needed on heavy pistols to justify its lower weight limit of 64 ounces only to claim that many pistols are too heavy to be considered for use with a stabilizing brace.

> d.   The "Catch-all" Provision

Even if a particular firearm manages to make it through the byzantine factoring criteria without being considered an NFA firearm, the Proposed Rule reserves the right to classify it as an NFA firearm anyways.

> Even if a weapon accrues less than 4 points in each section, attempts by a manufacturer or maker to circumvent Federal law by attaching purported "stabilizing braces" in lieu of shoulder stocks may result in classification of those weapons as "rifles" and "short-barreled rifles." While some manufacturers have recognized that there is a market advantage in designing and selling "short-barreled rifles" as "pistols" to customers seeking to avoid tax and registration requirements, "stabilizing braces" are not a method by which the Federal statutes may be circumvented. Therefore, efforts to advertise, sell, or otherwise distribute "short-barreled rifles" as such will result in a classification as a "rifle" regardless of the points accrued on the ATF Worksheet 4999 because there is no longer any question that the intent is for the weapon to be fired from the shoulder.

*Id*. at 30,384.

With this provision, ATF abandons any appearance of objectivity or consistency in the Proposed Rule. If ATF may continue to classify any firearm with an attached stabilizing brace as an NFA firearm, then the Proposed Rule exposes NRA members and other American gun owners to criminal prosecution at the whim of the ATF.

IV.   ATF's Change in Position

19

The Proposed Rule represents a clear change in position for ATF on stabilizing braces. Many designs that have been determined by the ATF to not be subject to the NFA in the past via private letter ruling will fail the factoring criteria. *See, e.g.*, FTISB Letter 304,679 (Oct. 3, 2016) *available at* https://gearheadworks.com/wp-content/uploads/2018/12/Mod-2-Approval-Letter.pdf. Yet, ATF has not acknowledged or explained this change in position.

"A central principle of administrative law is that, when an agency decides to depart from decades-long past practices and official policies, the agency must at a minimum acknowledge the change and offer a reasoned explanation for it." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017). With the Proposed Rule, ATF isn't even "display[ing] awareness that it *is* changing position." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

There are four things that an agency must do when changing a policy under the APA: (1) the agency must show "awareness that it is changing [its] position"; (2) that "the new policy is permissible under the statute"; (3) that the agency "believes" the new policy is better; and (4) "good reasons" for the new policy. *Id.* at 515-16.

ATF completely fails to offer any explanation, let alone a reasoned one, for why numerous brace designs that it once determined to not be subject to the NFA now will be. Because ATF has failed to comply with the Supreme Court's clearly established requirements for an agency changing its position, the Proposed Rule is in violation of the APA.

V.      Effect on Existing Owners

The Congressional Research Service recently estimated that there are 10-40 million[7] stabilizing braces in circulation. William J. Krouse, Cong. Research Serv., *Handguns, Stabilizing*

---

[7] ATF puts the estimate much lower at only three million stabilizing braces. 86 Fed. Reg. at 30,828.

*Braces, and Related Components*, (April 19, 2021) *available at*

https://crsreports.congress.gov/product/pdf/IF/IF11763. The Proposed Rule gives the millions of

Americans who lawfully acquired firearms with stabilizing braces in accordance with ATF's

prior application of the law only five options:

> (1) Permanently remove or alter the "stabilizing brace" such that it cannot be reattached, thus converting the firearm back to its original pistol configuration (as long as it was originally configured without a stock and as a pistol) and thereby removing it from regulation as a "firearm" under the NFA. Exercising this option would mean the pistol would no longer be "equipped with" the stabilizing brace within the meaning of the proposed rule.

> (2) Remove the short barrel and attach a 16-inch or longer barrel to the firearm thus removing it from the provisions of the NFA.

> (3) Destroy the firearm. ATF will publish information regarding proper destruction on its website, www.atf.gov.

> (4) Turn the firearm into your local ATF office.

> (5) Complete and submit an Application to Make and Register a Firearm, ATF Form 1 ("Form 1"). As part of the submission, the $200 tax payment is required with the application. Pursuant to 27 CFR 479.102, the name, city, and state of the maker of the firearm must be properly marked on the firearm. All other markings, placed by the original manufacturer, should be adopted. Proof of submission of the Form 1 should be maintained by all possessors. Documentation establishing submission of Form 1 includes, but is not limited to, eForm submission acknowledgement, proof of payment, or copy of Form 1 submission with postmark documentation.

86 Fed. Reg. at 30,843-44 (internal page number omitted).

The first option seems to indicate that the Proposed Rule would prohibit many stabilizing

brace owners from simply removing the brace from their firearm. Limiting this option to

firearms that were "originally configured without a stock and as a pistol" is a clear reference to

ATF's application of *United States v. Thompson/Ctr. Arms Co.* 504 U.S. 505 (1992).  In ATF

Ruling 2011-4, ATF held that

> [A] firearm, as defined by 26 U.S.C. 5845(a)(4), is made when a handgun or other weapon with an overall length of less than 26 inches, or a barrel or barrels of less

21

than 16 inches in length, is assembled or produced from a weapon originally assembled or produced only as a rifle. Such weapons must be registered and are subject to all requirements of the NFA.

By applying this ruling to the first option, ATF appears to claim that any firearm that was originally manufactured with a stabilizing brace and would be a "rifle" under the factoring criteria of the Proposed Rule cannot ever be considered a "pistol." Accordingly, owners of such firearms cannot avail themselves of the option of simply removing the stabilizing brace from their firearm.

If this is ATF's position, then the agency needs to make it much clearer than a single parenthetical reference in the Proposed Rule. This minor reference does not comport with the notice required under the APA. *See MCI Telecommunications Corp. v. F.C.C.,* 57 F.3d 1136, 1141-43 (D.C. Cir. 1995) (*holding* that "[A]n agency may not turn the provision of notice into a bureaucratic game of hide and seek" (Internal citations omitted)).

Options two through four are either extremely complicated or costly for most gun owners or completely destroy the value of their lawfully acquired property.

Option five simply doesn't make sense. It would allow gun owners to file an application to "make and register a firearm."[8] For those already in possession of firearms with stabilizing braces, no firearm is being "made." ATF's own regulation defines "make" to mean "manufacturing (other than by one qualified to engage in such business under this part), putting

---

[8] Requiring NFA registration and taxation also raises several tax issues. The firearms equipped with stabilizing braces that gun owners already possess have been subject to the federal excise tax. 26 U.S.C. § 4181. But, firearms subject to taxation under the NFA are exempt from the excise tax. 26 U.S.C. § 4182(a). If required to register and pay the NFA tax on firearms equipped with stabilizing braces, then gun owners will be subject to double taxation contrary to the law.

P. App'x 067

together, altering, any combination of these, or otherwise producing a firearm." 27 C.F.R. §

479.11.

Since no firearm is being produced, ATF cannot ask gun owners to submit such an

application. Falsely claiming to "make" a firearm that already exists could put gun owners in

legal jeopardy. As ATF's own application form notes:

> Any person who violates or fails to comply with any of the requirements of the
> NFA shall, upon conviction, be fined not more than $10,000 or be imprisoned for
> not more than 10 years, or both. Any firearm involved in a violation of the NFA
> shall be subject to seizure and forfeiture. *It is unlawful for any person to make or
> cause the making of a false entry on any application* or record required by the
> NFA knowing such entry to be false.

Application to Make and Register a Firearm, OMB No. 1140-0011 *available at*

https://www.atf.gov/file/11281/download (emphasis added).

Even if it were lawful for gun owners to use the application to make and register a

firearm in this way, for many, it simply isn't an option. Many states prohibit the possession of

short-barrel rifles. Gun owners in those states cannot register their firearms in violation of state

law.

Because the proposed rule leaves some gun owners with no option but to dispose of their

lawfully-acquired firearm, it also potentially violates the Takings Clause. *See Duncan v. Becerra*,

265 F. Supp. 3d 1106, 1138-39 (S.D. Cal. 2017), *aff'd,* 742 F. App'x 218 (9th Cir. 2018).

VI.  Reliance on ATF's Prior Position

The Supreme Court recently made clear that an agency action may be "arbitrary and

capricious" because if fails to account for the reliance interests of those affected by the action.

23

*See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1914-15 (2020).

The Proposed Rule puts millions of otherwise law-abiding Americans in danger of federal criminal prosecution. Manufacturers, dealers, NRA members, and other firearm owners have all relied on ATF's past decisions on stabilizing braces when exercising their fundamental right to manufacture, and own Constitutionally-protected arms. The Proposed Rule fails to address these interests entirely.

ATF is "required to assess whether there [are] reliance interests, determine whether they [are] significant, and weigh any such interests against competing policy concerns. *Id.* at 1915. Because ATF has completely failed to address these interests in the Proposed Rule, it is "arbitrary and capricious."

**Conclusion**

Large portions of the Proposed Rule are in violation of the APA, unconstitutionally vague, or simply unworkable for gun owners and the firearm industry. For these reasons, ATF should abandon this clearly unlawful Proposed Rule. Firearm manufacturers and gun owners do need an actual objective set of rules for stabilizing braces, but those rules must be consistent with the law and usable by those Americans who choose to own firearms with stabilizing braces.

Signed,

Josh Savani
Director
Research & Information Division
NRA-ILA

24

# EXHIBIT 4



**APPEARS IN**      **NEWS**

# Updates to ATF Final Rule on Stabilizing Braces

**MONDAY, JANUARY 30, 2023**



On Monday, January 30, the Bureau of Alcohol, Tobacco, Firearms, and Explosives' (ATF) published the final Factoring Criteria for Firearms with Attached "Stabilizing Braces" rule for public inspection in the federal register.

As we reported earlier this month, the rule would subject essentially all firearms with attached stabilizing braces to the registration and taxation requirements of the National Firearms Act (NFA).

Since 2012, when Biden was serving as then-President Barack Obama's vice president, ATF has recognized that stabilizing braces serve a legitimate function, and the inclusion of a stabilizing brace on a pistol or other firearm does not automatically subject that firearm to the provisions of the National Firearms Act. That's because stabilizing braces were first designed and intended to help disabled veterans fire large format pistols.

With the finalization of this rule, the Biden Administration is reversing over a decade of agency guidance and rulings that the firearms industry and law-abiding American gun owners have relied on when designing or acquiring firearms.

**P. App'x 071**

Case 3:21-cv-00116-B   Document 71-1   Filed 06/06/23   Page 72 of 252   PageID 716

NRA has repeatedly pushed back on administration attempts to classify firearms with attached braces under the NFA. When the most recent rule was proposed, NRA submitted comments, which you can find here.

Since the rule was first posted on ATF's website on January 13, ATF has already been required to "clarify" several issues with the rule.

First, at the Shooting, Hunting, Outdoor Trade Show, ATF confirmed that braces that are removed from firearms do not necessarily have to be destroyed or altered in a way that prevents them from being reattached to a firearm. While the rule claims that destruction or alteration is required for owners who choose the option of simply removing the brace from their firearm, that requirement would be contrary to the Supreme Court's decision in *United States v. Thompson/Center Arms Co.*

Under *Thompson/Center*, possession of a firearm and parts that can *only* be assembled into an NFA "firearm" constitutes possession of an NFA firearm. But, if the parts can be assembled into multiple lawful configurations, then the parts are not considered an NFA firearm (unless an unlawful configuration is actually assembled).

This should mean that a person who possesses an AR-15 pistol with a stabilizing brace and also possesses a 16-inch barreled upper receiver and/or a registered NFA lower should be able to keep the brace without destroying it or altering it. But, a person who only possesses a pistol with a stabilizing brace may have to dispose of or alter the brace to avoid creating an NFA firearm (in ATF's view).

Second, in the final rule posted to ATF's website, the agency appeared to claim that imported pistols with stabilizing braces would need to be destroyed or surrendered because they were unlawfully assembled in violation of 18 U.S.C. § 922(r), which generally prohibits the assembly of "non-sporting" rifles or shotguns without sufficient domestically manufactured parts.

Last week, ATF updated the final rule' Frequently Asked Questions page to include the following answer to the question of whether section 922(r) applies to firearm impacted by the rule.

> No. Section 922(r), in relevant part, makes it unlawful to assemble from imported parts a semiautomatic rifle that is otherwise not importable. The implementing regulations of the GCA at 27 CFR 478.39 provides that a person may not assemble a semiautomatic rifle using more than 10 of the imported parts listed in the relevant paragraphs of the regulation. As discussed in section IV.B.8.e of the final rule, the criminal violation under section 922(r) is for the "assembly" of the semiautomatic rifle; therefore, no modification of such firearm would cure the 922(r) violation because the "assembly" has already occurred. Accordingly, a person with an imported pistol that was subsequently equipped with a "stabilizing brace" will have the same options as anyone else under the final rule. Should that person choose to register the firearm, no further modification of the firearm with domestic parts is required.

While this answer seems to directly contradict the agency's response to comments in the final rule, it is certainly positive news for owners of imported pistols with attached stabilizing braces.

The fact that ATF already needs to "clarify" aspects of the rule before it has been officially published in the federal register further underscores the arbitrary and confusing nature of the rule.

**P. App'x 072**

Fortunately for law-abiding gun owners, federal courts have recently proven more willing to invalidate agency actions that go beyond congressionally enacted statutes. Earlier this month, one of ATF's most recent major rules was struck down by the United States Court of Appeals for the Fifth Circuit. The agency's stabilizing brace rule should meet the same end for the same reasons.

NRA-ILA is already working on litigation to challenge this arbitrary and capricious attack on law-abiding gun owners by the Biden Administration. Please check back to www.nraila.org for more updates.

**IN THIS ARTICLE**

ATF          STABILIZING BRACE          NATIONAL FIREARMS ACT (NFA)          REGISTRATION

NRA**EXPLORE**     **MORE LIKE THIS FROM AROUND THE NRA**



**FORMER FIRST LADY JUST DOESN'T GET IT**
An Official Journal Of The NRA



**DECIPHERING THE LANGUAGE OF THE REVISED ATF FORM 4473**

An NRA Shooting Sports Journal

**REGISTER BY JUNE 14 TO ORDER 2023 NRA NATIONAL MATCHES APPAREL**

6/6/23, 4:19 PM
NRA-ILA | Updates to ATF Final Rule on Stabilizing Braces
Case 3:21-cv-00116-B    Document 71-1    Filed 06/06/23    Page 75 of 252    PageID 719
An NRA Shooting Sports Journal

# EXHIBIT 5



**APPEARS IN**      **NEWS**

# Biden Administration Continues Push to Target Firearms with Attached Stabilizing Braces

MONDAY, DECEMBER 12, 2022



It seems like we have been warning about the Biden Administration's intent to reclassify handguns equipped with braces intended to help disabled veteran shooters for quite some time.

There were once signs that the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) intended to get out of the practice of making confusing regulations—including those involving stabilizing braces—that appeared to circumvent the authority of Congress to actually define and pass laws regarding firearms. But with Biden's election in 2020, a reinvigorated faction within ATF began a push to re-examine stabilizing braces. NRA immediately took notice, and put out a call to action.

Way back in June of 2021, Biden's Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) published a new notice of proposed rulemaking on its website entitled *Factoring Criteria for Firearms with Attached "Stabilizing Braces"*. The proposed rule was published in the Federal Register on June 10, 2021, giving interested parties until September 8, 2021

to file comments.

The rule seemed aimed at making nearly all configurations of firearms equipped with stabilizing braces subject to the taxation and registration requirements of the National Firearms Act.

Since 2012, when Biden was serving as then-President Barack Obama's vice president, ATF has recognized that stabilizing braces serve a legitimate function, and the inclusion of a stabilizing brace on a pistol or other firearm does not automatically subject that firearm to the provisions of the NFA. That's because stabilizing braces were first designed and intended to help disabled veterans fire large format pistols.

While ATF estimates that there are approximately three million pistol stabilizing braces, even other portions of the United States government recognize that this is a vast undercounting of the number of pistol braces currently in circulation. A report by the Congressional Research Service puts the estimate much higher; suggesting anywhere from 10 to 40 million pistol stabilizing braces. With so many in circulation, effectively banning firearms with these devices attached would be the largest confiscatory firearm regulation in the history of the United States.

NRA, of course, submitted comments to this terrible proposed rule, which you can find here.

More than one year since the comment period ended, and a year-and-a-half since the original proposed rulemaking, it is still unclear when, or how, the new rule will be implemented.

In January of this year, we reported, in a story on different rules Biden's ATF had put in place, that the regulations page for the proposed stabilizing brace rule indicated it would be finalized in August.

That didn't happen.

Now the regulations page says "Final Action" will take place on "12/00/2022." What date that actually signifies is unclear, but it would appear the final rule remains in a holding pattern.

There may be other complications facing Biden's ATF when it comes to this pending rule, other than the general complexity and poor optics of potentially criminalizing millions of Americans (especially disabled veterans) for owning items that same ATF previously said they could legally acquire and own.

The rule has now been transferred to the Office of Information and Regulatory Affairs for review. That means that the final rule could be posted in the federal register in the coming days.

With the House of Representatives coming under pro-gun leadership, scrutiny of this federal agency is likely to get much more intense. When the House was under the control of radical, anti-gun extremists like soon-to-be-former Speaker Nancy Pelosi (D-Calif.), virtually any anti-gun action taken by ATF was encouraged—even if it seemed to circumvent the authority granted by Congress.

A recent article noted Congressman Jim Jordan (R-Ohio) "is targeting newly-confirmed U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives Director Steve Dettelbach over new gun rules that Jordan calls 'a deliberate attempt to usurp the authority of Congress and infringe on American citizens' fundamental Second Amendment rights.'"

**P. App'x 078**

Case 3:21-cv-00116-B   Document 71-1   Filed 06/06/23   Page 79 of 252   PageID 723

Jordan will be serving as House Judiciary Chairman when the new Congress convenes in January, so it would behoove Dettelbach to take his stated concerns seriously.

The article mentions a letter Jordan sent Dettelbach outlining a number of concerns the Chairman-to-be has regarding ATF. Included among those concerns is the pending rule on stabilizing braces. Jordan notes that no federal law has been passed that "criminalized the use of a pistol arm-stabilizing brace."

In an earlier letter to ATF on the subject of these braces, Jordan wrote, "Through its proposed rule, ATF seeks to subject stabilizing braces to GCA criminal penalties and NFA regulation without Congressional prohibition of the underlying activity."

Other than the prospect of facing a House majority that does not work in lockstep with anti-gun activists, the ATF may be facing additional problems with what many consider to be overreach of its use of rulemaking. Recent actions by the Supreme Court of the United States (SCOTUS) may indicate the nation's top court may try to reign in federal rulemakers, which could include those at ATF.

Whatever develops on this front, you can count on NRA to remain involved, and to keep you updated.

**IN THIS ARTICLE**

UNITED STATES     ATF     STABILIZING BRACE     NATIONAL FIREARMS ACT (NFA)

NRA**EXPLORE**   **MORE LIKE THIS FROM AROUND THE NRA**



**FORMER FIRST LADY JUST DOESN'T GET IT**
An Official Journal Of The NRA

P. App'x 079



**DECIPHERING THE LANGUAGE OF THE REVISED ATF FORM 4473**

An NRA Shooting Sports Journal



**SHH ... HERE'S THE TRUTH ABOUT SILENCERS**

# EXHIBIT 6

[sb-tactical.com](sb-tactical.com)

# Company | SB Tactical

5–7 minutes

---

## The Company

As the originator of the forearm Pistol Stabilizing Brace®, SB Tactical® is a groundbreaking thought leader committed to providing hard-core shooters what they need. In an industry reluctant to challenge conventional wisdom, we transformed the possibilities of large frame pistols. We will stop at nothing to help our customers overcome challenges with brilliantly engineered, expertly constructed solutions.

Our History

SB Tactical has inspiring origins — from roots in military service to the altruistic genesis of the Pistol Stabilizing Brace. We hold steady to our principles and will let nothing stand in the way of our relentless quest to innovate and to help preserve and protect the Second Amendment.



P. App'x 083

Case 3:21-cv-00116-B   Document 71-1   Filed 06/06/23   Page 84 of 252   PageID 728



## 2012

It all began one fateful day at the firing range.

USMC and Army vet Alex Bosco was shooting with a disabled combat veteran when the range master asked Bosco's friend to stop firing for safety concerns due to lack of control. Determined to help his friend and other wounded combat veterans, Bosco had an idea. He produced the first Pistol Stabilizing Brace prototype in his garage.

After testing his concept with disabled vets, Bosco sought approval from the ATF. In November 2012, the agency responded with an approval letter stating that "the submitted brace, when attached to a firearm, does not convert that weapon to be fired from the shoulder and would not alter the classification of a pistol or other firearm. While a firearm so equipped would still be regulated by the Gun Control Act … such a firearm would not be subject to NFA controls."

Bosco co-founded SB Tactical with Grant Shaw and began making production prototypes for AR and AK platforms.



P. App'x 084

Company | SB Tactical      about:reader?url=https%3A%2F%2Fwww.sb-tactical.com%2Fabout%...

Case 3:21-cv-00116-B   Document 71-1   Filed 06/06/23   Page 85 of 252   PageID 729



2013

In January 2013, exclusive sales agreements were executed with SIG SAUER, Inc. and Century Arms International for the AR (SB15) and AK (SB47) braces, respectively.

In May 2013, the first Pistol Stabilizing Braces were delivered into the marketplace.



**P. App'x 085**

Company | SB Tactical        about:reader?url=https%3A%2F%2Fwww.sb-tactical.com%2Fabout%...

Case 3:21-cv-00116-B   Document 71-1   Filed 06/06/23   Page 86 of 252   PageID 730

2014

In March 2014, the ATF issued a second letter stating that "for the following reasons, we have determined that firing a pistol from the shoulder would not cause the pistol to be reclassified as an SBR: FTB classifies weapons based on their physical design characteristics. While usage/functionality of the weapon does influence the intended design, it is not the sole criterion for determining the classification of a weapon. Generally speaking, we do not classify weapons based on how an individual uses a weapon."

The product portfolio of Pistol Stabilizing Braces was expanded to include the SBX™, a pistol buffer tube compatible brace, and specialty braces for HK and CZ firearms.



2015

The ATF issued a third letter just before SHOT Show in January

P. App'x 086

Company | SB Tactical        about:reader?url=https%3A%2F%2Fwww.sb-tactical.com%2Fabout%2...

Case 3:21-cv-00116-B   Document 71-1   Filed 06/06/23   Page 87 of 252   PageID 731

2015 that resulted in widespread confusion and legal concerns in the firearms industry. The letter stated that, "the pistol stabilizing brace was neither 'designed' nor approved to be used as a shoulder stock, and therefore use as a shoulder stock constitutes a 'redesign' of the device because a possessor has changed the very function of the item."

Despite lingering confusion in the marketplace relative to compliance, SB Tactical continued to innovate and develop new products. In December of 2015, the ATF issued an approval letter, enabling adjustable technology to be built into Pistol Stabilizing Braces.



## 2016

After the exclusive sales agreements with SIG SAUER and Century Arms expired in 2015, SB Tactical underwent a significant rebranding effort including team, product portfolio and OEM

P. App'x 087

Company | SB Tactical               about:reader?url=https%3A%2F%2Fwww.sb-tactical.com%2Fabout...

Case 3:21-cv-00116-B   Document 71-1   Filed 06/06/23   Page 88 of 252   PageID 732

partnership expansion. SB Tactical implemented a dealer and distribution sales strategy to better support the marketplace.

After the success of the adjustable braces, SB Tactical released the innovative SBT Series of integral, side-folding braces for B&T, HK and CZ Scorpion pistols.



To the extent the January 2015 *Open Letter* implied or has been construed to hold that incidental, sporadic, or situational "use" of an arm-brace (in its original approved configuration) equipped firearm from a firing position at or near the shoulder was sufficient to constitute "redesign," such interpretations are incorrect and not consistent with ATF's interpretation of the statute or the manner in which it has historically been enforced.

2017

In March 2017, the ATF issued a private letter to SB Tactical clarifying that the mere act of firing an unmodified, SB Tactical® Pistol Stabilizing Brace® from the shoulder does not constitute a "redesign" of the host firearm into an NFA short barrel rifle. When fired from the shoulder, a Pistol Stabilizing Brace must be in its original, approved condition and may not be physically altered for use as a shoulder stock.



Service Discount

The least we can do to thank those who protect our rights and freedoms as Americans.

**P. App'x 088**

Company | SB Tactical         about:reader?url=https%3A%2F%2Fwww.sb-tactical.com%2Fabout%...

Case 3:21-cv-00116-B   Document 71-1   Filed 06/06/23   Page 89 of 252   PageID 733

[Discount Information](#)



Patents

As the inventor of the Pistol Stabilizing Brace®, SB Tactical is very active in protecting its designs, products and intellectual property by working to secure patents and trademarks with the U.S. Patents and Trademarks Office.

[Our Patents](#)

**P. App'x 089**

# EXHIBIT 7

# PRESS RELEASES

*Home (/Public/Home) / Media (/Public/Media)
/ Press Releases (/Public/Press-Releases)*

## Kennedy, Marshall, Clyde introduce resolution to stop Biden admin from turning lawful gunowners into felons with pistol brace rule (/public/press-releases?ID=4A693E02-E174-4435-A0DA-BD8B352FCAF1)

*Mar 15 2023*

WASHINGTON – Sen. John Kennedy (R-La.), Sen. Roger Marshall (R-Kan.) and more than 40 Republican senators today introduced a Congressional Review Act (CRA) resolution to prevent the Biden administration's Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) from enforcing an anti-Second Amendment pistol brace rule.

 The rule, titled Factoring Criteria for Firearms with Attached Stabilizing Braces (https://www.federalregister.gov/documents/2023/01/31/2023-01001/factoring-criteria-for-firearms-with-attached-stabilizing-braces), would reclassify pistols as short-barreled rifles if they have a stabilizing brace attachment, even though many disabled veterans and other Americans rely on these braces to use their firearms. Under this rule, otherwise lawful gun owners could face up to 10 years in jail and thousands of dollars in fines if they fail to register pistols with stabilizing braces with the ATF. If gun owners do not register their firearms, they would have to destroy the firearm, surrender their firearm to the ATF or remove the brace in such a way that it cannot be reattached.

In addition to the CRA resolution, Kennedy and Marshall are introducing a bill (https://www.kennedy.senate.gov/public/_cache/files/f/e/fe17f8c9-dd6e-47b5-a258-6cbdf7169799/75A412EDD38CC6B6FA7A2F98317364C7.defunding-the-atf-pistol-brace-rule.pdf) to prevent federal funds from being used to implement, administer, or enforce this unconstitutional rule.

**P. App'x 091**

"Millions of law-abiding Americans use pistol braces, and many of those Americans rely on braces because they are disabled. If Congress doesn't correct the ATF's misguided rule, countless law-abiding gunowners in Louisiana and other states will become criminals in the blink of an eye. The Biden administration's assault on the Second Amendment isn't going to stop unless we defend this fundamental liberty," said Kennedy.

"The Biden administration's war on every American's fundamental right to bear arms is relentless and an offense to our founders. Congress must use every tool at its disposal to stop the Biden ATF from enacting this unconstitutional gun grab and creating its newly proposed anti-2nd Amendment gun registry. The Congressional Review Act is one of those important tools and I'm pleased to co-lead this effort with Senator Kennedy," said Marshall.

Rep. Andrew Clyde (R-Ga.) is introducing Kennedy's resolution in the House of Representatives.

"The ATF's unconstitutional pistol brace rule reveals the agency's brazen disregard for our Constitution and Congress' sole legislative authority. Unelected anti-gun bureaucrats simply do not have the power to propel President Biden's goal of disarming our nation and dismantling our Second Amendment freedoms by registering and banning millions of firearms. In the face of the Biden Administration's latest gun-grabbing measure, it's time for Congress to utilize the Congressional Review Act to fight for law-abiding gun owners. As a stalwart supporter of the Second Amendment and a Federal Firearms Licensee by trade, I'm proud to lead the effort to terminate the ATF's latest tyrannical tactic with Congressman Richard Hudson and Senator John Kennedy. We remain unwavering in the defense of Americans' constitutional right to keep and bear arms," said Clyde.

In 2012, the Obama-Biden administration's ATF determined (https://vpc.org/wp-content/uploads/2019/08/ATF-Approval-Letter-2012.pdf) that pistol-brace attachments do not change the classification of a pistol to that of a rifle. Despite this, the Biden administration in 2021 directed the Department of Justice (DOJ) to propose a rule that clarifies when a pistol with a brace attachment should be designated as a rifle.

Earlier this year, the DOJ announced the "stabilizing braces" final rule (https://www.justice.gov/opa/pr/justice-department-announces-new-rule-address-

**P. App'x 092**

stabilizing-braces-accessories-used-convert).

"The ATF's overreaching rule seeks to penalize and disarm law-abiding gun owners across America, and I'm proud to join my colleagues in challenging this new regulation," said Sen. John Thune (R-S.D.).

"Every day, people across Wyoming responsibly use their Second Amendment rights to keep and bear arms. President Biden's unconstitutional rule threatens to turn law-abiding citizens into criminals. We must stop the administration from imposing the largest government-initiated gun registration and confiscation program in history. I will fight against any policies that jeopardize the Second Amendment rights of the people of Wyoming and across the country," said Sen. John Barrasso (R-Wyo.).

"The Biden administration's rulemaking on pistol braces is a gun confiscation scheme that would punish millions of Americans for exercising their constitutional right. This rule and the higher taxes, longer waiting periods, and red tape is by design to confiscate firearms from law-abiding citizens, and I urge Attorney General Garland and ATF Director Dettelbach to reverse it immediately,"said Sen. John Cornyn (R-Texas).

"The ATF's new rule forces Second Amendment sanctuary states like North Dakota to alter, destroy, surrender, or register pistol-stabilizing braces as short-barreled rifles. Instead of targeting criminals, the new rule punishes millions of law-abiding citizens. I will always protect our constitutional right to bear arms, which is why I strongly oppose this rule. I urge my Senate colleagues to do the same," said Sen. Kevin Cramer (R-N.D.).

"Gun owners in Nebraska and across our country have a fundamental right to bear arms that is protected by the Second Amendment. This proposal is yet another example of excessive overreach by the federal government that unfairly burdens law abiding firearm owners. I'm proud to join my colleagues in supporting a resolution to overturn this misguided rule," said Sen. Deb Fischer (R-Neb.).

"The new rule on pistol braces is a gross violation of Americans' Second Amendment rights. The Biden Administration has continuously demonstrated a willingness to overstep the bounds of the Constitution. We will stand with gun owners," said Sen. Roger Wicker (R-Miss.).

"**The President has no authority to order this backdoor attempt to infringe on the constitutional rights of millions of Americans. I'm pleased to join my Senate colleagues in fighting to stop this government gun grab,**" said Sen. Bill Hagerty (R-Tenn.).

"**I'm a proud supporter of our Constitution and the 2nd Amendment. Biden and the far-left's blatant attempt to push overreaching policies that infringe on the rights of law-abiding Americans is completely unacceptable. I'm proud to join my colleagues to reverse this ridiculous attempt to make criminals of law-abiding gun owners and protect the constitutional rights our nation was founded on,**" said Sen. Rick Scott (R-Fla.).

"**The Biden Administration's blatant disregard for Constitutional rights hit a new low with their pistol brace rule. A pistol brace is a stabilizer that serves as a gun accommodation to help veterans with disabilities more safely handle a pistol. Regardless of this safety function, this new rule will require owners of a pistol brace to consent to being added to a federal gun registry—which is blatantly illegal—or risk up to 10 years in jail and a fine of up to a quarter million dollars. The American people need a say in whether this bill is instituted, and the only way to guarantee that is for Congress to demand Congressional approval before this rule is implemented. I strongly oppose this unlawful ban, and I hope our Congressional Review Act ensures that I have the chance to vote against this rule in the Senate,**" said Sen. Jim Risch (R-Idaho).

"**Second Amendment rights are not based in law or regulation, but enshrined in the Constitution. Oklahomans know well how the progressive Biden Administration is trying to erode Second Amendment rights by making guns, ammunition, and gun-related products like pistol braces difficult to own. Law-abiding gun owners are counting on us to protect their rights and their use of pistol braces. Congress should make it clear to the ATF that we won't stand for this overreach,**" said Sen. James Lankford (R-Okla.).

"**After blessing the use of pistol braces for years, the ATF will now require anyone who owns a gun with a pistol brace to remove it, turn the gun in, or register it. This thoughtless regulation won't stop criminals—but it will saddle legal gun owners with even more rules,**" said Sen. Tom Cotton (R-Ark.).

"**The ATF under the Biden administration insists on issuing rules that end up infringing on the rights of law-abiding gun owners while doing next to nothing to**

**P. App'x 094**

stop violent crime. It's too much. I hope enough Senators will stand up and block this ill-advised and unneeded rule," said Sen. Cindy Hyde-Smith (R-Miss.).

"This new rule is yet another example of federal overreach by Biden's Department of Justice. The unconstitutional action from the ATF is an infringement on the Second Amendment rights of law-abiding gun owners. I hope my colleagues on both sides of the aisle will join us in halting this action by the Administration," said Sen. Ron Johnson (R-Wis.).

"The ATF has proven time and time again that they are determined on carrying out Biden and Senate Democrats' unconstitutional gun-grabbing agenda. I will fight this move by unelected Washington bureaucrats that would strip Montanans of their Second Amendment rights," said Sen. Steve Daines (R-Mont.).

"Joe Biden's Pistol Brace Rule is wholly inconsistent with the text, history, and tradition of the Second Amendment. Along with its impractical application, it is unacceptable for the federal government to tax and take away the ability of tens of millions of Americans, including disabled veterans, to exercise their constitutionally protected freedoms. As a strong defender of the Second Amendment, I will always protect the rights of all law-abiding Americans to keep and bear arms," said Sen. Markwayne Mullin (R-Okla.).

"Stabilizing braces were initially designed and manufactured to assist disabled combat veterans in shooting larger pistols that were otherwise too cumbersome for a gun owner with a disability to use. The ATF previously ruled that they are permissible. This decision to overturn that ruling infringes on the Second Amendment rights of Wyoming veterans who served our nation honorably as well as other people in Wyoming who use pistol braces. I'm proud to join Senator Kennedy in introducing this Congressional Review Act resolution opposing this unconstitutional rule," said Sen. Cynthia Lummis (R-Wyo.).

"The Biden administration is once again attempting to punish law-abiding Americans, including disabled veterans who have made tremendous sacrifices to protect our rights. Federal bureaucrats have no authority to tamper with or undermine the Second Amendment. Congress should use every tool to block ATF from acquiring information that could be used to confiscate firearms or target responsible gun owners," said Sen. John Boozman (R-Ark.).

"The disrespect shown to disabled veterans by the Biden administration is

**P. App'x 095**

unconscionable. Make no mistake; unelected and unaccountable bureaucrats are punishing veterans for enjoying their rights protected by the Second Amendment. Stabilizing braces have long been a safe, helpful, and legal remedy for those who have lost the physical ability to conventionally use a firearm due to their service to our country. Senator Kennedy's legislation is a thoughtful check on the disdain conveyed by President Biden. I'm proud to support those who have sacrificed their bodies to support America," said Sen. Mike Lee (R-Utah).

"Congress has the sole power to change our federal laws, and the Biden administration's rule on the use of pistol braces infringes on both the Constitutional authority granted to the legislative branch and further erodes public confidence in the administration's adherence to the Second Amendment rights of law-abiding citizens," said Sen. Jerry Moran (R-Kan.).

"The Biden Administration's recent stabilizing brace rule is blatant overreach of ATF's rulemaking authority—adding burdensome regulations on law-abiding gun owners without actually doing anything to make our communities safer. The Administration should focus on cracking down on violent crime, not punishing law-abiding Americans," said Sen. Mitt Romney (R-Utah).

Sens. Mitch McConnell (R-Ky.), Marsha Blackburn (R-Tenn.), Mike Crapo (R-Idaho), Ted Cruz (R-Texas), Josh Hawley (R-Mo.), Thom Tillis (R-N.C.), Joni Ernst (R-Iowa), Lindsey Graham (R-S.C.), Rand Paul (R-Ky.), Chuck Grassley (R-Iowa), Dan Sullivan (R-Ohio), Bill Cassidy (R-La.), J.D. Vance (R-Ohio), Mike Braun (R-Ind.), Todd Young (R-Ind.), John Hoeven (R-N.D.), Ted Budd (R-N.C.), Katie Britt (R-Ala.), Mike Rounds (R-S.D.), Tommy Tuberville (R-Ala.), Eric Schmitt (R-Mo.), Pete Ricketts (R-Neb.), Shelley Moore Capito (R-W.Va.) and Marco Rubio (R-Fla.) also cosponsored the legislation.

"The Second Amendment explicitly prohibits President Biden from using the ATF to ban millions of lawfully purchased pistols—especially without the passage of a new law by Congress. Gun Owners of America proudly supports using the Congressional Review Act to disapprove of the Biden Pistol Ban and stop this rule from infringing on the rights of millions of gun owners before they are compelled to rebuild, destroy, turn in, or register their pistols in the next 120 days. GOA is proud to see Representatives Andrew Clyde and Richard Hudson as well as Senators John Neely Kennedy and Roger Marshall leading the fight against President Biden's unconstitutional gun grab," said Gun Owners of America's Director of Federal Affairs Aidan Johnston.

P. App'x 096

Rep. Richard Hudson (R-N.C.) is leading the legislation with Clyde in the House.

**"This rule jeopardizes the Second Amendment rights of law-abiding gun owners and disabled combat veterans. I'm proud to lead the fight in blocking the ATF's unconstitutional pistol brace rule,"** said Hudson.

Full text of the CRA resolution is available here (https://www.kennedy.senate.gov /public/_cache/files/5/b/5beb9ecb-bd3f-4db4-80ef-92445f7bcc53 /25460943B69EA0FD171A31B85AD6210B.oll23241.pdf).

**P. App'x 097**

# EXHIBIT 8

06.25.21

# Cassidy, McConnell, Colleagues Call on Biden Administration to Withdraw Gun Braces Ban

**WASHINGTON** – U.S. Senator Bill Cassidy, M.D. (R-LA), Leader McConnell (R-KY) and 47 other Republican senators called on the Bureau of Alcohol, Tobacco, Firearms and Explosives to withdraw their proposed rule banning the use of stabilizing braces on firearms.

"We write to express our grave concern regarding the Bureau of Alcohol, Tobacco, Firearms & Explosives' (ATF) Proposed Rule 2021R-08," **wrote the senators**. "The way the proposed rule is written makes clear that ATF intends to bring the most common uses of the most widely possessed stabilizing braces within the purview of the [National Firearms Act of 1934]. Doing so would turn millions of law-abiding Americans into criminals overnight, and would constitute the largest executive branch-imposed gun registration and confiscation scheme in American history."

"This is plain wrong. The proposed rule is worse than merely abdicating your responsibility to protect Americans from criminals; you're threatening to turn law-abiding Americans into criminals by imposing the largest executive branch-initiated gun registration and confiscation program in American history. We urge you to turn back. Correct this mistake and withdraw the proposed rule," **continued the senators.**

Read the full letter here or below.

*Attorney General Garland and Acting Director Richardson:*

*We write to express our grave concern regarding the Bureau of Alcohol, Tobacco, Firearms & Explosives' (ATF) Proposed Rule 2021R-08, "Factoring Criteria for Firearms with Attached 'Stabilizing Braces,'" published in the Federal Register on June 10, 2021. ATF claims that the objective of the proposed rule is to "clarify" which uses of stabilizing braces bring within the strict regulatory ambit of the National Firearms Act of 1934 (NFA) certain*

**P. App'x 099**

*commonly used firearms that are otherwise regulated by the Gun Control Act of 1968 (GCA). The way the proposed rule is written makes clear that ATF intends to bring the most common uses of the most widely possessed stabilizing braces within the purview of the NFA. Doing so would turn millions of law-abiding Americans into criminals overnight, and would constitute the largest executive branch-imposed gun registration and confiscation scheme in American history. We therefore vehemently oppose this proposed rule and urge its immediate withdrawal.*

*To one unfamiliar with stabilizing braces, A TF's proposed rule and the accompanying regulatory analysis suggest that these braces are dangerous alterations to firearms designed to help criminals evade federal law. Nothing could be further from the truth, and ATF knows that. After all, it has repeatedly blessed their design, manufacture, sale, and use.*

*The impetus for the manufacture of stabilizing braces was to assist disabled combat veterans in shooting large pistol platforms that were otherwise too cumbersome for a disabled shooter to use. In 2012, ATF announced that attaching a stabilizing brace to an AR-type pistol did not convert that pistol-regulated by the GCA-into a short-barreled rifle (SBR) regulated by the NFA and subject to the NFA's taxation and registration regime. In 2015, ATF announce that attaching a stabilizing brace to a pistol that could allow the pistol to be fired from the shoulder converted that pistol into an SBR. Just two years later, however, in a letter to a manufacturer, ATF appeared to rescind its indefensible 2015 ruling. ATF thereafter issued private letter rulings blessing a wide array of stabilizing brace configurations from a host of manufacturers.*

*ATF's effective rescission in 2017 of its previous misapplication of the law, combined with its repeated letter rulings approving stabilizing braces, created a thriving market for these stabilizing braces. Millions of law-abiding Americans have purchased braces to add them to their own firearms, or purchased firearms with the braces already attached. They did so in reliance on what the ATF said in 2017 and on a plain reading of the governing statutes. At least eight firms manufacture the braces, including one in Kentucky; thousands of firearm manufacturers have built and sold firearms with braces attached; and tens of thousands of federal firearms licensees have sold firearms with these braces attached. Untold thousands of American jobs are associated with the design, production, marketing, and*

**P. App'x 100**

*sale of stabilizing braces.*

*Having fostered this vibrant market in which millions of law-abiding Americans have participated, ATF now suddenly changes course. Its proposed rule would yank the rug out from under those law-abiding Americans. Though the agency purports to seek comment, the notice and the criteria laid out in the proposed rule make clear that ATF has already made up its mind: the overwhelming majority of braces currently in use are unlawful. ATF is merely covering its retroactive gun grab with a patina of administrative process. The proposed criteria for making the ad hoc determination as to the status of a brace-equipped pistol were reverse engineered by ATF to ensure that they will be subject to NF A regulation as an SBR. If ATF proceeds as it proposes, virtually all stabilizing brace-equipped pistols in circulation will become contraband.*

*ATF has not disguised its intentions. It stated, for example, that the proposed rule "proposes factors ATF considers when evaluating firearms equipped with a purported 'stabilizing brace' to determine whether these weapons would be considered a 'rifle' or 'short-barreled rifle' under the [GCA] or a 'rifle' or 'firearm' subject to regulation under the [NFA]." "'Pistol' under the GCA" is not even an option on the table for ATF. ATF has adopted vague, confusing, and largely subjective criteria to govern the classification determination. And A TF says that it "reserves the right" to ignore its vague criteria in order to classify a brace-equipped pistol as an SBR if A TF believes that the use of the brace is "an attempt to make a 'short- barreled rifle' and circumvent the GCA or NFA."*

*ATF seems to believe that re-characterizing millions of pistols as SBRs is no big deal because the agency kindly offers gun owners what it deems to be plenty of means of complying. They can surrender their firearm to ATF. Or, for gun owners who purchased firearms without stabilizing brace and later added one, ATF will permit them to destroy their pistol braces (but not if the gun owners purchased the firearms already equipped with braces). Or they can spend more than $400 to convert a brace-equipped pistol to a long-barreled rifle subject to GCA regulation. (Where gun owners will find $400 lying around for such an undertaking, ATF doesn't venture a guess.) Or, they can register their brace-equipped pistols as SBRs under the NFA and pay a $200 tax on each pistol. Missing from ATF's reasoning, of course, is that, even in its own very conservative estimate, ATF requires many months to process*

**P. App'x 101**

the registration forms for SBRs. Thus, gun owners will have to give up the use of their firearms for months while waiting for ATF to process their registration forms and tax payments.

Moreover, the proposed rule says nothing about how any individual gun owner, gun shop, or manufacturer will go about determining whether an individual brace-equipped pistol is an SBR under the proposed rule's criteria. Does ATF expect individuals to apply the proposed rule's vague and confusing criteria on their own, knowing that a good-faith error could land them in prison?13 If not, are gun owners expected to ship off their firearms at their own expense to ATF's Firearms and Ammunition Technology Division (FATD) for classification? We understand that FATD currently takes about a year to classify a single firearm under its current workload. Does A TF actually expect millions of gun owners to ship off their firearms to FA TD potentially for years while awaiting a classification decision? And if FATD determines that a brace- equipped pistol is an SBR, will ATF confiscate the weapon until the gun owner complies with the NFA's registration and taxation requirements? To where will gun owners tum to appeal FATD's classification, or to sue for a potential taking of private property without compensation? A TF's proposed rule provides no answers to these questions.

Even more offensive than the operation of the proposed rule is its rationale. ATF claims, without evidence, that the "demand for 'stabilizing braces' ... sterns from the desire to have NFA items without paying for and undergoing the NFA regulatory regirne."14 This statement is shocking. The original demand for stabilizing braces was to promote inclusion-to ensure that disabled veterans could shoot large pistol platforms notwithstanding their disabilities. And demand over the last five years is surely attributable to A TF's classification letters and much publicized effective 2017 letter effectively rescinding its 2015 ruling against stabilizing braces. Demand for stabilizing braces therefore should not be attributed to the lawlessness of gun owners, but rather to their desire to exercise their Second Amendment rights consistent with how ATF interpreted the law in 2017. We are appalled to hear the agency charged with enforcing regulations on how Americans exercise their fundamental constitutional rights assume, without evidence, that millions of Americans are participating in a scheme to avoid their legal obligations.

***

P. App'x 102

*A crime wave is sweeping America. These aren't broken-windows crimes; they are violent crimes like murder, assault, and robbery. But rather than cracking down on the criminals who are turning America's cities into warzones, ATF and the Department of Justice have decided to go after law-abiding gun owners who are minding their own business and using equipment that A TF seemingly blessed in 2017.*

*This is plain wrong. The proposed rule is worse than merely abdicating your responsibility to protect Americans from criminals; you're threatening to turn law-abiding Americans into criminals by imposing the largest executive branch-initiated gun registration and confiscation program in American history. We urge you to turn back. Correct this mistake and withdraw the proposed rule.*

###

**P. App'x 103**

# EXHIBIT 9



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

---

*Martinsburg, WV 25405*

www.atf.gov

907010:CJT
3311/304679

**OCT 0 3 2016**

Paul Reavis
Gear Head Works, LLC
P.O. Box 49
Christiana, TN 37037

Dear Mr. Reavis:

This is in reference to your correspondence, with enclosed sample, to the Bureau of Alcohol,
Tobacco, Firearms and Explosives (ATF), Firearms Technology Industry Services Branch
(FTISB). In your letter, you asked for a classification of an "arm brace" as depicted in the
accompanying photos. Specifically, you requested a review and determination of the technology
for use on pistols as a support brace and not a shoulder stock.

As you may be aware, the amended Gun Control Act of 1968 (GCA), 18 U.S.C. § 921(a)(3),
defines the term "firearm" to include: *any weapon (including a starter gun) which will or is
designed to or may be readily converted to expel a projectile by the action of an
explosive...[and]...the frame or receiver of any such weapon....*

Also, with respect to the definitions of "handgun" and "pistol" under Federal statutes and
regulations, you may be aware that the GCA, 18 U.S.C. § 921(a)(29), defines "handgun" to
mean, in part *...a firearm which has a short stock and is designed to be held and fired by the use
of a single hand....*

Additionally, 27 CFR § 478.11, a regulation implementing the GCA, defines "pistol" as *...a
weapon originally designed, made, and intended to fire a projectile (bullet) from one or more
barrels when held in one hand, and having (a) a chamber(s) as an integral part(s) of, or
permanently aligned with, the bore(s); and (b) a short stock designed to be gripped by one hand
and at an angle to and extending below the line of the bore(s).*

Please note also that the GCA, 18 U.S.C. § 921(a)(7), defines the term "rifle" to include *...a
weapon designed or redesigned, made or remade, and intended to be fired from the shoulder....*

Mr. Paul Reavis

Finally, the National Firearms Act (NFA), 26 U.S.C. § 5845(a)(3), defines "firearm" to include *…a rifle having a barrel or barrels of less than 16 inches in length….*

The FTISB evaluation revealed that the submitted components, enumerated below, incorporate the following physical characteristics:

A forearm brace made of a polymer that incorporates a folding clamp type design which, when placed in the open position, is intended to provide support to the firing hand by providing additional leverage. This item is designed to attach to an AR-type buffer tube or similarly designed receiver extension.



The FTISB examination found that when the sample is assembled as submitted; to an AR type pistol, a shooter would open the clamping feature of the sample, and place the resulting surface under his or her forearm while gripping the pistol's handgrip which offers the additional support. In this configuration, the device provides the shooter with additional support of the firearm while

Mr. Paul Reavis

it is held and operated with one hand. When assembled in the aforementioned configuration, our Branch finds that the addition of this item does not change the subject firearm's classification.

Based on our evaluation, FTISB finds that the aforementioned submitted forearm brace assembly, when attached to an AR-type pistol, does not convert that weapon to be fired from the shoulder and would not alter the classification of the subject pistol. While a pistol so equipped would still be regulated by the Gun Control Act, 18 U.S.C. § 921(a)(3), such a firearm would not be subject to the NFA controls. However, if a pistol utilizing the aforementioned items is fired from the shoulder, intent to design or redesign such a weapon is demonstrated.

Further, if the following assembly is assembled to a pistol and *used* as a shoulder stock, in the designing, redesigning or making or remaking of a weapon to be fired from the shoulder, which incorporates a barrel length of less than 16 inches; this would constitute the making of "a rifle having a barrel or barrels of less than 16 inches in length"; an NFA firearm as defined in 26 U.S.C. § 5845(a)(3).

We should remind you that the information found in correspondence from FTISB is intended only for use by the addressed individual or company with regard to a specific scenario(s) or item(s) described within that correspondence.

We recommend you communicate to the purchasers of the subject accessories to ensure an AR-type firearm assembled utilizing the aforementioned firearms accessory does not violate any State laws or local ordinances where they reside. For your convenience, a copy of the ATF-Open Letter on the Redesign of "Stabilizing Braces" is enclosed.

We caution that these findings are based on the sample as submitted. If the design, dimensions, configuration, method of operation, or materials used were changed, our determination would be subject to review.

The submitted sample will be returned to you under separate cover.

We trust that the foregoing has been responsive to your request for an evaluation. If we can be of any further assistance, please contact us.

Sincerely yours,

Michael R. Curtis
Chief, Firearms Technology Industry Services Branch

Enclosure: Open letter on the redesign of "Stabilizing Braces"

# EXHIBIT 10



**Alcohol, Tobacco, Firearms and Explosives**

# Firearms Commerce in the United States

## ANNUAL STATISTICAL UPDATE 2021

## Exhibit 1: Firearms Manufactured (1986 – 2019)

| Calendar Year | Pistols | Revolvers | Rifles | Shotguns | Misc. Firearms[1] | Total Firearms |
|---|---|---|---|---|---|---|
| 1986 | 662,973 | 761,414 | 970,507 | 641,482 | 4,558 | 3,040,934 |
| 1987 | 964,561 | 722,512 | 1,007,661 | 857,949 | 6,980 | 3,559,663 |
| 1988 | 1,101,011 | 754,744 | 1,144,707 | 928,070 | 35,345 | 3,963,877 |
| 1989 | 1,404,753 | 628,573 | 1,407,400 | 935,541 | 42,126 | 4,418,393 |
| 1990 | 1,371,427 | 470,495 | 1,211,664 | 848,948 | 57,434 | 3,959,968 |
| 1991 | 1,378,252 | 456,966 | 883,482 | 828,426 | 15,980 | 3,563,106 |
| 1992 | 1,669,537 | 469,413 | 1,001,833 | 1,018,204 | 16,849 | 4,175,836 |
| 1993 | 2,093,362 | 562,292 | 1,173,694 | 1,144,940 | 81,349 | 5,055,637 |
| 1994 | 2,004,298 | 586,450 | 1,316,607 | 1,254,926 | 10,936 | 5,173,217 |
| 1995 | 1,195,284 | 527,664 | 1,411,120 | 1,173,645 | 8,629 | 4,316,342 |
| 1996 | 987,528 | 498,944 | 1,424,315 | 925,732 | 17,920 | 3,854,439 |
| 1997 | 1,036,077 | 370,428 | 1,251,341 | 915,978 | 19,680 | 3,593,504 |
| 1998 | 960,365 | 324,390 | 1,535,690 | 868,639 | 24,506 | 3,713,590 |
| 1999 | 995,446 | 335,784 | 1,569,685 | 1,106,995 | 39,837 | 4,047,747 |
| 2000 | 962,901 | 318,960 | 1,583,042 | 898,442 | 30,196 | 3,793,541 |
| 2001 | 626,836 | 320,143 | 1,284,554 | 679,813 | 21,309 | 2,932,655 |
| 2002 | 741,514 | 347,070 | 1,515,286 | 741,325 | 21,700 | 3,366,895 |
| 2003 | 811,660 | 309,364 | 1,430,324 | 726,078 | 30,978 | 3,308,404 |
| 2004 | 728,511 | 294,099 | 1,325,138 | 731,769 | 19,508 | 3,099,025 |
| 2005 | 803,425 | 274,205 | 1,431,372 | 709,313 | 23,179 | 3,241,494 |
| 2006 | 1,021,260 | 385,069 | 1,496,505 | 714,618 | 35,872 | 3,653,324 |
| 2007 | 1,219,664 | 391,334 | 1,610,923 | 645,231 | 55,461 | 3,922,613 |
| 2008 | 1,609,381 | 431,753 | 1,734,536 | 630,710 | 92,564 | 4,498,944 |
| 2009 | 1,868,258 | 547,195 | 2,248,851 | 752,699 | 138,815 | 5,555,818 |
| 2010 | 2,258,450 | 558,927 | 1,830,556 | 743,378 | 67,929 | 5,459,240 |
| 2011 | 2,598,133 | 572,857 | 2,318,088 | 862,401 | 190,407 | 6,541,886 |
| 2012 | 3,487,883 | 667,357 | 3,168,206 | 949,010 | 306,154 | 8,578,610 |

Source: ATF's Annual Firearms Manufacturing and Exportation Report (AFMER).

[1] Miscellaneous firearms are any firearms not specifically categorized in any of the firearms categories defined on the ATF Form 5300.11 Annual Firearms Manufacturing and Exportation Report. (Examples of miscellaneous firearms would include pistol grip firearms, starter guns, and firearm frames and receivers.)

The AFMER report excludes production for the U.S. military but includes firearms purchased by domestic law enforcement agencies. The report also includes firearms manufactured for export.

AFMER data is not published until one year after the close of the calendar year reporting period because the proprietary data furnished by filers is protected from immediate disclosure by the Trade Secrets Act.  For example, calendar year 2012 data was due to ATF by April 1, 2013, but not published until January 2014.

## Exhibit 1: Firearms Manufactured (1986 – 2019) — continued

| Calendar Year | Pistols | Revolvers | Rifles | Shotguns | Misc. Firearms[1] | Total Firearms |
|---|---|---|---|---|---|---|
| 2013 | 4,441,726 | 725,282 | 3,979,570 | 1,203,072 | 495,142 | 10,844,792 |
| 2014 | 3,633,454 | 744,047 | 3,379,549 | 935,411 | 358,165 | 9,050,626 |
| 2015 | 3,557,199 | 885,259 | 3,691,799 | 777,273 | 447,131 | 9,358,661 |
| 2016 | 4,720,075 | 856,291 | 4,239,335 | 848,617 | 833,123 | 11,497,441 |
| 2017 | 3,691,010 | 720,917 | 2,504,092 | 653,139 | 758,634 | 8,327,792 |
| 2018 | 3,881,158 | 664,835 | 2,880,536 | 536,126 | 1,089,973 | 9,052,628 |
| 2019 | 3,046,013 | 580,601 | 1,957,667 | 480,735 | 946,929 | 7,011,945 |

Source: ATF's Annual Firearms Manufacturing and Exportation Report (AFMER).

[1] Miscellaneous firearms are any firearms not specifically categorized in any of the firearms categories defined on the ATF Form 5300.11 Annual Firearms Manufacturing and Exportation Report. (Examples of miscellaneous firearms would include pistol grip firearms, starter guns, and firearm frames and receivers.)

The AFMER report excludes production for the U.S. military but includes firearms purchased by domestic law enforcement agencies. The report also includes firearms manufactured for export.

AFMER data is not published until one year after the close of the calendar year reporting period because the proprietary data furnished by filers is protected from immediate disclosure by the Trade Secrets Act.  For example, calendar year 2012 data was due to ATF by April 1, 2013, but not published until January 2014.

## Exhibit 1a: Firearms Manufactured (1986-2019)



## Exhibit 2: Firearms Manufacturers' Exports (1986 – 2019)

| Calendar Year | Pistols | Revolvers | Rifles | Shotguns | Misc. Firearms[1] | Total Firearms |
|---|---|---|---|---|---|---|
| 1986 | 16,511 | 104,571 | 37,224 | 58,943 | 199 | 217,448 |
| 1987 | 24,941 | 134,611 | 42,161 | 76,337 | 9,995 | 288,045 |
| 1988 | 32,570 | 99,289 | 53,896 | 68,699 | 2,728 | 257,182 |
| 1989 | 41,970 | 76,494 | 73,247 | 67,559 | 2,012 | 261,282 |
| 1990 | 73,398 | 106,820 | 71,834 | 104,250 | 5,323 | 361,625 |
| 1991 | 79,275 | 110,058 | 91,067 | 117,801 | 2,964 | 401,165 |
| 1992 | 76,824 | 113,178 | 90,015 | 119,127 | 4,647 | 403,791 |
| 1993 | 59,234 | 91,460 | 94,272 | 171,475 | 14,763 | 431,204 |
| 1994 | 93,959 | 78,935 | 81,835 | 146,524 | 3,220 | 404,473 |
| 1995 | 97,969 | 131,634 | 90,834 | 101,301 | 2,483 | 424,221 |
| 1996 | 64,126 | 90,068 | 74,557 | 97,191 | 6,055 | 331,997 |
| 1997 | 44,182 | 63,656 | 76,626 | 86,263 | 4,354 | 275,081 |
| 1998 | 29,537 | 15,788 | 65,807 | 89,699 | 2,513 | 203,344 |
| 1999 | 34,663 | 48,616 | 65,669 | 67,342 | 4,028 | 220,318 |
| 2000 | 28,636 | 48,130 | 49,642 | 35,087 | 11,132 | 172,627 |
| 2001 | 32,151 | 32,662 | 50,685 | 46,174 | 10,939 | 172,611 |
| 2002 | 22,555 | 34,187 | 60,644 | 31,897 | 1,473 | 150,756 |
| 2003 | 16,340 | 26,524 | 62,522 | 29,537 | 6,989 | 141,912 |
| 2004 | 14,959 | 24,122 | 62,403 | 31,025 | 7,411 | 139,920 |
| 2005 | 19,196 | 29,271 | 92,098 | 46,129 | 7,988 | 194,682 |
| 2006 | 144,779 | 28,120 | 102,829 | 57,771 | 34,022 | 367,521 |
| 2007 | 45,053 | 34,662 | 80,594 | 26,949 | 17,524 | 204,782 |
| 2008 | 54,030 | 28,205 | 104,544 | 41,186 | 523 | 228,488 |
| 2009 | 56,402 | 32,377 | 61,072 | 36,455 | 8,438 | 194,744 |
| 2010 | 80,041 | 25,286 | 76,518 | 43,361 | 16,771 | 241,977 |
| 2011 | 121,035 | 23,221 | 79,256 | 54,878 | 18,498 | 296,888 |
| 2012 | 128,313 | 19,643 | 81,355 | 42,858 | 15,385 | 287,554 |
| 2013 | 167,653 | 21,236 | 131,718 | 49,766 | 22,748 | 393,121 |
| 2014 | 126,316 | 25,521 | 207,934 | 60,377 | 784 | 420,932 |
| 2015 | 140,787 | 22,666 | 159,707 | 18,797 | 1,499 | 343,456 |

Source:  ATF's Annual Firearms Manufacturing and Exportation Report (AFMER).

[1] Miscellaneous firearms are any firearms not specifically categorized in any of the firearms categories defined on the ATF Form 5300.11 Annual Firearms Manufacturing and Exportation Report. (Examples of miscellaneous firearms would include pistol grip firearms, starter guns, and firearm frames and receivers.)

The AFMER report excludes production for the U.S. military but includes firearms purchased by domestic law enforcement agencies.

## Exhibit 2: Firearms Manufacturers' Exports (1986 – 2019) — continued

| Calendar Year | Pistols | Revolvers | Rifles | Shotguns | Misc. Firearms[1] | Total Firearms |
|---|---|---|---|---|---|---|
| 2016 | 172,408 | 24,587 | 147,044 | 24,668 | 8,111 | 376,818 |
| 2017 | 275,424 | 21,676 | 158,871 | 29,997 | 2,332 | 488,300 |
| 2018 | 333,266 | 21,498 | 165,573 | 27,774 | 6,126 | 554,237 |
| 2019 | 138,683 | 14,778 | 136,241 | 22,319 | 5,461 | 317,482 |

Source:  ATF's Annual Firearms Manufacturing and Exportation Report (AFMER).

[1] Miscellaneous firearms are any firearms not specifically categorized in any of the firearms categories defined on the ATF Form 5300.11 Annual Firearms Manufacturing and Exportation Report. (Examples of miscellaneous firearms would include pistol grip firearms, starter guns, and firearm frames and receivers.)

The AFMER report excludes production for the U.S. military but includes firearms purchased by domestic law enforcement agencies.

## Exhibit 2a: Firearms Manufacturers' Exports (1986-2019)



## Exhibit 3: Firearms Imports (1986 – 2020)

| Calendar Year | Shotguns | Rifles | Handguns | Total |
|---|---|---|---|---|
| 1986 | 201,000 | 269,000 | 231,000 | 701,000 |
| 1987 | 307,620 | 413,780 | 342,113 | 1,063,513 |
| 1988 | 372,008 | 282,640 | 621,620 | 1,276,268 |
| 1989 | 274,497 | 293,152 | 440,132 | 1,007,781 |
| 1990 | 191,787 | 203,505 | 448,517 | 843,809 |
| 1991 | 116,141 | 311,285 | 293,231 | 720,657 |
| 1992 | 441,933 | 1,423,189 | 981,588 | 2,846,710 |
| 1993 | 246,114 | 1,592,522 | 1,204,685 | 3,043,321 |
| 1994 | 117,866 | 847,868 | 915,168 | 1,880,902 |
| 1995 | 136,126 | 261,185 | 706,093 | 1,103,404 |
| 1996 | 128,456 | 262,568 | 490,554 | 881,578 |
| 1997 | 106,296 | 358,937 | 474,182 | 939,415 |
| 1998 | 219,387 | 248,742 | 531,681 | 999,810 |
| 1999 | 385,556 | 198,191 | 308,052 | 891,799 |
| 2000 | 331,985 | 298,894 | 465,903 | 1,096,782 |
| 2001 | 428,330 | 227,608 | 710,958 | 1,366,896 |
| 2002 | 379,755 | 507,637 | 741,845 | 1,629,237 |
| 2003 | 407,402 | 428,837 | 630,263 | 1,466,502 |
| 2004 | 507,050 | 564,953 | 838,856 | 1,910,859 |
| 2005 | 546,403 | 682,100 | 878,172 | 2,106,675 |
| 2006 | 606,820 | 659,393 | 1,166,309 | 2,432,522 |
| 2007 | 725,752 | 631,781 | 1,386,460 | 2,743,993 |
| 2008 | 535,960 | 602,364 | 1,468,062 | 2,606,386 |
| 2009 | 558,679 | 864,010 | 2,184,417 | 3,607,106 |
| 2010 | 509,913 | 547,449 | 1,782,585 | 2,839,947 |
| 2011 | 529,056 | 998,072 | 1,725,276 | 3,252,404 |
| 2012 | 973,465 | 1,243,924 | 2,627,201 | 4,844,590 |
| 2013 | 936,235 | 1,507,776 | 3,095,528 | 5,539,539 |

Source: ATF and United States International Trade Commission.

Statistics prior to 1992 are for fiscal years; 1992 is a transition year with five quarters.

### Exhibit 3: Firearms Imports (1986 – 2020)— continued

| Calendar Year | Shotguns | Rifles | Handguns | Total |
|---|---|---|---|---|
| 2014 | 648,339 | 791,892 | 2,185,037 | 3,625,268 |
| 2015 | 644,293 | 815,817 | 2,470,101 | 3,930,211 |
| 2016 | 736,482 | 729,452 | 3,671,837 | 5,137,771 |
| 2017 | 632,105 | 572,309 | 3,287,842 | 4,492,256 |
| 2018 | 713,931 | 652,031 | 2,939,889 | 4,305,851 |
| 2019 | 743,252 | 648,703 | 2,594,708 | 3,986,663 |
| 2020 | 1,924,937 | 875,159 | 4,031,280 | 6,831,376 |

Source: ATF and United States International Trade Commission.

Statistics prior to 1992 are for fiscal years; 1992 is a transition year with five quarters.

### Exhibit 3a: Firearms Imports (1986-2020)



## Exhibit 4: Importation Applications (1986 – 2020)

| Fiscal Year | Licensed Importer | Military* | Other | Total |
|---|---|---|---|---|
| 1986 | 7,728 | 9,434 | 2,631 | 19,793 |
| 1987 | 7,833 | 8,059 | 2,130 | 18,022 |
| 1988 | 7,711 | 7,680 | 2,122 | 17,513 |
| 1989 | 7,950 | 8,293 | 2,194 | 18,437 |
| 1990 | 8,292 | 8,696 | 2,260 | 19,248 |
| 1991 | 8,098 | 10,973 | 2,412 | 21,483 |
| 1992 | 7,960 | 9,222 | 2,623 | 19,805 |
| 1993 | 7,591 | 6,282 | 2,585 | 16,458 |
| 1994 | 6,704 | 4,570 | 3,024 | 14,298 |
| 1995 | 5,267 | 2,834 | 2,548 | 10,649 |
| 1996 | 6,340 | 2,792 | 2,395 | 11,527 |
| 1997 | 8,288 | 2,069 | 1,395 | 11,752 |
| 1998 | 8,767 | 2,715 | 1,536 | 13,019 |
| 1999 | 9,505 | 2,235 | 1,036 | 12,776 |
| 2000 | 7,834 | 2,885 | 1,416 | 12,135 |
| 2001 | 9,639 | 3,984 | 1,569 | 15,192 |
| 2002 | 9,646 | 6,321 | 3,199 | 19,166 |
| 2003 | 8,160 | 2,264 | 2,081 | 12,505 |
| 2004 | 7,539 | 1,392 | 1,819 | 10,750 |
| 2005 | 7,539 | 1,320 | 1,746 | 10,605 |
| 2006 | 8,537 | 1,180 | 1,505 | 11,222 |
| 2007 | 8,004 | 1,081 | 1,236 | 10,321 |
| 2008 | 7,610 | 718 | 980 | 9,308 |
| 2009 | 7,967 | 504 | 970 | 9,441 |
| 2010 | 7,367 | 823 | 1,088 | 9,278 |
| 2011 | 7,647 | 641 | 959 | 9,247 |
| 2012 | 8,408 | 420 | 895 | 9,723 |
| 2013 | 9,964 | 319 | 597 | 10,880 |

Source: ATF's Firearms and Explosives Import System (FEIS)

Import data excludes temporary permits issued to nonimmigrant aliens.

* Depicts ATF Form 6 Part II (5330.3C)

## Exhibit 4: Importation Applications (1986 – 2020) — continued

| Fiscal Year | Licensed Importer | Military* | Other | Total |
|---|---|---|---|---|
| 2014 | 8,529 | 255 | 429 | 9,213 |
| 2015 | 6,078 | 318 | 897 | 7,293 |
| 2016 | 6,154 | 220 | 814 | 7,188 |
| 2017 | 5,859 | 309 | 685 | 6,853 |
| 2018 | 6,631 | 289 | 670 | 7,590 |
| 2019 | 7,040 | 380 | 711 | 8,131 |
| 2020 | 7,243 | 180 | 583 | 8,006 |

Source: ATF's Firearms and Explosives Import System (FEIS)

Import data excludes temporary permits issued to nonimmigrant aliens.

* Depicts ATF Form 6 Part II (5330.3C)

## Exhibit 4a: Importation Application (1986-2020)



## Exhibit 5: Firearms Imported into the United States by Country 2020

| Country | Handguns | Rifles | Shotguns | Total Firearms |
|---|---|---|---|---|
| Turkey | 415,180 | 29,450 | 1,045,621 | 1,490,251 |
| Austria | 1,279,123 | 5,632 | 30 | 1,284,785 |
| Brazil | 849,700 | 120,864 | 46,066 | 1,016,630 |
| Croatia | 521,932 | 0 | 0 | 521,932 |
| Sweden | 45 | 1,680 | 430,062 | 431,787 |
| Italy | 146,565 | 48,705 | 175,818 | 371,088 |
| Germany | 274,799 | 73,118 | 2,374 | 350,291 |
| Czech Republic | 247,491 | 28,418 | 34 | 275,943 |
| Canada | 3,050 | 232,395 | 982 | 236,427 |
| China | 0 | 12,000 | 205,462 | 217,462 |
| Philippines | 113,399 | 3,818 | 0 | 117,217 |
| Japan | 0 | 78,249 | 620 | 78,869 |
| Spain | 960 | 57,506 | 515 | 58,981 |
| Israel | 41,357 | 7,839 | 7,697 | 56,893 |
| Serbia | 22,703 | 24,096 | 0 | 46,799 |
| Finland | 8 | 46,506 | 32 | 46,546 |
| Romania | 22,145 | 15,911 | 0 | 38,056 |
| Portugal | 0 | 34,576 | 72 | 34,648 |
| Argentina | 29,030 | 0 | 0 | 29,030 |
| Belgium | 14,120 | 9,533 | 212 | 23,865 |
| Switzerland | 17943 | 3,390 | 35 | 21,368 |
| Bulgaria | 6,937 | 13,733 | 1 | 20,671 |
| United Kingdom | 65 | 11,937 | 8492 | 20,494 |
| Poland | 10,286 | 8,291 | 0 | 18,577 |
| Slovenia | 4,902 | 0 | 0 | 4,902 |

[1] On May 26, 1994, the United States instituted a firearms imports embargo against China. Sporting shotguns, however, are exempt from the embargo.

[2] Imports of fewer than 1,000 per country.

Imports from Afghanistan, Belarus, Burma, China, Cuba, Democratic Republic of Congo, Haiti, Iran, Iraq, Libya, Mongolia, North Korea, Rwanda, Somalia Sudan, Syria, Unita (Angola), Vietnam, may include surplus military curio and relic firearms that were manufactured in these countries prior to becoming proscribed or embargoed and had been outside those proscribed countries for the preceding five years prior to import. Imports may also include those that obtained a waiver from the U.S. State Department.

Imports from Georgia, Kazakhstan, Kyrgyzstan, Moldova, Russian Federation, Turkmenistan, Ukraine, Uzbekistan are limited to firearms enumerated on the Voluntary Restraint Agreement (VRA).

## Exhibit 5: Firearms Imported into the United States by Country 2020 — continued

| Country | Handguns | Rifles | Shotguns | Total Firearms |
|---|---|---|---|---|
| Montenegro | 3,639 | 0 | 0 | 3,639 |
| Taiwan | 0 | 3,140 | 0 | 3,140 |
| Slovakia | 2,987 | 0 | 0 | 2,987 |
| Georgia | 608 | 1,500 | 0 | 2,108 |
| Hungary | 1,154 | 875 | 0 | 2,029 |
| Russia | 0 | 1,595 | 0 | 1,595 |
| France | 1,042 | 321 | 62 | 1,425 |
| Other [2] | 110 | 81 | 750 | 941 |
| **Total** | **4,031,280** | **875,159** | **1,924,937** | **6,831,376** |

[1] On May 26, 1994, the United States instituted a firearms imports embargo against China. Sporting shotguns, however, are exempt from the embargo.

[2] Imports of fewer than 1,000 per country.

Imports from Afghanistan, Belarus, Burma, China, Cuba, Democratic Republic of Congo, Haiti, Iran, Iraq, Libya, Mongolia, North Korea, Rwanda, Somalia Sudan, Syria, Unita (Angola), Vietnam, may include surplus military curio and relic firearms that were manufactured in these countries prior to becoming proscribed or embargoed and had been outside those proscribed countries for the preceding five years prior to import. Imports may also include those that obtained a waiver from the U.S. State Department.

Imports from Georgia, Kazakhstan, Kyrgyzstan, Moldova, Russian Federation, Turkmenistan, Ukraine, Uzbekistan are limited to firearms enumerated on the Voluntary Restraint Agreement (VRA).

## Exhibit 5a: Imported Firearms Type 2020



Shotguns 28%

Handguns 59%

Rifles 13%

## Exhibit 6: National Firearms Act
## Tax Revenues and Related Activities (1984 – 2020)

| | | | Enforcement Support [3] | |
|---|---|---|---|---|
| Fiscal Year [1] | Occupational Tax Paid [2] | Transfer & Making Tax Paid | Certifications | Records Checks |
| 1984 | $596,000 | $666,000 | 1,196 | 2,771 |
| 1985 | $606,000 | $594,000 | 921 | 3,682 |
| 1986 | $667,000 | $1,372,000 | 690 | 3,376 |
| 1987 | $869,000 | $1,576,000 | 575 | 4,135 |
| 1988 | $2,095,000 | $1,481,000 | 701 | 3,738 |
| 1989 | $1,560,000 | $1,527,000 | 1,196 | 6,128 |
| 1990 | $1,442,000 | $1,308,000 | 666 | 7,981 |
| 1991 | $1,556,000 | $1,210,000 | 764 | 7,857 |
| 1992 | $1,499,000 | $1,237,000 | 1,257 | 8,582 |
| 1993 | $1,493,000 | $1,264,000 | 1,024 | 7,230 |
| 1994 | $1,444,000 | $1,596,000 | 586 | 6,283 |
| 1995 | $1,007,000 | $1,311,000 | 882 | 5,677 |
| 1996 | $1,143,000 | $1,402,000 | 529 | 5,215 |
| 1997 | $1,284,000 | $1,630,000 | 488 | 4,395 |
| 1998 | $1,299,000 | $1,969,000 | 353 | 3,824 |
| 1999 | $1,330,000 | $2,422,000 | 345 | 3,994 |
| 2000 | $1,399,000 | $2,301,000 | 144 | 2,159 |
| 2001 | $1,456,000 | $2,800,000 | 402 | 5,156 |
| 2002 | $1,492,000 | $1,510,000 | 441 | 6,381 |
| 2003 | $1,758,000 | $2,699,000 | 401 | 6,597 |
| 2004 | $1,640,000 | $3,052,000 | 435 | 6,191 |
| 2005 | $1,659,000 | $2,810,000 | 447 | 6,218 |
| 2006 | $1,709,000 | $3,951,000 | 327 | 6,331 |
| 2007 | $1,815,000 | $4,890,000 | 530 | 7,468 |
| 2008 | $1,950,000 | $5,742,000 | 375 | 5,872 |
| 2009 | $2,125,000 | $7,971,000 | 418 | 5,736 |
| 2010 | $2,530,000 | $7,184,000 | 267 | 5,883 |
| 2011 | $2,952,000 | $9,576,000 | 287 | 6,313 |
| 2012 | $3,628,000 | $12,814,000 | 390 | 7,103 |
| 2013 | $4,294,000 | $18,182,000 | 501 | 7,138 |
| 2014 | $4,837,000 | $22,678,000 | 367 | 6,172 |

### Exhibit 6: National Firearms Act
### Tax Revenues and Related Activities (1984 – 2020) — continued

| Fiscal Year [1] | Occupational Tax Paid [2] | Transfer & Making Tax Paid | Enforcement Support [3] | |
| --- | --- | --- | --- | --- |
| | | | Certifications | Records Checks |
| 2015 | $5,417,000 | $32,462,000 | 338 | 5,650 |
| 2016 | $6,018,000 | $62,596,000 | 397 | 6,547 |
| 2017 | $6,371,000 | $22,972,000 | 469 | 6,749 |
| 2018 | $6,753,000 | $33,371,000 | 537 | 6,130 |
| 2019 | $7,014,000 | $37,285,000 | 447 | 5,426 |
| 2020 | $7,982,000 | $51,677,000 | 456 | 4,520 |

Source:  ATF's National Firearms Registration and Transfer Record (NFRTR).

[1] Data from 1997 - 2000 were based on calendar year data.

[2] Special occupational tax revenues for FY 1990 - 1996 include collections made during the fiscal year for prior tax years. Importers, manufacturers, or dealers in NFA firearms are subject to a yearly occupational tax.

[3] ATF searches the NFRTR in support of criminal investigations and regulatory inspections in order to determine whether persons are legally in possession of NFA weapons and whether transfers were made lawfully.

Data from 2000-2010 for Certifications and Records Checks was corrected in the 2012 update.

## Exhibit 7: National Firearms Act Firearms Processed by Form Type (1990 - 2020)

| Calendar Year [1] | Application to Make NFA Firearms (ATF Form 1) | Manufactured and Imported (ATF Form 2) | Application for Tax Exempt Transfer Between Licensees (ATF Form 3) | Application for Taxpaid Transfer (ATF Form 4) | Application for Tax-Exempt Transfer [2] (ATF Form 5) | Exported (ATF Form 9) | Total [3] |
|---|---|---|---|---|---|---|---|
| 1990 | 399 | 66,084 | 23,149 | 7,024 | 54,959 | 21,725 | 173,340 |
| 1991 | 524 | 80,619 | 19,507 | 5,395 | 44,146 | 40,387 | 190,578 |
| 1992 | 351 | 107,313 | 26,352 | 6,541 | 45,390 | 22,120 | 208,067 |
| 1993 | 310 | 70,342 | 22,071 | 7,388 | 60,193 | 24,041 | 184,345 |
| 1994 | 1,076 | 97,665 | 27,950 | 7,600 | 67,580 | 34,242 | 236,113 |
| 1995 | 1,226 | 95,061 | 18,593 | 8,263 | 60,055 | 31,258 | 214,456 |
| 1996 | 1,174 | 103,511 | 16,931 | 6,418 | 72,395 | 40,439 | 240,868 |
| 1997 | 855 | 110,423 | 18,371 | 7,873 | 70,690 | 36,284 | 244,496 |
| 1998 | 1,093 | 141,101 | 27,921 | 10,181 | 93,135 | 40,221 | 313,652 |
| 1999 | 1,071 | 137,373 | 28,288 | 11,768 | 95,554 | 28,128 | 302,182 |
| 2000 | 1,334 | 141,763 | 23,335 | 11,246 | 96,234 | 28,672 | 302,584 |
| 2001 | 2,522 | 145,112 | 25,745 | 10,799 | 101,955 | 25,759 | 311,892 |
| 2002 | 1,173 | 162,321 | 25,042 | 10,686 | 92,986 | 47,597 | 339,805 |
| 2003 | 1,003 | 156,620 | 21,936 | 13,501 | 107,108 | 43,668 | 343,836 |
| 2004 | 980 | 83,483 | 20,026 | 14,635 | 54,675 | 19,425 | 193,224 |
| 2005 | 1,902 | 65,865 | 26,603 | 14,606 | 26,210 | 20,951 | 156,137 |
| 2006 | 2,610 | 188,134 | 51,290 | 20,534 | 100,458 | 42,175 | 405,201 |
| 2007 | 3,553 | 296,267 | 51,217 | 22,260 | 194,794 | 76,467 | 644,558 |
| 2008 | 4,583 | 424,743 | 71,404 | 26,917 | 183,271 | 206,411 | 917,329 |
| 2009 | 5,345 | 371,920 | 56,947 | 31,551 | 201,267 | 163,951 | 830,981 |
| 2010 | 5,169 | 296,375 | 58,875 | 33,059 | 189,449 | 136,335 | 719,262 |
| 2011 | 5,477 | 530,953 | 107,066 | 33,816 | 147,341 | 311,214 | 1,135,867 |
| 2012 | 7,886 | 484,928 | 149,762 | 52,490 | 170,561 | 219,700 | 1,085,327 |
| 2013 | 9,347 | 477,567 | 206,389 | 57,294 | 110,637 | 224,515 | 1,085,749 |
| 2014 | 22,380 | 591,388 | 262,342 | 107,921 | 138,204 | 248,109 | 1,370,344 |
| 2015 | 32,558 | 583,499 | 365,791 | 130,017 | 127,945 | 306,037 | 1,545,847 |
| 2016 | 49,985 | 1,066,812 | 571,840 | 133,911 | 152,264 | 555,397 | 2,530,209 |
| 2017 | 40,444 | 497,329 | 344,197 | 184,312 | 180,850 | 224,389 | 1,471,521 |
| 2018 | 21,580 | 545,700 | 355,114 | 128,324 | 169,258 | 318,387 | 1,538,363 |
| 2019 | 28,006 | 844,378 | 361,754 | 170,182 | 234,486 | 402,626 | 2,041,432 |
| 2020 | 40,790 | 884,656 | 610,002 | 246,806 | 266,600 | 360,731 | 2,409,585 |

## Exhibit 7: National Firearms Act Firearms Processed by Form Type (1990 - 2020)

| Calendar Year [1] | Application to Make NFA Firearms (ATF Form 1) | Manufactured and Imported (ATF Form 2) | Application for Tax Exempt Transfer Between Licensees (ATF Form 3) | Application for Taxpaid Transfer (ATF Form 4) | Application for Tax-Exempt Transfer [2] (ATF Form 5) | Exported (ATF Form 9) | Total [3] |
|---|---|---|---|---|---|---|---|

Source:  ATF's National Firearms Registration and Transfer Record (NFRTR).

[1] Data from 1990 - 1996 represent fiscal year.

[2] Firearms may be transferred to the U.S., State or local governments without the payment of a transfer tax. Further transfers of NFA firearms between licensees registered as importers, manufacturers, or dealers who have paid the special occupational tax are likewise exempt from transfer tax.

[3] Totals do not include ATF Form  5320.20 or ATF Form 10 because these do not relate to commercial transactions.

### Exhibit 7a: National Firearms Act Firearms Processed by Form Type (1990-2020)



### Exhibit 7b: National Firearms Act Firearms Processed by Fiscal Year (2002-2020)



## Exhibit 8: National Firearms Act Registered Weapons by State (May 2021)

| State | Any Other Weapon [1] | Destructive Device [2] | Machinegun [3] | Silencer [4] | Short Barreled Rifle [5] | Short Barreled Shotgun [6] | Total |
|---|---|---|---|---|---|---|---|
| Alabama | 1,352 | 82,978 | 34,702 | 64,506 | 8,830 | 2,552 | 194,920 |
| Alaska | 345 | 6,256 | 1,802 | 15,192 | 3,108 | 1,534 | 28,237 |
| Arkansas | 703 | 83,161 | 5,689 | 38,058 | 5,076 | 1,294 | 133,981 |
| Arizona | 2,647 | 123,286 | 19,032 | 85,353 | 25,203 | 3,170 | 258,691 |
| California | 4,752 | 324,948 | 29,112 | 17,271 | 15,520 | 14,757 | 406,360 |
| Colorado | 1,154 | 57,926 | 7,666 | 67,008 | 13,509 | 2,119 | 149,382 |
| Connecticut | 1,034 | 14,610 | 35,235 | 18,648 | 4,212 | 1,135 | 74,874 |
| District of Columbia | 69 | 62,757 | 7,872 | 1,024 | 1,426 | 1,167 | 74,315 |
| Delaware | 52 | 3,876 | 537 | 411 | 565 | 651 | 6,092 |
| Florida | 4,100 | 230,917 | 47,117 | 175,156 | 50,848 | 10,587 | 518,725 |
| Georgia | 2,269 | 96,486 | 42,545 | 129,566 | 21,232 | 12,026 | 304,124 |
| Hawaii | 34 | 8,234 | 441 | 403 | 93 | 75 | 9,280 |
| Iowa | 919 | 19,353 | 7,228 | 22,529 | 2,937 | 1,212 | 54,178 |
| Idaho | 667 | 23,674 | 5,299 | 40,755 | 5,376 | 654 | 76,425 |
| Illinois | 1,075 | 103,440 | 30,576 | 3,297 | 4,622 | 1,739 | 144,749 |
| Indiana | 1,862 | 50,885 | 21,137 | 63,249 | 10,872 | 9,541 | 157,546 |
| Kansas | 823 | 26,035 | 3,986 | 31,811 | 5,924 | 1,271 | 69,850 |
| Kentucky | 1,212 | 36,615 | 18,128 | 44,040 | 6,717 | 2,121 | 108,833 |
| Louisiana | 713 | 60,863 | 7,206 | 72,042 | 9,212 | 2,025 | 152,061 |
| Massachusetts | 969 | 19,571 | 7,070 | 10,409 | 6,079 | 1,040 | 45,138 |
| Maryland | 1,137 | 61,460 | 29,854 | 32,275 | 7,633 | 3,898 | 136,257 |
| Maine | 600 | 3,789 | 5,109 | 8,285 | 3,057 | 556 | 21,396 |
| Michigan | 1,284 | 30,928 | 17,464 | 49,324 | 9,120 | 1,715 | 109,835 |
| Minnesota | 2,825 | 61,232 | 8,779 | 48,154 | 7,681 | 1,154 | 129,825 |
| Missouri | 1,574 | 37,631 | 11,167 | 49,754 | 10,230 | 2,995 | 113,351 |
| Mississippi | 564 | 32,211 | 4,906 | 36,545 | 5,354 | 1,132 | 80,712 |
| Montana | 467 | 4,999 | 2,531 | 25,409 | 2,612 | 660 | 36,678 |

## Exhibit 8: National Firearms Act Registered Weapons by State
### (May 2021) – continued

| State | Any Other Weapon[1] | Destructive Device[2] | Machinegun[3] | Silencer[4] | Short Barreled Rifle[5] | Short Barreled Shotgun[6] | Total |
|---|---|---|---|---|---|---|---|
| North Carolina | 1,158 | 107,333 | 15,875 | 76,759 | 17,478 | 3,563 | 222,166 |
| North Dakota | 215 | 3,726 | 1,670 | 23,042 | 2,003 | 319 | 30,975 |
| Nebraska | 816 | 9,780 | 2,403 | 25,879 | 3,472 | 911 | 43,261 |
| New Hampshire | 534 | 5,834 | 20,817 | 36,954 | 7,613 | 681 | 72,433 |
| New Jersey | 534 | 47,080 | 44,422 | 3,889 | 3,775 | 2,528 | 102,228 |
| New Mexico | 404 | 93,029 | 4,233 | 19,873 | 4,590 | 839 | 122,968 |
| Nevada | 1,264 | 50,124 | 14,577 | 37,880 | 12,662 | 2,500 | 119,007 |
| New York | 1,848 | 54,148 | 13,554 | 7,406 | 7,622 | 7,613 | 92,191 |
| Ohio | 2,312 | 92,909 | 22,979 | 68,736 | 15,158 | 6,567 | 208,661 |
| Oklahoma | 1,253 | 19,174 | 9,776 | 62,404 | 8,738 | 2,023 | 103,368 |
| Oregon | 1,683 | 28,654 | 6,740 | 49,197 | 9,483 | 1,717 | 97,474 |
| Pennsylvania | 2,482 | 205,854 | 21,169 | 83,563 | 21,215 | 13,884 | 348,167 |
| Rhode Island | 46 | 3,663 | 630 | 96 | 338 | 114 | 4,887 |
| South Carolina | 733 | 44,017 | 10,997 | 50,422 | 9,088 | 3,948 | 119,205 |
| South Dakota | 388 | 4,559 | 2,176 | 55,666 | 1,612 | 265 | 64,666 |
| Tennessee | 1,803 | 54,554 | 14,683 | 60,573 | 13,350 | 6,573 | 151,536 |
| Texas | 7,517 | 332,208 | 46,318 | 529,150 | 81,000 | 10,362 | 1,006,555 |
| Utah | 578 | 19,648 | 7,745 | 79,557 | 9,212 | 1,668 | 118,408 |
| Virginia | 3,094 | 250,986 | 43,877 | 90,454 | 26,361 | 8,935 | 423,707 |
| Vermont | 238 | 3,106 | 1,465 | 3,528 | 904 | 210 | 9,451 |
| Washington | 1,981 | 62,633 | 4,673 | 78,279 | 16,919 | 1,049 | 165,534 |
| Wisconsin | 853 | 36,053 | 8,391 | 40,596 | 8,070 | 1,467 | 95,430 |
| West Virginia | 465 | 25,315 | 7,359 | 13,696 | 2,913 | 1,215 | 50,963 |
| Wyoming | 337 | 120,688 | 2,019 | 16,681 | 2,089 | 433 | 142,247 |
| Other US Territories | 6 | 323 | 408 | 20 | 12 | 103 | 872 |
| **Total** | **67,744** | **3,343,519** | **741,146** | **2,664,774** | **532,725** | **162,267** | **7,512,175** |

## Exhibit 8: National Firearms Act Registered Weapons by State
### (May 2021) – continued

| State | Any Other Weapon [1] | Destructive Device [2] | Machinegun [3] | Silencer [4] | Short Barreled Rifle [5] | Short Barreled Shotgun [6] | Total |
|---|---|---|---|---|---|---|---|

Source:  ATF National Firearms Registration and Transfer Record (NFRTR).

[1] The term "any other weapon" means any weapon or device capable of being concealed on the person from which a shot can be discharged through the energy of an explosive, a pistol or revolver having a barrel with a smooth bore designed or redesigned to fire a fixed shotgun shell, weapons with combination shotgun and rifle barrels 12 inches or more, less than 18 inches in length, from which only a single discharge can be made from either barrel without manual reloading, and shall include any such weapon which may be readily restored to fire. Such term shall not include a pistol or a revolver having a rifled bore, or revolver having a rifled bore, or weapons designed, made, or intended to be fired from the shoulder and not capable of firing fixed ammunition.

[2] Destructive device generally is defined as (a) any explosive, incendiary, or poison gas (1) bomb, (2) grenade, (3) rocket having a propellant charge of more than 4 ounces, (4) missile having an explosive or incendiary charge of more than one-quarter ounce, (5) mine, or (6) device similar to any of the devices described in the preceding paragraphs of this definition; (b) any type of weapon (other than a shotgun or a shotgun shell which the Director finds is generally recognized as particularly suitable for sporting purposes) by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, and which has any barrel with a bore of more than one-half inch in diameter; and (c) any combination of parts either designed or intended for use in converting any device into any destructive device described in paragraph (a) or (b) of this section and from which a destructive device may be readily assembled. The term shall not include any device which is neither designed nor redesigned for use as a weapon; any device, although originally designed for use as a weapon, which is redesigned for use as a signaling, pyrotechnic, line throwing, safety, or similar device; surplus ordnance sold, loaned, or given by the Secretary of the Army pursuant to the provisions of section 4684(2), 4685, or 4686 of title 10, United States Code; any other device which the Director finds is not likely to be used as a weapon, is an antique, or is a rifle which the owner intends to use solely for sporting, recreational, or cultural purposes.

[3] Machinegun is defined as any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

[4] Silencer is defined as any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for the use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication.

[5] Short-barreled rifle is defined as a rifle having one or more barrels less than 16 inches in length, and any weapon made from a rifle, whether by alteration, modification, or otherwise, if such weapon, as modified, has an overall length of less than 26 inches.

[6] Short-barreled shotgun is defined as a shotgun having one or more barrels less than 18 inches in length, and any weapon made from a shotgun, whether by alteration, modification, or otherwise, if such weapon as modified has an overall length of less than 26 inches.

### Exhibit 9: National Firearms Act
### Special Occupational Taxpayers by State
### Tax Year 2020

| State | Importers | Manufacturers | Dealers | Total |
|---|---|---|---|---|
| Alabama | 26 | 118 | 272 | 416 |
| Alaska | 1 | 33 | 112 | 146 |
| Arizona | 30 | 407 | 276 | 713 |
| Arkansas | 15 | 132 | 168 | 315 |
| California | 14 | 122 | 86 | 222 |
| Colorado | 6 | 157 | 343 | 506 |
| Connecticut | 3 | 88 | 114 | 205 |
| Delaware | 0 | 0 | 3 | 3 |
| District of Columbia | 1 | 0 | 0 | 1 |
| Florida | 66 | 462 | 595 | 1123 |
| Georgia | 13 | 203 | 380 | 596 |
| Hawaii | 0 | 0 | 1 | 1 |
| Idaho | 2 | 130 | 155 | 287 |
| Illinois | 11 | 96 | 37 | 144 |
| Indiana | 6 | 103 | 310 | 419 |
| Iowa | 1 | 65 | 226 | 292 |
| Kansas | 4 | 80 | 268 | 352 |
| Kentucky | 18 | 95 | 254 | 367 |
| Louisiana | 2 | 85 | 220 | 307 |
| Maine | 3 | 48 | 95 | 146 |
| Maryland | 8 | 77 | 152 | 237 |
| Massachusetts | 5 | 118 | 27 | 150 |
| Michigan | 12 | 134 | 300 | 446 |
| Minnesota | 13 | 109 | 228 | 350 |
| Mississippi | 11 | 77 | 172 | 260 |
| Missouri | 15 | 147 | 255 | 417 |
| Montana | 4 | 72 | 148 | 224 |
| Nebraska | 0 | 33 | 132 | 165 |
| Nevada | 12 | 173 | 135 | 320 |
| New Hampshire | 6 | 101 | 121 | 228 |
| New Jersey | 1 | 7 | 21 | 29 |

**Source:** ATF's National Firearms Act Special Occupational Tax Database (NSOT).

**Numbers represent locations of qualified premises.**

### Exhibit 9: National Firearms Act
### Special Occupational Taxpayers by State
### Tax Year 2020 — continued

| State | Importers | Manufacturers | Dealers | Total |
|---|---|---|---|---|
| New Mexico | 10 | 70 | 133 | 213 |
| New York | 4 | 91 | 19 | 114 |
| North Carolina | 2 | 231 | 407 | 640 |
| North Dakota | 1 | 14 | 119 | 134 |
| Ohio | 6 | 239 | 379 | 624 |
| Oklahoma | 1 | 138 | 211 | 350 |
| Oregon | 1 | 110 | 210 | 321 |
| Pennsylvania | 17 | 210 | 457 | 684 |
| Rhode Island | 1 | 0 | 1 | 2 |
| South Carolina | 10 | 109 | 236 | 355 |
| South Dakota | 0 | 31 | 131 | 162 |
| Tennessee | 6 | 131 | 321 | 458 |
| Texas | 39 | 748 | 1035 | 1822 |
| Utah | 5 | 148 | 151 | 304 |
| Vermont | 4 | 26 | 71 | 101 |
| Virginia | 45 | 197 | 363 | 605 |
| Washington | 5 | 140 | 176 | 321 |
| West Virginia | 7 | 43 | 140 | 190 |
| Wisconsin | 1 | 115 | 252 | 368 |
| Wyoming | 2 | 47 | 119 | 168 |
| **Total** | **476** | **6,310** | **10,537** | **17,323** |

Source: ATF's National Firearms Act Special Occupational Tax Database (NSOT).

Numbers represent locations of qualified premises.

## Exhibit 10: Federal Firearms Licensees Total (1975-2020)

| Fiscal Year | Dealer | Pawn-broker | Collector | Manufacturer of | | | Destructive Device | | | Total |
| | | | | Ammunition | Firearms | Importer | Dealer | Manufacturer | Importer | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1975 | 146,429 | 2,813 | 5,211 | 6,668 | 364 | 403 | 9 | 23 | 7 | 161,927 |
| 1976 | 150,767 | 2,882 | 4,036 | 7,181 | 397 | 403 | 4 | 19 | 8 | 165,697 |
| 1977 | 157,463 | 2,943 | 4,446 | 7,761 | 408 | 419 | 6 | 28 | 10 | 173,484 |
| 1978 | 152,681 | 3,113 | 4,629 | 7,735 | 422 | 417 | 6 | 35 | 14 | 169,052 |
| 1979 | 153,861 | 3,388 | 4,975 | 8,055 | 459 | 426 | 7 | 33 | 12 | 171,216 |
| 1980 | 155,690 | 3,608 | 5,481 | 8,856 | 496 | 430 | 7 | 40 | 11 | 174,619 |
| 1981 | 168,301 | 4,308 | 6,490 | 10,067 | 540 | 519 | 7 | 44 | 20 | 190,296 |
| 1982 | 184,840 | 5,002 | 8,602 | 12,033 | 675 | 676 | 12 | 54 | 24 | 211,918 |
| 1983 | 200,342 | 5,388 | 9,859 | 13,318 | 788 | 795 | 16 | 71 | 36 | 230,613 |
| 1984 | 195,847 | 5,140 | 8,643 | 11,270 | 710 | 704 | 15 | 74 | 40 | 222,443 |
| 1985 | 219,366 | 6,207 | 9,599 | 11,818 | 778 | 881 | 15 | 85 | 45 | 248,794 |
| 1986 | 235,393 | 6,998 | 10,639 | 12,095 | 843 | 1,035 | 16 | 95 | 52 | 267,166 |
| 1987 | 230,888 | 7,316 | 11,094 | 10,613 | 852 | 1,084 | 16 | 101 | 58 | 262,022 |
| 1988 | 239,637 | 8,261 | 12,638 | 10,169 | 926 | 1,123 | 18 | 112 | 69 | 272,953 |
| 1989 | 231,442 | 8,626 | 13,536 | 8,345 | 922 | 989 | 21 | 110 | 72 | 264,063 |
| 1990 | 235,684 | 9,029 | 14,287 | 7,945 | 978 | 946 | 20 | 117 | 73 | 269,079 |
| 1991 | 241,706 | 9,625 | 15,143 | 7,470 | 1,059 | 901 | 17 | 120 | 75 | 276,116 |
| 1992 | 248,155 | 10,452 | 15,820 | 7,412 | 1,165 | 894 | 15 | 127 | 77 | 284,117 |
| 1993 | 246,984 | 10,958 | 16,635 | 6,947 | 1,256 | 924 | 15 | 128 | 78 | 283,925 |
| 1994 | 213,734 | 10,872 | 17,690 | 6,068 | 1,302 | 963 | 12 | 122 | 70 | 250,833 |
| 1995 | 158,240 | 10,155 | 16,354 | 4,459 | 1,242 | 842 | 14 | 118 | 71 | 191,495 |
| 1996 | 105,398 | 9,974 | 14,966 | 3,144 | 1,327 | 786 | 12 | 117 | 70 | 135,794 |
| 1997 | 79,285 | 9,956 | 13,512 | 2,451 | 1,414 | 733 | 13 | 118 | 72 | 107,554 |
| 1998 | 75,619 | 10,176 | 14,875 | 2,374 | 1,546 | 741 | 12 | 125 | 68 | 105,536 |
| 1999 | 71,290 | 10,035 | 17,763 | 2,247 | 1,639 | 755 | 11 | 127 | 75 | 103,942 |
| 2000 | 67,479 | 9,737 | 21,100 | 2,112 | 1,773 | 748 | 12 | 125 | 71 | 103,157 |

Source: ATF Federal Firearms Licensing Center, Federal Licensing System (FLS). Data is based on active firearms licenses and related statistics as of the end of each fiscal year.

## Exhibit 10: Federal Firearms Licensees Total (1975-2020)  — continued

| Fiscal Year | Dealer | Pawn-broker | Collector | Manufacturer of | | | | Destructive Device | | | Total |
| | | | | Ammunition | Firearms | Importer | Dealer | Manufacturer | Importer | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2001 | 63,845 | 9,199 | 25,145 | 1,950 | 1,841 | 730 | 14 | 117 | 72 | | 102,913 |
| 2002 | 59,829 | 8,770 | 30,157 | 1,763 | 1,941 | 735 | 16 | 126 | 74 | | 103,411 |
| 2003 | 57,492 | 8,521 | 33,406 | 1,693 | 2,046 | 719 | 16 | 130 | 82 | | 104,105 |
| 2004 | 56,103 | 8,180 | 37,206 | 1,625 | 2,144 | 720 | 16 | 136 | 84 | | 106,214 |
| 2005 | 53,833 | 7,809 | 40,073 | 1,502 | 2,272 | 696 | 15 | 145 | 87 | | 106,432 |
| 2006 | 51,462 | 7,386 | 43,650 | 1,431 | 2,411 | 690 | 17 | 170 | 99 | | 107,316 |
| 2007 | 49,221 | 6,966 | 47,690 | 1,399 | 2,668 | 686 | 23 | 174 | 106 | | 108,933 |
| 2008 | 48,261 | 6,687 | 52,597 | 1,420 | 2,959 | 688 | 29 | 189 | 113 | | 112,943 |
| 2009 | 47,509 | 6,675 | 55,046 | 1,511 | 3,543 | 735 | 34 | 215 | 127 | | 115,395 |
| 2010 | 47,664 | 6,895 | 56,680 | 1,759 | 4,293 | 768 | 40 | 243 | 145 | | 118,487 |
| 2011 | 48,676 | 7,075 | 59,227 | 1,895 | 5,441 | 811 | 42 | 259 | 161 | | 123,587 |
| 2012 | 50,848 | 7,426 | 61,885 | 2,044 | 7,423 | 848 | 52 | 261 | 169 | | 130,956 |
| 2013 | 54,026 | 7,810 | 64,449 | 2,353 | 9,094 | 998 | 57 | 273 | 184 | | 139,244 |
| 2014 | 55,431 | 8,132 | 63,301 | 2,596 | 9,970 | 1,133 | 66 | 287 | 200 | | 141,116 |
| 2015 | 56,181 | 8,152 | 60,652 | 2,603 | 10,498 | 1,152 | 66 | 315 | 221 | | 139,840 |
| 2016 | 56,754 | 8,076 | 57,345 | 2,481 | 11,083 | 1,105 | 71 | 332 | 217 | | 137,464 |
| 2017 | 56,638 | 7,871 | 55,588 | 2,259 | 11,946 | 1,110 | 78 | 357 | 234 | | 136,081 |
| 2018 | 55,891 | 7,639 | 54,136 | 2,119 | 12,564 | 1,127 | 98 | 378 | 239 | | 134,191 |
| 2019 | 53,924 | 7,341 | 52,446 | 1,910 | 13,044 | 1,109 | 129 | 391 | 252 | | 130,546 |
| 2020 | 52,799 | 7,141 | 52,865 | 1,797 | 14,054 | 1,127 | 128 | 425 | 269 | | 130,605 |

Source:  ATF Federal Firearms Licensing Center, Federal Licensing System (FLS).  Data is based on active firearms licenses and related statistics as of the end of each fiscal year.

## Exhibit 11: Federal Firearms Licensees by State 2020

| State | FFL Population |
|---|---|
| Alabama | 2,114 |
| Alaska | 833 |
| Arizona | 3,385 |
| Arkansas | 1,871 |
| California | 8,461 |
| Colorado | 2,945 |
| Connecticut | 1,743 |
| Delaware | 316 |
| District of Columbia | 34 |
| Florida | 6,988 |
| Georgia | 3,478 |
| Hawaii | 223 |
| Idaho | 1,506 |
| Illinois | 4,506 |
| Indiana | 2,730 |
| Iowa | 1,994 |
| Kansas | 1,773 |
| Kentucky | 2,225 |
| Louisiana | 1,937 |
| Maine | 880 |
| Maryland | 2,837 |
| Massachusetts | 3,960 |
| Michigan | 3,856 |
| Minnesota | 2,434 |
| Mississippi | 1,433 |
| Missouri | 4,242 |
| Montana | 1,499 |
| Nebraska | 1,098 |

## Exhibit 11: Federal Firearms Licensees by State 2020 — continued

| State | FFL Population |
|---|---|
| Nevada | 1,318 |
| New Hampshire | 1,174 |
| New Jersey | 473 |
| New Mexico | 1,022 |
| New York | 3,784 |
| North Carolina | 4,430 |
| North Dakota | 698 |
| Ohio | 4,454 |
| Oklahoma | 2,197 |
| Oregon | 2,148 |
| Pennsylvania | 6,136 |
| Rhode Island | 565 |
| South Carolina | 2,102 |
| South Dakota | 758 |
| Tennessee | 3,103 |
| Texas | 10,635 |
| Utah | 1,493 |
| Vermont | 548 |
| Virginia | 3,962 |
| Washington | 3,109 |
| West Virginia | 1,347 |
| Wisconsin | 2,848 |
| Wyoming | 878 |
| Other Territories | 122 |
| **Total** | **130,605** |

## Exhibit 12: Actions on Federal Firearms License Applications (1975 - 2020)

| | Original Application | | | |
|---|---|---|---|---|
| Fiscal Year | Processed | Denied | Withdrawn[1] | Abandoned[2] |
| 1975 | 29,183 | 150 | 1,651 | ... |
| 1976 | 29,511 | 209 | 2,077 | ... |
| 1977 | 32,560 | 216 | 1,645 | ... |
| 1978 | 29,531 | 151 | 1,015 | 414 |
| 1979 | 32,678 | 124 | 432 | 433 |
| 1980 | 36,052 | 96 | 601 | 661 |
| 1981 | 41,798 | 85 | 742 | 329 |
| 1982 | 44,745 | 52 | 580 | 370 |
| 1983 | 49,669 | 151 | 916 | 649 |
| 1984 | 39,321 | 98 | 706 | 833 |
| 1985 | 37,385 | 103 | 666 | 598 |
| 1986 | 42,842 | 299 | 698 | 452 |
| 1987 | 36,835 | 121 | 874 | 458 |
| 1988 | 32,724 | 30 | 506 | 315 |
| 1989 | 34,318 | 34 | 561 | 360 |
| 1990 | 34,336 | 46 | 893 | 404 |
| 1991 | 34,567 | 37 | 1,059 | 685 |
| 1992 | 37,085 | 57 | 1,337 | 611 |
| 1993 | 41,545 | 343 | 6,030 | 1,844 |
| 1994 | 25,393 | 136 | 4,480 | 3,917 |
| 1995 | 7,777 | 49 | 1,046 | 1,180 |
| 1996 | 8,461 | 58 | 1,061 | 629 |
| 1997 | 7,039 | 24 | 692 | 366 |
| 1998 | 7,090 | 19 | 621 | 352 |
| 1999 | 8,581 | 23 | 48 | 298 |
| 2000 | 10,698 | 6 | 447 | 91 |
| 2001 | 11,161 | 3 | 403 | 114 |
| 2002 | 16,100 | 13 | 468 | 175 |
| 2003 | 13,884 | 30 | 729 | 289 |
| 2004 | 12,953 | 18 | 572 | 235 |
| 2005 | 13,326 | 33 | 943 | 300 |
| 2006 | 13,757 | 35 | 898 | 234 |

Alcohol, Tobacco, Firearms and Explosives
Firearms Commerce in the United States – Annual Statistical Update 2021
| 23 |

P. App'x 132

## Exhibit 12: Actions on Federal Firearms License Applications
### (1975 - 2020) — continued

| | Original Application | | | |
|---|---|---|---|---|
| Fiscal Year | Processed | Denied | Withdrawn[1] | Abandoned[2] |
| 2007 | 14,123 | 32 | 953 | 402 |
| 2008 | 15,434 | 21 | 1,030 | 291 |
| 2009 | 16,105 | 20 | 1,415 | 724 |
| 2010 | 16,930 | 32 | 1,467 | 380 |
| 2011 | 19,923 | 22 | 1,744 | 369 |
| 2012 | 20,977 | 28 | 2,252 | 358 |
| 2013 | 23,242 | 30 | 2,901 | 385 |
| 2014 | 17,816 | 27 | 2,192 | 444 |
| 2015 | 15,219 | 34 | 1,953 | 387 |
| 2016 | 15,853 | 16 | 2,165 | 307 |
| 2017 | 14,546 | 17 | 2,038 | 366 |
| 2018 | 14,054 | 17 | 1,913 | 377 |
| 2019 | 12,966 | 9 | 1,993 | 382 |
| 2020 | 13,429 | 11 | 2,387 | 319 |

Source:  ATF Federal Firearms Licensing Center, Federal Licensing System (FLS).

[1] An application can be withdrawn by an applicant at any time prior to the issuance of a license.

[2] If ATF cannot locate an applicant during an attempted application inspection or cannot obtain needed verification data, then the application will be abandoned.

## Exhibit 13: Federal Firearms Licensees and Compliance Inspections (FY 1975 – 2020)

| Fiscal Year | Inspections | Total Licensees | Percent Inspected | Licensed Business Entities* | Percent Ins pected |
|---|---|---|---|---|---|
| 1975 | 10,944 | 161,927 | 6.7% | 156,716 | 7.0% |
| 1976 | 15,171 | 165,697 | 9.1% | 161,661 | 9.4% |
| 1977 | 19,741 | 173,484 | 11.3% | 169,038 | 11.7% |
| 1978 | 22,130 | 169,052 | 13.1% | 164,423 | 13.5% |
| 1979 | 14,744 | 171,216 | 8.6% | 166,241 | 8.9% |
| 1980 | 11,515 | 174,619 | 6.5% | 169,138 | 6.8% |
| 1981 | 11,035 | 190,296 | 5.7% | 183,806 | 6.0% |
| 1982 | 1,829 | 211,918 | 0.8% | 203,316 | 0.9% |
| 1983 | 2,662 | 230,613 | 1.1% | 220,754 | 1.2% |
| 1984 | 8,861 | 222,443 | 3.9% | 213,800 | 4.1% |
| 1985 | 9,527 | 248,794 | 3.8% | 239,195 | 4.0% |
| 1986 | 8,605 | 267,166 | 3.2% | 256,527 | 3.4% |
| 1987 | 8,049 | 262,022 | 3.1% | 250,928 | 3.2% |
| 1988 | 9,283 | 272,953 | 3.4% | 260,315 | 3.6% |
| 1989 | 7,142 | 264,063 | 2.7% | 250,527 | 2.9% |
| 1990 | 8,471 | 269,079 | 3.1% | 254,792 | 3.3% |
| 1991 | 8,258 | 276,116 | 3.0% | 260,973 | 3.2% |
| 1992 | 16,328 | 284,117 | 5.7% | 268,297 | 6.1% |
| 1993 | 22,330 | 283,925 | 7.9% | 267,290 | 8.4% |
| 1994 | 20,067 | 250,833 | 8.0% | 233,143 | 8.6% |
| 1995 | 13,141 | 191,495 | 7.0% | 171,577 | 7.7% |
| 1996 | 10,051 | 135,794 | 7.4% | 120,828 | 8.3% |
| 1997 | 5,925 | 107,554 | 5.5% | 94,042 | 6.3% |
| 1998 | 5,043 | 105,536 | 4.8% | 90,661 | 5.6% |
| 1999 | 9,004 | 103,942 | 8.7% | 86,179 | 10.4% |
| 2000 | 3,640 | 103,157 | 3.5% | 82,558 | 4.4% |
| 2001 | 3,677 | 102,913 | 3.6% | 77,768 | 4.7% |

Alcohol, Tobacco, Firearms and Explosives
Firearms Commerce in the United States – Annual Statistical Update 2021
| 25 |

P. App'x 134

## Exhibit 13: Federal Firearms Licensees and Compliance Inspections
### (FY 1975 – 2020) — continued

| Fiscal Year | Inspections | Total Licensees | Percent Inspected | Licensed Business Entities* | Percent Ins pected |
|---|---|---|---|---|---|
| 2002 | 5,467 | 103,411 | 5.2% | 73,254 | 7.5% |
| 2003 | 5,170 | 104,105 | 4.9% | 70,699 | 7.3% |
| 2004 | 4,509 | 106,214 | 4.2% | 69,008 | 6.5% |
| 2005 | 5,189 | 106,432 | 4.9% | 66,359 | 7.8% |
| 2006 | 7,294 | 107,316 | 6.8% | 63,666 | 11.5% |
| 2007 | 10,141 | 108,933 | 9.3% | 61,243 | 16.6% |
| 2008 | 11,100 | 112,943 | 9.8% | 60,346 | 18.4% |
| 2009 | 11,375 | 115,395 | 9.9% | 60,349 | 18.8% |
| 2010 | 10,538 | 118,487 | 8.9% | 61,807 | 17.0% |
| 2011 | 13,159 | 123,587 | 10.6% | 64,360 | 20.4% |
| 2012 | 11,420 | 130,956 | 8.7% | 69,071 | 16.5% |
| 2013 | 10,516 | 139,244 | 7.6% | 74,795 | 14.1% |
| 2014 | 10,437 | 141,116 | 7.4% | 77,815 | 13.4% |
| 2015 | 8,696 | 139,840 | 6.3% | 79,188 | 11.0% |
| 2016 | 9,790 | 137,464 | 7.1% | 80,119 | 12.2% |
| 2017 | 11,009 | 136,081 | 8.1% | 80,493 | 13.7% |
| 2018 | 10,323 | 134,191 | 7.7% | 80,055 | 12.9% |
| 2019 | 13,079 | 130,546 | 10.0% | 78,100 | 16.7% |
| 2020 | 5,827 | 130,605 | 4.5% | 77,740 | 7.5% |

Source: ATF Federal Firearms Licensing Center, Federal Licensing System (FLS).

*Does not include Collector of Curio and Relics (Type 03).



**PROTECTING THE PUBLIC**
**SERVING OUR NATION**

**U.S. Department of Justice**
**Bureau of Alcohol, Tobacco, Firearms and Explosives**
99 New York Ave., NE, Washington, DC 20226

**www.atf.gov**

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **SECOND AMENDMENT FOUNDATION,** *et al.*, | § § § | |
| **Plaintiffs,** | § § | |
| **vs.** | § § | **CIVIL ACTION NO.  3:21-CV-0116-B** |
| **BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES,** *et al.*, | § § § | |
| **Defendants.** | § § | |

**<u>DECLARATION OF CHARLES COTTON</u>**

My name is Charles Cotton. I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following declaration is true and correct:

1.      I am over twenty-one years old and am fully competent to make this declaration. Unless otherwise noted, I have personal knowledge of all matters stated herein.

2.      I have been a member of the National Rifle Association of America ("NRA") since the 1970s. In 2001, I was elected a member of the Board of Directors.

3.      Since October 2021, I have served as President of the NRA. I am intimately familiar with all aspects of the NRA's operations.

4.      The NRA is a nonprofit corporation organized under the laws of the State of New York with its principal place of business in Fairfax, Virginia. For many decades, it has been the largest and most effective gun rights lobbying organization in the country. It is a traditional membership association. Members can join via https://membership.nra.org/MultiStep/JoinToday and choose various membership tiers. Once they join, members have access to a choice of

1

magazines, grassroots gatherings, and educational opportunities. They receive many other benefits, including discounts from NRA business partners and free admission to special events.

5.      The NRA has more than 4 million members across the nation. Those millions of law-abiding NRA members rely on the NRA to protect their gun rights, including by pursuing litigation on behalf of its members to protect those rights.

6.      First among the "Purposes and Objectives" contained in the NRA's bylaws is "[t]o protect and defend the Constitution of the United States." The NRA is the foremost defender of the Second Amendment to the United States Constitution. The NRA's programs and outreach impact the lives of millions of law-abiding gun owners – around the United States and world. The NRA engages in extensive advocacy at all levels of government to promote the rights of its members and all Americans.

7.      The NRA spends tens of millions of dollars annually distributing pamphlets, fact sheets, articles, electronic materials, and other literature to advocate for its views on the Second Amendment and to assist NRA members engaging in the national, state, and local firearm debate. The NRA's direct mail, television, radio, and digital communications seek to educate the public about issues bearing on the Second Amendment, protect its millions of law-abiding members against laws and regulations that would infringe their rights, and galvanize participation in the political process by NRA members and supporters.

8.      In addition, the NRA's Institute for Legislative Action (NRA-ILA), the lobbying arm of the NRA, seeks to preserve the right of all law-abiding individuals to purchase, possess and use firearms as guaranteed by the Second Amendment by lobbying, litigation, and grassroots activism.

9.      The NRA's legal, political and grassroots advocacy is particularly important in the State of Texas. Texas is home to approximately 350,000 NRA members, including many thousands in each judicial district in Texas. Texas ranks #1 for NRA membership. Texas is one of the Top 10 "best states for gun owners."[1] Almost 50 percent of adults in Texas live in homes with guns.[2] According to industry reports, the state is reliant on the firearms industry, which, directly and indirectly, creates and sustains more than 30,000 jobs.[3] This industry is being irreparably threatened by the "Factoring Criteria for Firearms with Attached 'Stabilizing Braces'" (the "Final Rule") implemented by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").

10.      Many NRA members, including thousands in the Dallas area, possess firearms with attached stabilizing devices, and their freedom to do so is being hindered by the Final Rule. The NRA's members include consumers who purchase, transfer, possess, own, customize, accessorize, and utilize stabilizing braces and pistols. NRA members have relied on previous decisions that the attachment of a stabilizing brace does not automatically subject a firearm to regulation under the National Firearms Act ("NFA").

11.      For over a decade, ATF has recognized that stabilizing braces serve a legitimate function, and the inclusion of a stabilizing brace on a pistol or other firearm does not automatically subject that firearm to the provisions of the National Firearms Act. Indeed, stabilizing braces were first designed and intended to help disabled veterans fire large format pistols. The ATF has recognized that use of stabilizing braces does not transform a pistol into a rifle.

---

[1] Keith Wood, "The Best States for Gun Owners Ranked for 2022," *Guns & Ammo* (Aug. 18, 2022), available at https://www.gunsandammo.com/editorial/best-states-for-gun-owners-2022/463592.

[2] Jessica Learish & Elisha Fieldstadt, "Gun Map: Ownership by State," *CBS News* (April 14, 2022), available at https://www.cbsnews.com/pictures/gun-ownership-rates-by-state/.

[3] Lora Korpar, "Texas Tops in Creating Gun Company Jobs in 2021, California a Close Second," *Newsweek* (April 1, 2022), available at https://www.newsweek.com/texas-california-gun-firearm-jobs-output-1694315.

12.     Now, under the Final Rule, that recognition has been revoked. Because of the Final Rule, the millions of Americans, including NRA members, who own a pistol and a stabilizing brace, regardless of style or caliber or type of brace, must either dispose of, alter, or register their firearms.  If they fail to comply, they face the prospect of felony prosecution, 10 years in prison, and large fines.  And if the NRA's members and supporters register their newly-classified short-barreled rifles, they will potentially be providing evidence of both state and federal crimes to both state and federal governments.

13.     Implementation of the Final Rule thus directly infringes on the constitutional rights of individuals to keep and bear arms, to be free from arbitrary government action, to be regulated according to clear dictates, to freely advertise their firearms, and to engage in firearm-related speech without the threat of adverse government action.

14.     Preservation and safeguarding of these rights and interests align with the mission of the NRA, which aims to uphold and protect the Second Amendment and the rights of Americans to possess firearms, particularly in the face of unwarranted intervention by unelected and unaccountable anti-gun bureaucrats. The NRA is equipped to intervene in this case on behalf of its members who face this significant constitutional infringement.

15.     The Final Rule also threatens the First Amendment rights of its members. For example, they now may be forced to destroy their firearms under the NFA based on the "marketing and promotional materials" associated with the firearm.

16.     The NRA's members have relied upon the NRA to protect them from the Final Rule by means of litigation, lobbying, and other advocacy efforts. For example, on December 12, 2022, the NRA updated its members on the status of the Biden Administration's efforts to regulate pistol braces and promised, "Whatever develops on this front, you can count on NRA to remain involved,

4

and to keep you updated."[4] And on January 30, 2023, the NRA assured its members that it "is already working on litigation to challenge this arbitrary and capricious attack on law-abiding gun owners by the Biden Administration."

17.     The NRA has followed through on these promises, taking repeated steps to try to protect its members from the Final Rule.[5]

18.     For example, on September 8, 2021, the NRA filed public comments opposing the ATF's proposal to regulate stabilizing braces.[6] And then, the NRA successfully obtained clarification of multiple aspects of ATF's proposed rule before it went into effect, including 1) that braces removed from firearms do not necessarily have to be destroyed or altered in a way that prevents them from being reattached to a firearm; and 2) that imported pistols with stabilizing braces do not necessarily need to be destroyed or surrendered.[7]

19.     If the NRA does not obtain relief on behalf of its members, their constitutional and statutory rights will be significantly infringed. Among other things, they face the prospect of felony prosecution if the Final Rule is not enjoined. In order to avoid that prospect, they will have to dispose of their firearms.

20.     Further, the NRA faces institutional injury when it is unable to protect the rights of its members to the same extent as those of other guns-rights organizations. It has already had to invest time and resources to communicate to its members that it will protect their right to lawfully

---

[4] NRA-ILA, "Biden Administration Continues to Push to Target Firearms with Attached Stabilizing Braces" (Dec. 12, 2022); *available at* https://www.nraila.org/articles/20221212/biden-administration-continues-push-to-target-firearms-with-attached-stabilizing-braces.

[5] NRA-ILA, "Updates to Final Rule on Stabilizing Braces" (Jan. 30, 2023); *available at* https://www.nraila.org/articles/20230130/updates-to-atf-final-rule-on-stabilizing-braces.

[6] NRA-ILA, "Comments of the National Rifle Association on ATF's Proposed Rule 2021R-08" (September 8, 2021) [Attached as Exhibit A]; NRA-ILA, "Updates to ATF Final Rule on Stabilizing Braces

[7] NRA-ILA, "Updates to Final Rule on Stabilizing Braces" (Jan. 30, 2023); *available at* https://www.nraila.org/articles/20230130/updates-to-atf-final-rule-on-stabilizing-braces.

use pistol braces, by engaging outside counsel, preparing a media release and fielding multiple calls from members.

21.     The NRA's intervention is timely, because it had no notice that the existing plaintiffs would not be able to adequately represent the interests of its members until approximately two weeks ago.  The NRA first learned that the potential interests of its members would not be protected in this case as a result of the Injunction Order and Clarification Order, which were entered on May 25, 2023, and May 31, 2023, respectively.[8]  Specifically, the narrow scope of the preliminary injunction entered by the Court on May 25 and clarified on May 31, protecting only the Second Amendment Foundation ("SAF"), its members, and the other individual named plaintiffs, leaves no doubt that the interests of the current plaintiffs and the NRA diverge in ways that directly affect the NRA's ability to protect the rights of its members.

22.     The Complaint in this matter sought, *inter alia*, a preliminary injunction enjoining enforcement of the Final Rule and a judgment holding it unlawful and setting it aside.[9]  This relief would have benefitted the NRA and its members.  In their Injunction Motion, Plaintiffs sought a generally applicable injunction against any enforcement of the Final Rule.[10]  This also would have protected the NRA and its members.  Plaintiffs reiterated this request in their reply brief, arguing that the Court "should enter a preliminary injunction enjoining [Defendants] from enforcing" the Final Rule.[11]  But through the Clarified Injunction Order, the Court granted a preliminary injunction limited to the SAF and its members, along with other individual named plaintiffs.[12]

---

[8] *Espy*, 18 F.3d at 1206 (finding that the potential intervener's stake materialized after a preliminary injunction, not when the relevant complaint was filed).

[9] Compl., Doc. 50 at ¶¶ 88-90.

[10] Injunction Mot., Doc. 52 at p. 22.

[11] Plfs. Reply Br. In Support of Plfs. Mot. for a Preliminary Injunction, Doc. 59 at p 12.

[12] Order, Doc. 62 at pp. 2-3; Order, Doc. 65 at pp. 2-3.

6

23.     Similarly, in *Mock v. Garland*, the plaintiffs sought a nationwide injunction against enforcement of the Final Rule before the Fifth Circuit.[13] But the Fifth Circuit limited the scope of the preliminary injunction to only the Firearms Policy Coalition, its members, and other individual named plaintiffs, indicating that those individuals and entities could not adequately represent the interests of the NRA in this matter.[14]

24.     If intervention is denied in this case, the NRA will have no choice but to file its own separate lawsuit challenging the Final Rule.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 6th day of June 2023.

_____
Charles Cotton
President, National Rifle Association

---

[13] Plaintiff-Appellants' Opposed Emergency Motion for a Preliminary Injunction Pending Appeal, *Mock v. Garland*, No. 23-10319 (5th Cir.), Doc. No. 25, at pp. 21-22 (May 17, 2023).

[14] Order, *Mock v. Garland,* No. 23-10319 (5th Cir. May 23, 2023), Doc. 52-2, Order, *Mock v. Garland*, No. 23-10319 (5th Cir. May 26, 2023), Doc. 78-2.

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| SECOND AMENDMENT FOUNDATION, *et al.*, | § § § |
| Plaintiffs, | § |
| | § |
| vs. | § CIVIL ACTION NO. 3:21-CV-0116-B |
| | § |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, *et al.*, | § § § § |
| Defendants. | § |

## DECLARATION OF DR. CARL CARLSON

My name is Dr. Carl Carlson. I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following declaration is true and correct:

1. I am an adult resident of Irving, TX, in Dallas County. I am fully competent to make this declaration. I have personal knowledge of all matters stated herein.

2. I am a longtime member of the National Rifle Association of America ("NRA"), having been a member for over a decade. I am a gun owner and Second Amendment supporter. Like many other NRA members, I rely on the NRA to protect and advocate for my right to keep and bear arms.

3. I am not a prohibited person, and thus I can lawfully purchase and possess firearms under federal and state law.

4. I have read the Final Rule of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") regarding pistol braces. I understand that it will significantly impact and negatively affect myself and my activities now and in the future.

5. I suffer from diffuse idiopathic skeletal hyperostosis (DISH disease), which limits my mobility and causes me pain in everyday life activities, including using a firearm. Because of my condition, I need a stabilizing brace to use a firearm.

6. I own a Daniels Defense Mark 18 pistol. Before the Final Rule, I used it in conjunction with a stabilizing brace. Before the Final Rule, the pistol I was using was perfectly legal to possess. I relied on repeated ATF rulings holding that the addition of a stabilizing brace did not transform a pistol into a short-barreled rifle for purposes of ATF regulation. But my understanding is that, under the Final Rule, the ATF would now classify that configuration of a firearm (and virtually every firearm with a stabilizing brace) as a short-barreled rifle.

7. I wish to be able to continue to posses my Daniels Defense Mark 18 pistol in its current configuration. However, the Final Rule requires me to modify, destroy, or surrender it.

8. Unless the final rule is enjoined, I and all those similarly-situated to me will have to destroy my firearm. This is particularly difficult for me, and many others like me who suffer from chronic pain, because I cannot use the firearm without the stabilizing brace.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __ day of June 2023.

Dr. Carl Carlson

2

# EXHIBIT D



# The NRA

*A More Than Four Decade Brick-By-Brick Restoration And Defense Of Our Second Amendment Freedom*

*by* **A1F Staff**

**1975:** The NRA Institute for Legislative Action (ILA) was formed. ILA is the lobbying arm of the NRA. ILA is committed to preserving the right of all law-abiding individuals to purchase, possess and use firearms for legitimate purposes, as guaranteed by the Second Amendment to the U.S. Constitution. ILA's ability to fight successfully for the rights of America's law-abiding gun owners directly reflects the support of the NRA's more than 5 million members—a number that has more than tripled since 1978. When restrictive gun-control legislation is proposed at the local, state or federal level, NRA members and supporters are alerted, and they respond with individual letters, faxes, emails and calls to their elected representatives to make their views known.

NRA-ILA is also involved in educating the public about the facts concerning the many facets of firearm ownership in America. Through the distribution of millions of printed fact sheets, brochures and articles annually and the posting of information and the latest news daily on its website (nraila.org), ILA provides facts about responsible firearm ownership, the Second Amendment and other topics.

Today, ILA employs a staff of more than 50, with a team of full-time lobbyists defending Second Amendment issues on Capitol Hill, in state legislatures and in local government bodies.

**1981:** From 1981 through 1991, the NRA helped bring the number of states with firearm-preemption laws to 41. Today, 45 states limit the authority of

municipalities to regulate firearms and ammunition. These laws generally preclude local governments from enacting any additional regulations on firearms or ammunition beyond state law. Without firearm preemption, gun owners would be subjected to a patchwork of hundreds or even thousands of different sets of laws in every state. Before the 1980s, only three states had passed or confirmed, through litigation, firearm preemption laws.

**1986:** Years of NRA lobbying led to the Firearms Owners' Protection Act of 1986 being signed into law by President Ronald Reagan. The NRA worked for more than a decade to secure passage of this historic legislation in order to reform the Gun Control Act of 1968. Remember, before your NRA worked to change that law, every violation was

**NRA**



a federal felony and you didn't even need to have any intent to break the law. The government could enter a gun store every day simply to harass them out of business.

**1988:** Marion P. Hammer, who would be NRA president from 1995-1998, spearheaded the Eddie Eagle GunSafe program with a task force made up of educators, school administrators, curriculum specialists, urban housing safety officials, clinical psychologists, law-enforcement officials and NRA firearm safety experts. Since then, it has reached more than 32 million children in all 50 states, Canada and Puerto Rico.



**Marion P. Hammer was the first female president of the NRA (1995 to 1998). As an influential NRA lobbyist from the 1970s through today, Hammer is credited with influencing many of Florida's gun laws, including the 2005 Stand your ground law.**

**1994:** Since 1994, the number of states that have range-protection laws has risen from eight to 48 thanks to lobbying from the NRA. Gun-control activists have often tried to diminish our rights by trying to ban shooting ranges. Without ranges, responsible firearm owners have very little opportunity to shoot or to introduce others to shooting sports. When it was clear that those who despise the Second Amendment had targeted ranges with nuisance lawsuits and local "zoning" ordinances, the NRA began promoting range-protection laws. These laws are especially useful for established ranges, as they prevent local governments from forcing them to close down because they cannot comply with new noise ordinances or construction requirements that are put in place years (and sometimes decades) after the range was established in compliance with local zoning laws. Even former President Bill Clinton regretted taking on the NRA. When looking back on the 1994 "assault weapons" ban in his memoir, *My Life*, he concluded that he had likely "pushed the Congress, the country, and the administration too hard" by banning peoples' popular semi-automatic rifles.

**1996:** Since 2002, the National Institutes of Health (NIH) has spent millions on so-called "research" – actually propaganda designed to push gun control—even though their counterparts at the CDC have been prevented from funding similar studies since being blocked in 1996 by an NRA-backed provision.

**2000:** The NRA helped secure the White House victory for George W. Bush. In 2000, Al Gore made restricting your right to keep and bear arms a major part of his campaign platform. The NRA rallied members by letting American voters know what Gore would do; as a result, Gore lost his own home state and, with it, the election.

**2002:** The terrorist attacks of Sept. 11, 2001, changed the airline industry forever. In response to the attacks, the Transportation Security Administration (TSA), an agency of the U.S. Department of Homeland Security, was formed. The TSA at first resisted the concept of arming pilots, but, thanks to lobbying from the NRA,

Congress passed the "Arming Pilots Against Terrorism Act." Under the act, a pilot who volunteers and completes training is deputized as a federal flight deck officer (FFDO).

**2004:** The NRA opposed renewal of the Federal Assault Weapons Ban of 1994. The ban expired on Sept. 13, 2004.

**2005:** President George W. Bush signed the NRA-backed Protection of Lawful Commerce in Arms Act (PLCAA), which prevents firearms manufacturers and dealers from being held liable for negligence when crimes have been committed with their products. The PLCAA saved the American firearms industry from certain bankruptcy and elimination by passing lawsuit protection. Keep in mind that anti-gun groups were repeatedly suing America's manufacturers for the criminal misuse of firearms. This was burying the industry in legal fees and insurance problems, leading to possible bankruptcy for American gun makers.

**2005:** The NRA helped enact the nation's first Stand-Your-Ground law in Florida. Today, 27 states have Stand-Your-Ground laws, and another seven states have Stand-Your-Ground laws in practice, either through case law, precedent or via jury instructions.

**2005:** During and just after Hurricane Katrina, local government officials in New Orleans took guns from law-abiding people, leaving them defenseless in the chaos and darkness. The NRA moved to stop this from ever happening again. Since Katrina, the NRA has worked to pass such protections in 33 states. In 2006, Congress passed the Disaster Recovery Personal Protection Act to prevent the government from seizing legally-owned firearms during times of a declared state of emergency.

**2005:** The NRA and other gun advocates filed a lawsuit challenging San Francisco Proposition H, which banned the ownership and sales of firearms. The NRA argued that the proposition overstepped local government authority and intruded into an area regulated by the state. The San Francisco County Superior Court agreed with the NRA position. The city appealed the court's ruling, but lost a 2008 appeal.

**NRA.**

**2008:** San Francisco was forced to pay a $380,000 settlement to the NRA and other plaintiffs to cover the costs of litigating Proposition H.

**2008:** The NRA filed a friend-of-the-court brief with the U.S. Supreme Court in the 2008 landmark gun-rights case *District of Columbia v. Heller.* In a 5-4 vote, the U.S. Supreme Court ruled that the District of Columbia's gun laws were unconstitutional, and made it clear that an individual's right to a gun was unconnected to service in a militia.

**2009:** The NRA again filed suit *(Guy Montag Doe v. San Francisco Housing Authority)* in the city of San Francisco challenging the city's ban of guns in public housing. On Jan. 14, 2009, the San Francisco Housing Authority (SFHA) reached a settlement with the NRA, which allows residents to possess legal firearms within a SFHA apartment building.

**2009:** The NRA successfully lobbied to legalize the carrying of firearms for self-defense in national parks and fish and wildlife refuges; however, land managed by the Army Corps of Engineers was not included in this legislation. NRA-ILA is lobbying for the right to carry on the Army Corps' 13 million acres.

**2009:** The NRA worked to preserve the opportunity for American gun owners to purchase surplus firearms that were no longer of use to the U.S. military. This included M-1 Carbines, M-1 Garand rifles, M-14 rifles, .22-caliber rifles, .30-caliber rifles and M-1911 pistols. Starting in 1979, different versions of this measure's language have prevented these firearms from being needlessly destroyed. In 2009, Congress amended this language, at the urging of the NRA, to prevent the destruction of spent brass casings. This is especially important to gun owners and reloaders concerned about the rising price of ammunition.

**2010:** The NRA sued the city of Chicago, Ill., *(McDonald v. Chicago),* and the U.S. Supreme Court ruled that, like other substantive rights, the right to bear arms is incorporated via the Fourteenth Amendment to the Bill of Rights, and therefore applies to the states.

**2013:** The NRA joined a federal lawsuit with other gun-rights groups

challenging New York's gun-control law (the NY SAFE Act), arguing that N.Y. Gov. Andrew Cuomo "usurped the legislative and democratic process" in passing the law, which included restrictions on magazine capacity and expanded the state's "assault weapons" ban.

**2013:** The Obama administration instituted "Operation Choke Point," in which various federal regulators, including the U.S. Department of Justice, the Federal Deposit Insurance Corporation and the Office of the Comptroller of the Currency at the Treasury Department, used their ratings and enforcement authorities to intimidate banks into refusing or severing business relationships with lawful — though politically disfavored — industries, including those involving firearms and ammunition. The NRA exposed this unfair attack on the legitimate relationship America's gun makers and dealers have with financial institutions. Thanks to NRA lobbying, under President Donald J. Trump, this operation was formally axed.

**2014:** In Pennsylvania, the NRA lobbied for, and saw passed, a bill that grants it and other advocacy groups legal standing to sue municipalities with local firearm regulations violating state laws preempting such regulations, and also allows the court to force cities to pay their legal fees. As soon as it became law, the NRA sued three cities: Philadelphia, Pittsburgh and Lancaster.

**2015:** The NRA began lobbying aggressively for "National Right-to-Carry Reciprocity" laws. In 2015, numerous right-to-carry bills were introduced in the U.S. House of Representatives and one in the U.S. Senate. While all the bills are slightly different, NRA supported them all. The NRA is still working to achieve this important goal.

**2016:** Following the terrorist attack in Orlando, Fla., on June 12, 2016, U.S. Sen. Chris Murphy (D-CT) took to the Senate floor to filibuster the Commerce-Science-Justice Appropriations bill to talk about gun control. During his filibuster, Sen. Murphy demanded a vote on an amendment to prohibit individuals on the Terrorist Watch List from purchasing a firearm, as well as a vote on an amendment to implement a "universal" background check

system. The NRA opposed this amendment and it failed overwhelmingly.

**2016:** The NRA raised a record $366 million to fight for your freedom. The NRA also maintains a PAC that is separate from these figures. The organization donated to congressional races for pro-gun members of Congress. The NRA also endorsed Donald J. Trump in the 2016 U.S. presidential election after Hillary Clinton made it clear she wanted to take away much of this American freedom. In the 2016 presidential election, the NRA reported spending more than $60 million in support of Trump.

**2017:** Congress passed and President Donald Trump (R) signed NRA-backed legislation to repeal an Obama-era Social Security Administration (SSA) rule. The SSA rule would have resulted in an estimated 75,000 law-abiding social security beneficiaries losing their Second Amendment rights each year.

**2017:** On April 3, 2017 H.R. Res. 69 was signed into law by President Trump. Introduced by former Congressman and NRA board member Don Young (R-Alaska), H.J. Res. 69 restored Alaska's authority to manage its own wildlife by overturning an Obama administration rule that would have given the U.S. Fish and Wildlife Service control over hunting and fishing on National Wildlife Refuges in Alaska.

**2017:** Congressman Richard Hudson (R-N.C.) introduced NRA-supported H.R. 38, The Concealed Carry Reciprocity Act of 2017, which would require every state to recognize carry permits from all other states. On December 6, 2017, the U.S. House of Representatives passed H.R. 38 by a vote of 231-198.

**2017:** President Trump signed into law the NRA-backed National Defense Authorization Act (NDAA) Conference Report for Fiscal Year 2018. This law includes a provision that directs the Secretary of the Army to transfer surplus 1911 .45 ACP pistols to the Civilian Marksmanship Program (CMP). In the first run of the program, CMP received 8,000 surplus 1911s, and its random lottery auction for qualified applicants received more than 19,000 requests for purchase. The transfer of these historically-significant firearms

eases the burden on the government's heavily indebted balance sheet, in addition to allowing the CMP to keep revenues from the 1911 sales, ensuring CMP funding for the future.

**2017-2020:** The NRA supported President Trump's U.S. Supreme Court nominations and the confirmations of Justices Brett Kavanaugh, Neil Gorsuch, and Amy Coney Barrett.

**2018:** On March 14, 2018, the U.S. House of Representatives passed the "STOP School Violence Act of 2018," sponsored by Rep. John Rutherford (R-Fla.), by a vote of 407-10; Sen. Orrin Hatch (R-Utah) introduced a companion bill in the U.S. Senate. This legislation provides funding for training students, teachers, school administrators and local law enforcement to identify early warning signs that a person is a threat to themselves or others. The bill also provides funds to implement school threat-assessment procedures and create a coordinated violence-prevention reporting system. This legislation was included in the Omnibus Appropriations Act of 2018 and signed into law by President Trump on March 23, 2018.

**2019:** The New York State Rifle & Pistol Association (NYSRPA) filed its main brief in the U.S. Supreme Court case *NYSRPA, et al. v. the City of New York and the New York City Police Department-License Division.* The NRA-supported case challenges a New York City ordinance that violates the Second Amendment rights of law-abiding New York City residents by restricting lawful travel with firearms outside of city limits.

**2019:** At NRA's Annual Meeting, President Trump "unsigned" the United Nation's Arms Trade Treaty (ATT).

NRA has long fought the implementation of international gun controls that would give bureaucrats in Europe authority over American gun owners. The ATT contains a dangerous provision that provides for "end-user monitoring," which is just political-speak for an international gun registry. By withdrawing the United States from the ATT, President Trump prevented even partial implementation of the treaty's requirements against law-abiding American gun owners.

**2019:** The NRA is again suing the city of San Francisco, this time for officially deeming the NRA to be a "domestic terrorist organization" and for attacking the First Amendment-protected right to freely associate. This resolution from the San Francisco Board of Supervisors says "the City and County of San Francisco should take every reasonable step to limit those entities who do business with the City and County of San Francisco from doing business with this domestic terrorist organization." The NRA's lawsuit pointed out that the San Francisco Board of Supervisors' declaration discriminates against people "based on the viewpoint of their political speech."

**2020:** As a result of backing President Donald J. Trump, we now have a pro-Second Amendment majority on the U.S. Supreme Court with the addition of Justices Kavanaugh, Gorsuch and Barrett. President Trump also filled the lower courts with more than 200 judges.

**2022:** The U.S. Supreme Court ruled, in *NYSRPA v. Bruen,* that New York's concealed-carry law is unconstitutional due to the state's requirement that applicants for concealed-carry licenses demonstrate "proper cause" to carry a firearm outside of their home. This NRA-supported case affirmed that the right to bear arms does not stop at a person's front door, and is the most-significant Second Amendment ruling in more than a decade.

Meanwhile, a lot has been achieved in just the last 30 years:

**Since 1990:** The NRA helped pass shall-issue carry laws and constitutional-carry laws across America, enabling Americans to lawfully carry firearms for personal protection in almost every state.

**1990:** Just 16 states recognized the right to carry a concealed firearm with or without a permit; today, 42 states have either unrestricted concealed carry or are shall-issue states. 1990: Just one state recognized the right to carry a concealed firearm without a permit; today, 25 states recognize that right.

**1990:** Twenty states had may-issue policies for a concealed-carry permit that gave law-enforcement discretion in the awarding of licenses; today, there are only eight may-issue states.

- The number of states that do not allow concealed carry fell from 14 in 1990 to zero in 2019.
- Through the NRA's efforts, 34 states now have a no-retreat requirement before a person may exercise their right to lawful self-defense.
- Outright recognition is always the NRA's goal, and 21 states now recognize permits issued by other states.

We have freedom because we inherited it as Americans; we have individual freedom in America because early Americans insisted upon a U.S. Bill of Rights that included the Second Amendment; and we have the Second Amendment because of the National Rifle Association.



# EXHIBIT E



# Factoring Criteria for Firearms with Attached "Stabilizing Braces"

**27 CFR Parts 478 and 479**
**Docket No. 2021R-08F; AG Order No.     -**
**RIN 1140-AA55**
**Final Rulemaking**
*Final Regulatory Impact Analysis and Final Regulatory Flexibility Analysis*

**January 2023**

*Prepared by:*
Office of Regulatory Affairs
Bureau of Alcohol, Tobacco, Firearms, and Explosives
Washington, D.C.

1

This page left intentionally blank

2

Table of Contents

Abbreviations...................................................................................................................8

Executive Summary..........................................................................................................9

OMB A4 Accounting Statement....................................................................................12

1.      Introduction ......................................................................................................14

   1.1    Statutory Authority ......................................................................................16

   1.2    Need for Federal Regulatory Action ...........................................................17

2.      Population...........................................................................................................18

   2.1    Type 1 FFL dealers.......................................................................................23

   2.2    Type 7 FFL manufacturer and "brace" manufacturer...................................24

   2.3    Individuals....................................................................................................25

   2.4    State and local governments.........................................................................26

3.      Cost to Turn Firearms with Attached "Stabilizing Braces" in to ATF............28

   3.1    Population.....................................................................................................30

   3.2    Costs.............................................................................................................31

4.      Destroy the Whole Firearm...............................................................................36

   4.1    Population.....................................................................................................37

   4.2    Costs.............................................................................................................37

5.      Convert Firearm into Long-Barreled Rifle........................................................39

   5.1    Population.....................................................................................................39

   5.2    Costs.............................................................................................................43

6.      Apply to Register Under the NFA.....................................................................46

   6.1    Population Under NFA..................................................................................47

   6.2    Cost to Apply Under the NFA......................................................................48

7.      Cost to Permanently Remove and Dispose of or Alter a "Stabilizing Brace" such that it Cannot be Reattached and Forgone Future Sales.........................................................55

   7.1    Population Under Permanent Removal or Alteration of "Stabilizing Brace"...............55

   7.2    Cost to Permanently Remove and Dispose of or Alter "Stabilizing Braces" Such that it Cannot Be Reattached...................................................................................57

   7.3    Future Revenue of "Stabilizing Braces" Lost from Loss of Production.......................59

8.      Summary of the Overall Cost of the Rule..........................................................62

   8.1    Primary (low estimate) cost of the final rule................................................62

   8.2    Transfers from Industry to Public ................................................................63

8.3    Government Costs .................................................................................... 63

8.4    Combined Private Societal and Government Costs .................................... 65

8.5    High Cost of the Final Rule ....................................................................... 66

9.    Benefits ................................................................................................... 68

10.    Analysis of Alternatives Considered ...................................................... 71

10.1    This Final Rule—Factoring Criteria for Firearms with Attached "Stabilizing Braces." 72

10.2    Alternative 1—No change alternative ........................................................ 72

10.3    Alternative 2—Specific quantifiable standards with set metrics ............... 72

10.4    Alternative 3—Grandfather all existing firearms with an attached "stabilizing brace." 73

10.5    Alternative 4—Guidance documents. ........................................................ 73

10.6    Alternative 5—NPRM weighted criteria .................................................... 74

10.7    Alternative 6—No tax forbearance. ........................................................... 74

11.    Final Regulatory Flexibility Act ............................................................ 76

11.1    Findings .................................................................................................... 76

11.1.1    "Stabilizing Brace" Manufacturers ...................................................... 77

11.1.2    Destroy the Whole Firearm ................................................................. 78

11.1.3    Convert to Rifle ................................................................................... 78

11.1.4    Apply under NFA ................................................................................ 79

11.1.5    Accessories Retailers .......................................................................... 80

11.1.6    Other entities ....................................................................................... 80

11.2    Final Regulatory Flexibility Analysis ....................................................... 81

11.2.1    A statement of the need for, and objectives of, the rule ....................... 82

11.2.2    A statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a statement of the assessment of the agency of such issues, and a statement of any changes made to the proposed rule as a result of such comments. ............................................................................................... 84

11.2.3   The response of the agency to any comments filed by the Chief Counsel for Advocacy of the SBA in response to the proposed rule, and a detailed statement of any change made to the proposed rule in the final rule as a result of the comments. ................ 84

11.2.4   A description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available. ................................... 85

11.2.5   A description of the projected reporting, recordkeeping and other compliance requirements of the final rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record ................................................................................... 85

11.2.6   A description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.. 86

12.   Collection of Information ........................................................................................ 87

Appendix A Fingerprint Costs ........................................................................................ 90

Appendix B Market Value of Firearms with Attached "Stabilizing Brace" ............................. 91

Appendix C States with Short-Barreled Rifle and Other Weapons Restrictions ....................... 93

# Table of Tables

Table ES–1  Summary of Affected Population, Costs, and Benefits.........................................10

Table 3–1  Leisure Wage Rate for Individuals ........................................................................32

Table 3–2  Retail Wages ...........................................................................................................33

Table 3–3  Time and Miles Traveled to an ATF Office ...........................................................34

Table 4–1  Cost to Destroy a Firearm with Attached "Stabilizing Brace".................................37

Table 5–1  Calculation to Determine the Number of "Stabilizing Braces" Held by Type 7 FFL

Manufacturers ...........................................................................................................................41

Table 5–2  Wage Categories Used for Gunsmithing Activities ...............................................44

Table 6–1  Wage Categories used for Type 1 FFL Responsible Persons...................................51

Table 6–2  Wage Categories used for Type 7 FFL Responsible Persons...................................52

Table 7–1  Individuals and FFLs and Number of Firearms with "Stabilizing Braces" Affected

Across All Scenarios .................................................................................................................56

Table 8–1  Societal Cost of Final Rule Per Scenario...............................................................62

Table 8–2  Private Societal 10-year cost of rule .....................................................................62

Table 8–3  Government 10-year cost of rule ............................................................................65

Table 8–4  Combined Private Societal and Government 10-year cost of rule...........................65

Table 8–5  High Cost of Final Rule Per Scenario ...................................................................66

Table 8–6  High 10-year cost of rule .......................................................................................67

Table 10–1  Summary of Cost and Benefits of the Alternatives..............................................71

Table 11–1  Size Distribution of Affected Entities .................................................................76

Table 11–2  Top Seven Industries Affected by This Rule ........................................................77

Table 11–3  Economic Impact of "Stabilizing Brace" Manufacturers......................................77

Table 11–4  Percent Impact to Destroy the Whole Firearm......................................................78

Table 11–5  Percent Impact to Convert Firearm with "Brace" into Long-Barreled Firearm.......79

Table 11–6  Percent Impact for FFLs Applying Under NFA.....................................................79

Table 11–7  Estimated  Number of Small Entities Affected by this Rule.................................85

7

# Abbreviations

| | |
|---|---|
| ATF | Bureau of Alcohol, Tobacco, Firearms, and Explosives |
| BLS | Bureau of Labor Statistics |
| CFR | Code of Federal Regulations |
| DOT | Department of Transportation |
| FATD | Firearms and Ammunition Technology Division |
| FFL | Federal Firearms License |
| FRFA | Final Regulatory Flexibility Analysis |
| GCA | Gun Control Act |
| IRFA | Initial Regulatory Flexibility Analysis |
| NAICS | North American Industry Classification System |
| NFA | National Firearms Act |
| NPRM | Notice of Proposed Rulemaking |
| OMB | Office of Management and Budget |
| RFA | Regulatory Flexibility Act |
| RIA | Regulatory Impact Analysis |
| § | Section symbol |
| SBA | Small Business Administration |
| SOT | Special Occupational Tax |
| U.S. | United States |
| U.S.C. | United States Code |

# Executive Summary

Executive Order 12866 (Regulatory Planning and Review) directs agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic benefits, environmental benefits, public health and safety effects, distributive impacts, and equity). Executive Order 13563 (Improving Regulation and Regulatory Review) emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility.

The Office of Management and Budget ("OMB") has reviewed this final rule and determined that this rule is a "significant regulatory action" that is economically significant under section 3(f)(1) of Executive Order 12866 because, as discussed, the final rule will have an annual effect on the economy of $100 million or more.

This final Regulatory Impact Analysis ("RIA") provides supporting documentation for the regulatory evaluation in the preamble of the final rule for the Factoring Criteria for Firearms with Attached "Stabilizing Braces" [2021R-08].

This rule sets forth standards for evaluating "stabilizing braces" in conjunction with how they modify a firearm. This rule clarifies the definition of "rifle" by providing that the term "designed or redesigned, made or remade and intended to be fired from the shoulder" shall include a weapon that is equipped with an accessory, component, or other rearward attachment (*e.g.*, a "stabilizing brace") that provides surface area that allows shouldering of the weapon, provided other factors, as described in the final rule, indicate that the weapon is designed, made, and intended to be fired from the shoulder.

9

Not only will this rule impact how new firearms with certain firearm attachments (or accessories) are to be evaluated, it will also affect existing firearms with attached "stabilizing braces." Nothing in this rule bans "stabilizing braces" or the use of "stabilizing braces" on pistols; however, firearms with an attached "brace" device may be subject to statutory and regulatory requirements depending on the firearm's objective design features and other factors, as discussed in this rule. Should individuals and Federal firearms licensees ("FFLs") be in possession of a firearm with an attached "stabilizing brace" that constitutes a short-barreled rifle under the National Firearms Act of 1934 ("NFA") and the Gun Control Act of 1968 ("GCA"), the affected persons or FFLs will need to choose one of the following options. The options as presented in the final RIA are:

- Turn in the entire firearm with the attached "stabilizing brace" to ATF;
- Destroy the whole firearm;
- Convert the firearm into a long-barreled rifle;
- Apply to register under the NFA; or
- Permanently remove and dispose of, or alter, the "stabilizing brace" such that it cannot be reattached.

Table ES–1 summarizes the affects that this final rule will have on the industry and public.

Table ES–1  Summary of Affected Population, Costs, and Benefits

| Category | Affected Populations, Costs, and Benefits |
|---|---|
| Affected Population | • 5 Manufacturers of affected "stabilizing braces"<br>• 3,881 Manufacturers of short-barreled rifles that have a "stabilizing brace" attachment |

10

|  | • 13,210 Dealers of short-barreled rifles that have a "stabilizing brace" attachment<br>• 1.4 million firearm owners who have pistols with "stabilizing braces" attached and those who intend to purchase them in the future |
| --- | --- |
| Societal Costs (Annualized) | • $263.6 million at 7%<br>• $242.4 million at 3% |
| Government Costs (Annualized 7 percent) | • $3.3 million |
| Unquantified Benefits | • To prevent manufacturers and individuals from circumventing the requirements of the NFA.<br>• To enhance public safety by reducing the criminal use of NFA firearms, which are easily concealable from the public and first responders. |

11

# OMB A4 Accounting Statement

OMB has determined that this is an "economically significant" rule within the definition of Executive Order ("EO") 12866 because estimated annual costs or benefits exceed $100 million in any year. As required by OMB Circular A-4 (available at http://www.whitehouse.gov), ATF has prepared an accounting statement showing the classification of expenditures associated with the final rule.

Agency/Program Office: ATF
Rule Title: Factoring Criteria for Firearms with Attached "Stabilizing Braces"
RIN#: 1140-AA55
Date: January 2023

| Category | Primary Estimate | Minimum Estimate | Maximum Estimate | Units | | | Notes |
|---|---|---|---|---|---|---|---|
| | | | | Dollar Year | Disc | Period Covered | |
| Benefits | | | | | | | |
| Annualized monetized benefits ($ Millions/year) | N/A | N/A | N/A | 2021 | 7% | 10 years | |
| | N/A | N/A | N/A | 2021 | 3% | 10 years | |
| Annualized quantified | N/A | N/A | N/A | 2021 | 7% | 10 years | |
| | N/A | N/A | N/A | 2021 | 3% | 10 years | |
| Qualitative | - To prevent manufacturers and individuals from circumventing the requirements of the NFA.<br>- To enhance public safety by reducing the criminal use of firearms that are easily concealable from the public and first responders. | | | | | | |
| Costs | | | | | | | |
| Annualized monetized costs ($ Millions/year) | $266.9 | $266.9 | $581.9 | 2021 | 7% | 10 years | |
| | $245.6 | $245.6 | $529.8 | 2021 | 3% | 10 years | |
| | N/A | N/A | N/A | 2021 | 7% | 10 years | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Annualized quantified | N/A | N/A | N/A | 2021 | 3% | 10 years | |
| Qualitative (unquantified) | N/A | | | | | | |
| **Transfers** | | | | | | | |
| Federal | N/A | N/A | N/A | 2021 | 7% | 10 years | |
| Annualized Monetized ($ Millions/year) | N/A | N/A | N/A | 2021 | 3% | 10 years | |
| From/To | From: Individuals and FFLs | | | To: Federal Government | | | |
| Other Annualized | N/A | N/A | N/A | 2021 | 7% | 10 years | |
| monetized transfers ($ Million/year) | N/A | N/A | N/A | 2021 | 3% | 10 years | |
| From/To | From: N/A | | | To: N/A | | | |
| **Effects** | | | | | | | |
| State, local, and/or Tribal governments | The rule will not impose an intergovernmental mandate or have significant or unique effects on small governments, or have federalism or Tribal implications | | | | | | |
| Small businesses | Approximately 4 manufacturers of "stabilizing braces" will be significantly affected by more than 10 percent of their revenue. May affect 13,210 Type 1 FFL dealers and 3,881 Type 7 FFL manufacturers. Type 1 FFLs may experience a range of costs from $243 to $2,919. Most will not incur a significant effect. Type 7 FFLs may also experience a range of costs from $738 to $13,344, to an unknown loss of revenue due to the inability to sell firearms with attached "stabilizing braces" | | | | | | |
| Wages | N/A | | | | | | |
| Growth | N/A | | | | | | |

13

# 1. Introduction

This analysis provides an assessment of the impacts to society and government from final changes detailed in the rule on Factoring Criteria for Firearms with Attached "Stabilizing Braces." The RIA does not attempt to precisely replicate the regulatory language of the final rule; the regulatory text, not the text of this analysis, is legally binding.

In 2012, a company developed an "stabilizing brace," asserting that their device would help persons with disabilities or limited arm strength or mobility to fire heavy pistols[1] with a single hand. ATF examined the submitted "brace" device itself and found the sample "stabilizing brace" "provide[d] the shooter with additional support of a firearm while it is still operated with one hand" and that the device was not "designed or intended to fire a weapon from the shoulder."

In recent years, there has been an increase in the production of firearms with attached "stabilizing braces" that possess objective design characteristics that are indicative of firearms designed and intended to be fired from the shoulder (*i.e.*, rifles).[2] Many of these firearms with attached "stabilizing braces" fall under the purview of the NFA because the firearm has a barrel or barrels of less than 16 inches in length. Individuals who attach a "stabilizing brace" to their firearm could find themselves making an NFA firearm without abiding by the registration and taxation requirements of the NFA. Additionally, ATF has made clear that "stabilizing brace"

---

[1] For purposes of this rule and discussion, ATF generally refers to the type of firearms that are typically equipped with a "stabilizing brace" as heavy pistols based on the manufacturer's stated intent. The use of the term "pistol" in this rule should not be interpreted as an official classification from ATF that any of these firearms are "pistols" under Federal law. The Department recognizes that, under the final rule titled "Definition of 'Frame or Receiver' and Identification of Firearms," 87 FR 24652 (Apr. 26, 222), these firearms incorporate a rifle receiver (*e.g.*, AR-15 receiver).

[2] The rule makes clear that weapons with an attached "stabilizing brace" that have a barrel of less than 16 inches or an overall length of less than 26 inches are short-barreled rifles under the NFA if their objective design features and other evidence indicate the firearm is designed, made, and intended to be fired from the shoulder.

devices may not be used as an attempt to circumvent the NFA; however, companies continued to manufacture, market, and sell "stabilizing braces" as "stocks" that could be used to circumvent the NFA.

This rule sets forth standards for evaluating "stabilizing braces" in conjunction with how they modify a firearm. This rule clarifies the definition of "rifle" by providing that the term "designed or redesigned, made or remade and intended to be fired from the shoulder" shall include a weapon that is equipped with an accessory, component, or other rearward attachment (*e.g.*, a "stabilizing brace") that provides surface area that allows shouldering of the weapon, provided that other factors, as listed in the final rule, indicate that the weapon is designed, made, and intended to be fired from the shoulder.

This rule will impact both how ATF evaluates new firearms with certain attached firearm accessories and how ATF evaluates existing firearms with attached "stabilizing braces." Nothing in this rule bans "stabilizing braces" or the use of "stabilizing braces" on pistols; however, firearms with an attached "brace" device may be subject to statutory and regulatory requirements depending on the firearm's objective design features and other factors, as discussed in this rule. If a firearm with an attached "stabilizing brace" contains the objective design features that indicate (or if there are marketing materials or other information from the general community that indicate) that it is intended to be fired from the shoulder and the firearm has a barrel length of less than 16 inches, then it is a short-barreled rifle under the NFA and must be registered in the National Firearms Registration and Transfer Record ("NFRTR"). Thus, not only will this rule impact how new firearms with certain attachments or accessories are evaluated, it will also affect existing firearms with attached "stabilizing braces." Should individuals or FFLs be in possession of a firearm with an attached "stabilizing brace" such that

15

the firearm constitutes a short-barreled rifle under the NFA and the GCA, affected persons or FFLs would need to choose one of the following options:

- Turn the entire firearm with an attached "stabilizing brace" into ATF;

- Destroy the whole firearm;

- Convert the firearm into a long-barreled rifle;

- Apply to register under the NFA; or

- Permanently remove and dispose of, or alter, the "stabilizing brace" from the firearm such that it cannot be reattached.

## 1.1    Statutory Authority

The Attorney General is responsible for enforcing the GCA, as amended, and the NFA, as amended.[3] Congress has included provisions in these statutes that authorize the Attorney General to promulgate regulations as are necessary to enforce the provisions of the GCA and NFA. *See* 18 U.S.C. 926(a); 26 U.S.C. 7801(a)(2)(A)(ii), 7805(a).  Congress and the Attorney General have delegated the responsibility for administering and enforcing the GCA and NFA to the Director of ATF, subject to the direction of the Attorney General and the Deputy Attorney General.  *See* 26 U.S.C. 7801(a)(2); 28 U.S.C. 599A(b)(1), (c)(1); 28 CFR 0.130(a)(1)–(2); T.D. Order No. 221(2)(a), (d), 37 FR 11696–97 (June 10, 1972).  Accordingly, the Department of Justice ("Department") and ATF have promulgated regulations to implement the GCA and NFA. *See* 27 CFR parts 478, 479.  "Because § 926 authorizes the [Attorney General] to promulgate those regulations which are 'necessary,' it almost inevitably confers some measure of discretion

---

[3] NFA provisions still refer to the "Secretary of the Treasury." However, the Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135, transferred the functions of ATF from the Department of the Treasury to the Department of Justice, under the general authority of the Attorney General.  26 U.S.C. 7801(a)(2); 28 U.S.C. 599A(c)(1).  Thus, for ease of reference, this notice refers to the Attorney General throughout.

16

to determine what regulations are in fact 'necessary.'" *Nat'l Rifle Ass'n v. Brady*, 914 F.2d 475, 479 (4th Cir. 1990). And courts have long recognized that regulatory agencies do not establish rules to last forever. "They are neither required nor supposed to regulate the present and the future within the inflexible limits of yesterday." *Am. Trucking Ass'n* v. *Atchison, Topeka, and Santa Fe Ry. Co*, 387 U.S. 397, 416 (1967). For more details regarding the statutory authority of ATF, please refer to section IV.B.1.a in the final rule.

## 1.2   Need for Federal Regulatory Action

One of the reasons the Department is issuing rule is that individuals and affected entities affix purported "stabilizing braces" to firearms to circumvent the requirements of the NFA, which requires registration and taxes to be paid on the making and transfer of NFA weapons. Congress chose to regulate these items more stringently, finding them to be especially dangerous to the community if not regulated since they are used for violence and criminal activity. *See United States v. Gonzalez*, No. 2:10-cr-00967, 2011 WL 5288727, at *5 (D. Utah Nov. 2, 2011) ("Congress specifically found that 'short-barreled rifles are primarily weapons of war and have no appropriate sporting use or use for personal protection." (quoting S. Rep. No. 90-1501, at 28 (1968))). Therefore, if persons can circumvent the NFA by effectively making unregistered "short-barreled rifles" by attaching an accessory such as a "stabilizing brace," these dangerous, easily concealed weapons could more easily proliferate and hence pose an increased public safety problem.

17

# 2. Population

This rule does not regulate "stabilizing brace" devices themselves, and individuals may retain possession of them. The rule also does not ban the use of "stabilizing brace" devices on firearms. However, this final rule amends the definition of "rifle" under 27 CFR 478.11 and 479.11 to clarify that the definition of "rifle" shall include a weapon that is equipped with an accessory, component, or other rearward attachment (*e.g.*, a "stabilizing brace") that provides surface area that allows the weapon to be fired from the shoulder, provided other factors, as described in the amended regulations, indicate that the weapon is designed, made, and intended to be fired from the shoulder. As a result, for those firearms with an attached "stabilizing brace" that constitute NFA weapons, ATF anticipates that future sales of those "braces" or firearms with an attached "stabilizing brace" would diminish significantly, if not completely.

This rule would affect both future and past retail purchases of "stabilizing braces" and firearms with attached "stabilizing braces." Based on anecdotal evidence from the manufacturers of "stabilizing braces," the manufacturers have sold between 3 million and 7 million "stabilizing brace" devices between the years 2013 to 2020. Subject matter experts estimate that the manufacturers likely inflated their sales estimates in recent years, and therefore ATF estimates the number of "stabilizing braces" sold to be 3 million, rather than the midpoint of 5 million or the high end of 7 million. This estimate is based on the number of firearms with a "stabilizing brace" in circulation, as described below. Nonetheless, ATF has also calculated the anticipated costs of this rule using an estimate of 7 million "stabilizing braces" to account for uncertainty regarding the full cost of the rule.

Commenters stated that a recently published Congressional Research Service ("CRS") report had an estimate suggesting there may be between 10 and 40 million "braces," with some

18

arguing that the number of "braces" and pistol-"brace" combinations would be "upwards of 40,000,000."[4] One commenter implied that, if ATF were to use the 3 to 7 million range, then the midpoint (5 million) should be the number ATF uses. Furthermore, public comments have pointed out that ATF assumed that the entire estimated number of "stabilizing braces" were assumed to have been deemed a "stock" and that ATF did not take into account any firearms with attached "stabilizing brace" that, when attached to a weapon, did not create a weapon designed, made, and intended to be fired from the shoulder.

To determine whether the CRS estimate was suitable for purposes of ATF's RIA, ATF compared CRS's figures against those provided in the report on *Firearms Commerce in the United States: Annual Statistical Update 2021*.[5] This report provides an estimate of the number of firearms (including pistols, revolvers, rifles, shotguns, and miscellaneous firearms) manufactured in the United States, as reported by manufacturers. According to the report, ATF estimates that a total of 65.1 million firearms, with just under 27 million pistols, were manufactured in the United States between 2013 and 2019.[6] Although the most recent report is not yet final, ATF estimates that 12 million firearms were manufactured in 2020.[7] Therefore, ATF now estimates that, between 2013 to 2020, a total of 77.1 million firearms, of which 32.4 million pistols, were manufactured in the United States.

If there was a population of 10 to 40 million "stabilizing braces," similar components, or "stabilizing braces attached to firearms," as suggested by CRS, this range would be too high:

---

[4] William J. Krouse, Congressional Research Service, Handguns, Stabilizing Braces, and Related Components (updated Apr. 19, 2021), https://crsreports.congress.gov/product/pdf/IF/IF11763.

[5] ATF, Firearms Commerce in the United States: Annual Statistical Update 2021, https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download.

[6] *See id.* at 2.

[7] ATF Office of Strategic Intelligence and Information ("OSII").

Using the upper end of the range would mean there are at least as many "brace" devices or firearms with an attached "brace" device as there are pistols that were manufactured in the U.S. between 2013 to 2020 (*i.e.*, 32.4 million pistols).  And even at the low end of the CRS estimate, it would mean nearly a third of the pistols manufactured between 2013 to 2020 are equipped with a "stabilizing brace."  Because "stabilizing braces" are only used on a subset of pistols, not on all pistols, and because not all pistols manufactured are pistols equipped with a "stabilizing brace"[8] or a type of pistol for which a person would attach a "stabilizing brace," ATF's subject matter experts concluded that using the CRS estimate was not appropriate for this analysis.  Further, ATF notes that the CRS report did not provide a source or methodology for how it obtained its estimate of 10 to 40 million.  Moreover, anecdotal commentary specifically from industry, information gleaned from ATF field offices throughout the United States, and the conclusions of internal subject matter experts all indicate that—based on the number of pistols manufactured during the same time period and the popularity of the "brace" devices over the years— manufacturers may have inflated their sales estimates in recent years.

ATF also is choosing not to use the 5 million estimate suggested by Sig Sauer.  Based on the historical number of pistols produced, an estimate of 5 million would suggest that there was just under 1 firearm with a "stabilizing brace" produced for every 6 pistols (or approximately 16 percent of all pistols).  Additionally, based on information gleaned from field offices throughout ATF, ATF estimates that only a subset of FFLs sold firearms with a "stabilizing brace" and, of those that sold them, the FFLs may carry in their inventory on average only 7 firearms with an

---

[8] Note that this estimate is based on the assumption that a "stabilizing brace" device is designed for use on pistols as claimed by "brace" manufacturers

attached "stabilizing brace" for their entire inventory of firearms.[9]  This survey as described in footnote 10 indicates that a ratio of 1 firearm with a "stabilizing brace" produced for every 6 pistols  would still be too high.  ATF thus concluded that, based on its experience, an estimate of 5 million was too high.  ATF also considers that choosing to use 3 million rather than 5 million is reasonable because "stabilizing braces" did not become more popular until recent years, and hence manufacturers likely did not have sufficient time to produce numbers in the range of the higher estimates suggested by commenters or CRS and as discussed in the paragraphs above.

ATF estimates there may be "stabilizing braces," including some that may have been purchased by persons with disabilities, that will not be affected by the rule.  Therefore, based on anecdotal estimates from the Firearms and Ammunition Technology Division ("FATD") that there may be approximately 1 percent of "stabilizing braces" that, when attached to the firearm, would not result in a firearm that is designed and intended to be fired from the shoulder, ATF modified the estimated number of firearms with a "stabilizing brace" from a total of 3 million to 2,970,000.

In 2012, ATF received its first submission of a "stabilizing brace" to determine if it changed the classification of a "pistol."  Since then, "stabilizing braces" have been modified and sold in such a way that, when they are affixed to certain weapons, these firearms constitute an NFA firearm, *i.e.*, a short-barreled rifle.  Dividing the estimated number of firearms with "stabilizing braces" (2,970,000 to 6,930,000 "braces") by 8 years, ATF estimates that the future

---

[9] Based on an informal survey of ATF's 25 field divisions, 11 of the field divisions provided an estimated number of FFLs dealing in firearms with an attached "stabilizing brace," along with an estimated number of affected firearms per FFL.  Based on the responses, ATF estimated that approximately 10,420 FFLs from the 11 field divisions deal in firearms with attached "brace" devices and, of these FFLs, they may have carried between 1 to 52 firearms with an attached "stabilizing brace," with the majority of FFLs having under 20 such firearms in their inventory.  Therefore, for the purposes of the final RIA, ATF used the NPRM estimate of 25 percent of FFLs dealing in firearms with attached "stabilizing braces" and used the survey average of 7 firearms for inventory, which is higher than the 3 used in the NPRM.

number of firearms with "stabilizing braces" would range from 371,250 to 866,250 per year. Because ATF is here considering the estimated population of firearms with "stabilizing braces" to be 2,970,000, the annual number relevant here is 371,250. However, ATF will also undertake future enforcement actions regardless of the publication of the rule. ATF estimates that these enforcement actions will reduce the future number of firearms with "stabilizing braces" by an amount equal to the number of firearms with "stabilizing braces" sold through FFLs (124,192 from Type 7 FFL manufacturers and 92,470 from Type 1 FFL dealers), making the estimated future number of firearms with "stabilizing braces" affected by this rule 154,588.

Overall, ATF anticipates that this rule would affect (1) the manufacturers of these "stabilizing braces"; (2) Type 1 FFL dealers who sell either "stabilizing braces" or the completed firearm with an attached "stabilizing brace;" (3) Type 7 FFL manufacturers who attach these "stabilizing braces" to their firearms and sell them as a completed firearm with a "stabilizing brace"; and (4) individuals who have either purchased these "stabilizing braces" and attached them to existing firearms or have purchased a firearm with an attached "stabilizing brace."

Based on estimates from FATD, ATF estimates that 25 percent of Type 1 and Type 7 FFLs would be affected by this rule. Based on ATF licensing numbers, there are 52,840 Type 1 FFL dealers, of which 13,210 may be affected. Based on the same licensing numbers, there are 15,524 Type 7 FFL manufacturers, of which 3,881 may be affected. No comments were received regarding the number of affected FFLs; therefore, these numbers remain the same as stated in the notice of proposed rulemaking ("NPRM"). *See* Factoring Criteria for Firearms With Attached "Stabilizing Braces", 86 FR 30826, 30840 (June 10, 2021).

22

2.1   Type 1 FFL dealers

This rule would affect dealers who sell either "stabilizing brace" devices or firearms equipped with a "stabilizing brace" that are subject to regulation under the NFA.  Based on ATF licensing numbers, there are 52,840 Type 1 FFL dealers; however, ATF anticipates that not all FFLs sell firearms equipped with a "stabilizing brace" or sell "stabilizing braces" as a firearms accessory.  Because "stabilizing braces" are not themselves regulated under the GCA or NFA, ATF does not know exactly the number of FFLs that deal in these items.  Therefore, for the purposes of this analysis, ATF estimates that 25 percent, or 13,210, of Type 1 FFL dealers may deal in "stabilizing braces" or firearms with an attached "stabilizing brace."  This percentage was based on an estimate from FATD and was presented in the Initial Regulatory Impact Analysis during the NPRM, and no comments were received regarding this percentage.  Therefore, ATF retained this estimate as the best available information gathered regarding the population of FFLs dealing in these items.

Based on information gleaned from the disposal of bump-stock-type devices, which was an option under Final Rule 2018R-22F, ATF estimated in the NPRM that FFLs may have in inventory an average of 3 firearms.  *See, e.g.*, 86 FR at 30846.  However, because there are more firearms with an attached "stabilizing brace" than there were bump-stock-type devices, ATF uses for purposes of this analysis a different methodology to estimate the number of firearms with "stabilizing braces" that an FFL may have in inventory.  Based on a survey of field offices throughout ATF, ATF for this final rule estimates that a Type 1 FFL may carry in its inventory approximately 7 firearms with an attached "stabilizing brace."

2.2   Type 7 FFL manufacturer and "brace" manufacturer

The rule would affect Type 7 FFL manufacturers that purchased "stabilizing braces" and attached them to firearms, thereby manufacturing (and subsequently transferring) firearms equipped with "stabilizing braces" that may constitute short-barreled rifles. Based on ATF licensing numbers, there are 15,524 Type 7 FFL manufacturers. However, not all Type 7 FFL manufacturers manufacture and sell firearms with an attached "stabilizing brace." For the purposes of this analysis, ATF estimates that 25 percent, or 3,881, Type 7 FFL manufacturers may have been manufacturing and selling complete firearms equipped with a "stabilizing brace." There is a subcategory of Type 7 FFL manufacturers that have paid a special (occupational) tax ("SOT"). Based on ATF licensing numbers, of the total number of Type 7 FFLs, there are 7,057 Type 7 FFLs with an SOT. We estimate 25 percent of them (1,764) may have been manufacturing firearms equipped with "stabilizing braces" subject to the NFA. Therefore, for the purposes of this analysis, the estimated 3,881 Type 7 FFL manufacturers affected by this rule consist of 2,117 Type 7 FFLs without an SOT and 1,764 Type 7 FFLs with an SOT.

As described in more detail below, Type 7 FFL manufacturers without an SOT may use ATF's eForms system to complete an Application to Make and Register a Firearm, ATF Form 1 ("E-Form 1"), for each and every firearm affected by this rule that they currently have in their inventory; upon their doing so, the Department will forbear the NFA making tax typically due upon submission of a Form 1.

While this topic is primarily discussed in the Final Regulatory Flexibility Analysis ("FRFA") chapter of the RIA, this rule would indirectly and significantly affect "brace" manufacturers. "Brace" manufacturers are companies that manufacture "stabilizing braces." Based on an Internet search, ATF estimates that there are at least five manufacturers of

24

"stabilizing braces."  ATF anticipates that, if many currently available firearms with attached "stabilizing braces" are considered short-barreled rifles under the NFA as a result of the rule, then the demand for these items would be significantly affected.  Because "stabilizing brace" devices alone will continue to be an unregulated product, these "brace" manufacturers may continue to sell firearm accessories, but four may lose their business activities altogether due to this rule's impact on demand.  The remaining business—in addition to "braces"—also manufactures other firearm accessories; thus, although this business may incur a significant loss of revenue, it may be able to remain in business.

## 2.3    Individuals

This rule would affect all individuals who currently own a firearm with an attached "stabilizing brace" that is subject to regulation under the NFA, as well as individuals who intend to purchase a firearm and attach a "stabilizing brace" to the firearm that would be subject to NFA regulations.  Based on information gleaned from the disposal of bump-stock-type devices, which was an option under Final Rule 2018R-22F,[10]  ATF estimates that individual owners may own between 1 and 63 firearms.[11]  However, the mean ownership is approximately 2, which ATF uses for purposes of this analysis.  Because there may be approximately 3 million firearms with

---

[10] 83 FR 66514 (Dec. 26, 2018) (effective date March 26, 2019).  ATF notes that there is a difference between bump-stock-type devices and firearms with an attached "stabilizing brace" because the bump-stock-type devices themselves are regulated under the GCA and NFA.  Specifically, bump-stock-type devices are machineguns as defined by the GCA and NFA.  Unlike "stabilizing braces," bump-stock-type devices cannot be possessed by individuals under Federal law and therefore must be destroyed or turned into ATF.  *See* 18 U.S.C. 922(o).  However, ATF still uses the bump-stock-type device number to estimate the number of firearms with an attached "stabilizing brace" that individuals may possess because both bump-stock-type devices and "braces" are seen by many individuals as ways to circumvent the restrictions of the NFA and generally appeal to the same population of firearms owners.

[11] ATF anticipates that the demand for firearms with an attached "stabilizing brace" would have been similar to the demand for bump-stock-type devices since the demand for both items stems from the desire to circumvent the NFA.  Therefore, the information obtained from the disposal of bump stocks was used as a source of information for "stabilizing braces."

an attached "stabilizing brace" currently in circulation, ATF uses 1.4 million individuals.[12]  For more details on how 1.4 million individuals were derived from 3 million firearms with attached "stabilizing braces," please refer to chapter 7 of this RIA.

ATF received estimates from commenters that the number of individuals is equal to the number of firearms with "stabilizing braces" in circulation.  ATF disagrees with this assessment.  The Pew Research Center states that, of people who own firearms, two-thirds own multiple firearms.[13]  And, as evidenced by the number of bump-stock-type devices turned in as a result of the bump-stock rule, individuals can and are likely to purchase more than one firearm or, in this case, more than one "stabilizing brace" or firearm with an attached "stabilizing brace."  After publication of the Bump-Stock-Type Device final rule in December 2018, individual owners turned in between 1 and 63 bump-stock-type devices.  Overall, ATF found that people turned into ATF an average of 2 bump-stock-type devices.  Individuals in possession of a firearm with an attached "stabilizing brace" device may have acquired a firearm configured with a "brace" device or may have attached a "brace" device to a pistol.  Therefore, ATF estimates that the number of individuals in possession of a firearm with an attached "stabilizing brace" that are affected by this rule is lower than the number of firearms equipped with a "stabilizing brace" currently in circulation.

2.4    State and local governments

Although some State laws incorporate Federal law for purposes of banning or otherwise regulating short-barreled rifles, this rule does not purport to preempt any State laws, nor does it

---

[12] 1,376,699 individuals affected = (2,970,000 firearms with attached "stabilizing brace" - (13,210 Type 1 FFL Dealers * 7 firearms with attached "stabilizing brace") – (3,881 Type 7 FFL Manufacturers * 32 firearms with attached "stabilizing brace")) / 2 firearms with attached "stabilizing brace" per individual.

[13]  The Demographics of Gun Ownership, Pew Research Center (June 22, 2017), https://www.pewresearch.org/social-trends/2017/06/22/the-demographics-of-gun-ownership/.

require any State to change its laws.  Should a State or a political subdivision of a State (for example, a local police department) possess unregistered firearms equipped with "stabilizing braces" that constitute unregistered short-barreled rifles under the NFA, these firearms must be registered in the NFRTR.  ATF estimates that this rule will not affect many States or political subdivisions.

# 3. Cost to Turn Firearms with Attached "Stabilizing Braces" in to ATF

As stated before, there are five means of complying with Federal law after this rule is published. One way of complying is to allow individuals and FFLs to turn in firearms with attached "stabilizing brace" devices that are subject to the NFA to ATF. Turning in the firearm to ATF will mean that the individual or FFL will need to turn in the whole firearm, *i.e.*, the firearm with the attached "stabilizing brace," to ATF.

Public comments suggested that the loss of the firearm should be included in the analysis. ATF concurs that there may be a small number of individuals or FFLs that choose to turn in their whole firearm to ATF. These may include individuals who imported pistols and who may end up losing the value of their firearm if the firearm is a semi-automatic rifle. This is due to the restriction of 18 U.S.C. 922(r), which makes it unlawful for any person to assemble from imported parts any semiautomatic rifle which is identical to any rifle that is prohibited from importation because it is non-sporting. *See* 18 U.S.C. 925(d)(3), 27 CFR 478.39. It may also include individuals and FFLs whose States generally restrict the possession of short-barreled rifles or other weapons based on the characteristics of certain rifles (commonly referred to as "assault weapon" restrictions under State law[14]) so that individuals can generally not possess their firearm except under limited circumstances.[15]

---

[14] There is no definition of "assault weapon" under Federal law, but for purposes of this analysis ATF will refer to these restrictions on weapons with certain features as being restrictions on "assault weapons." This is neither an adoption or affirmation of the definition of "assault weapon" from any State, but only an effort to categorize these States' feature-based restrictions for purposes of this analysis.

[15] ATF notes in these States there may be limited exceptions for individuals to continue to possess short-barreled rifles or rifles with specific characteristics that are generally prohibited from possession under State law. Additionally, ATF is aware that individuals may also modify their firearm to fall within the confines of State law in certain circumstances, but ATF is unable to account for every variable and feature-based restriction under each State law. Finally, commenters concerned about the application of State law seemed to assume at times that the Federal

ATF estimates the population under this scenario to be similar in proportion to the number of individuals and FFLs who turned in bump-stock-type devices during the implementation of the rule 1140-AA52 Bump-Stock-Type Devices,[16] as well as percentages derived from the populations of States that have general restrictions on the possession of both short-barreled rifles and "assault weapons" restrictions. The population derived from the number of individuals and FFLs who turned in bump-stock-type devices would serve as a proxy for individuals and FFLs who would turn in firearms with "stabilizing arm braces" voluntarily and those who may decide that their firearm does not conform with 18 U.S.C 922(r), as implied by the commenter regarding compliance with 18 U.S.C. 922(r).[17]

ATF's review of State laws found there are eight States that generally restrict, with limited exception, the possession of both short-barreled rifles and "assault weapons." Specifically, a rifle may include specific characteristics that would bring it within the State's weapons restrictions based on its objective design characteristics regardless of whether the barrel is greater than 16 inches. Based on this information, ATF assumes that individuals residing

definition of "rifle," as clarified in this rule, would change the way in which State laws are applied to their firearms. This is not necessarily the case. Even when a State law uses the same word—such as "rifle"—as does Federal law, the States' specific definitions and interpretations of the words in their statutes may differ from Federal definitions and Federal interpretations of Federal law. *Cf. Molina v. I.N.S.*, 981 F.2d 14, 19 (1st Cir. 1992) (Breyer, J.) (observing that nothing "prevent[s] federal legislative authorities from writing federal statutes that differ from state statutes or from attaching, to words in a federal statute, a meaning that differs from the meaning attached to the same word when used in a statute enacted by a state"). Hence, this rule may have no effect on how States determine what sort of weapons are "rifles" for purposes of State law. Nonetheless, the Department acknowledges the concerns raised by commenters, and, in order to ensure a comprehensive consideration of the possible effects of this rule, the Department has accounted for commenters' concerns in this regulatory analysis.

[16] 83 FR 66514.

[17] As stated in the final rule, the Department disagrees that there will be financial implications resulting from the removal and replacement of imported parts for owners who imported pistols and added a "stabilizing brace." The commenter incorrectly interprets 18 U.S.C. 922(r) as requiring the removal and replacement of imported parts to comply with section 922(r). Section 922(r) generally makes it unlawful "for any person to assemble from imported parts any semiautomatic rifle," and 27 CFR 478.39 provides that a person may not assemble a semiautomatic rifle using more than 10 of the imported parts listed in the regulation. The criminal violation under section 922(r) is for the assembly of the semi-automatic rifle; therefore, modification of this kind of firearm through the removal of the relevant parts would not cure the 922(r) violation because the violation occurred at the time of the initial assembly.

within these States would not be able to own a firearm with an attached "stabilizing brace" because it would constitute a short-barreled rifle. Furthermore, they would not be able to convert the firearm into a long-barreled rifle because the State may consider the converted rifle an "assault weapon." For more details regarding these States and the number and percentages of individuals and Type 1 FFL dealers by State, please refer to appendix C.

3.1    Population

Based on information gleaned from individuals and FFLs who turned in bump-stock-type devices, ATF estimates that individuals may have an average of 2 firearms with an attached "stabilizing brace." Based on a survey of field offices throughout ATF, ATF estimates that an FFL may have approximately 7 firearms with an attached "stabilizing brace." For more detailed information about individuals and Type 1 FFL dealers, please refer to chapter 2.

Overall, under the bump-stock-type devices rule, individuals turned in 0.105 percent of the total number of bump-stock-type devices that were estimated to be in circulation, and FFLs turned in 0.0065 percent of the total number of bump-stock-type devices.[18],[19] Furthermore, 26.546 percent of individuals living in the U.S. reside in States that restrict possession of both short-barreled rifles and "assault weapons." For purposes of this analysis, ATF divided the proportion of individuals living in States that have general restrictions on short-barreled rifles and "assault weapons" evenly (13.385 percent) between this scenario to turn in firearms with an attached "stabilizing brace" and destroying the whole firearm (chapter 4).[20] Similarly, ATF estimates that 10.06 percent of Type 1 FFL dealers are located in these same States with prohibitions on both short-barreled rifles and "assault weapons," which, for purposes of this

---

[18] 0.105 percent = (546 bump-stock-type devices turned into ATF / 520,000 bump-stock-type devices in total).

[19] 0.0065 percent = (34 bump-stock-type devices turned into ATF / 520,000 bump-stock-type devices in total).

[20] 13.385 percent = 26.55 percent ÷ 2 scenarios used for compliance.

analysis, are divided evenly (5.03 percent) between this scenario and destroying the whole firearm (chapter 4).[21] Combining these percentages, ATF estimates that 13.385 percent of individuals and 5.04 percent of Type 1 FFL dealers may end up choosing to turn in to ATF the whole firearm with an attached "stabilizing brace" that is subject to the NFA regulations.[22, 23]

Using these percentages, ATF anticipates that approximately 184,267 individuals may turn in an estimated 368,534 firearms with an attached "stabilizing brace" and approximately 665 FFLs may turn in an estimated 4,655 firearms with an attached "stabilizing brace."[24, 25, 26, 27]

3.2    Costs

In the NPRM, ATF did not estimate anyone undertaking this scenario, and most comments also indicated that affected persons would not choose this scenario. However, other comments suggested incorporating a low percentage of individuals falling under this scenario. ATF concurs because there were a small number of individuals and FFLs who turned in bump-stock-type devices and there may be individuals who choose this route due to their State's restrictions. ATF did not use the suggested percentages as provided by one commenter; rather, ATF used percentages based on people and FFLs turning in bump-stock-type devices to ATF and on information regarding States that have general restrictions on short-barreled rifles and "assault weapons." Furthermore, in light of comments received regarding wages when ATF published

---

[21] 5.0365 percent = 10.06 percent ÷ 2 scenarios used for compliance.

[22] 13.385 combined percent individuals = 0.105 percent estimated from bump-stock-type devices turned in + 13.28 percent residing in States with both NFA weapons and "assault weapon" restrictions.

[23] 5.0365 combined percent FFLs = 0.0065 percent estimated from bump-stock-type devices turned in + 5.03 percent FFLs located in States with both NFA weapons and "assault weapon" restrictions.

[24] 184,267 individuals = 1,376,669 individuals * 13.385 percent individuals.

[25] 368,534 firearms with attached "stabilizing brace" = 184,267 individuals * 2 firearms per individual.

[26] 665 Type 1 FFL dealers = 13,210 affected Type 1 FFL dealers * 5.0365 percent.

[27] 4,655 firearms with attached "stabilizing brace" = 665 Type 1 FFL dealers * 7 firearms with "brace" per FFL.

31

the rulemaking on the Definition of Frame or Receiver and Identification of Firearms NPRM, [28] ATF updated the wages to account for inflation during the year 2021.

      In order to estimate the leisure wage of an individual traveling to a local ATF office and turning in the whole firearm(s), ATF updated the leisure wage rate as described by the Department of Transportation ("DOT") based on the methodology found in DOT's guidance on the costs for leisure time.[29]   DOT uses the median household income as the base for income from the U.S. Census.  Therefore, ATF uses the median income of a household from the U.S. Census, published September 2021.[30]  Table 3–1 outlines the leisure wage.

Table 3–1  Leisure Wage Rate for Individuals

| | |
|---|---|
| Median Household Income (2021) | $67,521 |
| DOT's Travel Time | 2,080 |
| DOT's Value of Travel Time Savings | 50% |
| Leisure Wage | $16 |

      In order to comply with this scenario, individuals or FFLs would need to drive to their local ATF office and turn in the firearm for disposal.  The costs for this scenario include the lost wage, including leisure wage, for time traveled, along with mileage costs.  ATF accounts for the mileage that individuals and FFLs took to drive to an ATF field office.  The General Services Administration ("GSA") provides a cost for milage, which is $0.625 per mile.[31]

---

[28] 87 FR 24652 (Apr. 26, 2021); *see also* https://www.regulations.gov/docket/ATF-2021-0001/document.

[29] https://www.transportation.gov/office-policy/transportation-policy/revised-departmental-guidance-valuation-travel-time-economic.

[30] https://www.census.gov/library/publications/2021/demo/p60-273 html

[31] https://www.gsa.gov/travel/plan-book/transportation-airfare-pov-etc/privately-owned-vehicle-pov-mileage-reimbursement-rates

ATF estimates the potential wage rates that would be used by individuals and FFLs driving to an ATF field office. For the purposes of this analysis, ATF groups all FFLs turning in the firearms with an attached "stabilizing brace." Also, because FFLs may have various employees to turn in firearms with attached "stabilizing braces," ATF uses some possible wage rates from the Bureau of Labor Statistics ("BLS") and uses the average wage rate as the wage rate for FFLs. ATF uses a loaded wage rate to account for fringe benefits such as insurance. The load rate used for this rule is 1.416.[32] Based on the updates made to the RIA as published with the Definition of "Frame or Receiver" and Identification of Firearms final rule, ATF added an Employee Cost Index of 1.031 to account for wage increases in 2022.[33,34] Table 3–2 shows the estimated wage rates.

Table 3–2  Retail Wages

| Wage Series | Series Code | Unloaded Wage Rate | Loaded Wage Rate | Employee Cost Index | Source |
|---|---|---|---|---|---|
| Minimum wage rate | Minimum Wage | $7.25 | $10 | $11 | https://www.bls.gov/opub/reports/minimum-wage/2021/home.htm |
| Packers and Packagers, Hand | 53-7064 | $14.88 | $21 | $22 | https://www.bls.gov/oes/2021/may/oes537064.htm |
| Retail Salespersons | 41-2031 | $15.35 | $22 | $22 | https://www.bls.gov/oes/2021/may/oes412031.htm |
| Building Cleaning Workers, All Other | 37-2019 | $18.52 | $26 | $27 | https://www.bls.gov/oes/2021/may/oes372019.htm |
| Average | | | | $20 | |

\* Note, numbers may not average due to rounding.

[32] BLS Series ID CMU2010000000000D, CMU2010000000000P (Private Industry Compensation = $37.15) / BLS Series ID CMU2020000000000D, CMU2020000000000P (Private Industry Wages and Salaries = $26.23 = 1.416. BLS average 2021. U.S. Bureau of Labor Statistics, https://beta.bls.gov/dataQuery/find?fq=survey:[cm]&s=popularity:D.

[33] 87 FR 24652 *see* https://www.regulations.gov/docket/ATF-2021-0001/document

[34] https://www.bls.gov/news release/archives/eci_04292022.pdf.

33

Based on information gleaned from individuals and FFLs who turned in bump-stock-type devices to ATF, the average miles traveled by an individual to turn in bump stocks was 35.48 miles with an average travel time of 0.78 hours. FFLs traveled an average of 31 miles with an average travel time of 0.65 hours. Table 3–3 reiterates the time and miles traveled, along with the government cost for miles traveled in a personal vehicle.

Table 3–3   Time and Miles Traveled to an ATF Office

| Item Type | Time Travel | Miles Traveled | Source |
|---|---|---|---|
| Travel Time Individual | 0.78 | 35.48 | Bump-stock-type devices turned in |
| Travel Time FFL | 0.65 | 30.74 | Bump-stock-type devices turned in |
| Per Diem for miles traveled | | $0.625 | https://www.gsa.gov/travel/plan-book/transportation-airfare-pov-etc/privately-owned-vehicle-pov-mileage-reimbursement-rates |

The average value of a firearm with an attached "stabilizing brace" is $1,246. To see the market prices gathered in order to determine the average price of a firearm with attached "stabilizing brace," please refer to appendix B. The individual opportunity cost of time is $12.[35] The individual cost for miles traveled is $22.[36] The individual cost to travel to an ATF field office and turn in 2 firearms with an attached "stabilizing brace" is $2,526.[37] The Type 1 FFL dealer opportunity cost of time is $13.[38] The Type 1 FFL dealer cost for miles traveled is $19.[39]

---

[35] $12 opportunity cost of time = $16 leisure wage * 0.78 hours traveled.

[36] $22 cost for miles traveled = 35.48 miles * $0.625 per diem per mile traveled.

[37] $2,526 = ($12 opportunity cost of time) + ($22 cost for miles traveled) + (2 firearms * $1,246 average value of firearm with attached "stabilizing brace").

[38] $13 opportunity cost of time = $20 loaded hourly wage rate * 0.65 hours traveled.

[39] $19 cost for miles traveled = $30.74 miles * $0.625 per diem per mile traveled.

34

It would cost an FFL $8,754[40] to turn in 7 firearms with an attached "stabilizing brace" to a local ATF field office. The total cost of this scenario to turn in to ATF firearms with an attached "stabilizing brace" is $471.3 million.[41]

---

[40] $8,754 = ($13 opportunity cost of time) + ($19 cost for miles traveled) + (7 firearms * $1,246 average value of firearm with attached "stabilizing brace").

[41] $471.3 million = (184,267 individuals * $2,526) + (665 FFLs * $8,754).

# 4. Destroy the Whole Firearm

As stated before, there are five means of complying with Federal law after this rule is published.  One means of complying allows individuals and FFLs to destroy all their firearms with an attached "stabilizing brace" that fall under the purview of the NFA.  ATF concurs with commenters that there may be a small number of individuals or FFLs that choose to destroy their whole firearm.  The population derived from the number of individuals and FFLs who turned in bump-stock-type devices would serve as a proxy for individuals and FFLs who would turn in firearms with "stabilizing arm braces" voluntarily and those who may decide that their firearm does not conform with 18 U.S.C 922(r) as implied by the commenter regarding compliance with 18 U.S.C 922(r).  Other individuals and FFLs choosing this route may be those whose States generally restrict possession of short-barreled rifles and "assault weapons."  ATF estimated the population under this scenario by using (1) the number of individuals and FFLs who turned in bump-stock-type devices during the implementation of the rule 1140-AA52, Bump-Stock-Type Devices,[42] and (2) the percentage of the population that is located in States that have general restrictions on the possession of both short-barreled rifles and "assault weapons."  As mentioned above in chapter 3, ATF's review of State laws found that there are eight States that generally restrict, with limited exception, the possession of both short-barreled rifles and "assault weapons."  For more details regarding these States and the number and percentages of individuals and Type 1 FFL dealers by State, please refer to appendix C.

---

[42] 83 FR 66514.

4.1   Population

Because ATF does not maintain records on firearm ownership or inventories to determine who would destroy their entire firearm, ATF used the same population numbers and methodology as those who turn their whole firearm with attached "stabilizing brace" in to ATF. Using the same information, ATF anticipates that approximately 184,267 individuals may destroy an estimated 368,534 firearms with an attached "stabilizing brace" and approximately 665 FFLs may destroy an estimated 4,655 firearms with a "stabilizing brace." [43, 44, 45, 46]

4.2   Costs

Individuals and FFLs currently in possession of firearms with an attached "stabilizing brace" that are subject to the NFA would need to destroy the firearms themselves or turn the firearm in to their local ATF office. For costs related to turning in the firearm to ATF, please see chapter 3 above. Options for destroying the firearm include melting, crushing, or shredding in a manner that renders the firearm with an attached "stabilizing brace" incapable of ready restoration. Other destruction options that ATF has historically accepted include torch cutting or sawing the device in a manner that removes at least 1/4 inch of material for each cut and completely severing design features critical to the functionality of the firearm. ATF uses the same wages categories as under chapter 3. Table 4–1 illustrates the opportunity cost of time to destroy a firearm with an attached "stabilizing brace" that is subject to NFA regulations.

Table 4–1   Cost to Destroy a Firearm with Attached "Stabilizing Brace"

| Cut with saw or torch | Incremental Cost | Hourly burden | Opportunity Cost of Time |
|---|---|---|---|

---

[43] 184,267 individuals = 13.385 percent * 1,376,669 total affected firearms with attached "brace."

[44] 368,534 firearms with attached "stabilizing brace" = 184,267 individuals * 2 firearms with attached "stabilizing brace."

[45] 665 Type 1 FFL dealers = 13,210 affected Type 1 FFL dealers * 5.0365 percent.

[46] 4,655 firearms with attached "stabilizing brace" = 655 Type 1 FFL dealers * 7 firearms with "brace" per FFL.

| Individual | $16 | 0.25 | $4.00 |
|---|---|---|---|
| FFL | $20 | 0.25 | $5.00 |

As stated in chapter 3, above, the average value of a firearm with attached "stabilizing brace" is $1,246.  The per individual cost for this scenario to destroy the whole firearm is $2,500 and the per FFL cost is $8,757, making the total cost for this scenario $466.5 million.[47, 48, 49]

---

[47] $2,500 Per individual cost to destroy firearms = 2 firearms * ($4 time to destroy a firearm + $1,246 price of a firearm with attached "stabilizing brace.")

[48] $8,757 Per FFL cost to destroy firearms = 7 firearms * ($5 time to destroy a firearm + $1,246 price of a firearm with attached "stabilizing brace.")

[49] $466.5 million = (184,267 individuals * $2,500 per individual cost) + (665 FFLs * $8,757 per FFL cost).

38

# 5. Convert Firearm into Long-Barreled Rifle

Another scenario is for individuals and FFLs to convert or reconfigure their firearms equipped with "stabilizing braces" that are subject to the NFA so that the firearms are removed from the scope of the NFA. These firearms would then be regulated only under the CGA. Under this scenario, individuals and FFLs may convert the firearms into long-barreled rifles.

## 5.1   Population

While ATF received comments on the estimated percent of populations that fall under each category, these percentages were based on the assumption that there would be taxes imposed for persons in possession of firearms with "stabilizing braces" that are subject to the NFA. However, the Department has decided it will forbear the making tax that is usually due upon submission of an application to register an NFA firearm when submitting a Form 1. ATF thus expects that any person or entity for whom a Form 1 would be appropriate (*i.e.*, any individual or any entity that lacks an SOT[50]), would be more likely to retain and register the firearm than ATF originally anticipated. The estimated percentages of individuals and FFLs used in this scenario will accordingly differ from both the NPRM's estimates and the public comment estimates. For more information regarding tax forbearance, refer to chapter 6 below.

Based on public comments, there may be individuals who reside in States that generally restrict possession of short-barreled rifles but do not have general restrictions on "assault weapons."[51] Individuals residing in these States would be able to convert their firearm with an attached "stabilizing brace" into a long-barreled rifle. ATF's review of State laws found that

---

[50] Type 7 FFL manufacturer who are SOT holders, as discussed elsewhere in this RIA, would use a Form 2 rather than a Form 1.

[51] States typically provide exemptions for law enforcement or government personnel, but generally restrict availability of short-barreled rifles for personal use.

39

there are three States that prohibit possession of short-barreled rifles but do not have general restrictions on possession of "assault weapons."  For purposes of this RIA, ATF assumes that the proportion of people living in States that generally restrict possession of short-barreled rifles (but not "assault weapons") is the percentage of people choosing to convert their firearm into a long-barreled rife.  Based on States that generally restrict possession of short-barreled rifles (but not "assault weapons") for personal use, ATF estimates 4.5 percent of affected individuals (1,376,669 individuals) will choose to convert their firearm with an attached "stabilizing brace" into a long-barreled rifle.  Therefore, the estimated number of individuals who will convert their firearms with an attached "stabilizing brace" into long-barreled rifles is 61,950.[52]  The number of firearms associated with individuals under this scenario is estimated to be 123,900.[53]  Please refer to appendix C for the list of States that generally have restrictions on the possession of short-barreled rifles (but not "assault rifles") and their populations relative to the whole United States.

Because FFLs are businesses and businesses prefer to avoid a loss of revenue, ATF assumes most FFLs will either choose to convert their inventory of firearms with attached "stabilizing braces" into long-barreled rifles to remove the firearms from the purview of the NFA or apply to register the firearms with an attached "stabilizing brace" under the NFA, as discussed in chapter 6.

As for Type 1 FFL dealers, only a portion of Type 1 FFLs retain gunsmithing staff, and ATF estimates that only those FFL dealers with staff that have gunsmithing capabilities will choose to convert their firearms with an attached "stabilizing brace" into a long-barreled rifle.

---

[52] 61,950 individuals = 1,376,669 affected individuals * 4.5 percent.

[53] 123,900 firearms with attached "stabilizing brace" = 61,950 individuals * 2 firearms.

40

Based on a survey of field offices throughout ATF, ATF estimates that approximately 27.56 percent (3,274) of Type 1 FFL dealers may retain staff that can perform gunsmithing activities.[54] By multiplying the number of Type 1 FFLs under this scenario by 7 firearms with attached "stabilizing brace" in inventory, the number of firearms that will be converted into long-barreled rifles by Type 1 FFL dealers is 22,918.[55]

For the purposes of this analysis, ATF estimates that Type 7 FFL manufacturers may have in their inventory 32 firearms with an attached "stabilizing brace" that are subject to the NFA.[56]  ATF estimated this number by taking the average of the total number of estimated firearms with "stabilizing braces" sold over the eight years of their production to come up with an average of 371,250 firearms with "stabilizing braces" per year.  Because firearms equipped with "stabilizing braces" were sold to individuals, Type 1 FFL dealers, and Type 7 FFL manufacturers, ATF split the average production among the 3 groups.  As stated in chapter 2, above, ATF estimates that this rule would affect 3,881 Type 7 FFL manufacturers.  ATF divided the remaining number of firearms with "stabilizing braces" (123,750) evenly among these Type 7 manufacturers to derive an estimated 32 firearms with an attached "stabilizing brace" per Type 7 FFL manufacturer.  To summarize the analysis, Table 5–1 illustrates the analysis to derive 32 firearms per Type 7 FFL manufacturer.

Table 5–1  Calculation to Determine the Number of "Stabilizing Braces" Held by Type 7 FFL Manufacturers

| Total "Stabilizing Braces" Manufactured | 2,970,000 |
|---|---|

[54] 3,274 Type 1 FFLs = (13,210 Type 1 FFLs affected – 665 Type 1 FFLs who turn firearm into ATF – 665 FFLs who destroy firearms) * 27.56 percent.

[55] 22,918 firearms with attached "stabilizing brace" = 3,274 Type 1 FFLs * 7 firearms.

[56] ATF estimates that Type 7 manufacturers would have more in inventory than Type 1 FFLs because they are producing firearms for sale to a greater number of Type 1 FFLs.  Furthermore, ATF estimates that bump-stock-type devices were primarily sold to only individuals and Type 1 FFLs because ATF is not aware of Type 7 manufacturers who dealt with bump-stock-type devices in their manufacturing.

| 8 Years of Manufacturing | 8 |
| Annual Number of "Stabilizing Braces" Held by Entity or Individual | 33.33% |
| Estimated Type 7 FFL Manufacturers Affected | 3,881 |
| Estimated "Stabilizing Braces" Held by Type 7 FFL Manufacture | 32 |

As mentioned above, FFLs, as business entities, prefer to avoid a loss of revenue. Therefore, assuming that FFLs will choose a method that allows them to continue to sell their inventory rather than lose their inventory, ATF assumes that Type 7 FFLs manufacturers will either convert their firearms into a long-barreled rifle or register their firearms with attached "stabilizing brace" as a short-barreled rifle in accordance with the NFA. Type 7 FFLs are capable of choosing either scenario as likely options because all Type 7 FFL manufacturers retain the staffing capabilities to remanufacture their existing inventory. Because there is no known information as to which scenario a given Type 7 FFL manufacture may chose, ATF assumes an even distribution between the two scenarios, *i.e.*, 50 percent of Type 7 FFLs will convert their firearms with an attached "stabilizing brace," while 50 percent of Type 7 FFLs will apply to register their firearms with an attached "stabilizing brace" under the NFA. Based on this even distribution between the two scenarios, ATF anticipates a total of 1,940 Type 7 FFLs— *i.e.*, 1,058 Type 7 FFL manufacturers without an SOT and 882 Type 7 FFL manufacturers with an SOT—will convert their firearms with attached "stabilizing braces" into long-barreled rifles.[57] By multiplying the number of Type 7 FFL manufacturers under this scenario by 32 firearms with an attached "stabilizing brace" in inventory, the number of firearms that will be converted into long-barreled rifles by Type 7 FFL manufacturers is 62,080.[58] The total number of firearms with

---

[57] 1,940 Type 7 FFLs = ((3,881 Type 7 FFLs affected – 1,764 Type 7 FFLs with SOT affected) * 50 percent) + (1,764 Type 7 FFLs with SOT affected * 50 percent).

[58] 62,080 firearms with attached "stabilizing brace" = 1,940 Type 7 FFLs * 32 firearms with attached "stabilizing brace."

42

an attached "stabilizing brace" that will be converted into long-barreled rifles is estimated to be 208,898.[59]

## 5.2   Costs

ATF estimates the cost to convert an existing firearm with an attached "stabilizing brace" from a short-barreled rifle into a long-barreled rifle.  To do so, ATF anticipates that the conversion requires a long barrel and handrails.  The average cost of a long barrel is $200.[60]  The average cost for handrails is $164.[61]

In the NPRM, the Department requested information regarding re-barreling a firearm. The comments received stated that ATF did not estimate the labor cost of re-barreling a firearm and that ATF should estimate the amount to send the firearm to a gunsmith and have a gunsmith re-barrel the firearm.  ATF concurs and adds the cost for a gunsmith to re-barrel the firearm at an

---

[59] 208,898 firearms = 123,900 firearms owned by individuals + 22,918 firearms in Type 1 FFL inventory + 62,080 firearms in Type 7 FFL inventory.

[60] https://www.brownells.com/rifle-parts/barrel-parts/rifle-barrels/ar-15-6mm-arc-barrels-heavy-profile-prod135844.aspx (accessed July 8, 2022); https://www.hinterlandoutfitters.com/mossberg-92062-rifled-barrel-wsights-gauge-slug-p-13798 html (accessed July 8, 2022); https://www hinterlandoutfitters.com/mossberg-90831-ulti-barrel-wparkerized-finish-accu-chokes-gauge-ulti-slug-p-13809.html (accessed July 8, 2022); https://www hinterlandoutfitters.com/mossberg-93356-model-stand-barrel-cylinder-borebead-front-sight-p-13748.html (accessed July 8, 2022); https://www hinterlandoutfitters.com/carl-87004-barrel-p-76645.html (accessed July 8, 2022); https://www.gunpartscorp.com/category/barrels/rifle-barrels/colt/lightning-cf-rifle (accessed July 8, 2022); https://www.midwayusa.com/product/1017600744 (accessed July 8, 2022); https://www.midwayusa.com/product/1023207522 (accessed July 8, 2022).

[61] https://www.aeroprecisionusa.com/ar15-atlas-r-one-m-lok-handguard (accessed July 8, 2022); https://ar15discounts.com/products/aim-sports-inc-ar-15-free-float-m-lok-handguard/ (accessed July 8, 2022); https://ar15discounts.com/products/dirty-bird-ar-15-smrs-handguard-slim-m-lok-rail-system-gen-2/ (accessed July 8, 2022); https://ar15discounts.com/products/aero-precision-enhanced-m-lok-free-float-handguard-gen-2/ (accessed July 8, 2022); https://www.odinworks.com/O2_Lite_M_LOK_Forend_p/f-12-ml-o2.htm (accessed July 8, 2022); https://seekinsprecision.com/noxs-mlok-rail-1-1.html (accessed July 8, 2022); https://www.odinworks.com/category-s/2018.htm?searching=Y&sort=2&cat=2018&show=30&page=1&f-15.2%E2%80%9D=2138 (accessed July 8, 2022); https://www.odinworks.com/O2-Lite-M-LOK-Forend-p/f-17-ml-o2.htm (accessed July 8, 2022).

average rate of $203 per firearm.[62]  The per individual cost for this scenario, based on each individual having two firearms that would be converted to long-barreled rifles, is $1,134.[63]

However, ATF estimates that costs of sending firearms to a gunsmith will likely be incurred by an individual and not a Type 1 or Type 7 FFL.  For the purposes of this RIA, ATF assumes that FFLs choosing this option are only those FFLs that currently have gunsmithing capabilities; therefore, ATF added an hourly wage rate for labor.  Table 5–2 demonstrates the possible wage categories that may apply to a gunsmith.

Table 5–2  Wage Categories Used for Gunsmithing Activities

| Hourly Wage | Hourly Wage Adjusted with Employee Cost Index | Loaded Wage Rate | BLS Occupation | Website |
|---|---|---|---|---|
| $21.35 | $22 | $31 | 51-4022 Forging Machine Setters, Operators, and Tenders, Metal and Plastic | https://www.bls.gov/oes/2021/may/oes514022.htm |
| $19.23 | $20 | $28 | 51-4199 Metal Workers and Plastic Workers, All Other | https://www.bls.gov/oes/2021/may/oes514031.htm |
| $18.98 | $20 | $28 | 51-4031 Cutting, Punching, and Press Machine Setters, Operators, and Tenders, Metal and Plastic | https://www.bls.gov/oes/2021/may/oes514199.htm |
| Average Wage | | $29 | | |

ATF assumes that an FFL that undertakes conversion of a firearm with attached "stabilizing brace" will have a gunsmith on staff.  FATD estimates that it will take a few minutes

---

[62] https://shawsheenfirearms.com/services/ (accessed July 8, 2022);
https://www.brownells.com/userdocs/miscellaneous/shoppricesurvey.pdf (accessed July 8, 2022);
https://mcgowenbarrel.com/rebarreling-services/ (accessed July 8, 2022).

[63] $1,134 per individual cost = ($200 barrel + $164 handguards + $203 re-barreling service) * 2 firearms.

for a gunsmith to re-barrel the firearm, which, for the purposes of this RIA, ATF estimates to be 15 minutes (0.25 hours), making the hourly burden per firearm $7.[64] Including the average cost of a long barrel and handguards, the cost for each Type 1 dealer is estimated to be $2,597, and the cost for each Type 7 manufacturer is estimated to be $11,872.[65,66] The total cost for this scenario is $101.8 million.[67]

---

[64] $7 hourly burden for a gunsmith to re-barrel a firearm with attached stabilizing brace = $29 hourly wage rate * 0.25 hours.

[65] $2,597 per Type 1 FFL cost = ($7 hourly burden + $164 handguards + $200 long barrel) * 7 firearms.

[66] $11,872 per Type 7 FFL cost = ($7 hourly burden + $164 handguards + $200 long barrel) * 32 firearms.

[67] $101.8 million = ((61,950 individuals * $1,134 per individual cost) + (3,274 Type 1 FFLs * $2,597 per Type 1 FFL cost) + (1,940 Type 7 FFLs * $11,872 per Type 7 FFL cost)).

45

# 6. Apply to Register Under the NFA

As stated before, there are five means of complying with Federal law after this rule is published. One option, discussed here, is for individuals and FFLs to keep firearms with attached "stabilizing braces" that are subject to the NFA and apply to register them under the NFA. Based on public comments, the Department has decided to forbear the NFA tax that is required upon application to make and register an NFA weapon. Affected persons in possession of firearms with attached "stabilizing braces" that are short-barreled rifles under the NFA and GCA will have 120 days from the publication of the final rule to register their firearm without paying the $200 making tax. ATF strongly encourages that all applications be submitted electronically. After 120 days, registrations of affected firearms will no longer be permitted. As of the date of the rule's publication, any subsequent making, sales, or transfers of firearms equipped with a "stabilizing brace" that are NFA firearms must comply with the NFA's requirements.

Individuals, Type 1 FFL dealers, Type 7 FFL manufacturers without an SOT, and Type 8 importers should use ATF's eForms system to complete an E-Form 1 for each and every firearm affected by this rule. Type 7 FFL manufacturers without an SOT may also complete an E-Form 1 application to register the affected firearms in their inventory as of the date of the final rule's publication. However, should non-SOT Type 7 FFL manufacturers opt to continue manufacturing and transferring firearms with attached "stabilizing brace" in the future, these FFLs will need to apply for an SOT. Upon obtaining an SOT, they would then complete on the eForms system a Notice of Firearms Manufactured or Imported, ATF Form 2 ("E-Form 2") to register all of their affected firearms in inventory. After registering their affected firearms on either an E-Form 1 or E-Form 2, FFLs would then be able to sell their existing inventory of

46

firearms with an attached "stabilizing brace" as NFA weapons in accordance with NFA requirements to individuals who wish to purchase them.  As mentioned above, the Department is not collecting the making tax so long as firearms equipped with "stabilizing braces" that are currently in the possession of the affected parties are registered within the defined period.

6.1   Population Under NFA

Based on public comments, ATF assumes most persons will choose this option, and ATF thus estimates that, for purposes of this analysis, the majority (60 percent) of individuals will opt to file an E-Form 1 under the NFA.  This amounts to 826,001 individuals who own 1.65 million firearms with attached "stabilizing braces."[68, 69]

Because Type 1 FFL dealers can file E-Form 1 applications without paying the NFA making tax within the defined time period, ATF assumes that those Type 1 FFL dealers who have not chosen to turn in their inventory to ATF, destroy their inventory, or convert their inventory into long-barreled rifles will choose this scenario.  For purposes of this analysis, this suggests that 8,606 Type 1 FFL dealers will file E-Form 1 applications under the NFA.[70]  By multiplying the number of Type 1 FFL dealers under this scenario by 7 firearms with an attached "stabilizing brace" in inventory, the number of firearms affected is 60,242.[71]

As stated in chapter 5 above, ATF assumes 50 percent of Type 7 FFL manufacturers will convert their firearms with an attached "stabilizing brace" and 50 percent of Type 7 FFL manufacturers will choose this scenario to register their firearms under the NFA.  Based on this

---

[68] 826,001 individuals = 1,376,669 total affected individuals * 60 percent.

[69] 1,652,002 firearms with attached "stabilizing braces" = 826,001 individuals * 2 firearms.

[70] 8,606 Type 1 FFLs = 13,210 Type 1 FFLs affected - 665 Type 1 FFLs who turn firearm into ATF - 665 FFLs who destroy firearms - 3,274 FFLs who convert to rifle.

[71] 60,242 firearms with attached "stabilizing braces" = 8,606 Type 1 FFLs * 7 firearms with attached "stabilizing brace."

47

even distribution between the two scenarios, ATF anticipates a total of 1,941 Type 7 FFLs—*i.e.*, 1,059 Type 7 FFL manufacturers without an SOT and 882 Type 7 FFL manufacturers with an SOT—will register their affected firearms under the NFA.[72, 73]  By multiplying the number of Type 7 FFL manufacturers under this scenario by 32 firearms with an attached "stabilizing brace" in inventory, the number of firearms affected is 62,112.[74]

Finally, should a State or political subdivisions of a State (for example, local police departments) possess firearms with attached "stabilizing braces" that qualify as NFA firearms, the firearms must be registered in the NFRTR.  However, ATF estimates that this rule will not affect many States or political subdivisions.

The total number of firearms with an attached "stabilizing brace" that would be registered in the NFRTR under this scenario would be 1.77 million.[75]

## 6.2    Cost to Apply Under the NFA

Individuals, Type 1 FFL dealers, and Type 7 FFL manufacturers without an SOT will need to file a E-Form 1 should they opt to retain their firearms with an attached "stabilizing brace."  The Department has decided to forbear the NFA making tax that is typically required upon submission of a Form 1 to make and register an NFA weapon.

Based on the collection of information OMB 1140-0011, ATF estimates that it takes 2.33 hours to fill out a E-Form 1, making 4.66 hours the total burden in hours for an individual filling

---

[72] 1,059 Type 7 FFLs without SOT = ((3,881 Type 7 FFLs affected – 1,764 Type 7 FFLs with SOT affected) * 50 percent).

[73] 882 Type 7 FFL with SOT = 1,764 Type 7 FFLs with SOT affected * 50 percent.

[74] 62,112 firearms with attached "stabilizing braces" = 1,941 Type 7 FFLs * 32 firearms with attached "stabilizing brace."

[75] 1.77 million firearms with attached "stabilizing braces" = (826,001 individuals * 2 "stabilizing braces") + (8,606 Type 1 FFLs * 7 firearms with attached "stabilizing braces") + (1,941 Type 7 FFLs * 32 firearms with attached "stabilizing braces").

out two E-Form 1 applications.  Note, however, that the actual burden may be smaller because most, if not all, the information can be quickly duplicated.

As stated above in chapter 3, ATF followed DOT's methodology and updated an individual's leisure wage, estimating it to be $16 per hour.  The cost for an individual to fill out two E-Form 1 applications to register two firearms with an attached "stabilizing brace" is $75.[76] In addition to filing out an E-Form 1 for an NFA registration, individuals will need to include digital fingerprints and upload a passport photo.  The average cost for a digital set of fingerprints is $22.[77]  The average cost for a passport photo is $16.[78, 79]  Using the same wage rates and travel rates from chapters 3 and 4 (Turn in Firearm to ATF and Destroy Whole Firearm), ATF estimates that completing the forms takes 2 trips—one to obtain photographs and one to obtain fingerprints—making the total trip cost $20.[80, 81]  The total cost per individual to submit two E-Form 1 applications is $133.[82]

Commenters suggested that the firearm will also need to be engraved with the required marks of identification by an FFL and that costs will be incurred to dissemble and re-assemble the firearm in order to mark it.  ATF disagrees.  The final rule allows the current possessor of the firearm to adopt the markings on the firearm for purposes of the E-Form 1 if the firearm is currently marked in accordance with 27 CFR 478.92 and 479.102.  Individuals who have attached a "stabilizing brace" to a "privately made firearm" ("PMF"), as defined in 27 C.F.R.

---

[76] $75 = ($16 leisure hourly wage * 2.33 hours) * 2 applications.

[77] For a list of sources for fingerprinting costs, please refer to Appendix A at the end of the RIA.

[78] https://www.cvs.com/photo/passport-photos?algSearch=passport%20pho&fromSrc=serp.

[79] https://photo.walgreens.com/store/passport-photos.

[80] $6 cost for miles traveled = 10-mile trip * $0.625 per diem per mile traveled.

[81] $20 travel costs = 2 * ($6 mileage + ($16 leisure wage * 0.25 travel time)).

[82] $133 individual cost to apply under NFA = ($16 leisure wage * 2.333 NFA applications * 2 firearms with attached "stabilizing brace") + $16 photograph + $22 fingerprints + $20 travel times).

49

478.11 and 479.11, without marking the PMF would be required to serialize the firearm in accordance with section 479.102 of the NFA in order to register the firearm. For the purposes of this analysis, ATF estimates that this rule will not affect many PMFs because PMFs generally are not the sort of weapon to which a "stabilizing brace" is attached; hence, ATF did not include serialization costs in this analysis. Nevertheless, ATF notes that the cost to retroactively serialize a PMF to comply with NFA markings is approximately $30 to $65 per PMF.[83]

As indicated in chapter 3, ATF estimates that Type 1 FFL dealers may have in their inventory an average of 7 firearms with attached "stabilizing braces" that are subject to the NFA. Based on the collection of information OMB 1140-0011, ATF estimates that it takes 0.33 hours for an FFL to fill out an E-Form 1. For purposes of filling out an E-Form 1, ATF assumes that a responsible person[84] would fill out the form. ATF reviewed ATF's databases on responsible persons by FFL type and attempted to compare wage titles between the responsible persons' listed job titles and occupations listed on the BLS wage rates. ATF adds a load rate of 1.416 to the hourly wage to account for fringe benefits like health insurance.[85] Based on the updates made to the RIA as published with the Definition of Frame or Receiver and Identification of Firearms final rule, ATF added an Employee Cost Index of 1.031 to account for wage increases

---

[83] https://tarheelstatefirearms.com/store/index.php?route=product/product&product_id=232; https://www.capitolarmory.com/sbr-sbs-nfa-firearm-laser-engraving-form1.html; https://www.accubeam.com/services/nfa-trust-gun-engraving/; SBS and SBR Laser Engraving | Veritas Machining | United States (veritasmachiningllc.com); (accessed Sept. 30, 2022).

[84] As described on ATF From 7/7CR, a responsible person is a sole proprietor, or, "in the case of a Corporation, Partnership, or Association, any individual possessing, directly or indirectly, the power to direct or cause the direction of the management, policies, and practices of the Corporation, Partnership, or Association, insofar as they pertain to firearms."

[85] A loaded wage rate is hourly wage rate, including fringe benefits such as insurance. The load rate is based on the average total compensation $37.15 (CMU2010000000000D) year 2022 / average wages and salaries $26.23 (CMU2020000000000D) year 2022. https://data.bls.gov/cgi-bin/surveymost?cm.

in 2022.[86] Table 6–1 shows the BLS codes used for the various job titles listed under the responsible persons.

Table 6–1  Wage Categories used for Type 1 FFL Responsible Persons

| Job Category | Wage Rate | Loaded Wage Rate | Wage Rate with Employee Cost Index | Source |
|---|---|---|---|---|
| 11-2022 Sales Managers | $68.46 | $97 | $100 | https://www.bls.gov/oes/2021/may/oes112022.htm |
| 11-3061 Purchasing Managers | $64.71 | $92 | $94 | https://www.bls.gov/oes/2021/may/oes113061.htm |
| 1-4199 Metal Workers and Plastic Workers, All Other | $18.98 | $27 | $28 | https://www.bls.gov/oes/2021/may/oes514199.htm |
| 33-9099 Protective Service Workers, All Other | $20.27 | $29 | $30 | https://www.bls.gov/oes/2021/may/oes339099.htm |
| 41-2011 Cashiers | $12.87 | $18 | $19 | https://www.bls.gov/oes/2021/may/oes412011.htm |
| 41-2031 Retail Salespersons | $15.35 | $22 | $22 | https://www.bls.gov/oes/2021/may/oes412031.htm |
| 43-5071 Shipping, Receiving, and Traffic Clerks | $18.37 | $26 | $27 | https://www.bls.gov/oes/2021/may/oes435071.htm |
| 43-6014 Secretaries and Administrative Assistants, Except Legal, Medical, and Executive | $19.75 | $28 | $29 | https://www.bls.gov/oes/2021/may/oes436014.htm |
| 53-7064 Packers and Packagers, Hand | $14.88 | $21 | $22 | https://www.bls.gov/oes/2021/may/oes537064.htm |
| Weighted Average | | | $83 | |

* Note: Date accessed: Apr. 25, 2021.

ATF used the weighted average across all Type 1 FFL dealers to determine an average wage rate of $83 (loaded wage rate with Employee Cost Index) to fill out seven E-Form 1 application, making the cost per Type 1 FFL dealer to fill out seven E-Form 1 applications

---

[86] https://www.bls.gov/news release/archives/eci_04292022.pdf.

$194.[87]  Using the travel rates from chapters 3 and 4 (Turn in Firearm to ATF and Destroy Whole Firearm) ATF estimates that completing the forms takes 2 trips—one to obtain photographs and one to obtain fingerprints—making the total cost of the trip $54.[88]  Including the cost for fingerprints and photo, the per Type 1 FFL dealer cost to submit seven E-Form 1 applications is $286.[89]

Type 7 FFL manufacturers without an SOT may also file an E-Form 1 to register their existing inventory, provided they will not continue to be engaged in the business of manufacturing NFA firearms.  ATF used the same review of ATF's database and compared wage titles between the job titles of responsible persons for Type 7 FFL manufacturers to the listed BLS wages in order to determine the average wage rate of a Type 7 FFL manufacturer filling out a E-Form 1.  Table 6–2 provides the different wage categories used.

Table 6–2  Wage Categories used for Type 7 FFL Responsible Persons

| Job Category | Wage Rate | Loaded Wage Rate | Wage with Employee Cost Index | Source |
|---|---|---|---|---|
| 11-3051 Industrial Production Managers | $56.62 | $80 | $83 | https://www.bls.gov/oes/2021/may/oes113051.htm |
| 11-3071 Transportation, Storage, and Distribution Managers | $50.76 | $72 | $74 | https://www.bls.gov/oes/2021/may/oes113071.htm |
| 17-3027 Mechanical Engineering Technicians | $30.47 | $43 | $44 | https://www.bls.gov/oes/2021/may/oes173027.htm |
| 43-6014 Secretaries and Administrative Assistants, Except Legal, Medical, and Executive | $19.75 | $28 | $29 | https://www.bls.gov/oes/2021/may/oes436014.htm |

---

[87] $194 cost to complete application = $83 average loaded hourly wage * 0.333 hours * 7 firearms.

[88] $54 travel costs = 2 * ((10-mile trip * 0.$625 per diem per mile traveled) + ($83 loaded wage with Employee Cost Index * 0.25 travel time).

[89] $286 Type 1 FFL cost to apply under NFA = $194 Form 1 applications + $16 photo + $22 fingerprints + $54 travel time.

| 51-4199 Metal Workers and Plastic Workers, All Other | $18.98 | $27 | | $28 | https://www.bls.gov/oes/2021/may/oes514199.htm |
|---|---|---|---|---|---|
| 51-9199 Production Workers, All Other | $17.42 | $25 | | $25 | https://www.bls.gov/oes/2021/may/oes519199.htm |
| Weighted Average | $44 | | | $65 | |

*Note: date accessed Apr. 25, 2021.

ATF used the weighted average across all Type 7 FFL manufacturers to determine an average of $65 (loaded wage rate and Employee Cost Index) to fill out 32 E-Form 1 applications. Using the travel rates from chapters 3 and 4 (Turn in Firearm to ATF and Destroy Whole Firearm) ATF estimates completing the forms takes 2 trips—one to obtain photographs and one to obtain fingerprints—making the total trip cost $44.[90],[91],[92] Including the fingerprints and photographs, this makes the total cost per Type 7 FFL without an SOT to submit 32 E-Form 1 applications $775.[93],[94]

As an alternative to using the E-Form 1, these Type 7 FFL manufacturers without an SOT also have the option to file for an SOT, obtain an SOT, and register their firearms using an E-Form 2. The costs to do so, however, were not included in this analysis because doing so is not required and is a more expensive option. ATF believes that Type 7 FFL manufacturers without an SOT will most likely not apply and pay for an SOT because they can submit E-Form 1s to register the affected firearms that are in their possession as of the date of the rule and, because of the Department's decision to forbear taxes, are not liable to pay the making taxes for those firearms. However, should any Type 7 FFL without an SOT decide to remain in the business of

---

[90] $6 mileage cost = 10-mile trip * $0.625 per diem per mile traveled.

[91] $22 hourly burden per trip = $6 mileage cost + ($65 loaded wage with Employee Cost Index * 0.25 travel time).

[92] $44 travel costs = $22 * 2 trips.

[93] $693 Cost to complete application = $65 loaded hourly wage rate * 0.333 hours to complete application * 32 firearms.

[94] $775 = $693 time to submit applications + $22 fingerprints + $16 photograph + $44 travel time.

53

manufacturing firearms with an attached "stabilizing brace" that qualify as NFA firearms, these FFLs will need to obtain an SOT before registering their inventory on an E-Form 2.

Those Type 7 FFL manufacturers that already have an SOT may file an E-Form 2 to register their existing affected inventory. Based on the collection of information OMB 1140-0012, ATF estimates that it takes 0.5 hours to fill out an E-Form 2. Using the same wage rate as Type 7 FFL manufacturers without an SOT, ATF estimates that the cost for each Type 7 FFL manufacturer with an SOT to submit an E-Form 2 is $33.[95]

ATF estimates that this rule will not affect many States or political subdivisions, so ATF did not include the cost of registering such firearms under the NFRTR. However, ATF notes that it may take 30 minutes to complete an Application for Registration of Firearms Acquired by Certain Governmental Entities ("Form 10"). Using a loaded wage rate of $49.67,[96,97,98] the cost per government entity, such as a local police department, to submit a Form 10 is $25.[99]

Overall, the total societal cost to this scenario is a one-time cost of $113.2 million.[100]

---

[95] $33 for Type 7 FFL with SOT to file E-Form 2 application = $65 average, loaded hourly wage with employee cost index * 0.5 hours. In contrast to the E-Form 1, the E-Form 2 can be used for multiple weapons and does not require obtaining a new set of fingerprints or a photo. Thus, ATF did not multiply the cost to file a single E-Form 2 by the number of firearms in inventory, nor did ATF include the costs for fingerprints and a photo.

[96] Average wage rate for Police and Sheriff's Patrol Officers is $34.02.
https://www.bls.gov/oes/2021/may/oes333051.htm

[97] ATF uses a loaded wage rate to account for fringe benefits such as insurance. The load rate used for this rule is 1.416. BLS Series ID CMU2010000000000D,CMU2010000000000P (Private Industry Compensation = $37.15) / BLS Series ID CMU2020000000000D,CMU2020000000000P (Private Industry Wages and Salaries = $26.23 = 1.416. BLS average 2021. U.S. Bureau of Labor Statistics,
https://beta.bls.gov/dataQuery/find?fq=survey:[cm]&s=popularity:D.

[98] Employee Cost Index of 1.031 to account for wage increases in 2022.
https://www.bls.gov/news.release/archives/eci_04292022.pdf

[99] $25 for Government Entity to apply under NFA = $49.67 average, loaded hourly wage with employee cost index * 0.5 hours.

[100] $113.2 million = (8,606 Type 1 FFL dealers * $286 per Type 1 FFL dealer cost) + (1,059 Type 7 FFL manufacturers without an SOT * $775 per Type 7 FFL manufacturer without SOT cost) + (882 Type 7 FFL manufacturer with SOT * $33 per Type 7 FFL manufacturer cost) + (826,001 individuals * $133 per individual cost).

# 7. Cost to Permanently Remove and Dispose of or Alter a "Stabilizing Brace" such that it Cannot be Reattached and Forgone Future Sales

This section addresses the loss in retail value of "stabilizing braces" that are permanently removed and disposed of or altered so that they cannot be attached to firearms and the lost value of forgone future sales.

## 7.1   Population Under Permanent Removal or Alteration of "Stabilizing Brace"

As stated in the population chapter above, ATF uses the low number of 3 million firearms with "stabilizing braces," less the 1 percent (30,000) estimated to be sold to assist persons with one-handed firing of pistols where the firearm is not a short-barreled rifle under the NFA. ATF thus uses 2,970,000 as the primary estimated number of firearms with "stabilizing braces" currently in circulation.

The fifth option to comply with the rule is to permanently remove and dispose of or alter the "stabilizing brace" such that it cannot be reattached, thus converting the firearm back to its original pistol configuration and thereby removing it from regulation as a "firearm" under the NFA. For purposes of this analysis, ATF estimates that zero FFLs will choose this scenario as ATF assumes they will choose to find a means to sell their inventory of firearms or dispose of the firearm. As discussed above, ATF anticipates some FFLs will either turn in their inventory of firearms with an attached "stabilizing brace" to ATF or dispose of the whole firearms. To determine the number of individuals who would choose this scenario, the "remaining" number of firearms with "stabilizing braces" that have not been accounted for were estimated to belong to individuals who affixed a "stabilizing brace" on to a pistol. ATF estimates that the number of

55

individuals choosing this scenario is 120,184.[101]  The number of firearms with an attached "stabilizing brace" owned by individuals under this scenario is 240,368.[102]

In order to simplify the different populations for each scenario provided in the rule, Table 7–1 shows a line-by-line estimate of the individuals, FFLs, and firearms with "stabilizing braces" across all five scenarios.  Scenario 5 is removal of the "stabilizing brace."

Table 7–1  Individuals and FFLs and Number of Firearms with "Stabilizing Braces" Affected Across All Scenarios

| Scenario 1: Turn into ATF | Individuals/FFLs | Number of Firearms with "Stabilizing Braces" Affected |
|---|---|---|
| Individuals | 184,267 | 368,534 |
| Type 1 FFLs | 665 | 4,655 |
| Type 7 FFLs | 0 | 0 |
| Subtotal of Firearms with "Stabilizing Braces" Affected | | 373,189 |
| | | |
| Scenario 2: Destroy Whole Firearm | Individuals/FFLs | Number of Firearms with "Stabilizing Braces" Affected |
| Individuals | 184,267 | 368,534 |
| Type 1 FFLs | 665 | 4,655 |
| Type 7 FFLs | 0 | 0 |
| Subtotal of Firearms with "Stabilizing Braces" Affected | | 373,189 |
| | | |
| Scenario 3: Convert into Rifles | Individuals/FFLs | Number of Firearms with "Stabilizing Braces" Affected |
| Individuals | 61,950 | 123,900 |
| Type 1 FFLs | 3,274 | 22,918 |
| Type 7 FFLs | 1,940 | 62,080 |
| Subtotal of Firearms with "Stabilizing Braces" Affected | | 208,898 |

---

[101] 120,184 individuals removing "brace" = 1,376,669 total affected individuals – 184,267 individuals who turned in firearms to ATF – 184,267 individuals who destroyed whole firearm – 61,950 individuals who converted their firearms into rifles – 826,001 individuals who applied under the NFA.

[102] 240,368 firearms with attached "stabilizing brace" = 120,184 individuals * 2 firearms.

56

| | | Number of Firearms with "Stabilizing Braces" Affected |
|---|---|---|
| Scenario 4: Apply under NFA | Individuals/FFLs | |
| Individuals | 826,001 | 1,652,002 |
| Type 1 FFLs | 8,606 | 60,242 |
| Type 7 FFLs | 1,941 | 62,112 |
| Subtotal of Firearms with "Stabilizing Braces" Affected | | 1,774,356 |
| | | |
| Scenario 5: Permanently Remove and Dispose of or Alter "Stabilizing Brace" Such that it Cannot be Reattached | Individuals/FFLs | Number of Firearms with "Stabilizing Braces" Affected |
| Individuals | 120,184 | 240,368 |
| Type 1 FFLs | 0 | 0 |
| Type 7 FFLs | 0 | 0 |
| Subtotal of Firearms with "Stabilizing Braces" Affected | | 240,368 |
| **Total of Number of Firearms with "Stabilizing Braces" Affected** | | **2,970,000** |
| | | |
| Future Foregone: | | 154,588 |

ATF estimates that 120,184 individuals and no FFLs would permanently remove or alter the "stabilizing brace" from their firearm such that it cannot be reattached, thus bringing the pistol back to its original configuration and out of the purview of the NFA. The number of affected firearms with a "stabilizing brace" in this scenario is 240,368.

7.2   Cost to Permanently Remove and Dispose of or Alter "Stabilizing Braces" Such that it Cannot Be Reattached

Individuals affected could permanently remove or alter the "stabilizing braces" that they had originally attached such that it cannot be reattached to the firearm. This would be a loss of the value of the "stabilizing brace." Because ATF has no way to determine how these affected "stabilizing braces" have been purchased, ATF uses the direct retail sales of these "stabilizing

braces" as a proxy for the cost that individuals, FFL dealers, and FFL manufacturers incur for "stabilizing braces" purchased.  There are numerous types of "stabilizing braces" that would be affected by this final rule.  We assume that the lost value to owners of a "stabilizing brace" would be at least as much as the cost of a new "stabilizing brace."  While the Department recognizes that some owners may perceive that removal of the "brace" from the firearm diminishes the value of owning that firearm, the Department cannot reasonably estimate the diminished valuation to such owners because those perceived valuations are subjective and vary from owner to owner.

The average cost for a "stabilizing brace" is $270.[103]  Prior to the publication of ATF's proposed guidance document in December 2020 regarding "stabilizing braces,"[104] the retail price of a firearm with an attached "stabilizing brace" may have ranged from $549 to $1,980.[105]  On the other hand, a short-barreled rifle may retail anywhere from $1,295 to $5,795, plus the $200 NFA tax.[106]  ATF estimates that the majority of individuals and FFLs would be inclined to retain the firearm regardless of whether they retain the "stabilizing brace."  Furthermore, most commenters suggested that losing the entire firearm was an unlikely scenario.  However, there were some commenters requesting ATF estimate the cost of the loss of the entire firearm.  As stated in Scenarios 1 (Turn in Firearm to ATF) and 2 (Destroy the Whole Firearm), ATF incorporated the cost of the loss of the whole firearm under those scenarios.  ATF now estimates the cost for those individuals who opt to retain the firearm but to permanently remove and

---

[103] https://www.sb-tactical.com/product/sba3/ (accessed Apr. 22, 2021); https://www.sb-tactical.com/product/sbm47/ (accessed Apr. 22, 2021); https://www.sb-tactical.com/product/hkpdw/ (accessed Apr. 22, 2021); https://www.sb-tactical.com/product/tac13-sba3/ (accessed Apr. 22, 2021); https://www.sb-tactical.com/product/czpdw/ (accessed Apr. 22, 2021); https://www.sb-tactical.com/product/fs1913/ (accessed Apr. 22, 2021).

[104] 85 FR 82516 (Dec. 18, 2020).

[105] https://www.pewpewtactical.com/best-ar-15-pistols/ (accessed May 23, 2021).

[106] https://www.capitolarmory.com/class-3-nfa/sbr-short-barrel-rifle.html (accessed May 23, 2021).

dispose of or alter the "stabilizing brace" such that it cannot be reattached.  ATF estimates that the cost to permanently remove and dispose of or alter the 240,368 "stabilizing braces" involved in this scenario would be $64.9 million.[107]

## 7.3    Future Revenue of "Stabilizing Braces" Lost from Loss of Production

After publication of this rule, ATF does not anticipate a similar or increased demand for firearms with attached "stabilizing braces."  This is because a majority of firearms equipped with "stabilizing braces" that are currently or were previously available on the market incorporate rifle characteristics and, because of their barrel length, are short-barreled rifles under the NFA. No additional NFA taxes were considered in this analysis because ATF is anticipating a decrease in future demand for firearms with an attached "stabilizing brace."  Because the rule will affect future demand for these types of firearms, ATF also calculated the loss in revenue from future production.  One commenter suggested using "current trends" rather than historical purchases. However, because there is no information regarding current trends in purchasing rates, ATF uses historical information.

ATF uses the production of "stabilizing braces over the course of eight years to estimate the expected lost value of firearms equipped with "stabilizing braces" or the individual "stabilizing brace" devices for firearms that are "short-barreled rifles" subject to NFA regulations.  This lost value would be equal to the consumer and producer surplus from these forgone sales, which would be equal to the area under purchasers' demand curves (and above the market price) and above producers' costs curves (and below the market price).  Lacking data on producers' costs, this might be proxied with an estimate of the expected reduction in future sales revenues from firearms with "stabilizing braces" devices.

---

[107] $64.9 million = 240,368 firearms with "stabilizing braces" * $270 average cost of a "brace."

In order to determine the reduction in future sales, ATF must establish an estimate of future sales. ATF considered basing its estimate of future sales in the absence of the final rule on recent sales averages; however, ATF expects that, even without a rule, sales of "stabilizing braces" would fall in the future. This is because ATF has conducted and would continue to conduct enforcement actions, including criminal actions, against existing FFLs that manufacture firearms that do not comply with the law. In the absence of this rule, ATF estimates that these enforcement actions against existing FFLs, which would ultimately impact individuals in possession of firearms with an attached "stabilizing brace," would change the market perception of firearms with "stabilizing braces" and affect the overall demand for these items, regardless of the implementation of the rule.

Dividing the estimated number of firearms with "stabilizing braces" (2,970,000 "braces") by 8 years, ATF estimates that the future number of firearms with "stabilizing braces" would be about 371,250 a year. However, in light of future enforcement actions taken, regardless of this rulemaking, ATF estimates the future number of firearms with "stabilizing braces" will be less than the current annual number of firearms with "stabilizing braces" by an amount equal to the amount sold through FFLs (124,192 from Type 7 FFL manufacturers and 92,470 from Type 1 FFL dealers), making the estimated future number of firearms with "stabilizing braces" 154,588 sold to individuals.[108]

Because diminished demand may affect demand for the entire firearm and not simply the "brace" device itself, ATF assumed a 50 percent even distribution between the value of the "brace" device and the whole firearm. The average value of the "stabilizing brace" is $270 and

---

[108] 154,588 future "stabilizing braces" = 371,250 annual firearms with "stabilizing braces" – (13,210 Type 1 FFL * 7 firearms with "stabilizing braces") – (3,881 Type 7 FFL * 32 firearms with "stabilizing braces").

the average value of a firearm with attached "stabilizing brace" is $1,246, which would mean a loss of $117.2 million in sales per year.[109]

---

[109] $117.2 million = (154,588 * 50 percent * $270) + (154,588 * 50 percent * $1,246).

# 8. Summary of the Overall Cost of the Rule

As stated in chapter 2 (Population), there may be a range between 3 and 7 million "stabilizing braces" already purchased by the public. This chapter reviews the overall potential costs depending on the estimated number of firearms with attached "stabilizing braces," with ATF's primary (low estimate) of 3 million and a high estimate of 7 million firearms with attached "stabilizing braces."

## 8.1    Primary (low estimate) cost of the final rule

This section summarizes the total private societal costs for individuals and industry of this final rule as described throughout this RIA. In order to simplify the expected costs of this rule, ATF summarizes each of the scenarios and frequency of the scenarios. Table 8–1 shows the total private societal costs for each scenario.

Table 8–1  Societal Cost of Final Rule Per Scenario

| Scenario | Cost | Frequency |
|---|---:|---|
| Turn in to ATF | $471,279,852 | one-time |
| Destroy Whole Firearm | $466,490,905 | one-time |
| Convert into Rifle | $101,785,677 | one-time |
| Apply Under NFA | $113,169,280 | one-time |
| Loss in Existing Firearms with "Stabilizing Braces" and "Brace" Devices | $64,899,360 | one-time |
| Foregone Revenue | $117,177,704 | annual |

Based on the above information, ATF shows the total private societal 10-year cost of the rule using a primary estimate of 3 million firearms with attached "stabilizing braces." Table 8–2 shows the 10-year cost.

Table 8–2  Private Societal 10-year cost of rule

| Year | Undiscounted | Discounted |
|---|---|---|

62

| | | 3% | 7% |
|---|---|---|---|
| 1 | $1,217,625,074 | $1,182,160,266 | $1,137,967,359 |
| 2 | $117,177,704 | $110,451,224 | $102,347,545 |
| 3 | $117,177,704 | $107,234,198 | $95,651,911 |
| 4 | $117,177,704 | $104,110,872 | $89,394,309 |
| 5 | $117,177,704 | $101,078,517 | $83,546,083 |
| 6 | $117,177,704 | $98,134,482 | $78,080,452 |
| 7 | $117,177,704 | $95,276,196 | $72,972,385 |
| 8 | $117,177,704 | $92,501,162 | $68,198,491 |
| 9 | $117,177,704 | $89,806,953 | $63,736,907 |
| 10 | $117,177,704 | $87,191,217 | $59,567,203 |
| Total | $2,272,224,410 | $2,067,945,087 | $1,851,462,645 |
| Annualized | | $242,426,250 | $263,606,628 |

Using a primary (low) estimate of 3 million firearms equipped with "stabilizing braces," the annualized private societal cost of this final rule would be $242.4 million and $263.6 million, at 3 percent and 7 percent respectively.

8.2   Transfers from Industry to Public

Based on public comments, the Department has decided to forbear all NFA taxes for all firearms encompassed by this rule for all makings and transfers that occurred prior to the date of the rule's publication. As a result, there will be no transfers from the industry to the government as a result of this rule.

8.3   Government Costs

In addition to the private societal costs to this rule, there would be government costs associated with this rule to handle the processing of NFA applications received. ATF's National Firearms Act Division anticipates having to hire 10 additional staff 2 years earlier than originally planned. These 10 employees will be a mix between GS-6 and GS-7s. Because they will be hired as new employees and because ATF does not know the precise number of GS levels to be hired, ATF assumes an even mix (5) of employees at each GS level and assumes all will be hired

63

at a step 1.  The base salary for the locality pay area of Washington-Baltimore-Arlington – DC-MD-VA-WV-PA for a GS-6 is $45,574, and the base salary for a GS-7 is $50,643.

To account for things like fringe benefits, ATF uses the Congressional Budget Office's ("CBO") report to account for the difference in benefits between workers in the industry versus workers in the Federal government.  In a comparison of compensation from 2011 through 2015, CBO estimated that, although total compensation differed by varying degrees between the private sector and Federal government depending on workers' education attainment, "[o]verall, the [F]ederal government paid 17 percent more in total compensation [including benefits] than the private sector, after accounting for certain observable characteristics of workers."[110]  Based on information from BLS, ATF estimates that the 2021 load factor for all of private industry is 1.425; therefore, the estimated Federal load rate was calculated to be 1.67.[111]

Assuming a load rate of 1.67, the loaded salaries for additional staff are $76,109 for a GS-6 and 84,574 for a GS-7, making the total yearly government cost for 10 additional staff to be $481,085 for the first 2 years.[112, 113]

In anticipation of a significant increase in NFA applications, ATF plans to use additional resources to maintain the server and information technology to support the workload.  ATF estimates an up-front cost of $2.2 million to upgrade the NFA application system and handle actions related to the tax forbearance and an annual cost of $2.85 million to maintain the level of

---

[110] Congressional Budget Office, Comparing the Compensation of Federal and Private-Sector Employees, 2011–2015, at 3 (2017), https://www.cbo.gov/system/files/115th-congress-2017-2018/reports/52637-federalprivatepay.pdf.

[111] 1.67 Federal load rate = 1.4247 industry load rate * 1.17 factor in additional compensation.

[112] GS-6 $76,109 = $45,574 * 1.67.

[113] GS-7 $84,574 = $50,643 * 1.67.

applicants. Combined, the first-year cost is $5.5 million. Table 8–3 shows the 10-year government cost to implement this rule.

Table 8–3  Government 10-year cost of rule

| Year | Undiscounted | Discounted | |
|---|---|---|---|
| | | 3% | 7% |
| 1 | $5,531,085 | $5,369,985 | $5,169,238 |
| 2 | $3,331,085 | $3,139,867 | $2,909,499 |
| 3 | $2,850,000 | $2,608,154 | $2,326,449 |
| 4 | $2,850,000 | $2,532,188 | $2,174,251 |
| 5 | $2,850,000 | $2,458,435 | $2,032,011 |
| 6 | $2,850,000 | $2,386,830 | $1,899,075 |
| 7 | $2,850,000 | $2,317,311 | $1,774,837 |
| 8 | $2,850,000 | $2,249,816 | $1,658,726 |
| 9 | $2,850,000 | $2,184,288 | $1,550,211 |
| 10 | $2,850,000 | $2,120,668 | $1,448,795 |
| Total | $31,662,170 | $27,367,542 | $22,943,093 |
| Annualized | | $3,208,311 | $3,266,580 |

Other government actions were not accounted for in this analysis because these actions will be budget neutral. For instance, ATF does not anticipate needing to add or otherwise require additional law enforcement personnel to impose civil or criminal penalties after the period to comply ends.

8.4   Combined Private Societal and Government Costs

This section summarizes the combined total costs of under this final rule as described throughout this RIA. In order to simplify the expected costs of this rule, ATF summarizes each of the scenarios and frequency of the scenarios. Table 8–4 shows the combined private societal and government costs for each scenario.

Table 8–4  Combined Private Societal and Government 10-year cost of rule

| Year | Undiscounted | Discounted | |
|---|---|---|---|
| | | 3% | 7% |

65

| 1 | $1,223,156,159 | $1,187,530,252 | $1,143,136,597 |
|---|---|---|---|
| 2 | $120,508,789 | $113,591,092 | $105,257,043 |
| 3 | $120,027,704 | $109,842,352 | $97,978,360 |
| 4 | $120,027,704 | $106,643,060 | $91,568,561 |
| 5 | $120,027,704 | $103,536,952 | $85,578,094 |
| 6 | $120,027,704 | $100,521,312 | $79,979,527 |
| 7 | $120,027,704 | $97,593,507 | $74,747,222 |
| 8 | $120,027,704 | $94,750,978 | $69,857,217 |
| 9 | $120,027,704 | $91,991,241 | $65,287,118 |
| 10 | $120,027,704 | $89,311,884 | $61,015,998 |
| Total | $2,303,886,580 | $2,095,312,630 | $1,874,405,737 |
| Annualized | | $245,634,561 | $266,873,208 |

The combined private societal and government annualized cost of under this final rule would be $245.6 million and $266.9 million, at 3 percent and 7 percent respectively.

8.5   High Cost of the Final Rule

This section summarizes the total costs of this final rule based on the methodology described above, but on the assumption that the current population of "stabilizing braces" is 7 million rather than 3 million.  ATF summarizes each of the scenarios and the frequency of the scenarios.  Table 8–5 shows the costs for each scenario.

Table 8–5  High Cost of Final Rule Per Scenario

| Scenario | Cost | Frequency |
|---|---|---|
| Turn in to ATF | $1,189,880,980 | one-time |
| Destroy Whole Firearm | $1,081,102,130 | one-time |
| Convert into Rifle | $242,058,964 | one-time |
| Apply Under NFA | $261,296,059 | one-time |
| Loss in Existing Firearms with "Stabilizing Braces" and "Brace" Devices | $149,727,420 | one-time |
| Foregone Revenue | $218,634,488 | annual |

Based on the above information, ATF shows the 10-year cost under this final rule using a high estimate of 7 million firearms with attached "stabilizing braces." Table 8–6 shows the 10-year cost, including the aforementioned government costs.

Table 8–6  High 10-year cost of rule

| Year | Undiscounted | Discounted | |
| | | 3% | 7% |
|---|---|---|---|
| 1 | $2,929,596,638 | $2,844,268,581 | $2,737,940,783 |
| 2 | $221,965,573 | $209,223,841 | $193,873,328 |
| 3 | $221,484,488 | $202,689,682 | $180,797,317 |
| 4 | $221,484,488 | $196,786,099 | $168,969,455 |
| 5 | $221,484,488 | $191,054,465 | $157,915,379 |
| 6 | $221,484,488 | $185,489,772 | $147,584,466 |
| 7 | $221,484,488 | $180,087,157 | $137,929,408 |
| 8 | $221,484,488 | $174,841,900 | $128,905,989 |
| 9 | $221,484,488 | $169,749,418 | $120,472,886 |
| 10 | $221,484,488 | $164,805,260 | $112,591,483 |
| Total | $4,923,438,115 | $4,518,996,175 | $4,086,980,494 |
| Annualized | | $529,764,211 | $581,894,076 |

Using a high estimate of 7 million firearms equipped with "stabilizing braces," the annualized high cost under this final rule would be $529.8 million and $581.9 million, at 3 percent and 7 percent respectively.

# 9. Benefits

The purpose of this rule is to put forward ATF's best interpretation of "rifle" to clarify when a rifle is "designed or redesigned, made or remade, and intended to be fired from the shoulder." The rule sets forth factors that that are to be considered in determining whether firearms with an attached "stabilizing brace" are "rifles" or "short barreled rifles" under the GCA or NFA. Congress placed stricter requirements on the making and possession of short-barreled rifles because it found that, as uniquely dangerous weapons, they pose a significant risk of crime and a danger to the public. This danger arises from the fact that short-barreled rifles are more easily concealable than long-barreled rifles but still have more destructive power than other weapons. Because these types of weapons are subject to a more complex regulatory scheme (*i.e.*, requiring approval by the Attorney General prior to their making or transfer and registration in the NFRTR), they are generally more difficult and less attractive for criminals to obtain and use.

ATF estimates that NFA weapons are less likely to be used due to the registration and tax processes involved with acquiring NFA weapons. Based on trace data between the years 2018 to 2021, there have been approximately 1.9 million traces on both GCA firearms and NFA weapons. Of weapons traced, NFA weapons, not including short-barreled rifles, are less likely to be used in criminal activities. Because trace data does not distinguish between short-barreled rifles and long-barreled rifles, ATF used NFA weapons (other than short-barreled rifles) as a proxy to make a comparison between the likely use of short-barreled rifles versus long-barreled rifles in crimes.[114] In order to make proxy comparisons between the likelihood of GCA firearms

---

[114] NFA weapons (other than short-barreled rifles) such as "any other weapon," "destructive devices," "silencers," "machine guns," and tear gas launchers are items that are tracked in ATF's trace database.

and NFA weapons used in crime, ATF used the ATF's Annual Firearms Manufacturing and Exportation Report ("AFMER") to estimate a population of GCA firearms currently in circulation (i.e., pistols and rifles in the Table 9–1).[115] And to estimate the population of NFA weapons in circulation, ATF used information from the NFRTR on all approved registrations of NFA weapons for the same time period.[116] Table 9–1 illustrates the comparisons of traces among pistols, rifles, and other NFA weapons.

Table 9–1  Comparison of Traces Between GCA firearms versus NFA weapons

| Weapon Type | Number in Circulation From 2018 to 2021 years | Traces by Weapon Type from 2018 to 2021 | Percent found in Traces |
|---|---|---|---|
| Pistols | 20,352,712 | 1,246,631 | 6.13% |
| Rifles (including SBRs) | 22,365,873 | 259,492 | 1.16% |
| NFA Weapons (Not including SBRs) | 8,119,469 | 11,464 | 0.14% |

Based on Table 9–1, NFA weapons, other than short-barreled rifles, are used in 0.14 percent of crimes where a firearm is found versus 6.13 percent of pistols.

Congress passed the NFA for the express purpose of regulating specific firearms, such as short-barreled rifles, which Congress determined posed a greater risk to public safety as "gangster" type weapons of an especially unusual and dangerous nature.  Therefore, the Department emphasizes that the risk to public safety posed by these weapons was identified by Congress, not ATF, and this rule acts to serve the interests of Congress, as expressed in the NFA. Therefore, by providing clarity to the public and industry on how ATF interprets and enforces

---

[115] The AFMER contains information for GCA firearms that were manufactured per year as reported by manufacturers.  The AFMER contains manufacturing data for pistols, rifles, and miscellaneous firearms (i.e., firearm receivers).  This was considered the best available information for the manufacturing of long-barreled rifles.

[116] The population of rifles in Table 9–1 includes all firearms (not including pistols) from the AFMER report and short-barreled rifles that are registered and approved in the NFRTR.

the NFA, as described throughout the final rule, the rule is intended to enhance public safety in a manner determined by Congress.

Lastly, as discussed in the rule, firearms equipped with "stabilizing braces" have been used in at least two mass shootings, with shooters in both instances reportedly shouldering the "brace" as a shoulder stock, demonstrating the weapons' efficacy as "short-barreled rifles."[117] The compact size of these firearms also assists with concealability of a firearm with a large destructive power. Since 2014, the Firearms Technology Criminal Branch reports that there have been approximately 104 federal criminal classifications where firearms equipped with a "stabilizing brace" have been received by FATD for classification as a part of criminal investigations. Further, since 2015, ATF reports that approximately 63 firearms with "stabilizing braces" have been traced in criminal investigations.[118] ATF has approximately 105 firearms cases or investigations involving "stabilizing brace" devices.[119] For more information, please see section IV.A.2 in the final rule for further details.

---

[117] *See, e.g.*, Cameron Knight, *Dayton shooter used a modified gun that may have exploited a legal loophole* USA Today (published Aug. 5, 2019, updated Aug. 6, 2019), https://www.usatoday.com/story/news/nation/2019/08/05/dayton-shooter-used-gun-may-have-exploited-legal-loophole/1927566001/ (the firearm used in a shooting killing 9 people and wounding 14 had a "pistol brace" used to "skirt[]" regulation of short-barrel rifles); Melissa Macaya *et al.*, *10 killed in Colorado grocery store shooting*, CNN (updated Mar. 23, 2021), https://www.cnn.com/us/live-news/boulder-colorado-shooting-3-23-21/h_0c662370eefaeff05eac3ef8d5f29e94 (reporting that the firearm used in a shooting that killed 10 was an AR-15 pistol with an "arm brace").

[118] This information is drawn from the Firearms Tracing System ("FTS") database maintained by ATF's National Tracing Center's covering January 1, 2015, through November 1, 2022. The number of traced firearms equipped with a "stabilizing brace" device may be underreported because this information is captured in FTS when the user entering the firearm information makes observations and enters relevant terms like "brace" or "stabilizing brace" in the "Additional Markings" field of FTS.

[119] This information is from ATF's OSII covering January 1, 2015, through November 1, 2022.

70

# 10.  Analysis of Alternatives Considered

This chapter outlines the alternatives considered by the Department prior to and during this rulemaking.  Table 10–1 provides a summary outline of the alternatives, along with the benefits and drawbacks of each alternative.

Table 10–1  Summary of Cost and Benefits of the Alternatives

| Summary | 7% Annualized Discounted Costs | Benefits |
|---|---|---|
| Preferred Alternative | $266.9 million | - To prevent manufacturers and individuals from circumventing the requirements of the NFA.<br>- To enhance public safety by reducing the criminal use of such firearms, which are easily concealable from the public and first responders. |
| Alternative 1: No Change | $0 | $0 |
| Alternative 2: Specific Quantifiable Standards with Set Metrics | Less than Preferred Alternative | Less than Preferred Alternative since it does not account for non-quantifiable features. |
| Alternative 3: Grandfather all existing firearms with stabilizing arm brace | $117.2 million | Similar but not identical to the Preferred Alternative due to these firearms not being registered as per the NFA. |
| Alternative 4: Guidance documents | $164.2 million | Less than the Preferred Alternative because not as clear as amended regulations and non-FFLs may be less aware of guidance and hence continuing selling firearms outside the purview of the NFA. |
| Alternative 5: NPRM Weighted Criteria | Same as the Preferred Alternative, but potential for greater public confusion | Same as Preferred Alternative but may be more confusing to individuals and FFLs in terms of compliance. |
| Alternative 6: No Tax Amnesty | $293.0 million | Similar but not identical to the Preferred Alternative |

71

A discussion of the costs follows in the sections below.

10.1   This Final Rule—Factoring Criteria for Firearms with Attached "Stabilizing Braces."

This alternative allows individuals and entities that currently have firearms with attached "stabilizing braces" to submit an application to register their affected firearms in the NFRTR within 120 days from the date the rule is published without paying the $200 making tax.  In this scenario, there will be fewer transfer payments than if the Department had not provided this tax forbearance.  Overall, under this final rule, more individuals and FFLs will apply to register their affected firearms under the NFA.  This alternative also clarifies the criteria to be applied by ATF in determining whether a firearm with attached "stabilizing brace" falls under the GCA or the NFA.

10.2   Alternative 1—No change alternative.

Some commenters requested that there be no change made.  Making no change would have no costs or benefits because it would maintain the existing status quo.  This alternative was considered and not implemented because the NFA requires regulation of short-barreled rifles, and ATF has determined that the best reading of the statutory definition of rifle includes many weapons with purported "stabilizing braces."  Currently, many persons could be in possession of firearms regulated under the NFA without complying with NFA requirements.

10.3   Alternative 2—Specific quantifiable standards with set metrics.

This alternative would provide specific, defined parameters in terms of defining a "stabilizing brace" or a stock (such as by using length only) and establishing set metrics for the standard.  This alternative would be easier for the public to apply to their firearms than the weighted criteria as presented in the NPRM.  Where this was feasible, the Department has incorporated quantifiable standards into the factors that in this final rule so that the public may

72

easily apply and follow them. The Department considered and incorporated, where appropriate, this alternative as requested by commenters. Some of factors included in this final rule, however, do not lend themselves to readily quantifiable standards, and yet still may be probative of whether a weapon is designed and intended to be fire from the shoulder. Hence, the Department determined that it would not be appropriate to rely solely on specifically quantified standards with established metrics.

10.4   Alternative 3—Grandfather all existing firearms with an attached "stabilizing brace."

This alternative would grandfather all existing firearms with an attached "stabilizing brace." The Department cannot have a grandfather clause that prospectively excuses individuals from compliance with the provisions of the NFA. For more details as to why the Department cannot provide grandfathering, please refer to section IV.B.9.b in the final rule.

10.5   Alternative 4—Guidance documents.

This alternative would publish a guidance document that would be similar to open letters that ATF has issued in the past and would not, in contrast to the current rule, amend ATF's current definitions of "rifle." While this alternative might have been faster than issuing the current interpretive rule, it would not have fully met the objectives outlined in this rule. The Department is seeking to correct prior misapplication of the statutory definitions by parties who are in possession of firearms equipped with a "stabilizing brace." Thus, the Department believes that amending the regulatory definitions themselves is necessary to provide additional clarity. Further, the Department determined that issuing another open letter or issuing enforcement actions against FFLs would only affect the regulated community but not individuals or entities not regulated by ATF. Entities outside the regulatory regime under ATF will continue to manufacture, market, and sell such firearms as firearms falling outside the purview of the NFA.

73

The Department thus believes its current approach both provides more clarity and allows for more public participation than would have been involved in issuing a more abbreviated guidance document.

10.6   Alternative 5—NPRM weighted criteria.

This alternative would clarify that a "rifle" includes any weapon with a rifled barrel equipped with an accessory or component purported to assist the shooter to stabilize the weapon while shooting with one hand, commonly referred to as a "stabilizing brace," that has objective design features and characteristics that facilitate shoulder fire as described in ATF Worksheet 4999 as described in the NPRM.  Based on public comments, the Department rejected a weighted criteria in the final rule because the criteria included a point system that would be difficult for users to apply.  In addition, the NPRM alternative included certain criteria that focused on the effectiveness of a "stabilizing brace" for operating a firearm with one hand, rather than whether the firearm is designed and intended to be fired from the shoulder.

10.7   Alternative 6—No tax forbearance.

This alternative would require individuals and entities that currently have firearms with attached "stabilizing braces" to apply and register their affected firearms under the NFA and pay the $200 making tax.  The private social costs of this alternative would be similar but not identical to the Preferred Alternative as more individuals would choose to dispose the "stabilizing brace" rather than register their firearms with attached "stabilizing brace" and pay the $200 tax.  Similar to this final rule, the bulk of the cost to this alternative would be the forgone future revenue and the loss in property for individuals not applying under the NFA.  This alternative was rejected because individuals and Type 1 FFL dealers who currently possess firearms with attached "stabilizing brace" may not have been the makers of said firearm, and

74

under the NFA it is the maker or manufacturer who incurs the NFA tax liability for the making

of a NFA firearm.  *See* 26 U.S.C. 5821.

75

# 11.  Final Regulatory Flexibility Act

In accordance with the Regulatory Flexibility Act ("RFA"), ATF prepared a Final Regulatory Flexibility Analysis ("FRFA") that examines the impacts of the rule on small entities (5 U.S.C. 601 *et seq.*).  The term "small entities" comprises small businesses, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, and governmental jurisdictions with populations of fewer than 50,000 people.

## 11.1  Findings

ATF performed an FRFA of the impacts on small businesses and other entities from the Factoring Criteria of Firearms with Attached "Stabilizing Braces" final rule [2021R-08].  ATF performed this assessment using the cost information discussed in chapters 3 through 8.

ATF estimates that, based on public response to this rule's clarification of the status of certain firearms with attached "stabilizing braces," at least five manufacturers of "stabilizing braces" would be potentially affected.  Based on a review of their websites, it is anticipated that four of them would go out of business.  ATF also anticipates that this rule would affect 17,091 FFLs (13,210 Type 1 FFLs and 3,881 Type 7 FFLs), many of whom would be considered small businesses.  Based on an Internet search of entities that sell "stabilizing braces" or firearms equipped with a "stabilizing brace," ATF found 91 entities dealing in either "braces" or firearms equipped with a "stabilizing brace."  Table 11–1 shows the size distribution by entity type.

Table 11–1  Size Distribution of Affected Entities

| Company Type | Size Small | Size Not Small |
|---|---|---|
| "Stabilizing Brace" Manufacturers | 5 | 0 |
| Type 7 FFL | 43 | 2 |
| Type 1 FFL | 21 | 7 |
| Accessories Retailers | 13 | 1 |

| | | |
|---|---|---|
| Total Small Companies | 82 | |

Of the 91 entities found, 82 were deemed small based on the size standards set by the Small Business Administration ("SBA").  Table 11–2 illustrates the top seven industries affected by this rule, based on the entities found.

Table 11–2  Top Seven Industries Affected by This Rule

| NAICS | Industry Affected | Number of Entities | Percent of Entities |
|---|---|---|---|
| 451110 | Sporting Goods Stores | 38 | 46.34% |
| 332994 | Small Arms, Ordnance, and Ordnance Accessories Manufacturing | 20 | 24.39% |
| 423910 | Sporting and Recreational Goods and Supplies Merchant Wholesalers | 9 | 10.98% |
| 999990 | Undefined | 5 | 6.10% |
| 423990 | Other Miscellaneous Durable Goods Merchant Wholesalers | 3 | 3.66% |
| 339999 | All Other Miscellaneous Manufacturing | 3 | 3.66% |
| 811490 | Other Personal and Household Goods Repair and Maintenance | 2 | 2.44% |
| All Other NAICS | All Other NAICS | 2 | 2.44% |

11.1.1  "Stabilizing Brace" Manufacturers

As stated above, four manufacturing entities are likely to discontinue their business activities after ATF's interpretation of the NFA and GCA is published.  Table 11–3 shows the average revenue of the affected entities and the average number of employees they retain.

Table 11–3  Economic Impact of "Stabilizing Brace" Manufacturers

| Complete Impact (100%) | | | |
|---|---|---|---|
| Number of Companies | Average Revenue | Average Employees | Number Small |
| 4 | $65,846.00 | 5 | 4 |
| Partial Impact (Unknown %) | | | |
| Number of Companies | Average Revenue | Average Employees | Number Small |
| 1 | $1,360,000.00 | 1 | 1 |

On average, this rule will result in an estimated overall loss of $263,384 in revenue and 20 jobs.

### 11.1.2 Destroy the Whole Firearm

Based on the information provided in chapter 4, ATF estimates that the FFL cost to destroy their inventory of firearms with attached "stabilizing brace" is $8,757. Using this figure, ATF compared the cost of this scenario against the revenues of FFLs. Table 11–4 illustrates the percent impact that this scenario will have on FFLs.

Table 11–4  Percent Impact to Destroy the Whole Firearm

| Percent Impact | FFL |
|---|---|
| 0%<X≤1% | 15 |
| 1%<X≤3% | 3 |
| 3%<X≤5% | 1 |
| 5%<X≤10% | 1 |
| 10%<X | 1 |

Based on the table above, FFLs will experience a range of impacts.

### 11.1.3 Convert to Rifle

Based on the information provided in chapter 5, ATF estimates that the per retailer (primarily Type 1 FFL) cost to convert their inventory of firearms with attached "stabilizing brace" is $2,597. For a firearm manufacturer's (Type 7 FFL) inventory of firearms with attached "stabilizing braces," ATF estimates that it will cost $11,872. Using these figures, ATF compared the cost of this scenario against the revenues of firearm manufacturers (Type 7 FFLs) and dealers (primarily Type 1 FFL). Table 11–5 illustrates the percent impact that this scenario will have on retailers and manufacturers.

78

Table 11–5  Percent Impact to Convert Firearm with "Brace" into Long-Barreled Firearm

| Percent Impact | Retailers | Manufacturers |
|---|---|---|
| 0%<X≤1% | 18 | 22 |
| 1%<X≤3% | 2 | 14 |
| 3%<X≤5% | 0 | 0 |
| 5%<X≤10% | 1 | 4 |
| 10%<X | 0 | 3 |

Based on the table above, FFLs will experience a range of impacts.

## 11.1.4  Apply under NFA

Based on the information provided in chapter 6, ATF estimates that the per Type 1 FFL dealer cost to register their inventory of firearms with attached "stabilizing brace" as an NFA weapon is $286.  For a Type 7 FFL manufacturer with an SOT inventory of firearms with attached "stabilizing braces," ATF estimates that it will cost $33.  For a Type 7 FFL manufacturer without an SOT inventory of firearms with attached "stabilizing braces," ATF estimates that it will cost $775.  Using these figures, ATF compared the cost of this scenario against the revenues of Type 1 FFL dealers, Type 7 FFL manufacturer with an SOT and Type 7 FFL manufacturer without an SOT.  Table 11–6 illustrates the percent impact that this scenario will have on FFLs.

Table 11–6  Percent Impact for FFLs Applying Under NFA

| Percent Impact | Type 1 FFL | Type 7 FFL w/ SOT | Type 7 FFL no SOT |
|---|---|---|---|
| 0%<X≤1% | 18 | 43 | 43 |
| 1%<X≤3% | 2 | 0 | 0 |
| 3%<X≤5% | 0 | 0 | 0 |
| 5%<X≤10% | 1 | 0 | 0 |
| 10%<X | 0 | 0 | 0 |

Based on the table above, FFLs will experience a range of impacts.

## 11.1.5 Accessories Retailers

ATF determined that the economic impact to entities dealing only in "stabilizing braces" as part of their inventory of accessories or other non-firearm items (as opposed to dealing in firearms themselves) would not be significant. This rule only affects a "stabilizing brace" once it is attached to a firearm. Entities may continue to sell "stabilizing braces" so long as they are not attached to a firearm. In addition, although this rule will likely affect the demand for "stabilizing braces," these "braces" constitute only a small fraction of the goods sold by accessories dealers, and this decrease in demand is not expected to significantly affect them.

## 11.1.6 Other Entities

There may be some government entities that qualify as small entities and may be affected by this rule. ATF, however, estimates that this rule will not affect many States or political subdivisions, and that the number of such subdivisions qualifying as small entities will be even smaller, so ATF did not include the cost of registering such firearms under the NFRTR. However, ATF notes it may take 30 minutes to complete a Form 10. Using a loaded wage rate of $49.67,[120, 121, 122] the cost per government entity, such as a local police department, to submit a Form 10 is $25.[123]

---

[120] Average wage rate for Police and Sherriff's Patrol Officers is $34.02. https://www.bls.gov/oes/2021/may/oes333051.htm

[121] ATF uses a loaded wage rate to account for fringe benefits such as insurance. The load rate used for this rule is 1.416. BLS Series ID CMU2010000000000D, CMU2010000000000P (Private Industry Compensation = $37.15) / BLS Series ID CMU2020000000000D, CMU2020000000000P (Private Industry Wages and Salaries = $26.23 = 1.416. BLS average 2021. U.S. Bureau of Labor Statistics, https://beta.bls.gov/dataQuery/find?fq=survey:[cm]&s=popularity:D.

[122] Employee Cost Index of 1.031 to account for wage increases in 2022. https://www.bls.gov/news.release/archives/eci_04292022.pdf

[123] $25 for Government Entity to apply under NFA = $49.67 average, loaded hourly wage with employee cost index * 0.5 hours.

80

11.2  Final Regulatory Flexibility Analysis

The RFA establishes that agencies must try to fit regulatory and informational requirements to the scale of the businesses, organizations, and governmental jurisdictions subject to regulation.  To achieve this principle, agencies must solicit and consider flexible regulatory proposals and explain the rationale for their actions to assure that such proposals are given serious consideration.[124]

Under the RFA, the agency is required to consider what, if any, impact this final rule would have on small entities.  Agencies must perform a review to determine whether a rule will have such an impact.  Because the agency has determined that it will have a significant impact on a substantial number of small entities, the agency has prepared a FRFA as described in the RFA.

Under section 604(b) of the RFA, the FRFA must contain:

- a statement of the need for, and objectives of, the rule;

- a statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a statement of the assessment of the agency of such issues, and a statement of any changes made to the proposed rule as a result of such comments;

- the response of the agency to any comments filed by the Chief Counsel for Advocacy of the SBA in response to the proposed rule, and a detailed statement of any change made to the proposed rule in the final rule as a result of the comments;

- a description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available;

---

[124] Regulatory Flexibility Act, Pub. L. 96-354, sec. 2(b), 94 Stat. 1164 (1980).

- a description of the projected reporting, recordkeeping and other compliance requirements of the final rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record; and

- a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.

11.2.1   A statement of the need for, and objectives of, the rule.

One of the reasons the Department is issuing this rule is that individuals and affected entities have possessed, manufactured, or made NFA firearms—i.e., a rifle with a barrel or barrels less than 16 inches in length—without compliance with the registration and tax requirements of the NFA.  Specifically, they have made weapons that, when equipped with "stabilizing braces," are designed, made, and intended to be fired from the shoulder and thus meet the definition of a "rifle" under the GCA and NFA.  Many of these firearms incorporate a barrel of less than 16 inches in length, which requires registration in the NFRTR and a tax payment for the making and transfer of these firearms.  Short-barreled rifles have been recognized by Congress and the courts as the type of uniquely dangerous weapons appropriately regulated under the NFA.  *See United States v. Jennings*, 195 F.3d 795, 799 (5th Cir. 1999) (Congress determined that the unregistered possession of the particular firearms regulated under the NFA should be outlawed because of "the virtual inevitability that such possession will result in violence"); *United States v. Cox*, 906 F.3d 1170, 1184 (10th Cir. 2018) ("[T]he historical

82

tradition of prohibiting the carrying of dangerous and unusual weapons" supported limiting the Second Amendment's protection to weapons "in common use at the time" of ratification. (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626–27 (2008)); = *Gonzalez*, 2011 WL 5288727, at \*5 ("Congress specifically found that 'short-barreled rifles are primarily weapons of war and have no appropriate sporting use or use for personal protection." (quoting S. Rep. No. 901501, at 28)).

The compact size of these firearms assists with concealability of a firearm with a large destructive power, and these are firearms Congress specifically intended to regulate. If persons can circumvent the NFA by effectively making unregistered short-barreled rifles by using an accessory such as a "stabilizing brace," these weapons can continue to proliferate and could pose an increased public safety problem. ATF has made clear to makers and manufacturers that their purported intent for the use or design of an accessory such as a "stabilizing brace" cannot be used to circumvent the requirements of the NFA when the affixed device and configuration of the firearm includes features inherent in shoulder-fired weapons. For these reasons, it is necessary for the Department to clarify the definition of "rifle" by informing the public of the objective design features and other factors that will be considered when evaluating a firearm equipped with a "stabilizing brace" or other rearward attachment to determine if the firearm, as configured, is designed, made, and intended to be fired from the shoulder. These objective design features may support or undercut a manufacturer's stated intent regarding whether the firearm is or is not designed, made, and intended to be fired from the shoulder. For more details, please refer to section IV.A.2 in the final rule.

83

11.2.2  A statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a statement of the assessment of the agency of such issues, and a statement of any changes made to the proposed rule as a result of such comments.

Commenters suggested that Form 1 applications are for makers of NFA firearms; and because they bought their firearms configured with a "stabilizing brace," they should not be assessed the $200 NFA tax.  The Department concurred with this argument and is forbearing from collecting the $200 NFA making tax so long as parties submit a registration within 120 days after the final rule is published.  The Department is also forbearing from collecting any transfer tax that should have been paid with the transfer of firearms of the sort described in this rule for all transfers that occurred prior to the date of the publication of the final rule. Commenters also suggested including other costs that were not accounted for in the NPRM.  The Department concurred in part and incorporated some of the costs commenters suggested where possible.  Commenters suggested that this rule will close hundreds of businesses.  The Department concurred that there may be some small businesses that will be significantly affected and provided a more complete analysis on the impacts to small businesses.

11.2.3  The response of the agency to any comments filed by the Chief Counsel for Advocacy of the SBA in response to the proposed rule, and a detailed statement of any change made to the proposed rule in the final rule as a result of the comments.

The Chief Counsel for Advocacy of the SBA did not file comments in response to the proposed rule.

84

11.2.4  A description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available.

This rule will affect a significant number of small businesses.  Table 11–7 provides an estimated number of entities affected by the rule, most of which are considered small businesses under the SBA size standards.

Table 11–7  Estimated  Number of Small Entities Affected by this Rule

| Company Type | Estimated Number |
|---|---|
| "Stabilizing Brace" Manufacturers | 5 |
| Type 7 FFL | 3,881 |
| Type 1 FFL | 13,210 |
| Accessories Retailers | 13 |

Of these entities affected by the rule, the majority fall under the industry code for Sporting Goods Stores and Small Arms, Ordinance, and Ordinance Accessories Manufacturing, while others may fall under various other industry standards.  For more details regarding the industries affected, please refer to Table 11–2 above.

11.2.5  A description of the projected reporting, recordkeeping and other compliance requirements of the final rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record.

The Department estimates that most entities will file an E-Form 1 or E-Form 2 application under the NFA.  Please see chapter 6 regarding recordkeeping requirements.  However, if the entity does not choose to register its inventory of firearms with attached "stabilizing braces" under the NFA, then it will not need to file paperwork.  Should entities opt to convert their inventory of firearms with attached "stabilizing braces" into long-barreled rifles,

85

they may use existing employees with gunsmithing capabilities, but ATF notes that converting a firearm into a long-barreled rifle does not require any professional skills.

11.2.6 A description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.

The Department provides five means by which entities may comply with the final rule. Furthermore, the Department is also forbearing the tax for certain[125] entities to register their current inventory of firearms with attached "stabilizing braces" under the NFA, provided they submit the registration within 120 days of the date of the rule's publication.

---

[125] The only entities that would not receive the "forbearance" for registration of their current inventories would be SOT holders that file an E-Form 2 to register. Because the E-Form 2 does not require submission of an accompanying NFA tax, there is no tax for ATF to "forbear" from collecting for these entities.

# 12.  Collection of Information

This rule would call for collections of information under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501–20).  As defined in 5 CFR 1320.3(c), "collection of information" comprises reporting, recordkeeping, monitoring, posting, labeling, and other similar actions.  The title and description of the information collection, a description of those who must collect the information, and an estimate of the total annual burden follow.  The estimate covers the time for reviewing instructions, searching existing sources of data, gathering and maintaining the data needed, and completing and reviewing the collection.

Under the provisions of this final rule, there is a one-time increase in paperwork burdens of NFA applications.  This requirement would be added to an existing approved collection covered by OMB control number 1140-0011 and 1140-0012.

TITLE:  Application to Make and Register a Firearm

OMB Control Number:  OMB 1140-0011

FINAL USE OF INFORMATION:  The ATF Form 1 (5320.1) is required to register an NFA firearm by any person, other than a qualified manufacturer, who wishes to make and register an NFA firearm.  The implementing regulations are in 27 CFR 479.61–479.71. Under the provisions of 26 U.S.C. 5822, no person can make an NFA firearm until he or she has applied for and received approval from the Attorney General (delegated to ATF).  Subject to certain exceptions, the making of an NFA firearm is subject to a tax of $200 (26 U.S.C. 5821).  The use of this information is to ensure that applicants are in compliance with relevant laws.

DESCRIPTION AND NUMBER OF RESPONDENTS:  Currently, there is a total of 25,716 respondents to this information collection.  Of these 25,716 respondents, 477 of them are FFLs, 21,879 of them are trusts and legal entities, and 3,360 of them are individuals.  For the purposes

87

of this final rule, ATF estimates 8,606 Type 1 FFL dealers, 1,059 Type 7 FFLs manufacturers without an SOT, and 826,001 individuals will submit a response due to this final rule.  For the purposes of this final rule, the numbers of trusts and legal entities were not calculated.

FREQUENCY OF RESPONSE:  Currently, one time.  For this final rule, 2 to 32 times, depending on the number of firearms.

BURDEN OF RESPONSE:  Currently, one time.  For this final rule, 2 to 32 times, depending on the number of firearms.

ESTIMATE OF TOTAL ANNUAL BURDEN:  The existing burden is 102,808 hours, with an additional 1,746,132 hours due to this final rule.

TITLE:  Notice of Firearms Manufactured or Imported

OMB Control Number:  OMB 1140-0012

FINAL USE OF INFORMATION:  The Notice of Firearms Manufactured or Imported—ATF Form 2 (5320.2) is required of (1) a person who is qualified to manufacture NFA firearms, or (2) a person who is qualified to import NFA firearms, to register manufactured or imported NFA firearm(s).  In general, under the provisions of 26 U.S.C. 5822, no person can make an NFA firearm until he or she has applied for and received approval from the Attorney General of the United States (delegated to ATF).  Subject to certain exceptions, the making of an NFA firearm is subject to a tax of $200.  Section 5841(b) provides that each manufacturer and importer shall register each firearm manufactured or imported.  Section 5841(c) provides that each manufacturer shall notify the Attorney General about the manufacture of a firearm, as provided by the regulations.  These provisions further state that each importer must obtain authorization as required by regulations, prior to importing a firearm.  Section 5852(c) exempts a qualified

88

manufacturer from payment of the making tax for manufactured firearms. The final use of this information is to ensure that applicants are in compliance with relevant laws.

DESCRIPTION AND NUMBER OF RESPONDENTS:  Currently, there are 14,384 FFLs with an SOT.  For the purposes of this final rule, ATF estimates 882 Type 7 FFL manufacturers with an SOT will submit a response due to this final rule

FREQUENCY OF RESPONSE:  One time.

BURDEN OF RESPONSE:  Currently, respondents will respond one time.  This final rule may require a second response to incorporate a change in inventory.

ESTIMATE OF TOTAL ANNUAL BURDEN:  Currently, the burden in hours is 7,192.  This final rule would add an additional burden of 441 hours.

As required by the Paperwork Reduction Act of 1995 (44 U.S.C. 3507(d)), we have submitted a copy of this final rule to OMB for its review of the collections of information.

.

89

# Appendix A Fingerprint Costs

Appendix A provides the list of digital fingerprint cards used to determine costs to apply under the NFA.

| | | |
|---|---|---|
| Goshen County Sheriff's Office | $5.00 | Questions/Answers (goshensheriff.org) |
| Muscogee County Sheriff's Office | $5.00 | FAQ (columbusga.gov) |
| Idaho Falls PD | $10.00 | Finger Printing \| Idaho Falls, ID (idahofallsidaho.gov) |
| Middletown PD | $10.00 | Services - Middletown Police Department (middletownkypd.org) |
| South Sound 911 | $10.00 | Fingerprints - South Sound 911 |
| Minnehaha County Sheriff's Office | $12.50 | Minnehaha County, South Dakota Official Website - Sheriff's Office - Fingerprinting |
| Arkansas Livescan | $15.00 | Arkansas Live Scan - An Arkansas-Based Digital Fingerprinting Company |
| Ramsey County Sheriff | $15.00 | Fingerprinting \| Ramsey County |
| Kingsguard | $20.00 | KINGSGUARD - Livescan, Fingerprints, Fingerprinting Services |
| Accelerated Fingerprints | $25.00 | Accelerated Fingerprints® - Las Vegas Fingerprinting Services |
| Fingerprint Technologies | $25.00 | Services & Prices — Fingerprint Technologies (fingerprints4all.com) |
| Shelburne Police Department | $25.00 | Fingerprinting \| Shelburne, VT - Official Website (shelburnevt.org) |
| Fingerprinting Services & Investigations | $30.00 | Digital Fingerprinting Services, Investigative Services \| Portland, OR |
| DigitScan | $35.00 | Home - Arizona Fingerprints And More |
| Maryland Mobile Fingerprinting | $35.00 | Ink Fingerprinting - Maryland Mobile Fingerprinting |
| WOVO Identity Solutions | $35.00 | Fingerprinting on Card Services \| Colorado Fingerprinting Services (wovois.com) |

90

# Appendix B Market Value of Firearms with Attached "Stabilizing Brace"

Appendix B provides the list of firearms with "stabilizing brace" used to determine the average cost of a firearm with "brace."

| | | |
|---|---|---|
| Angstadt Arms | $1,379.00 | https://angstadtarms.com/product/udp-9-pistol-with-sba3-brace/ |
| BG Defense | $1,699.00 | https://bgdefense.com/product/type-a-sipr-10-5-gen3-pistol-sb-tactical-a3-brace/ |
| Bereli | $1,049.00 | https://www.bereli.com/saint-victor-5-56-ar-15-pistol-b5-low-capacity/ |
| Charlie's Custom Clones | $2,349.99 | Mk18 Folding Daniel Defense Pistol in FDE with SB-Tactical brace and Law Tactical folder in FDE \| For Sale at CCC (charliescustomclones.com) |
| Atlantic Firearms | $1,189.99 | https://atlanticfirearms.com/zastava-arms-zpap92-1-5mm-ak-pistol-w-folding-brace |
| Gun Broker | $1,324.89 | https://www.gunbroker.com/item/920335752 |
| Omaha Outdoors | $2,079.99 | Sig Sauer MCX TACOPS 30 RD 300 Blackout 6.75" Pistol PCB Brace - Omaha Outdoors |
| Omaha Outdoors | $2,529.00 | Sig Sauer MCX Rattler Pistol 5.56 NATO 5.5" 30 RD M-LOK PCB Folding Brace - Omaha Outdoors |
| Atlantic Firearms | $1,187.00 | Zastava ZPAP92 Alpha Tactical Pistol For SALE - AtlanticFirearms.com |
| Atlantic Firearms | $1,284.99 | Zastava ZPAP92 Tactical Pistol Package On SALE - AtlanticFirearms.com |
| Classic Firearms | $943.99 | 9mm AR / AK Pistols For Sale at Classic Firearms |
| Gun Zone | $799.00 | https://gunzonedeals.com/product/grand-power-stribog-sp9a1-gen2-301-non-reciprocating-with-folding-sb-tactical-brace-and-hb-industries-mount#product_detail |
| Gun Zone | $1,089.00 | FDE Stribog SP9A1 30+1 Non-Reciprocating With FDE A3 Tactical Aluminum Side Folding Brace And Tailhook - Flat Trigger \| GunZoneDeals.com Inc. |
| Gun Zone | $887.00 | Black Multi-Cam Stribog SP9A1 30+1 Non-Reciprocating With A3 Tactical Aluminum Side Folding Brace And Tailhook \| GunZoneDeals.com Inc. |
| Gun Zone | $1,049.00 | https://gunzonedeals.com/product/grand-power-stribog-sp9a3-delayed-roller-blowback-9mm-pistol-with-a3-tactical-aluminum-folding-brace-and-tailhook-for-sale-gunprodeals.com#product_detail |
| Armory Weapons | $869.00 | https://armoryweapons.com/product/ak-15-pistol-mm47-762x39/ |
| Gun Buyer | $729.00 | https://www.gunbuyer.com/ati-300blk-omni-hybrid-10-5-f-atigomx30010mp4bfde-d.html |

91

| ak47gunssilencers | $779.00 | DRACO AK47 PISTOL WITH BRACE , ROMANIAN \| ak47gunssilencers |
|---|---|---|
| Gun Buyer | $2,999.00 | F1 Custom UDP9 Rocket Pop 9mm 8.3" Barrel 30+1 - Gunbuyer |
| Guns Atlantic | $749.99 | PSA AK-P MOE SBA3 PISTOL BLACK - PALMETTO STATE ARMORY 5165450735 \| Guns Atlantic |
| Armory Weapons | $749.00 | https://armoryweapons.com/product/psa-ak-p-rail-moe-sba3-pistol-black-palmetto-state-armory-5165490401/ |
| Guns Atlantic | $699.00 | https://gunsatlantic.com/product/psa-ak-p-red-wood-triangle-side-folding-pistol/ |
| Palmetto State Armory | $949.99 | PSA AK-V 9mm MOE SBA-3 Pistol, Black \| Palmetto State Armory |
| Gun Buyer | $839.99 | S&W M&P 15 Pistol w/SBA3 Brace 223Rem/5.56 NATO 7.5" Barrel 30+1 - Gunbuyer |
| Guns Atlantic | $1,210.00 | SA VZ 58 PISTOL 762B 12"- CZECHPOINT \| Guns Atlantic |
| Express Ammunition Shop | $449.99 | SMITH & WESSON M&P15-22 22LR 7" BARREL 25+1 13321 - Express Ammunition Shop |
| Guns Atlantic | $1,235.00 | VZ 58 PISTOL 762B CZECHPOINT W/ BRACE \| Guns Atlantic |
| Sportsmans Outdoor Superstore | $1,774.99 | Sig Sauer MPX Pistols for Sale \| Sportsman's Outdoor Superstore (sportsmansoutdoorsuperstore.com) |
| Average Cost of Firearm | $1,246 | |

# Appendix C States with Short-Barreled Rifle and Other Weapons Restrictions

Appendix C provides the population and percent populations by State as well as numbers of FFLs by State. This appendix also marks which States have general restrictions on both short-barreled rifles (SBRs) and "assault weapons" and States that have general restrictions on SBRs but not "assault weapons."

| State | General Restrictions on Both SBR and Assault Weapons | General Restriction on SBR but not on Assault Weapons | Population | Percent of US Population | Number of Type 1 FFL Dealers | Percent of FFLs |
|---|---|---|---|---|---|---|
| Alabama | -- | -- | 5,024,279 | 1.52% | 852 | 1.63% |
| Alaska | -- | -- | 733,391 | 0.22% | 852 | 1.63% |
| Arizona | -- | -- | 7,151,502 | 2.16% | 1309 | 2.50% |
| Arkansas | -- | -- | 3,011,524 | 0.91% | 840 | 1.61% |
| California | X | -- | 39,538,223 | 11.93% | 1791 | 3.42% |
| Colorado | -- | -- | 5,773,714 | 1.74% | 1442 | 2.76% |
| Connecticut | X | -- | 3,605,944 | 1.09% | 418 | 0.80% |
| Delaware | -- | X | 989,948 | 0.30% | 122 | 0.23% |
| District of Columbia | X | -- | 689,545 | 0.21% | 5 | 0.01% |
| Florida | -- | -- | 21,538,187 | 6.50% | 2272 | 4.34% |
| Georgia | -- | -- | 10,711,908 | 3.23% | 1355 | 2.59% |
| Hawaii | X | -- | 1,455,271 | 0.44% | 97 | 0.19% |
| Idaho | -- | -- | 1,839,106 | 0.55% | 719 | 1.37% |
| Illinois | -- | X | 12,812,508 | 3.87% | 1250 | 2.39% |
| Indiana | -- | -- | 6,785,528 | 2.05% | 1272 | 2.43% |
| Iowa | -- | -- | 3,190,369 | 0.96% | 1196 | 2.29% |
| Kansas | -- | -- | 2,937,880 | 0.89% | 937 | 1.79% |
| Kentucky | -- | -- | 4,505,836 | 1.36% | 1047 | 2.00% |
| Louisiana | -- | -- | 4,657,757 | 1.41% | 929 | 1.78% |
| Maine | -- | -- | 1,362,359 | 0.41% | 421 | 0.80% |
| Maryland | X | -- | 6,177,224 | 1.86% | 530 | 1.01% |
| Massachusetts | X | -- | 7,029,917 | 2.12% | 320 | 0.61% |
| Michigan | -- | -- | 10,077,331 | 3.04% | 1885 | 3.60% |

93

| | | | | | | |
|---|---|---|---|---|---|---|
| Minnesota | -- | -- | 5,706,494 | 1.72% | 1247 | 2.38% |
| Mississippi | -- | -- | 2,961,279 | 0.89% | 1885 | 3.60% |
| Missouri | -- | -- | 6,154,913 | 1.86% | 176 | 0.34% |
| Montana | -- | -- | 1,084,225 | 0.33% | 821 | 1.57% |
| Nebraska | -- | -- | 1,961,504 | 0.59% | 636 | 1.22% |
| Nevada | -- | -- | 3,104,614 | 0.94% | 400 | 0.76% |
| New Hampshire | -- | -- | 1,377,529 | 0.42% | 369 | 0.71% |
| New Jersey | X | -- | 9,288,994 | 2.80% | 313 | 0.60% |
| New Mexico | -- | -- | 2,117,522 | 0.64% | 481 | 0.92% |
| New York | X | -- | 20,201,249 | 6.09% | 1787 | 3.42% |
| North Carolina | -- | -- | 10,439,388 | 3.15% | 1842 | 3.52% |
| North Dakota | -- | -- | 779,094 | 0.24% | 448 | 0.86% |
| Ohio | -- | -- | 11,799,448 | 3.56% | 1994 | 3.81% |
| Oklahoma | -- | -- | 3,959,353 | 1.19% | 1057 | 2.02% |
| Oregon | -- | -- | 4,237,256 | 1.28% | 1150 | 2.20% |
| Pennsylvania | -- | -- | 13,002,700 | 3.92% | 2494 | 4.77% |
| Rhode Island | -- | X | 1,097,379 | 0.33% | 68 | 0.13% |
| South Carolina | -- | -- | 5,118,425 | 1.54% | 891 | 1.70% |
| South Dakota | -- | -- | 886,667 | 0.27% | 473 | 0.90% |
| Tennessee | -- | -- | 6,910,840 | 2.09% | 1159 | 2.22% |
| Texas | -- | -- | 29,145,505 | 8.79% | 4957 | 9.47% |
| Utah | -- | -- | 3,271,616 | 0.99% | 692 | 1.32% |
| Vermont | -- | -- | 643,077 | 0.19% | 279 | 0.53% |
| Virginia | -- | -- | 8,631,393 | 2.60% | 1395 | 2.67% |
| Washington | -- | -- | 7,705,281 | 2.32% | 911 | 1.74% |
| West Virginia | -- | -- | 1,793,716 | 0.54% | 658 | 1.26% |
| Wisconsin | -- | -- | 5,893,718 | 1.78% | 1341 | 2.56% |
| Wyoming | -- | -- | 576,851 | 0.17% | 535 | 1.02% |
| US Population | | | 331,449,281 | 100.00% | 52320 | 100.00% |
| Total | 8 | 3 | | | | |

To summarize, 4.5 percent of the U.S. population lives in States with restrictions on short-barreled rifles but not "assault weapons," and 26.55 percent of the U.S. population lives in States with general restrictions on the possession of both short-barreled rifles and "assault

94

P. App'x 247

weapons."  This latter percentage was divided two-ways (13.28 percent), to account for one half choosing to turn in firearms to ATF and the other half destroying the whole firearm.

Approximately 10.06 percent of Type 1 FFL dealers are located in States with bans on both NFA weapons and "assault weapons."  This percentage (10.06 percent) was divided evenly (5.03 percent) between choosing to turn in firearms to ATF and destroying the whole firearm.

# EXHIBIT F





Updated April 19, 2021

# Handguns, Stabilizing Braces, and Related Components

On April 7, 2021, the White House announced that the Department of Justice has been directed to issue a proposed rule within 60 days (by June 6, 2021) to clarify when a device marketed as a stabilizing brace might turn a pistol into a short-barreled rifle. On December 18, 2020, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) published guidance in the *Federal Register* for public comment that indicated that it was preparing to reclassify certain ***heavier, larger handguns (pistols) equipped with stabilizing braces*** as more stringently regulated ***short-barreled rifles***. Such a reclassification would retroactively trigger the more extensive paperwork and background check requirements of the 1934 National Firearms Act (NFA), and require registration of the owner and firearm with ATF. While this guidance was withdrawn on December 23, 2020, the proposed rule could address some of the same issues.

## Stabilizing Brace: Shooter's Assist or Shoulder Stock?

Stabilizing braces are devices that can be attached to the rearward portion (breech) of a handgun or other pistol grip firearm's frame or receiver. The brace extends backwards, generally in alignment with the axis of the barrel(s), so the firearm can be secured to the shooter's forearm, while it is held by its pistol grip or other short stock, making a heavier, larger short-stocked firearm easier to handle. The first prototype stabilizing brace was designed to assist a veteran and service-connected amputee with firing an AR-type handgun singlehandedly. Stabilizing braces and similar devices, however, could serve more generally as a quasi-shoulder stock. The addition of shoulder stock to a short-stocked firearm could possibly change a firearm's classification under current law due to definitional differences between the NFA and Gun Control Act of 1968 (GCA).

ATF has long ruled that the attachment of a shoulder stock to a handgun or pistol grip firearm transformed that GCA-regulated firearm into an NFA-regulated short-barreled rifle or shotgun. In November 2012, however, ATF determined that attaching a stabilizing brace to an AR-type pistol would not change that firearm's classification from a solely GCA-regulated handgun to an NFA-regulated short-barreled rifle. Since then, many variations of stabilizing braces have been manufactured and sold in the United States. In 2015, in an Open Letter, ATF raised questions as to the legality of using or intending to use stabilizing braces as shoulder stocks. In several private letters, made public by the addressees, ATF appeared to walk back these considerations. In 2018, however, ATF charged an individual with unlawfully possessing an unregistered short-barreled rifle—an AR-type pistol equipped with a cheek rest, which is arguably a variant of a stabilizing

brace. ATF submitted that this cheek rest, when fully extended, constituted a shoulder stock, because its "length of pull" was greater than 13.5 inches (i.e., the distance from the trigger pad to the end of the cheek rest fully extended). The defendant was found not guilty by a jury, based partly on ATF's failure to take the measurement properly in alignment with the barrel's axis. This case is an example of how the absence of definitive determinations about the legality of firearms equipped with stabilizing braces and similar devices may create repercussions.

## GCA- and NFA-Regulated Firearms

When Congress passed the GCA, it significantly amended and repassed the NFA as Title II of that measure. These acts include different, but respective definitions for the term "firearm" (18 U.S.C. §921(a)(3) and 26 U.S.C. §5845(a)). Under these definitions, all firearms regulated under the NFA are first regulated under the GCA. As discussed below, the three basic types of firearms regulated under the GCA are shotguns, rifles, and handguns.

### SBSs, SBRs, AOWs, and DDs

The NFA further regulates short-barreled shotguns, or SBSs, and short-barreled rifles, or SBRs: (1) shotguns with barrels less than 18 inches in length, (2) rifles with barrels less than 16 inches in length, or (3) any existing shotgun or rifle that has been modified to be less than 26 inches in overall length by shortening its stock and/or barrel(s). (See 18 U.S.C. §§921(a)(6) and (8), and 26 U.S.C. §5845(a).)

Under "any other weapon," or AOW, the NFA regulates smoothbore handguns (less than 26 inches in overall length) and other "concealable" firearms with combination smoothbore and rifled bore barrels between 12 and 18 inches in length. The AOW classification also captures certain deceptive or disguised firearms (e.g., umbrella, belt buckle, and pen guns). The term "any other weapon" is defined at 26 U.S.C. §5845(e).

Under "destructive device," or DD, the NFA regulates "non-sporting" shotguns; firearms with barrel bore diameters greater than one-half inch (e.g., grenade launchers, bazookas, and mortars); as well as grenades, rockets, mortar rounds, mines, and other explosive devices (e.g., Molotov cocktails). Congress included similar definitions for the term "destructive device" in the GCA and NFA (18 U.S.C. §921(a)(4) and 26 U.S.C. §5845(f)). In addition, the NFA regulates machine guns and firearms silencers, which are beyond the scope of this In Focus.

### Shotgun and Rifle Definitions

Congress included identical statutory standalone definitions for the terms "shotgun" and "rifle" under the GCA and NFA. The term "shotgun" means "a weapon designed or

redesigned, made or remade, and intended to be fired from
the shoulder and designed or redesigned and made or
remade to use the energy of an explosive to fire through a
smooth bore either a number of ball shot or a single
projectile for each single pull of the trigger" (18 U.S.C.
§921(a)(5) and 26 U.S.C. §5845(d)). The term "rifle"
means "a weapon designed or redesigned, made or remade,
and intended to be fired from the shoulder and designed or
redesigned and made or remade to use the energy of an
explosive to fire only a single projectile through a rifled
bore for each single pull of the trigger" (18 U.S.C.
§921(a)(7) and 26 U.S.C. §5845(c)).

From these definitions, it can be deduced that the defining
characteristic of a long gun (shotgun or rifle) is that it is
intended to be shoulder-fired, from which it follows that the
defining feature of a long gun is a *shoulder stock* of some
type. In addition, shotguns are "smoothbore." The barrel of
a rifle is "rifled bore," and consists of lines and grooves
machine-cut into the interior of the barrel (the bore) to spin
a bullet as it travels at a high velocity down the barrel bore.

### Handgun Definition and Other Pistol Grip Firearms
Under the GCA, the term "handgun" means "(A) a firearm
which has a short stock and is designed to be held and fired
by the use of a single hand; and (B) any combination of
parts from which a firearm described in subparagraph (A)
can be assembled" (18 U.S.C. §921(a)(29)). From this
definition, it can be deduced that the defining feature of a
handgun is its *short stock*, and that it is designed to be fired
singlehandedly. The term handgun includes both pistols and
revolvers (26 C.F.R. §§478.11 and 479.11). Under current
law, *rifled bore handguns* are regulated solely under the
GCA and there are no restrictions on the barrel or overall
length of such handguns.

*Smoothbore handguns* are regulated under the NFA under
the AOW classification. Since at least 1976, however, ATF
has adopted 26 inches in overall length as the determining
dimension that separates NFA-regulated "concealable"
smoothbore handguns, or AOWs, from GCA-regulated
short-stocked, smoothbore firearms. ATF adopted this
presumptive dimension of concealability from the statutory
definitions for short-barreled rifles and shotguns discussed
above. ATF refers to these solely GCA-regulated short-
stocked, smoothbore firearms, which are greater than 26
inches in overall length, as "pistol grip firearms." The
popularity of pistol grip firearms arguably increased in
2008, when ATF determined that the barrel length was
"immaterial" to the classification of such firearms, while
the 26 inches in overall length restriction remained
unchanged. Prior to this, most firearms makers believed that
the barrel of a pistol grip firearm had to be greater than 18
inches.

### "Gray Area" in the Law?
In a potentially legal gray area, some GCA-regulated
handguns and pistol grip firearms are dimensionally
equivalent—in terms of their barrel lengths, overall lengths,
and/or barrel bores—to other NFA-regulated firearms. As
discussed above, it is unlawful to modify an existing rifle or
shotgun by shortening its stock and/or barrel(s) into a short-
barreled rifle or shotgun without following the NFA

requirements, which includes remitting a $200 making tax.
However, a handgun with equivalent dimensions does not
trigger the NFA requirements, as long as a shoulder stock is
never affixed to its frame or receiver.

The same is true for pistol grip firearms. However, ATF
holds out the possibility of reclassifying pistol grip firearms
as AOWs under the NFA if they are ever used in a
concealed manner in the commission of a crime. Others
counter that pistol grip firearms would be more properly
classified as DDs, under ATF's reasoning that these short-
stocked, smoothbore firearms are "non-handguns" and
"non-shotguns," and are usually firearms with barrel bores
of greater than one-half inch in diameter.

### Larger, Heavier Handguns, and Pistol Grip Firearms
In the past 16 years, firearms manufacturers in the United
States have successfully marketed certain larger, heavier
handguns and other pistol grip firearms that arguably push
the limits of current law definitions of firearms types and
classes under current law. Some of these handguns are
assembled around frames and receivers originally designed
for AR- and AK-type rifles, and are sometimes chambered
for mid-size rifle cartridges and shotgun shells.

Under the 1994-2004 Semiautomatic Assault Weapons
(SAW) ban, some of these handguns could have been
prohibited under its 50 ounce weight limit (unloaded) and
other characteristics that defined an "assault pistol." The
SAW ban did not address pistol grip firearms substantively,
as many of these firearms were pump-action, as opposed to
semiautomatic, when the ban was enacted. The introduction
of stabilizing braces and similar components has
significantly increased the popularity of heavier, larger
pistols and pistol grip firearms.

In the past eight years, larger, heavier handguns and pistol
grip firearms have seen increased sales likely due, in no
small part, to stabilizing braces. Most major firearms
manufacturers are making firearms equipped with
stabilizing braces as part of their featured product lines.
While there are no available statistics to gauge
authoritatively the number of stabilizing braces already
made and sold in the United States, unofficial estimates
suggest that there are between 10 and 40 million stabilizing
braces and similar components already in civilian hands,
either purchased as accessories or already attached to
firearms made at home or at the factory. Altering the
classification of firearms equipped with stabilizing braces
would likely affect millions of owners.

Today, some firearms enthusiasts view GCA-regulated
handguns and pistol grip firearms equipped with stabilizing
braces as viable alternatives to the more strictly NFA-
regulated short-barreled rifles and shotguns. At the same
time, gun control advocates have called on ATF to reverse
its determinations with regard to stabilizing braces, as well
as, larger, heavier handguns and other pistol grip firearms.
They view such firearms as "assault pistols" or "assault
shotguns," and have called on Congress to reconstitute an
assault weapons ban.

The Gun Control Act: Prohibited Firearm Recipients

**William J. Krouse**, Specialist in Domestic Security and
Crime Policy

IF11763

## Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to
congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress.
Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has
been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the
United States Government, are not subject to copyright protection in the United States. Any CRS Report may be
reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include
copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you
wish to copy or otherwise use copyrighted material.