UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECOND AMENDMENT FOUNDATION, INC., RAINIER ARMS, LLC, SAMUEL WALLEY, and WILLIAM GREEN<br><br>   Plaintiffs,<br><br>v.<br><br>BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, STEVEN M. DETTELBACH, in his official capacity as Acting Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, UNITED STATES DEPARTMENT OF JUSTICE, and MERRICK B. GARLAND, in his official capacity as Attorney General of the United States,<br><br>   Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. 3:21-CV-0116-B |

## MEMORANDUM OPINION AND ORDER

Before the Court is Second Amendment Foundation, Inc. ("SAF"), Rainier Arms, LLC ("Rainier Arms"), Samuel Walley, and William Green ("Plaintiffs")'s Motion for a Preliminary Injunction (Docs. 51, 52, 55, 59, 95, 97).

Plaintiffs in this case challenge an administrative rule (the "Final Rule") regulating firearms equipped with a stabilizing brace ("brace-equipped firearms"). The Final Rule was published by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") on January 31, 2023. Plaintiffs contend the Final Rule is invalid because it: (i) is not a logical outgrowth of the Proposed Rule, (ii) is promulgated in excess of agency authority and contradicts the statute the ATF seeks to interpret, (iii) has an unlawful effective date, (iv) is unconstitutionally vague, (v) is arbitrary and capricious

for failure to consider the Second Amendment inquiry under *Bruen*, and (vi) is unconstitutional under the Second Amendment. Doc. 52, Pls' Br., 14–17 (citing *New York State Rifle & Pistol Ass'n, v. Bruen*, 142 S. Ct. 2111 (2022)); Doc. 95, Pls' Supp. Br., 2–3. The Final Rule, in its simplest terms, sets out a multi-factor test to define when statutory registration and taxation would apply to a brace-equipped firearm. Plaintiffs seek to enjoin the Final Rule's enforcement nationwide[1] and specifically against them until this case's resolution. Having considered the parties' briefing and oral arguments under the applicable law, the Court **DENIES** Plaintiffs' Motion for a Preliminary Injunction.

# I.

## BACKGROUND

A.  *The Final Rule and its Statutory Background*

The National Firearms Act of 1934 ("NFA") was enacted by Congress to deter the use of dangerous, concealable firearms associated with emerging organized criminal activity. 26 U.S.C §§ 5801–5872; *Lomont v. O'Neill*, 285 F.3d 9, 11 (D.C. Cir. 2002); *see also United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517 (1992) (plurality op.). One category of firearms regulated by the NFA is a short-barreled rifle ("SBR"). 26 U.S.C. § 5845(a). Over thirty years following its enactment of the NFA, Congress enacted the Gun Control Act of 1968 ("GCA"), expanding federal firearms regulation. 18 U.S.C. §§ 921–31.

The NFA defines a rifle as:

> [A] weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of

---

[1] During the evidentiary hearing Plaintiffs' counsel represented that at this stage, Plaintiffs seek an "injunction, personalized that binds these plaintiffs and defendants." Doc. 106, Hearing Transcript, 5. However a "universal vacatur . . . . is pleaded for . . . ultimately. *Id.*

the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge.

*Id.* § 5845(c).

The NFA and GCA define "rifle" almost identically. *Compare* 26. U.S.C. § 5845(c) *with* 18 U.S.C. § 921(a)(7). The statutory definitions of a "rifle" implicate the definitions of an SBR under the GCA and NFA. The GCA defines an SBR as "a rifle having one or more barrels less than 16 inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than 26 inches." 18 U.S.C. § 921(a)(8). The NFA has a similar definition for SBRs. 26 U.S.C. §§ 5845(a)(3), (4).

The NFA imposes registration, taxation, and use requirements over SBRs. 26 U.S.C. §§ 5801–02, 5811–12, 5821–22, 5841, 5845(a). Specifically, SBRs "must be registered in the National Firearms Registration and Transfer Record ('NFRTR') to a person entitled to possess the firearm," they "require approval by the Attorney General before their transfer or making," and they "are subject to transfer and making taxes." Final Rule at 6,479 (citing 26 U.S.C. §§ 5811–12, 5821–22, 5841). Importers, manufacturers, and dealers of SBRs must register certain identifying information with the Attorney General and pay a special occupation tax for each place of business. 26 U.S.C. §§ 5801–02. SBRs are regulated by the NFA in part because they have firepower similar to an ordinary rifle but are more concealable than ordinary rifles. *See Thompson/Center Arms Co.*, 504 U.S. at 517 ("It is of course clear from the face of the [NFA] that the NFA's object was to regulate certain weapons likely to be used for criminal purposes, just as the regulation of short-barreled rifles, for example, addresses a concealable weapon likely to be so used."). Violations of both the NFA and GCA carry criminal penalties. Violations under the NFA are punishable by up to ten

years in prison and a fine of up to $10,000. 26 U.S.C. § 5871. Non-compliance with the GCA is punishable by up to five years in prison and a fine of up to $250,000. 18 U.S.C. §§ 924(a)(1), 3571.

Recently, confusion has arisen about whether brace-equipped firearms constitute SBRs under the NFA and GCA. Doc. 55, ATF Resp., 5–7. In response to this confusion, the ATF engaged in rulemaking to creates framework to determine whether attaching a brace to a firearm renders that brace-equipped firearm an SBR under the NFA. Factoring Criteria for Firearms with Attached "Stabilizing Braces," 88 Fed. Reg. 6,478 (Jan. 31, 2023) ("the Final Rule"). The Final Rule comes years after informal ATF classifications of various types of brace-equipped firearms. *Id.*

Stabilizing braces were originally designed to assist people with disabilities or limited strength or mobility to safely and single-handedly fire heavy pistols. *Id.* at 5. In 2012, the ATF received its first request to classify a brace prototype designed to attach onto one's forearm and a receiving AR-15 type pistol, which the ATF concluded did not change the resulting device's classification "into a weapon designed or intended to be fired from the shoulder" *Id.*

In the following years, the "ATF received an increasing number of classification requests" for braced firearms that the ATF admits it did not resolve with "a standard set of criteria . . . resulting in inconsistent (and occasionally incorrect) guidance." Doc. 55, ATF Resp., at 5–7 (discussing select classification responses between 2012-2020). In some instances, the ATF concluded the brace-equipped firearm was not an SBR under the NFA. *Id.* In 2014, the ATF started classifying certain brace-equipped firearms as SBRs. *Id.* But later classifications by the ATF included limitations to when brace-equipped firearms could be considered SBRs. At the same time brace-equipped firearms continued to evolve and many emerged that included characteristics resembling shoulder stocks. *Id.*; Defs' Evidentiary Hearing Slides, 35–42. The ATF also learned that manufacturers were widely marketing these "braces" to consumers as a means of creating

- 4 -

functional SBRs that avoided NFA requirements for SBRs, thereby allowing consumers to fire the brace-equipped firearms from the shoulder. Final Rule at 6,503, 6,527, 6,545–48.



Figure 1. The "forearm brace" prototype of 2012, which the ATF did not classify as a short-barreled rifle. Final Rule at 6,483.



Figure 2. Contemporaneously marketed heavy pistols equipped with a "stabilizing brace" (top) compared with contemporaneously marketed rifle by same company (bottom). Final Rule at 6,494.

To respond to this trend in manufacturing and consumer use, as well as its varied classifications, the ATF published a notice of proposed rulemaking ("Proposed Rule") in June 2021. 86 Fed. Reg. 30,826. The Final Rule was published on January 31, 2023. 88 Fed. Reg. 6,478. The Final Rule amends the definition of "rifle" under ATF regulations, which address the ATF's meaning for the term "rifle" in the NFA and GCA. 27 CFR §§ 478.11, 479.11. The Final Rule sets up a multi-factor criterion by which the ATF determines whether a brace-equipped firearm is

"designed or redesigned, made or remade, and intended to be fired from the shoulder" under the NFA and GCA's definition of "rifle." Final Rule at 6,574–75.

According to the Final Rule, "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder," is interpreted by the ATF to include any weapon "that is equipped with an accessory, component, or other rearward attachment," such as a stabilizing brace, "that provides surface area that allows the weapon to be fired from the shoulder, provided other factors . . . indicate that the weapon is designed, made, and intended to be fired from the shoulder." *Id.* The "other" factors used in this determination are:

> (1) Whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;
> (2) Whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method), that is consistent with similarly designed rifles;
> (3) Whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;
> (4) Whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;
> (5) The manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and
> (6) Information demonstrating the likely use of the weapon in the general community.

*Id.*

After the Final Rule's publication, anyone who newly acquired or transferred a brace-equipped firearm deemed an SBR under the Final Rule's criteria was required to follow the NFA's requirements over SBRs, namely, to register the device and pay a $200 tax. Final Rule at 6,481; 26 U.S.C. §§ 5801–02. While the Final Rule was "immediately effective," the Final Rule simultaneously states the ATF would not initiate any enforcement action over new acquisitions or transfers for at least 60 days from the date of publication. Final Rule at 6,481. The Final Rule also

states that, as of the publication date, individuals or Federal Firearms Licensees[2] who already possessed qualifying brace-equipped firearms had a 120-day registration period to comply with the NFA without paying the $200 tax.[3] Final Rule at 6,481, 6,570, 6,498. Importers, manufacturers, and dealers of qualifying brace-equipped pistols did not need to pay the $200 tax upon registration if they already paid the special occupation tax under the NFA. *Id.*; 26 U.S.C. §§ 5801–02. The ATF estimates the Final Rule applies to 99% of brace-equipped firearms, meaning the ATF considers those devices SBRs subject to the NFA. *Mock v. Garland*, 75 F.4th 563, 574 (5th Cir. 2023) (citing ATF FINAL REGULATORY IMPACT ANALYSIS AND FINAL REGULATORY FLEXIBILITY ANALYSIS at 21).

The ATF provides two justifications for its exercise of its rulemaking authority: regulatory clarity and public safety. First, the ATF asserts that the Final Rule provides regulatory clarity by rescinding the ATF's prior differing classifications—informal agency actions that the ATF admits did not rely on a standard criterion—and creates a publicly known framework for determining when a brace-equipped firearm is an SBR. Doc. 55, ATF Resp., 5–7, 10; *see also* Final Rule at 6,495 (referencing "criticism from various parties that [the] ATF had not widely published a definitive approach"). Second, the ATF justifies the Final Rule as protecting the public by attempting to remove from widespread circulation brace-equipped firearms that effectively function as SBRs, especially given their use in recent mass shootings. The ATF emphasizes recent mass shootings in Colorado, Ohio, and Tennessee involved gunmen using stabilizing braces with their firearms. Doc.

---

[2] This is a term used in the Final Rule to refer to licensed importers, manufacturers, dealers, or collectors, who are statutorily obligated to obtain authorization from the Attorney General to transport SBRs for interstate or foreign commerce. 18 U.S.C. §§ 922(a)(4), (b)(4).

[3] Brace-equipped firearms qualifying under the framework of the Final Rule are deemed SBRs, and thus subject to the NFA's existing taxation and registration requirements over SBRs. *See* 26 U.S.C. §§ 5801-5802, 5811-5812, 5821-5822, 5841, 5845(a)(3), 5845(c).

55, ATF Response, 20; Doc. 97, ATF Supp., 8 ("[B]race-equipped AR-type pistol killed nine people and injured at least fourteen others."). Some commenters to the Proposed Rule are former law enforcement officers echoing the concern that brace-equipped firearms "are unusually dangerous" due to their ability to "be easily concealed like a handgun but have the firepower and accuracy of a rifle." Final Rule at 6,498.

The ATF emphasizes the Final Rule does not ban brace-equipped firearms. Doc. 55, ATF Resp., 22–23, 25–26. Persons affected by the Final Rule have five options: (1) remove the short barrel of the firearm and attach a 16-inch or longer rifled barrel, (2) register the firearm with the ATF as an SBR, (3) permanently remove and destroy, or alter the "stabilizing brace" such that it cannot be reattached to a firearm, (4) forfeit the braced firearm to a local ATF office, or (5) destroy the entire braced firearm. Final Rule at 6,570.

B.  *Factual and Procedural Background*

This lawsuit commenced on January 15, 2021. There are four Plaintiffs in the instant case: (1) Rainier Arms is a Washington company selling firearms and accessories nationwide, (2) Second Amendment Foundation, Inc. ("SAF") is a Washington organization that promotes Second Amendment rights and has over 720,000 members and supporters, (3) Samuel Walley is a Georgia resident, a member of SAF, and a disabled veteran who owns multiple brace-armed pistols, and (4) William Green is a Texas resident, a member of SAF, and a disabled police officer who owns multiple brace-armed pistols. Doc. 50, Am. Compl., ¶¶ 6–7, 11, 20–21. In their initial complaint, Plaintiffs challenged the ATF's 2015 "Open Letter on the Redesign of 'Stabilizing Braces'" as an invalid exercise of legislative power. Doc. 3, Compl. ¶ 47. Four months later, the Government requested the Court stay all proceedings as the ATF was initiating a notice and comment period

for the Proposed Rule. Doc. 24, Mot., 1. Through a series of orders, the Court stayed this case until the ATF promulgated the Final Rule over a year and a half later.

Shortly after the ATF published the Final Rule, Plaintiffs filed an Amended Complaint (Doc. 50) and preliminary injunction motion (Docs. 51–52) seeking to enjoin the Final Rule. A parallel case, *Mock v. Garland*, No. 4:23-cv-95 (N.D. Tex.), made its way up to the Fifth Circuit during the parties' preliminary injunction briefing. The Fifth Circuit granted the *Mock* plaintiffs an injunction pending appeal. Order, Mock v. Garland, No. 23-cv-10319, ECF No. 52. Pending the resolution of the appeal in *Mock*, this Court administratively stayed this case and administratively issued a preliminary injunction. Docs. 62, 65, 82, 93.

C.  *The Fifth Circuit's Ruling in Mock v. Garland*

The *Mock* appellate decision addressed only the plaintiffs' logical outgrowth claim. In the Fifth Circuit, the logical-outgrowth rule requires a proposed administrative rule to provide "fair notice" of the eventual Final Rule. *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 381 (5th Cir. 2021). Failing to do so constitutes a procedural error. *Mock*, 75 F.4th at 586.  If a procedural error is found, a party must "demonstrate prejudice" to its own notice interests. *Id.* (citing *City of Arlington, Tex. v. F.C.C.*, 668 F.3d 229, 243 (5th Cir. 2012) ("The harmless error rule requires the party asserting error to demonstrate prejudice from the error."), *aff'd*, 569 U.S. 290 (2013)); *State of Tex. v. Lyng*, 868 F.2d 795, 799 (5th Cir. 1989) (addressing the "specific prejudice alleged by appellants in the procedure followed" by the agency).

In bringing their logical outgrowth claim, the *Mock* plaintiffs addressed certain differences between the Proposed Rule and the Final Rule. The ATF's Proposed and Final Rules laid out methodologies for determining if a brace-equipped firearm falls within the statutory definition of SBRs. The Proposed Rule's methodology was based on a total points system, which assigned points

to various design criteria to judge whether a brace-equipped firearm constituted an SBR under the NFA. Proposed Rule at 30,830–31. The Final Rule replaced the points system with a multi-factor test. Final Rule 6,574–75; *see also Mock*, 75 F.4th at 584.

A divided Fifth Circuit panel ultimately reversed the district court's denial of a preliminary injunction. *Mock*, 75 F.4th at 588. The Fifth Circuit found that the methodologies of the Proposed Rule and the Final Rule were "vastly different," such that the Final Rule should have been subject to a second notice and comment process. *Id.* 585–86 (finding the Final Rule to be legislative, not interpretive). The ATF's failure to "start the notice-and-comment process again and receive public comments on the new test" therefore constituted a procedural error. *Id.* at 584. Next, the majority found that the *Mock* plaintiffs "easily" illustrated prejudice from the procedural error by showing "through [their] briefing" several comments they would have made, but were not able to make, to the Final Rule. 75 F.4th at 586, n.58. Therefore, the Fifth Circuit found that the plaintiffs adequately demonstrated they were likely to succeed on their claim that the Final Rule was not a "logical outgrowth" of the Proposed Rule, in violation of the APA. *Id.* at 578–86.

Rather than holding the Final Rule unlawful and enjoining its enforcement, the Fifth Circuit remanded the case back to the district court for further findings as to the remaining preliminary injunction factors. *Id.* at 587 ("The Final Rule therefore must be set aside as unlawful *or* otherwise remanded for appropriate remediation. . . . [We] remand for a ruling on a preliminary injunction (emphasis added)). On remand, the district court issued a preliminary injunction to the *Mock* plaintiffs, their members, customers, and family members. 2023 WL 6457920, at *17 (N.D. Tex. Oct. 2, 2023) (O'Connor, J.).

Following the Fifth Circuit's ruling in *Mock*, this Court ordered the parties to submit supplemental briefing. Doc. 93, Order. Plaintiffs had not asserted their logical outgrowth claim in

their initial preliminary injunction briefing. *Compare* Doc. 52, Pls' Br. and Doc. 59, Reply *with* Doc. 50, Am. Compl. Therefore, in their supplemental brief, Plaintiffs raised their logical outgrowth claim to support an award of preliminary injunctive relief. Doc. 95, Pls' Supp. Br. However, without any substantive analysis, or showing of prejudice, Plaintiffs' four-page supplemental brief simply asserts that *Mock* "assured" success on their logical outgrowth claim. Doc. 95, Pls' Supp. Br., 2. The ATF emphasized in its supplemental brief factual and legal deficiencies in Plaintiffs' irreparable harm argument even if the logical outgrowth claim is likely to succeed. Doc. 97, ATF Supp. Br., 2–9. The Court held an evidentiary hearing on October 18, 2023, to ascertain whether Plaintiffs' logical outgrowth claim and asserted irreparable harm have sufficient factual support. The administrative stay and preliminary injunction in this case expired on October 13, 2023.

Multiple cases like the one currently before this Court continue to circulate through federal courts nationwide with varying outcomes.[4]

## II.

## LEGAL STANDARD

"Injunctive relief is an extraordinary and drastic remedy, and should only be granted when the movant has clearly carried the burden of persuasion." *Anderson v. Jackson*, 556 F.3d 351, 360

---

[4] *Mock v. Garland*, No. No. 4:23-CV-00095-O, 2023 WL 6457920, at *18 (N.D. Tex. Oct. 2, 2023) (J. O'Connor) (granting preliminary injunction motion); *Britto v. ATF*, No. 2:23-cv-00019 (N.D. Tex.) (Kacsmaryk, J.); *Nat'l Rifle Ass'n of Am., Inc. v. ATF*, No. 3:23-cv-01471 (N.D. Tex.) (Lindsey, J.); *Texas v. ATF*, No. 6:23-cv-00013, 2023 WL 7116844 (S.D. Tex. Oct. 27, 2023) (granting preliminary injunction motion); *Miller v. Garland*, 2023 WL 3692841 (E.D. Va., May 26, 2023) (denying preliminary injunction motion), *appeal filed*, (4th Cir. 2023); *Firearms Regul. Accountability Coal., Inc. v. Garland*, No. 1:23-CV-024, 2023 WL 5942365, at *5 (D.N.D. Sept. 12, 2023) (denying preliminary injunction motion), *appeal filed*, (8th Cir. 2023); *Colon v. ATF*, No. 8:23-cv-00223 (M.D. Fla.); *Watterson v. ATF*, No. 4:23-cv-00080 (E.D. Tex.) (Mazzant, J.).

(5th Cir. 2009) (internal quotation omitted). A plaintiff seeking a preliminary injunction must establish (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The third and fourth requirements "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). A preliminary injunction should only be granted if the party seeking the injunction has clearly carried the burden of persuasion on all factors. *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).

## III.

## ANALYSIS

As of October 18, 2023, none of the Plaintiffs are protected by the preliminary injunction issued in *Mock* on October 2, 2023. 2023 WL 6457920; Doc. 106, Hearing Transcript, 14–15. Therefore, the instant Motion is not mooted as to any Plaintiff.

The Court first addresses whether Plaintiffs are entitled to a preliminary injunction based on their logical outgrowth claim, given the Fifth Circuit's directive in *Mock*. Finding Plaintiffs are not likely to succeed on their logical outgrowth claim, the Court next addresses the likelihood of success on the merits of Plaintiffs' other claims in support of their preliminary injunction motion. The Court concludes Plaintiffs are not likely to succeed on the other claims. Finally, even assuming that Plaintiffs are likely to succeed on at least one of their claims, the Court addresses the irreparable harm and balance of the equities factors.

A.  *Likelihood of Success as to Logical Outgrowth Claim*

The Court adheres to the Fifth Circuit's directive in *Mock*, and finds that the Final Rule is not a logical outgrowth of the Proposed Rule. *Mock*, 75 F.4th at 584–86. However, as the Fifth

Circuit recognized, procedural error alone is not sufficient to support a finding of likelihood of success on the merits. *Id.* at 586. The plaintiffs in *Mock*, like the Plaintiffs here, still needed to show that they were prejudiced by the procedural error in order to demonstrate likelihood of success as to their logical outgrowth claim. *Id.*

Plaintiffs have not met their burden of showing they were prejudiced by the procedural error raised in *Mock*. "The harmless error rule requires the party asserting error to demonstrate prejudice from the error." *City of Arlington, Tex.*, 668 F.3d at 243; *see also Shinseki v. Sanders*, 556 U.S. 396 (2009)). Moreover, that prejudice must be specific to the asserting party by a showing of some "new information they would have submitted to the agency if given the opportunity." *State of Tex. v. Lyng*, 868 F.2d at 800; *see City of Arlington, Tex.*, 668 F.3d at 244 (comparing party's asserted concerns with comments submitted during notice and comment period). The Fifth Circuit has recognized, however, that adequate notice from an agency's notice and comment period "may be achieved in cases where the agency's decision-making process centered on the identical substantive claims as those proposed by the party asserting error, even if there were APA deficiencies." *Id.* at 245 (discussing *United States v. Johnson*, 632 F.3d 912, 930 (5th Cir. 2011)).

Despite having the chance to submit a supplemental brief and present oral argument to raise and fully argue their logical outgrowth claim in support of a preliminary injunction, Plaintiffs merely concluded their claim "matches" the one raised in *Mock*, without delineating any reasons why their notice interests were harmed when the ATF did not conduct a second notice and comment process. Doc. 95, Pls' Supp., 2–4; Doc. 106, Hearing Transcript. Plaintiffs' counsel incorrectly asserted "*Mock* has already decided" prejudice as to Plaintiffs in this case. Doc. 106, Hearing Transcript, 64.

In *Mock*, the plaintiffs "suggested, through briefing, a number of comments they would have liked to have made against the Final Rule" if given the opportunity. 75 F.4th at 586 n.58. When pressed at the evidentiary hearing to explain the prejudice as to Plaintiffs, counsel made the broad assertion "we would have made due process comments." Doc. 106, Hearing Transcript, 16. But without more information, it is possible the Final Rule's "decision-making process centered on the identical substantive [due process] claims" as those broadly raised by Plaintiffs. *City of Arlington, Tex.*, 668 F.3d at 245; Final Rule at 6,549–52 (summarizing and addressing public comments regarding due process). Plaintiffs have not provided the Court with any examples or particular due process concerns Plaintiffs have between the Proposed Rule and the Final Rule, or any "new information they would have submitted to the agency" in another notice and comment period.[5] *Lyng*, 868 F.2d at 800; Doc. 97, Pls' Supp. Br., at 15-17. Although Plaintiffs need not have made comments to the Proposed Rule to show prejudice, they need to "explain what they would have said in response" to an agency's procedural error. *Lyng*, 868 F.2d at 799; *Mock*, 75 F.4th at 586.

The Court fully applies the Fifth Circuit's directive in *Mock*, but this case presents a different record than the one presented by the *Mock* plaintiffs. Based on the record here, the Court finds Plaintiffs have not shown prejudice. Therefore, Plaintiffs are not likely to succeed on the merits of their logical outgrowth claim.

The Court thus proceeds to assess the likelihood of success of Plaintiffs' remaining claims—none of which were analyzed by the Fifth Circuit in *Mock*.

---

[5] Plaintiffs' counsel "do[es]n't think" any Plaintiffs submitted comments during the notice and comment process. Doc. 106, Hearing Transcript, 15. Counsel attested SAF monitored the comment process and determined the organization did not need to submit comments because the comments submitted by others addressed SAF's concerns. *Id.* at 15–16. Counsel attested Rainier Arms, Green, and Walley "observed" comments submitted as well. *Id.*

B.  *Likelihood of Success as to Other Procedural Claims Arising Out of APA § 706(2)(A) and (C)*

Plaintiffs contend the Final Rule exceeds the ATF's rulemaking authority and contradicts

the statutes it was delegated to enforce in violation of APA § 706(2)(A) and (C). Doc. 52, Pls' Br.,

9–10. According to Plaintiffs, the Final Rule is also unlawful because it impermissibly went into

immediate effect without fitting a statutory exception. *Id.* at 17. Addressing each argument in turn,

the Court concludes Plaintiffs are not likely to succeed on the merits of these claims.

The Court first addresses the claim that the ATF has acted in excess of its authority. The

APA requires reviewing courts to "hold unlawful and set aside agency action, findings, and

conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of

statutory right." 5 U.S.C. § 706(2)(C). In this case, authority to administer and enforce the NFA

and GCA through "all needful rules and regulations" is vested in the Attorney General, who

properly delegated this responsibility to the ATF Director. 26 U.S.C. §§ 7801(a)(2)(A), 7805(a);

18 U.S.C. § 926(a); 28 C.F.R. § 0.130; *Guedes v. ATF*, 356 F. Supp. 3d 109, 129 n.3 (D.D.C. 2019)

(noting "ATF's clear authority to interpret" the NFA's definitions), *aff'd*, 920 F.3d 1 (D.C. Cir.

2019). When agencies are given the authority to administer and enforce a statute, they often must

interpret relevant provisions to ensure efficient and accurate implementation. *See Gonzales v.*

*Oregon*, 546 U.S. 243, 255 (2006).

The ATF has accordingly promulgated rules and regulations enforcing the NFA, including

by classifying particular weapons and devices as subject to or exempt from federal regulation. *E.g.*,

Definition of "Frame or Receiver" and Identification of Firearms, 87 FR 24652 (Apr. 26, 2022)

(revising and clarifying the definition of "frame or receiver"). The Court does not find the ATF's

promulgation of the Final Rule departs from the ATF's delegated authority to enforce the NFA

and GCA through "all needful rules and regulations." After careful review of the full administrative

and factual record, the Court does not find the Final Rule to be impermissibly exceeding its authority to enforce the statutory definition of "rifle" because, in the absence of Congressional guidance, the Final Rule appears "needful" to enforce the NFA and GCA definitional phrase "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. §§ 7801(a)(2)(A), 7805(a); 18 U.S.C. § 926(a); 28 C.F.R. § 0.130. In light of the evolution of manufactured braces, *see* Final Rule at 6,482–83, 6,493-94, 6,529, 6,543, the Final Rule provides, at the very least, some comprehensible standard for enforcement by placing brace-equipped devices that act like SBRs and are being marketed as SBRs into the statutory definition of SBRs. Final Rule 6,575; 26. U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). Therefore, Plaintiffs are not likely to succeed on the merits of their excess of authority claim. *See Gonzales*, 546 U.S. at 255.

Next, the Court turns to the statutory contradiction argument. Even when acting within its authority, an agency is constrained by the language of the statute it must administer and may not rewrite or redefine terms in a way that contradicts the original statute.[6] *Texas v. United States*, 497 F.3d 491, 500-01 (5th Cir. 2007) (*citing Massachusetts v. EPA*, 549 U.S. 497 (2007)). According to Plaintiffs, the ATF improperly "expands" the definition of a "rifle" under the NFA by adding "elements to the definition that Congress never made part of the law." Doc. 52, Pls' Br., 9. But this legislative rule appears to pose an inquiry identical to the one posed by the NFA's definitional phrase "designed or redesigned, made or remade, and intended to be fired from the shoulder." 18 U.S.C. § 921(a)(7); 26 U.S.C. § 5845(c). For example, the Final Rule's third factor asks whether a brace-equipped firearm "is equipped with sights or a scope with eye relief that

---

[6] *Chevron* deference does not apply both because the ATF has not raised it and because the Final Rule interprets the NFA, which imposes criminal liabilities. *Cargill v. Garland*, 57 F.4th 447, 466 (5th Cir. 2023) (holding *Chevron* does not apply to regulations imposing criminal liability).

*requires the weapon to be fired from the shoulder* in order to be used as designed." This factor necessarily means one is looking to the brace-equipped firearm's intended use from the shoulder, just like the NFA's definitional phrase. And the first and second factors similarly pose an inquiry to identify a brace-equipped firearm whose use and design is akin to that of a rifle. Final Rule 6,757 (assessing whether design criteria are akin to "similarly designed rifles"). Indeed, all of the factors are textually grounded in the inquiry posed by the definitional phrase in "rifle" under the NFA. *E.g.*, Final Rule 6,757 ("provided other factors . . . indicate the weapon is *designed, made, and intended to be fired from the shoulder*." (emphasis added)).

Plaintiffs contend that the Final Rule's term "equipped" is a term that "must be different than 'made'" under the NFA, Doc. 52, Pls' Br., 9, without explaining why an "equipped" brace cannot be synonymous with the inquiries raised by the other statutory terms "remade," "redesigned," or "intended to be fired from the shoulder." The Government, on the other hand, illustrates reasonable decision-making behind the factors, however imperfect. *See FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016), as revised (Jan. 28, 2016) ("A court is not to ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives."). Multiple demonstratives, pulled from the Final Rule, and the Government's briefing show a rational connection between the Final Rule's factors and the underlying factual record. Doc. 55, ATF Resp., 17–19; Doc. 106, Hearing Transcript, 53–54 (explaining marketing factor); *see also* Defs' Evidentiary Hearing Slides at 17-19 (images and videos from Final Rule at 6,494, 6,546, and 6,506 n.94)).

Relatedly, Plaintiffs argue that the Final Rule should be set aside as invalid under the rule of lenity. *See* Doc. 52, Pl's Br., 10. The rule of lenity is a principle of statutory construction that applies to laws imposing criminal penalties. *See Albernaz v. United States*, 450 U.S. 333, 342 (1981).

The "touchstone" of the rule of lenity "is statutory ambiguity." *Id.* However, the rule of lenity only applies in cases of genuine ambiguity. *Voisine v. United States*, 579 U.S. 686, 698 (2016). The Court does not find the rule of lenity applicable because Plaintiffs do not adequately explain how the Final Rule creates genuine ambiguity[7] nor does the Court find a grievous ambiguity or uncertainty regarding Congress's intent behind the meaning of the NFA's definitional phrase "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); *United States v. Palomares*, 52 F.4th 640, 647 (5th Cir. 2022) ("Because we need not 'guess' at the statute's meaning, the rule of lenity does not apply."). The Court finds Plaintiffs unlikely to succeed on their claim arising out of APA § 706(2)(A).

Finally, the Court addresses Plaintiffs' argument that the Final Rule is unlawful under 5 U.S.C. § 553(d) because it expressly took effect "immediately." Doc. 52, Pls' Br., 17; Final Rule at 6,480. A substantive rule cannot be effective for at least thirty days following the rule's publication unless one of the following three exceptions applies: (i) the substantive rule "grants or recognizes an exemption or relieves a restriction;" (ii) the rule is an "interpretative rule[] or statement[] of policy;" or (iii) "as otherwise provided by the agency for good cause found and published with the rule." 5 U.S.C.A. §§ 553(d)(1)–(3). Section 533(d) "protects those who are affected by agency action taken during the 30-day waiting period without disturbing later action that is not the product" of a substantive rule's improper immediate effect. *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, No. 5:21-CV-071-H, 2023 WL 2753978, at *7 (N.D. Tex. Mar. 31, 2023) (Hendrix, J.) (quoting *Prows v. Dep't of Justice*, 938 F.2d 274, 276 (D.C. Cir. 1991)). "[T]he purpose of the

---

[7] In their Reply, Plaintiffs argue the statutory phrase "intended to be fired from the shoulder" is "best read" to mean both the intent of the manufacturer and end user. Doc. 59, Reply, 7. There is not textual basis for limiting the statutory intent to that of a manufacturer and end user. The Final Rule also takes both sources of intent into account through the fifth and sixth factors. Final Rule at 6,574–75.

thirty-day waiting period is to give affected parties a reasonable time to adjust their behavior before the final rule takes effect." *City of Arlington, Tex.*, 668 F.3d at 245.

Neither party's briefing addresses the first exception. The second exception does not apply because the Fifth Circuit has held the Final Rule to be legislative. *Mock*, 75 F.4th at 578; *cf.* Doc. 55, ATF Resp., 33. Because the Government has not addressed whether the third exception applies, there is procedural error in violation of § 553(d). *See Black*, No. 5:21-CV-071-H, 2023 WL 2753978, at *5 (N.D. Tex. Mar. 31, 2023) ("The burden of establishing good cause is on the agency, and the exception is applicable in emergency situations, or where delay could result in serious harm.")

Such error is ultimately harmless because the Plaintiffs fail to explain how they would be "affected by agency action" during the 30-day period following the Final Rule's promulgation. *Black*, 2023 WL 2753978, at *7; *City of Arlington, Tex.*, 668 F.3d at 243 ("The harmless error rule requires the party asserting error to demonstrate prejudice from the error."). Although Final Rule was "immediately effective," it imposed a 120-day registration period for existing possessors of brace-equipped firearms—including Rainier Arms, Walley, Green, and certain SAF members—to comply with the Final Rule without facing any agency enforcement action. Final Rule at 6,481; Doc. 52-2, Gottlieb Decl., 1; Doc. 52-3, Green Decl., 1; Doc. 52-4, Walley Decl., 1. The certain SAF members who "would in the immediate future" following the Final Rule's publication acquire a stabilizing brace or brace-equipped firearm also were not "affected by agency action" because of an express 60-day waiting period before the initiation of any agency enforcement as to newly acquired or transferred devices. *Black*, 2023 WL 2753978, at *7; Final Rule at 6,481; Doc. 52-2, Gottlieb Decl., 1. Moreover, these members' alleged harm of wanting to purchase new brace-equipped firearms without agency interference does "not flow 'from the immediate effective date'"

but rather from choosing to purchase but not register a qualifying device under the Final Rule. *See Ctr. for Biological Diversity v. Regan*, No. CV 21-119, 2023 WL 5437496, at *3 (D.D.C. Aug. 23, 2023) (addressing source of alleged loss).

In any event, this Court issued an administrative stay and preliminary injunction for almost five months of the litigation, curing any potential prejudice arising from the procedural defect. Docs. 62, 65, 82, 93; *Black*, 2023 WL 2753978, at *7 (enjoining agency rule for thirty days as remedy for § 553(d) violation); *Jicarilla Apache Nation v. U.S. Dep't of the Interior*, 613 F.3d 1112, 1121 (D.C.Cir.2010) ("The harmless error rule applies to agency action because '[i]f the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration.'"). Therefore, Plaintiffs have not shown they are likely to succeed on the merits of their unlawful effective date claim.

C.  *Likelihood of Success as to Void for Vagueness Claim Under Constitution and APA § 706(2)(B)*

The Court next addresses Plaintiffs' facial vagueness challenge to the Final Rule. Plaintiffs argue the Final Rule uses "inherently amorphous terms" and "is so inherently subjective that it invites arbitrary enforcement." Doc. 52, Pls' Br., 14. A law is unconstitutionally vague if it does not "give [a] person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A facial challenge to a law considers only the text of the statute itself, not its application to the particular circumstances of an individual. *See Freedom Path, Inc. v. Internal Revenue Serv.*, 913 F.3d 503, 508 (5th Cir. 2019). A plaintiff can only succeed on a facial challenge by establishing "that no set of circumstances exists under which the Act would be valid." *Wash. St. Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (quotations omitted). Plaintiffs have not met their burden. Conversely, Defendants have shown that the Final Rule is likely valid because in at least

some circumstances the multi-factor framework allows a person of ordinary intelligence to assess whether his brace-equipped firearm is "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7).

The first focus of dispute is the Final Rule's phrase "provides surface area that allows the weapon to be fired from the shoulder," which Plaintiffs find vague because "surface area" does not have a quantifiable measurement. Doc. 52, Pl's Br., 15. But a test without "numeric thresholds" is not dispositively vague. *Cf. Texas v. EPA*, 983 F.3d 826, 839–40 (5th Cir. 2020) (upholding an agency's use of "a multi-factor balancing test" that included no "numeric thresholds"). Moreover, the language identifies a straightforward goal: identifying whether there is *a* surface area permitting a user to fire a firearm from the shoulder. And this goal appears to derive directly from the statutory definition of "rifle" as being "fired from the shoulder." 26. U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). The Final Rule provides a pictorial example supporting that the language means the brace-equipped firearm has some surface area that one would use to fire from the shoulder like a rifle. Final Rule at 6,529. Defendants also provide examples supporting this interpretation. *See* Defs' Evidentiary Hearing Slides, 40. The record also suggests that it would be impractical, given the evolving variety of braces, to lay out a precise surface area in the Final Rule. *See generally* Non-Exhaustive List (illustrating braces); *see supra* Part I.A.

Plaintiffs argue the factor regarding the "weight or length consistent with the weight or length of similarly designed rifles" is also vague without "[s]pecific measurements." Doc. 52 Pls' Br., 15. Neither their cited cases nor the record supports Plaintiffs' argument. [8] The evolution of

---

[8] The Court declines to apply *Johnson v. United States*, 576 U.S. 591 (2015) because Plaintiffs fail to sufficiently explain how the case matters here. In *Johnson*, the Supreme Court invalidated a statutory clause for vagueness because it required court-derived interpretations of "conduct that presents a serious potential risk of physical injury to another" form prior cases to define a "violent felony." Plaintiffs are not challenging

braces supports the interpretation of this factor as covering modern-day braces that are long or heavy enough to be used as shoulder stocks, unlike initial brace prototypes that locked closer to the forearm. *Compare* Final Rule at 6,483 (2012 brace prototype) *with id.* at 6,494. While the Court agrees that this factor certainly could have been phrased with more precise language, the law does not require "perfect clarity and precise guidance." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989).

Plaintiffs further argue that no reasonable person can reliably infer the meaning of the "manufacturer's direct and indirect marketing" factor and the "general community" use factor. Doc. 52, Pls' Br., 15–16. The record suggests a contrary conclusion. During the evidentiary hearing, Defendants presented sample materials demonstrating applications of the marketing and community use factors. Doc. 106, Hearing Transcript, 53; Defs' Evidentiary Hearing Slides, 17–19 (citing materials published in Final Rule). Such examples illustrate that there are at least some circumstances in which these factors have meaning and are valid. Figure 3, below, is a sample marketing photo that illustrates the meaning of the marketing factor. Final Rule at 6,546. The Government explained that the brace-equipped firearm pictured was "marketed as a pistol even though it is so heavy [that] it is set up on a tripod, . . . [and], even though this individual has shouldered what is, for all intents and purposes, a buttstock into their shoulder." Doc. 106, Hearing Transcript, 53.

---

the terms of the NFA that impose criminal liability nor does this Court find the language at issue in *Johnson* relevant to the instant analysis. Plaintiffs' other supporting cases are likewise incongruent.



Figure 3. Marketing photo of Reece 11 MCMR 5.56 NATO caliber pistol with SBA3 stabilizing brace. Defs' Hearing Slide 18 (depicting picture in Final Rule at 6,546).

The example of the community use factor featured at the evidentiary hearing also shows there are at least some circumstances in which this factor has an understandable meaning. Doc. 106, Hearing Transcript, 54. The example, a YouTube video with 159,654 views and 235 comments, captures two firearm enthusiasts discussing brace-equipped firearms and demonstrating how a brace-equipped pistol can be fired from the shoulder. Defs' Evidentiary Hearing Slides at 19 (embedding link to video cited in Final Rule at 6,509 n.94); Doc. 106, Hearing Transcript, 54 (explaining community use factor goes to the same inquiry of whether a weapon is fired from the shoulder).

There are at least some instances in which a reasonable person can infer meaning from the Final Rule to determine whether a brace-equipped pistol is "designed, made, and intended to be fired from the shoulder" under the NFA. Final Rule at 6,574–75; 26. U.S.C. § 5845(c); *see Wash. State Grange*, 552 U.S. at 449. Therefore, the Court concludes that Plaintiffs are not likely to succeed on the merits of their vagueness claim.

D.  *Likelihood of Success as to Second Amendment Claims*

Plaintiffs contend the Final Rule is unlawful due to procedural and substantive Second Amendment violations. The Court reviews each argument and concludes Plaintiffs are not likely to succeed on the merits of their claims.

1.  Procedural Failure to Consider Claim (APA § 706(2)(A))

SAF brings a second "arbitrary and capricious" challenge under the APA, arguing the ATF failed to conduct a full Second Amendment inquiry under *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). Doc. 52, Pls' Br., 11. *Bruen* sets forth a two-step test for evaluating Second Amendment claims. 142 S. Ct. at 2126–34. First, a court must determine whether the regulated activity falls within the scope of the Second Amendment. *Id.* at 2126–27. If the activity implicates the Second Amendment, a court moves onto the second step, which asks "whether [the Final Rule] 'is consistent with this Nation's historical tradition of firearm regulation.'" *Id.* at 2126. "The APA's arbitrary-and-capricious standard requires that an agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Here, Court finds that Plaintiff has not shown that the Final Rule inadequately addresses *Bruen*.

SAF argues the ATF did not conduct the second step of the *Bruen* analysis. In the Final Rule, the ATF describes the comments to the Proposed Rule that invoked the Second Amendment. Final Rule at 6,548. Certain commenters, for example, voiced their view that the Proposed Rule "attacked" and "infringed" on citizens' Second Amendment rights. *Id.* Many others specifically cited to the Supreme Court's *Heller* opinion to argue the Final Rule was unlawful. *Id.* (referencing *District of Columbia v. Heller*, 554 U.S. 570 (2008)). In response, the ATF discussed *Heller*'s holding and its application to SBRs—the weapon equivalent to brace-equipped firearms subject to the Final Rule. *Id.* The ATF also responded to these comments by addressing

implications from *Bruen*. First, the ATF explained that *Heller* confirms that Second Amendment rights are not absolute. *Id.* (citing 554 U.S. at 627). In *Heller*, the ATF explained, the Supreme Court recognized that Second Amendment rights are not absolute partly because of "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* (citing 554 U.S. at 627). The ATF interpreted that under *Heller*, "dangerous and unusual weapons" are unprotected by the Second Amendment. *Id.* Next, the ATF catalogued a number of post-*Heller* federal cases concluding that SBRs are "dangerous and unusual" weapons falling outside of the Second Amendment's protection. *Id.* The ATF concluded, based on *Heller* and its progeny, that weapons "regulated by the NFA, such as short-barrel rifles, were not historically protected by the Second Amendment and thus fall outside of the scope of the Second Amendment." *Id.* The ATF also concluded that "[n]othing in the Supreme Court's recent decision in . . . *Bruen* . . . changes this analysis." *Id.* Finally, the ATF summarized and applied *Bruen*'s legal test to the Final Rule. *Id.* n. 145. Based on its conclusion that brace-equipped firearms subject to the Final Rule are SBRs— "dangerous and unusual weapons" unprotected by Second Amendment—the ATF ended its analysis at *Bruen*'s first step.

Plaintiffs argue that "the record shows no *Bruen*-compliant considerations." Doc. 52, Pls' Br., 12. But their qualm is with the fact that the ATF did not reach the second step of *Bruen*, conducting an analysis of a firearm's historical tradition. Plaintiffs' argument poses a disagreement with the *outcome* of the ATF's consideration of *Bruen*, not a disagreement with an actual failure to consider *Bruen*. *See id.* (contending ATF's "premise" that SBRs are dangerous and unusual "is wrong"). The APA requires that agency action is "reasonably explained," which ATF has done here. 5 U.S.C. § 706(2)(A). The agency raised the operative law and applied it reasonably. Nothing in *Bruen* requires one to unconditionally proceed to the second step of the inquiry where the first

step is not met. Therefore, Plaintiffs are not likely to prevail on their claim that the Final Rule is arbitrary and capricious for failure to consider *Bruen*.

### 2.   Violation of Second Amendment Right

Plaintiffs also contend that the Final Rule is invalid because it violates the Second Amendment right to keep and bear arms. The Court concludes Plaintiffs are unlikely to succeed on their claim because the Final Rule does not implicate the Second Amendment.

The Fifth Circuit has at least tacitly recognized that, in the context of a facial challenge under the Second Amendment, the standard recognized in *Washington State Grange* and *United States v. Salerno* is superseded by the two-step process laid out in *Bruen*. *See United States v. Rahimi*, 61 F.4th 443, 453 (5th Cir.), *cert. granted*, 143 S. Ct. 2688 (2023) ("[I]f a statute is inconsistent with the Second Amendment's text and historical understanding, then it falls under any circumstances."). The Court therefore looks to *Bruen* to assess Plaintiff's facial challenge. [9]

Under the first step, a rule implicates the Second Amendment when the instrument at issue "constitute[s] [a] bearable arm." *Heller*, 554 U.S. at 582; *Hollis v. Lynch*, 827 F.3d 436, 447 (5th Cir. 2016). Courts have held that "arm" typically covers "[w]eapons of offence or armour of defence." *Heller* 554 U.S. at 581. If a regulated device is not encompassed by "arms," it falls outside the protection of the Second Amendment. The Supreme Court has additionally noted that the Second Amendment does not protect "dangerous and unusual weapons." *Id. at* 625 (explaining "historical tradition in prohibiting dangerous and unusual weapons" justified limiting Second

---

[9]  Individual Plaintiffs assert constitutional injury in their declarations based on their individual constitutional rights being violated by the Final Rule if they were to destroy or surrender their brace-equipped weapons. Doc. 52-3, Green Decl.; Doc. 52-4, Walley Decl. The Court does not have a record of them intending to do so or having done so. Therefore, such harm is speculative, *supra* Part B.3, and the Court does not construe a viable as-applied challenge.

Amendment's protection); *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring). Where a rule does implicate a bearable arm, the Government must show that the rule "is consistent with the Nation's historical tradition of firearm regulation," by showing there is a "well-established and representative historical analogue." *Bruen*, 142 S. Ct. at 2130, 2133.

Plaintiffs contend that under *Bruen*, the Final Rule infringes on the Second Amendment right to keep and bear arms. Doc. 52, Pls' Br., 12. The parties' arguments require the Court to first determine Final Rule's scope, and whether that scope of regulation implicates the Second Amendment. Only after making these determinations can the Court proceed to assess whether a Second Amendment right is actually infringed upon.

> *a. The Final Rule's Scope of Regulation*

Plaintiffs argue the first step of *Bruen* is satisfied because the ATF "acted directly on the Second Amendment subject of a 'rifle,' [by] changing that term's definition." Doc. 59, Reply, 9. The Court has already ruled that Plaintiffs are unlikely to succeed on their claim that the Final Rule contradicts the NFA, and specifically the NFA's definition of a rifle. *Supra* Part III.B. By its plain function and text, the Final Rule acts on an "*accessory…(e.g., a 'stabilizing brace')*" and how an accessory can render a firearm an SBR. Final Rule at 6,480. No firearm on its own is suddenly being pulled under the ambit of the NFA. *See generally supra* Part I.A.

The Final Rule operates in two-tiers. The first tier indicates that accessories, namely stabilizing braces, are the focus. The Final Rule states that the NFA's definitional phrase "'designed or redesigned, made or remade, and intended to be fired from the shoulder" includes "a weapon *that is equipped* with an accessory, component, or other rearward attachment" providing surface area for the user to fire from the shoulder. Final Rule at 6,574–75 (emphasis added). The second tier of the Final Rule lays out six non-dispositive factors focusing on whether the resulting device—

the firearm *equipped with an accessory*—"is designed, made and intended to be fired from the shoulder." *Id.* Therefore, it is the addition of an accessory to a firearm that renders that firearm to be construed as a different device.

### b. *Stabilizing Braces Do Not Implicate the Second Amendment*

Laws that regulate the use of firearm accessories or attachments do not generally implicate the Second Amendment. *See, e.g.*, *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (A silencer is a firearm accessory . . . . Accordingly, it can't be a 'bearable arm' protected by the Second Amendment."); *United States v. Saleem*, No. 3:21-cr-00086-FDW-DSC, 2023 WL 2334417, at *11 n. 9 (W.D.N.C. Mar. 2, 2023). The most salient example of an accessory not implicating the Second Amendment is a silencer. *See Cox*, 906 F.3d at 1186. Courts have routinely held that a silencer is not a bearable arm as defined in *Heller* because a silencer cannot cause harm on its own, nor is it of any use "independent of its attachment to a firearm." *United States v. Peterson*, No. CR 22-231, 2023 WL 5383664, at *2 (E.D. La. Aug. 21, 2023) (quotations omitted); *United States v. Al-Azhari*, No. 8:20-CR-206-T-60AEP, 2020 WL 7334512, at *3 (M.D. Fla. Dec. 14, 2020); *United States v. Hasson*, No. GJH-19-96, 2019 WL 4573424, at *4–5 (D. Md. Sept. 20, 2019), *aff'd*, 26 F.4th 610 (4th Cir. 2022) (collecting cases). Additionally, an "accessory" like a silencer does not implicate the Second Amendment because "a firearm remains an effective weapon without a silencer." *Hasson*, WL 4573424, at *4–5.

Applying the same logic, a stabilizing brace cannot cause harm on its own and is not useful independent of its attachment to a firearm. Nothing in record evidence indicates that braces are necessary for the actual use of a firearm. Indeed, both parties recognize only that stabilizing braces improve the "accuracy" or "efficacy" of one's firearm use. Final Rule 6,499, 6,557; Doc. 52, Pls' Br., 21; Doc. 52-4, Walley Decl., 1; Doc. 106, Hearing Transcript, 27–30. In the absence of additional

facts, the Court sees no other reason to believe that stabilizing braces are necessary to actually fire or operate a firearm. *Hasson*, WL 4573424, at *4-5. The Court concludes that, like silencers, stabilizing braces are not "bearable arms" under the Second Amendment. *See Heller*, 554 U.S. at 582; *Cox*, 906 F.3d at 1186. Under *Bruen*, the analysis ends at the first step because the regulated activity does not fall within the scope of the Second Amendment. 142 S. Ct. at 2129–30.

### c. *"Brace-Equipped Pistols" Do Not Implicate the Second Amendment*

Plaintiffs assert the regulation of pistols as part of a brace-equipped firearm violates the Second Amendment. Doc. 52, Pls' Br., 12–14. No matter how the Court conceptualizes the scope of the regulation, however, the result is the same. The Final Rule does not implicate the Second Amendment. Plaintiffs' argument goes that when considering the Final Rule as covering the entire brace-equipped pistol, the Court should move to the second step of *Bruen* because brace-equipped pistols are within the Second Amendment's orbit. Doc. 52, Pls' Br., 13–14. But brace-equipped pistols subject to the Final Rule are equivalent to SBRs,[10] which are "dangerous and unusual weapons" outside of the protection of the Second Amendment.

The Fifth Circuit has established a two-step approach for determining when a device is "dangerous and unusual." *Hollis*, 827 F.3d at 446. First, a "dangerous and unusual" weapon is one that is "not in common use" at the time of founding. *Id.*; *United States v. Miller*, 307 U.S. 174, 178 (1939) (holding short-barreled shotguns fall outside the protection of the Second Amendment). Invoking *Jennings*, *Heller*, *Thompson/CTranscript Arms Co.*, and *Bruen*, at least one court within this District has concluded that short-barreled rifles are "dangerous and unusual." *United States v.*

---

[10] The parties do not dispute that the Final Rule addresses the definition of a "rifle" and SBRs under the NFA. *See* Part I.A, III.B (the inquiries are the same); Final Rule at 6,478–80, 6,494–95.

*Miller*, No. 3:23-CR-0041-S, 2023 WL 6300581, at *3 (N.D. Tex. Sept. 27, 2023) (Scholer, J.).
Other circuit courts have held there are sufficient similarities between SBRs and other weapons
deemed "dangerous and unusual," such that "possession of SBRs falls outside the Second
Amendment's guarantee." *Cox*, 906 F.3d 1170, 1185–86 (comparing to short-barreled shotgun and
sawed-off shotgun). Although the Fifth Circuit has not addressed whether SBRs are "dangerous
and unusual" weapons, the Circuit has noted the NFA, which regulates SBRs, was "designed to
target" weapons thar are "dangerous and unusual." *Mock*, 75 F.4th at 567–68. The Fifth Circuit
has also recognized Congress's "specific declaration and finding [when expanding the scope of the
NFA] that ... short-barreled rifles are primarily weapons of war and have no appropriate sporting
use or use for personal protection." *United States v. Jennings*, 195 F.3d 795, 799 n.4 (5th Cir. 1999)
(citing S. REP. No. 90–1501, at 28 (1968)). The Supreme Court has also recognized that
Congress's object with passing the NFA was to regulate SBRs as "concealable weapon[s] likely to
be" used "for criminal purposes." *Thompson/CTranscript Arms Co.*, 504 U.S. at 517.

Plaintiffs do not contend that the NFA or its definition of SBRs is unconstitutional.  And
no court has held that SBRs are no longer unusually dangerous, associated with criminal activity,
or otherwise contrary to Congress's stated position during the passing of the NFA. Therefore, this
Court does not take the tremendous step of finding otherwise as to traditional SBRs and brace-
equipped firearms equivalent to SBRs.

The Court's conclusion is also unchanged by Plaintiffs' assertion that brace-equipped pistols
are "in common use now." As the regulatory history reveals, the very point of promulgating the
Final Rule was the agency's discovery that there was an emerging evasion of the NFA through
evolving models of braces and brace-equipped pistols. *See supra* Part I.A. The fact that over this
same period, brace-equipped pistols that effectively operated as SBRs have been used by criminal

gunmen to successfully execute mass shootings of innocent people lends additional support to the conclusion that brace-equipped firearms deemed SBRs under the Final Rule are "dangerous and unusual." *See* Doc. 55, ATF Resp. 8–9, 26; Doc. 97, ATF Supp. Br., 8; Final Rule at 6,495–99, 6,508 ("[T]here have been at least two mass shooting incidents where the shooters reportedly shouldered their weapons by using purported 'stabilizing braces' as stocks, killing a total of 19 people."), 6,566. For the forgoing reasons, SAF is unlikely to succeed on the merits of the facial Second Amendment challenge.

E.  *Irreparable Harm*

      In the event Plaintiffs are likely to succeed on any of their claims, Plaintiffs must still show they are likely to face irreparable harm. *Winter*, 555 U.S. at 20. Assuming Plaintiffs have shown prejudice through their assertion that their logical outgrowth claim entirely "matches" the logical outgrowth claim in *Mock*, the Court must still conduct an analysis of the remaining factors. Doc. 95, Pls' Supp. Br., 2; *see* 75 F.4th 563. Despite ample time and opportunity to evidence their asserted harm through briefing, supplemental briefing, declarations, and an evidentiary hearing,[11] Plaintiffs have failed to sufficiently establish they likely will face irreparable harm in the absence of a preliminary injunction. The Court first addresses the asserted compliance costs and business injuries, and next the asserted constitutional harm.

      "To be considered irreparable, the injury in question must be imminent and cannot be speculative." *Terex Corp. v. Cubex Ltd.*, No. 3:06–CV–1639–G, 2006 WL 3542706, at *9 (N.D. Tex. Dec. 7, 2006) (Fish, J.). Costs arising from compliance with a regulation can also constitute irreparable harm, but they must also "be based on more than speculation." *Rest. L. C Transcript v.*

---

[11] No Plaintiff attended or participated in the evidentiary hearing to testify about the injuries they will or have suffered such that the injury is irreparable.

*United States Dep't of Lab.*, 66 F.4th 593 (5th Cir. 2023) (citing *Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022)). A party must show that its non-speculative compliance costs are more than *de minimis* and cannot be recovered in the ordinary course of litigation. *Id.* at 597–600. While a business injury, such as lost profits, may be sufficient to show irreparable harm, a party must meet a heavy burden showing such injury is "substantial," beyond the realm of everyday losses. *Cf. Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.*, 16 F.4th 1130, 1142 (5th Cir. 2021); *Texas v. United States Env't Prot. Agency*, 829 F.3d 405, 433 (5th Cir. 2016). Finally, "[w]hile courts are willing to entertain a loss of customers or goodwill as a harm, the movant must come forward with evidence that such an injury is irreparable by showing that the loss cannot be measured in money damages." *Brink's Inc. v. Patrick*, No. 3:14-CV-775-B, 2014 WL 2931824, at *6 (N.D. Tex. June 27, 2014) (Boyle, J.) (citation omitted).

 1. <u>Harm as to Rainier Arms</u>

 Rainier Arms asserts four types of injuries: (i) "substantial" lost profits from pending orders that were canceled "[i]mmediately" upon the Final Rule's issuance, (ii) "substantial" lost profits from fallen demand for "brace-equipped AR-style pistols and components thereof," (iii) "substantial" loss in customer goodwill caused by "a chilling legal cloud," and (iv) "substantial" unrecoverable compliance costs." *See* Doc. 52-1, Hwang Decl. ¶ 5; Doc. 103-1, Hwang Add'l Decl., 1. The declarant for Rainier Arms, John Hwang, is the company's founder and CEO.

 As a preliminary matter, the lost profits from past, pending orders are never defined but even if they were, they cannot justify a forward-looking preliminary injunction. *See* Doc. 52-1, Hwang Decl.; *Mayo Found. for Med. Educ. & Rsch. v. BP Am. Prod. Co.*, 447 F. Supp. 3d 522, 534 (N.D. Tex. 2020) (Kacsmaryk, J.) ("Plaintiff's reference to *past* injuries . . . do not constitute the type of ongoing or probable future injuries requiring [a] preliminary injunction.").

Next, the nature of the asserted ongoing lost profits is unclear. Hwang's March 2023 declaration asserted the Final Rule "deprive[d] Rainier of substantial profits by making otherwise willing customers either legally ineligible or practical[ly] incapable of using Rainier's arm brace products." Doc. 52-1, Hwang Decl. ¶ 5. Rainier Arms does not provide any further context or supporting facts. Hwang's October 2023 declaration asserts for the first time that Rainier Arms that the continuing "lost revenue . . . easily exceed[s] tens of thousands of dollars per month." Doc. 103-1, Hwang Add'l Decl., 1. While Hwang's second declaration does provide the Court with a number, Rainier Arms fails to provide other contextual facts such as when this loss began, how the figure is calculated, or whether the figure represents total or product-specific lost revenue. Doc. 103-1, Hwang Add'l Decl., 1; *cf. Wages & White Lion Invs., L.L.C.*, 16 F.4th at 1142 (finding irreparable harm where party responding to agency order stopped all production of a product line representing 90% of its annual revenue). The Court cannot simply assume Rainier Arm's financial losses are "substantial" and support a finding of irreparable harm based only on the company's own conclusion. *Cf. Wages & White Lion Invs., L.L.C.*, 16 F.4th at 1142; *Texas v. EPA*, 829 F.3d at 433; Doc. 106, Hearing Transcript, 17.

The Court tried to ascertain whether the asserted monthly loss constituted irreparable harm or likely irreparable harm. During the evidentiary hearing, the Court asked for context from "Rainier Arms' total monthly sales revenue" or what percentage of Rainier Arms' "average monthly income derived from the sales of brace-equipped pistols" both before and after the Final Rule went into effect. Doc. 106, Hearing Transcript, 17–18. But Plaintiffs' counsel had no further information to share. Counsel effectively asks the Court to take Hwang's word that such asserted monthly losses are "substantial." Doc. 106, Hearing Transcript, 17–20.

In contrast, the manufacturer in *Mock*, Maxim Defense, showed irreparable harm by not only asserting drastic figures but by showing why those figures mattered. Maxim Defense had an estimated to-date loss of over $7 million attributed to braced pistol and stabilizing brace sales. *Mock v. Garland*, No. 4:23-CV-00095-O, 2023 WL 6457920, at *15 (N.D. Tex. Oct. 2, 2023) (O'Connor, J.). Further, Maxim Defense projected losing over $9 million in sales in 2023 due to the Final Rule, which represented more than half of the prior year's gross revenues. *Id.* Here, Rainier Arms' loss does not threaten the existence of its business and the company provides no other context for the asserted the monthly loss. Doc. 106, Hearing Transcript, at 18; *cf. Mock*, 2023 WL 6457920 at *15 (finding Maxim Defense would "not be able to sustain its business for any longer" absent an injunction); *Wages & White Lion Invs., L.L.C.*, 16 F.4th at 1142 (finding irreparable harm from ongoing losses "representing 90 percent of [party's] annual revenue, thereby requiring the company to make plans to lay off its employees [in] two weeks").

Rainier Arms' other asserted business harm lacks sufficient support. The company's asserted goodwill injury is speculative both as to actual loss of goodwill and its nexus to the Final Rule. *See Terex Corp.*, 2006 WL 3542706, at *9. Rainier Arms says it cannot measure goodwill nor a change in goodwill. Doc. 106, Hearing Transcript, 20. The Court cannot divine irreparable harm from Hwang's mere "inference" of lost goodwill. *Id.* Thus, Rainier Arms has not sufficiently established likely irreparable harm from unclear business losses.

Finally, Rainier Arms alleges it has hefty monetary or time compliance costs. *Id.* 20–21. Its asserted monetary compliance cost of "legal fees" is asserted without any estimated value or supporting caselaw that legal fees constitute compliance costs. *Id.* at 20; *but see United States v. Vineland Chem. Co.*, Civ. No. 86-1936, 1990 WL 157509, at *11 (D.N.J. Apr. 30, 1990) (suggesting legal fees and compliance costs are distinct), *aff'd*, 931 F.2d 52 (3d Cir. 1991). Plaintiffs are also

silent as to whether Rainier Arms has paid a special occupation tax, *supra* Part I.A., which would negate compliance costs in terms of taxes.[12] The amount of time Rainier Arms has or will expend to comply with the Final Rule is also unknown. Doc. 106, Hearing Transcript, 21. Rainier Arms only asserts that it has a time burden of determining "what the [Final R]ule covers and what [Rainier Arms] can't sell anymore." *Id.*; *cf. EPA*, 829 F.3d at 433 (finding "several irreparable injuries" from $2 billion compliance cost affecting Petitioner power companies and downstream third parties like everyday consumers, businesses, and unions members). And it is unclear why the asserted need to determine "what Rainier Arms can't sell anymore" is a compliance cost at all since the Final Rule does not ban Rainier Arms from selling anything. *See supra* Part I.A. The record simply does not illustrate the nature of Rainier Arms' compliance costs, let alone that they are more than *de minimis*. Therefore, Rainier Arms has not met its burden of showing likely irreparable harm.

Separately, the Court concludes a preliminary injunction is not appropriate because such relief would not prevent Rainier Arms' asserted business harms. The Final Rule has been in place for nine months, with this Court imposing an administrative stay and preliminary injunction for Plaintiffs for nearly five of those months pending the resolution of *Mock*. Docs. 62, 65, 82, 93. Rainier Arms' asserted "substantial" lost profits during part of the administratively imposed relief suggests a preliminary injunction would not prevent the threatened financial harm. *United States*

---

[12] If Rainier Arms turns out to be SOT payer, it would have no further tax obligation. Final Rule at 6,498 (explaining Form 2 registration notice is tax-free). Plaintiffs state without explaining that Rainier Arms' compliance costs are unrecoverable. Doc. 52, Pls' Br., 19; Doc. 59, Reply, 12. While there's a strong reason to believe that monetary compliance costs would be unrecoverable from the ATF, which enjoys sovereign immunity for any monetary damages, *Alabama-Coushatta Tribe of Texas v. United States*, 757 F.3d 484, 488 (5th Cir. 2014), Plaintiffs have not sufficiently alleged monetary compliance costs such that they would be unrecoverable. *Cf. Rest. L. C Transcript*, 66 F.4th 593 (addressing unrecoverable compliance cost that was first found to represent significant monetary value).

*v. St. Bernard Par.*, 756 F.2d 1116, 1123 (5th Cir. 1985) ("It is black letter law that an injunction will not issue when it would be ineffectual."); Doc. 103-1, Hwang Add'l Decl.

> 2.   Harm as to SAF Members, Walley, and Green

Walley, Green, and other SAF members assert two types of harm arising out of the Final Rule: constitutional harms and compliance costs.[13] Doc. 52-2, Gottlieb Decl., 1; Doc. 103-2, Gottlieb Add'l Decl., 1; Doc. 52-4, Walley Decl. ¶ 5; Doc. 103-3, Walley Add'l Decl., 1; Doc. 52-3, Green Decl., 1; Doc. 106, Hearing Transcript, 28. The Court addresses the asserted constitutional harms under the Second Amendment in Part E. Plaintiffs assert three compliance costs: the time burden to understand the Final Rule, the practical injury of reduced efficacy from altering a brace-equipped firearm, and the $200 tax upon registration. *Id.*

As to their time burden, these Plaintiffs allege there is an "extraordinary" compliance cost of navigating the Final Rule's "complex" registration system that "requires specialized legal knowledge." *Id.* When asked for factual support behind the asserted harm, Plaintiffs' counsel simply replied the entire Final Rule is unclear. Doc. 106, Hearing Transcript, 22–23. Plaintiffs have also failed to tell the Court exactly what brace-equipped firearms they possess or wish to possess but cannot evaluate under the Final Rule. *See* Doc. 52-2, Gottlieb Decl., 1; Doc. 103-2, Gottlieb Add'l Decl., 1; Doc. 52-4, Walley Decl. ¶ 5; Doc. 103-3, Walley Add'l Decl., 1; Doc. 52-3, Green Decl., 1. Plaintiffs do not provide an estimate or any other metric for measuring an average SAF member's time cost to understand and comply with the Final Rule. Doc. 103-2, Gottlieb Add'l Decl., 1; Doc. 103-3, Walley Add'l Decl., 1; Doc. 52-3, Green Decl., 1; Doc. 106, Hearing Transcript, 22–24, 29; *cf. Rest. L. CTranscript*, 66 F.4th at 599–600 (finding district court erred when rejecting existence

---

[13] SAF asserts constitutional harms on behalf of itself and its members, as well as compliance costs on behalf of its members.

of compliance costs where "witnesses offered specific estimates of the additional time that managers would incur to comply with the rule"). Without more, the alleged costs are conclusory and therefore insufficient to establish a concrete, imminent harm. *See Wages & White Lion Invs., L.L.C.,* 16 F.4th at 1142.

The Court also finds the mere assertions of "complexity" unconvincing given that the registration form seeks basic information such as whether the registrant is a fugitive or intends to use the brace-equipped firearm to commit a felony. Doc. 106, Hearing Transcript, 59. Moreover, the ATF has published educational resources to address questions or concerns about the Final Rule. Doc. 55 at 10 n.4 (citing sources); Doc. 106, Hearing Transcript, 22. One of these documents is a "non-exhaustive" 38-page list with names and pictures of brace-equipped firearms that the ATF "has determined are short-barrel rifles." Doc. 55 at 10 n.4 (referencing *Commercially available firearms equipped with a "stabilizing brace" that are short-barrel rifles,* BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVE, https://www.atf.gov/rules-and-regulations/docs/undefined/bracefinalruleguidance-commerciallypdf/download (last accessed, Oct. 19, 2023) (hereafter "Non-Exhaustive List"). The Court asked but did not learn whether these resources alleviate these Plaintffs' asserted time cost. *See* Doc. 106, Hearing, Transcript 23. Individuals still uncertain from the Final Rule and educational resources can also seek classification from the ATF. Doc. 55, ATF Resp., 31 (citing Final Rule at 6,552). While such classifications are not binding, there is a safe harbor protecting an individual's reliance on an ATF classification that later changes or is withdrawn. Doc. 106, Hearing Transcript, 59. The time compliance costs therefore have not been shown to be more than a *de minimis* amount.

Walley, Green, and SAF members additionally assert a "substantial practical injury" of reduced efficacy and safety from having to permanently separate the brace from their pistols. Doc.

52-4, Walley Decl. ¶ 5; Doc. 52-3, Green Decl. ¶ 7; Doc. 52-2, Gottlieb Decl. ¶ 6. Plaintiffs assert this harm without providing any case suggesting that such a "practical injury" can constitute irreparable harm or any factual support showing why the injury is "substantial." Doc. 52, Pls' Br., 19, 21. Green's asserted practical injury also appears to be undercut by his own statement that he can and does "utilize" other firearms as required by his job as a full-time police officer. Doc. 52-3, Green Decl. ¶ 7 (expressing Green's utilization of firearms but not brace-equipped firearms). Oral argument also suggests Green can handle a non-brace-equipped firearm. Doc. 106, Hearing Transcript., 29–30. The "practical" injury does not sufficiently show likely irreparable harm.

Finally, Walley, Green, and other SAF members say they face an alternative monetary compliance cost of $200—the tax on any newly acquired or transferred brace-equipped pistol. Doc. 106, Hearing Transcript, 23–24, 28; Doc. 52, Pls' Br., 20. Plaintiffs provide no case to support that a $200 tax is more than *de minimis*. SAF asserts the tax is "financially onerous, not *de minimis*" since many SAF members earn "near or below" the national average income. Doc. 103-2, Gottlieb Add'l Decl., 1. When asked, Plaintiffs' counsel did not further explain why the $200 tax was "onerous" against his researched national average income figure of $70,000 per year. Doc. 106, Hearing Transcript, 24. The Court asked for the average cost of a brace-equipped pistol purchased by an average SAF member to see if the tax was proportionally "onerous." *Id.* at 26. But Plaintiffs' counsel did not have a number. *Id.* A search on Rainier Arms' website of AK-styled pistols without any add-ons or braces reveals a cost between $1,200 and $2,500. Search Results for AK-Style Pistols, RAINER ARMS, https://www.rainierarms.com/athena/?q=pistols&page=5&product_list_order=price_desc. Stabilizing pistol braces on the same website range from $64 to $460. Search Results for "pistol brace," RAINIER ARMS https://www.rainierarms.com/athena/?q=pistol+brace&product_list_order=price_desc&page=4. Plaintiffs ultimately do not provide

evidence to support their contention that choosing, from multiple options, to pay a $200 tax is more than a *de minimis* compliance cost.[14] Accordingly, these Plaintiffs have not met their burden to show their monetary compliance costs likely cause them irreparable harm.

### 3.  Constitutional Harms as to SAF and its Members

SAF asserts constitutional harm on behalf of itself and its members from compliance with the Final Rule. Doc. 103-2, Gottlieb Decl., 1 ("One of SAF's core functions is to vindicate the Second Amendment's right to keep and bear arms, including brace-equipped AR-style pistols that the Rule illegally regulates."); *id.* (explaining members are "similarly burdened by . . the Rule"). As SAF members, Green and Walley also assert constitutional harm arising from the Final Rule. Doc. 52-3, Green Decl., 1 ("Worst of all, compliance by way of firearm destruction or surrender inflicts the irreparable harm of abridging my Second Amendment right to keep and bear arms."); Doc. 52-4, Walley Decl., 1 (same); Doc. 103-3, Walley Add'l Decl., 1.

As a preliminary matter, it is not clear that the asserted individual harm is imminent or more than speculative. *Terex Corp.*, 2006 WL 3542706, at *9. Specifically, the Court does not understand Walley, Green, or any other SAF member to be choosing or seriously intending to choose either option at this time. Doc. 52-3, Green Decl., 1; Doc. 52-4, Walley Decl., 1; Doc. 103-3, Walley Add'l Decl., 1; Doc. 103-2, Gottlieb Decl., 1. The Final Rule does not impose a ban on brace-equipped firearm. *Supra* Part I.A.; *cf. Bruen*, 142 S. Ct. at 2138, n.9, 2162 (explaining licensing schemes "which often require applicants to undergo a background check," or similar reasonable measures are unlikely to pose a constitutional problem). The alleged constitutional

---

[14] The Court also does not know whether Walley, Green or any other SAF member has mitigated the $200 tax over their existing brace-equipped devices by registering during the registration grace period. *See Am. Telnet, Inc. v. GTE Corp.*, 1999 WL 242686, at *3 (N.D. Tex. Apr. 16, 1999) (Fitzwater, J.) (finding mitigation of costs undercuts finding of irreparable harm).

harm arises out of one's *choosing* to surrender or destroy a brace-equipped firearm out of the five options provided by the Final Rule. *See supra* Part I.A. For example, possessors are also free to continue to use their firearms without the brace if they do not want to register their brace-equipped firearm. *Id.*

It is also unclear whether allegations of Second Amendment violations alone are sufficient to establish irreparable harm is likely. *Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680, 689 (W.D. Tex. 2015), *aff'd sub nom. Def. Distributed v. United States Dep't of State*, 838 F.3d 451 (5th Cir. 2016).  It is widely accepted that allegations of First Amendment violations can sufficiently show likely irreparable harm. *E.g., Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 295 (5th Cir. 2012) ("Opulent Life has satisfied the irreparable-harm requirement because it has alleged violations of its First Amendment"); *see also* Wright & Miller, § 2948.1 Grounds for Granting or Denying a Preliminary Injunction—Irreparable Harm, 11A Fed. Prac. & Proc. Civ. § 2948.1, n.24–25 (3d ed.) (citing examples under the First Amendment). But the Fifth Circuit has never held that *allegations of Second Amendment violations alone* are sufficient to establish irreparable harm.

The Court is unaware of any circuit or district court finding an allegation of a Second Amendment violation alone to be sufficient to satisfy the irreparable harm prong. In the only relevant case this Court could find, *Defense Distributed*, the Fifth Circuit only assumed for purposes of appeal—but did not decide—that alleged deprivations of First and Second Amendment freedoms constituted irreparable harm. 838 F.3d at 457.  Issuing a preliminary injunction based only on a "possibility" of irreparable harm is inconsistent with the principle that injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. Accordingly, the Court concludes that Plaintiffs'

mere allegations that their Second Amendment rights were violated do not establish likely irreparable harm.

### F.  Balance of the Harms

While Plaintiffs have not sufficiently shown they face likely irreparable harm, the Court considers their asserted harms against the public interest in the Final Rule. *See Fisher v. Texas*, 556 F. Supp. 2d 603, 610 (W.D. Tex. 2008) (considering balance of equities despite no likelihood of success and no irreparable harm); *see also Winter*, 555 U.S. at 20–26; *Nken*, 556 U.S. at 435. Plaintiffs contend the balance tips in their favor because they are likely to succeed on the merits of their claims and there is no public interest in perpetuating an unlawful agency action. Doc. 52, Pls' Br., 22. The Court does not deem the Final Rule to be invalid, *see supra* Parts A-D, and the Fifth Circuit expressly declined to hold the Final Rule unlawful in *Mock*. 75 F.4th at 587. The purported harm to public interest is losing a standard enforcement criterion and reduced public safety. Doc. 55, ATF Resp., 24–25. The Court understands there to be a dual public safety justification: enforcing the existing public safety justification behind the NFA's requirements over SBRs, as well as deterring the use of brace-equipped firearms by mass shooters. The Court agrees the public has a safety interest in the continued enforcement of the NFA and its regulation of SBRs. The Court also finds that there is at least some public interest in having a standard regulatory criterion over brace-equipped firearms, given the evolution of stabilizing braces. *See supra* Part I.A. The Court does not find Plaintiffs' unclear or unsubstantiated harms outweigh the interests of the public. Plaintiffs' balancing arguments do not change the Court's finding given the forgoing analysis. The Plaintiffs therefore fail to establish that the balance of equities tips in their favor.

### IV

## CONCLUSION

The Court has conducted a thorough inquiry into several factual questions that required resolution before a ruling could be issued in response to the instant motion. The Court does not find Plaintiffs have established a likelihood of success on the merits of any of their claims. Even assuming likelihood of success on the merits of one of Plaintiffs' claims, the Court finds Plaintiffs have not met their burden to show they likely face irreparable harm from the Final Rule. Finally, Plaintiffs have not established that the harms they face without a preliminary injunction outweigh the interests of the public. Accordingly, the Court finds that Plaintiffs have failed to establish the factors necessary for the relief they seek and **DENIES** Plaintiffs' Motion for a Preliminary Injunction.

SO ORDERED.

SIGNED: November 13, 2023.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE